AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATRICIA COHEN | ) |
| *Plaintiff* | ) |
| v. | ) |
| STEVEN A. COHEN, et al. | ) |
| *Defendant* | ) |

Civil Action No. 09 CV 10230

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

    Donald T. Cohen
    2500 North Military Trail #283
    Boca Raton, Florida 33431

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

    Paul Batista, P.C.
    26 Broadway, Suite 1900
    New York, New York 10004
    (212) 980-0070

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

J. MICHAEL McMAHON
*CLERK OF COURT*

Date: DEC 1 6 2009

_____
*Signature of Clerk or Deputy Clerk*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
PATRICIA COHEN,

                    Plaintiff,

        - against -

STEVEN A. COHEN, S.A.C. TRADING
CORP., S.A.C. CAPITAL MANAGEMENT,
INC., S.A.C. CAPITAL MANAGEMENT,
LP, S.A.C. CAPITAL MANAGEMENT,
LLC, S.A.C. CAPITAL ADVISORS, LLC,
S.A.C. CAPITAL ASSOCIATES, LLC,
SIGMA CAPITAL MANAGEMENT, LLC,
and DONALD T. COHEN,

                  Defendants.

-------------------------------------------------------- x

09 Civ.

**JURY TRIAL DEMANDED**

## COMPLAINT UNDER
## THE RACKETEER INFLUENCED
## AND CORRUPT ORGANIZATIONS ACT

       Plaintiff Patricia Cohen, by and through her attorney, Paul Batista, P.C., for

her Complaint against defendants respectfully alleges as follows:

### Nature of the Action

       1.    This is an action arising from defendants' violation of the Racketeer

Influenced and Corrupt Organizations Act, 18 U.S.C. §§1961 *et. seq.* ("RICO"). As

alleged more fully in the balance of this Complaint, defendant Steven A. Cohen

("Cohen"), during a period of two decades, has consistently and systematically engaged

in a scheme to defraud plaintiff of millions of dollars through repeated acts of mail fraud

and wire fraud in violation of 18 U.S.C. §§1341 and 1343, both of which are predicate acts of "racketeering activity" under RICO.

2.    Moreover, defendant Cohen has conducted the affairs of an enterprise identified in this Complaint as the "SAC Enterprise" through a pattern of racketeering activity involving repeated acts of mail fraud and wire fraud by which he and his associates have implemented defendants' overall scheme to defraud Ms. Cohen. Among other things, defendants have concealed millions of dollars of assets from Ms. Cohen – and from the Supreme Court of the State of New York – during the course of divorce proceedings, filed false affidavits and other sworn statements, and fraudulently concealed their activities from Ms. Cohen.

3.    As described later in this Complaint, Ms. Cohen was put on notice of defendant Cohen's fraudulent filings at the time of the broadcast, in March 2006, of a report on *60 Minutes* highly critical of defendant Cohen's business practices. In the wake of the *60 Minutes* broadcast, Ms. Cohen and others acting on her behalf conducted an investigation that by 2008 revealed the existence of bank accounts, real estate transactions and other facts that should have been, but were not, disclosed to her and to the Supreme Court of the State of New York in filings made by defendant Cohen or on his behalf.

4.    Defendant Cohen's fraudulent concealment of his activities from Ms. Cohen was consistent with a pattern of highly secretive conduct that has long characterized his business and personal affairs. As recently as December 4, 2009, *Reuters* reported that "SAC places a premium on secrecy" and that defendant "Cohen is

2

so intensely private he hates being photographed and has even bought the rights to some pictures taken by freelancers."

## Jurisdiction and Venue

5.     This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961 *et seq.*, 28 U.S.C. §1331, 28 U.S.C. §1337 and 28 U.S.C. §1367.

6.     Personal jurisdiction and venue in this District are proper pursuant to 18 U.S.C. §1965 and 28 U.S.C. §1391(b) because (1) defendants reside in, have agents in, and transact their business and affairs in, this District, and (2) a substantial part of the events giving rise to the claims for relief took place in this District.

## Parties

7.     Plaintiff is a citizen of the State of New York.

8.     Defendant Cohen is a citizen of the State of Connecticut.  Cohen owns and controls, directly or indirectly, each of the named entity defendants and a group of at least 25 domestic and off-shore entities described by *Business Week* as "a highly secretive and stupendously successful $4 billion group of hedge funds [bearing Cohen's] initials."

9.     Upon information and belief, defendant S.A.C. Trading Corp. ("SAC Trading") is a corporation organized in 1986 under the laws of the State of New York.

10.     Defendant S.A.C. Capital Management, Inc. ("SAC Capital Inc.") is a corporation organized on or about January 28, 1992 under the laws of the State of Delaware.

3

11.    Defendant S.A.C. Capital Management, LP ("SAC Capital LP") is an entity organized under the laws of the State of Delaware on or about May 22, 1992 with an office located at 72 Cummings Point Road, Stamford, Connecticut 06902.

12.    Defendant S.A.C. Capital Management, LLC ("SAC LLC") is an entity organized under the laws of the State of Delaware on October 27, 1995 with an office located at 540 Madison Avenue, New York, New York 10022.

13.    Defendant S.A.C. Capital Advisors, LLC ("SAC Advisors"), organized under the laws of the State of Delaware on or about November 22, 1995, is an entity with an office at 72 Cummings Point Road, Stamford, Connecticut 06902.

14.    Defendant Sigma Capital Management, LLC ("Sigma") is an entity organized under the laws of the State of Delaware.

15.    Defendant Donald T. Cohen ("D. Cohen"), the brother of defendant Cohen, is a Certified Public Accountant with an office at 2500 North Military Trail #283, Boca Raton, Florida 33431, who has served as Treasurer of SAC Trading and as an officer of defendant SAC Capital Inc.

### Statement of Facts

**A.    General Background**

**(i)    The Marriage of Plaintiff and Defendant**

16.    Plaintiff and defendant were married on December 7, 1979. They are the parents of two children.

17.    From the date of his marriage to Ms. Cohen through June 1988, when they separated, defendant Cohen, a graduate of the University of Pennsylvania's

4

Wharton School, was associated with a number of firms in the securities industry as a proprietary trader and independent contractor.

18.    Defendant Cohen – who was recently ranked by *Forbes* as the 36th richest person in the United States – enjoyed significant financial success from the outset of his career. During 1980, the first full year of his marriage to Ms. Cohen, defendant Cohen earned more than $600,000.

19.    At an early point in their marriage, defendant Cohen urged Ms. Cohen to end the work in which she had engaged before their marriage. Instead, at defendant Cohen's request, Ms. Cohen devoted herself to her children and her husband and also engaged in real estate transactions involving the family's residences.

20.    Ms. Cohen's real estate activities yielded approximately $900,000 in profits. At defendant Cohen's insistence, the profits were deposited into an account in his name only at Gruntal & Co. ("Gruntal") based on his representation that the approximately $900,000 would yield a gain of 50% to 100% if he traded with the margin and leverage allotted to him by Gruntal because of his relationship with Gruntal.

21.    Ms. Cohen placed full reliance on defendant Cohen's representations. Among other things, defendant Cohen told Ms. Cohen that she could not have access to the funds deposited with Gruntal or to other marital assets deposited with that firm. Defendant Cohen advised plaintiff that the account into which those funds and others were placed had to be solely in his name because Gruntal's policy allegedly entitled only defendant Cohen to access to the trading account.

5

22.    Defendant Cohen also advised Ms. Cohen that it was his goal to establish his own investment fund and that he required as much capital as he could secure to advance that goal. In order to assist defendant Cohen, Ms. Cohen never questioned his claims that only he could have access to the trading account at Gruntal.

### (ii)    Defendant Cohen's Insider Trading Activity

23.    In late 1985, defendant Cohen advised Ms. Cohen that he had received inside information in advance of the purchase of RCA Corporation ("RCA") by General Electric Company ("GE"). Although she did not have a college degree and had no training in finance or law, Ms. Cohen questioned defendant Cohen about the legality of trading on inside information in general and with respect to the RCA-GE transaction in particular. Defendant Cohen assured Ms. Cohen that, although he knew the insider (who was a Wharton classmate of Cohen), he had not received the information directly from the insider but from a mutual friend. According to defendant Cohen, this meant that he was not involved in illegal insider trading.

24.    Soon after Ms. Cohen's discussions with defendant Cohen about insider trading, the takeover of RCA by GE was announced. Upon information and belief – the sources of which are statements made by him to plaintiff – defendant Cohen traded on the inside information he had received and realized substantial profits in late 1985 and early 1986 from insider trading generated by the RCA-GE transaction. Cohen assured Ms. Cohen that insider trading was only a civil matter, not a criminal one.

### (iii)    The SEC Investigation and Cohen's Invocation of His Fifth Amendment Privilege

25.    The Securities and Exchange Commission (the "SEC") investigated Cohen's role in the RCA-GE transaction. In connection with that investigation, Cohen was required to appear at an examination under oath before the SEC on June 5, 1986. Ms. Cohen first learned of the fact of defendant Cohen's appearance before the SEC and the details of the events at that examination when she obtained from the SEC in June 2009 the transcript of defendant Cohen's testimony pursuant to a Freedom of Information Act request.

26.    At the examination, defendant Cohen refused to produce any documents, citing his privilege against self-incrimination under the Fifth Amendment to the United States Constitution.

27.    Likewise, as disclosed in the transcript recently obtained from the SEC, defendant Cohen refused to answer, on Fifth Amendment grounds, the SEC's questions regarding, among other things, (i) his "purchase" of securities "while in possession of non-public information concerning RCA;" (ii) whether "anyone [had told Cohen] prior to the public announcement that RCA would be involved in a merger with General Electric;" and (iii) whether Cohen "had any agreement to share profits and/or losses with anyone else for securities transactions in any account which is in [Cohen's] name or the name of any other person or entity."

28.   At the SEC examination, defendant Cohen also invoked his Fifth Amendment Privilege and did not testify in response to the question, "[D]o you have a securities brokerage account at any foreign financial institution?"

29.   Upon information and belief, the events associated with the RCA-GE transaction involving insider trading and related fraud were consistent with repeated subsequent acts revealing an on-going, long-term pattern in the conduct of business by defendant Cohen and the multiple SAC and related entities he controls. As recently as November 6, 2009, *The Wall Street Journal* reported that a former employee of one or more of the SAC entities had signed a cooperation agreement with federal prosecutors and was expected to cooperate with them in a criminal investigation of the SAC entities for possible insider trading.

**B.   The Divorce Proceedings**

**(i)   Defendant Cohen's Financial Statement**

30.   Defendant Cohen filed a July 1, 1988 Statement of Financial Condition (the "1988 Statement") in connection with a divorce action involving himself and Ms. Cohen in the Supreme Court of the State of New York, County of New York. The 1988 Statement was, upon information and belief, sent through the United States Postal Service, as well as by wire transmission, and was also filed in the Supreme Court of the State of New York.

31.   The 1988 Statement was materially false and misleading as a consequence of the scheme to defraud Ms. Cohen, and to conceal the fraud, in which defendants Cohen and D. Cohen participated with the assistance of others.

32.    Among other things, the 1988 Statement failed to disclose the existence and scope of a substantial bank account at the Pan American Bank in Miami, Florida (the "Pan American Account"). Upon information and belief, defendants Cohen and D. Cohen utilized the Pan American Account – the existence of which was not disclosed in the 1988 Statement – to transfer millions of dollars before and after the filing of the 1988 Statement as part of their scheme to defraud Ms. Cohen.

33.    In addition, the 1988 Statement failed to disclose that SAC Trading was an active entity operating from a location at 8525 SW 19th Avenue, Cooper City, Florida 33330, rather than an entity with "no liquid assets," as asserted in the 1988 Statement.

34.    Moreover, the 1988 Statement failed to disclose the existence of putative entities variously identified by defendants Cohen and D. Cohen as "CPA Hedgefund Co., Ltd." and "CPA Hedge Co." Upon information and belief, CPA Hedgefund Co., Ltd. and CPA Hedge Co. were fictitious entities through which defendants Cohen and D. Cohen concealed multiple real estate transactions from Ms. Cohen (see ¶53, infra).

### (ii)    Defendant Cohen's May 1, 1991 Affidavit

35.    On May 1, 1991, defendant Cohen, in an affidavit filed in the Supreme Court of the State of New York (the "May 1 Affidavit"), repeated the false claims made in the 1988 Statement. Cohen testified as follows in the affidavit:

> Prior to entering into [the December 15, 1989 Separation Agreement], defendant [Ms. Cohen] was furnished with a copy of a statement of our financial condition as of July 1,

9

1988 . . . This statement indicated a net worth of
$16,930,537, $8,745, 169 of which was represented by a
"real estate deal with Brett Lurie" (coop mortgages) and this
was so indicated on the statement. The Brett Lurie deal is
presently involved in bankruptcy proceedings. Even then I
suspected that this would happen because the general
partner was in default. *I am writing it off as totally
worthless. Subtracting the value of Brett-Lurie from my net
assets at that time means that my net worth was $8,185,368.*
[*See* Affidavit dated May 1, 1991 at ¶16; emphasis
supplied.]

36.    Defendant Cohen's May 1 Affidavit was sent on or about May 1,
1991, through the United States Postal Service and by wire transmission.

37.    As was the case with the 1988 Statement, the May 1 Affidavit was
materially false and misleading. Among other things, defendant Cohen never "wrot[e]
off" (*id.*) the so-called Brett-Lurie deal as "totally worthless." In addition, the affidavit
failed to disclose, either to Ms. Cohen or to the Court to which the affidavit was
submitted, a complex set of transactions (*see* ¶¶49-52, *infra*) relating to the so-called
Brett Lurie "deal" orchestrated by defendant Cohen, defendant D. Cohen, and others
through which Ms. Cohen was defrauded. Moreover, the May 1 Affidavit, like the 1988
Statement, concealed the existence of the so-called "CPA Hedge Co." and "CPA
Hedgefund Co., Ltd." entities and the transactions in which they, defendant Cohen and
defendant D. Cohen engaged.

### (iii)    Defendant Cohen's May 16, 1991 Affidavit

38.    On May 16, 1991, defendant Cohen filed an affidavit (the "May 16
Affidavit") in the Supreme Court of the State of New York. Upon information and

10

belief, the May 16 Affidavit was sent through the United States Postal Service and by facsimile transmission.

39.     The May 16 Affidavit was as false and misleading as the 1988 Statement and the May 1 Affidavit. Among other things, defendant Cohen in his May 16 Affidavit asserted that "I am merely an employee of Gruntal & Co." That assertion was false. Upon information and belief, defendant Cohen, who consistently maintained that he was "merely an employee of" Gruntal, always functioned as an independent contractor and proprietary trader while he was affiliated with Gruntal. His description of himself as a "mere[] employee" of Gruntal was calculated to advance his deception of Ms. Cohen and to conceal from her the substantial financial activity defendants Cohen and D. Cohen had initiated as early as 1986 through defendants SAC Trading and the so-called "CPA Hedge" entities.

## C.   **Defendants' Fraudulent Concealment**

40.     In March 2006, the CBS program *60 Minutes* broadcast a report on defendant Cohen and "one of the largest hedge funds in the world, called SAC." Ms. Cohen watched the program.

41.     *60 Minutes* summarized its report: "This is a story about a large company accusing another large company of deliberately trying to drive down its stock price to make money. If the allegations are true, it's like fixing a game." The "game fixer" at issue in the *60 Minutes* report was defendant Cohen and one or more of his SAC entities.

42.    The broadcast revolved around claims that "SAC," described in the report as a "hedge fund," had influenced publicly available information about Biovail Corporation ("Biovail") in an effort artificially to drive down the price of Biovail shares. According to the *60 Minutes* report: "Normally when most people buy a stock, they hope the price will go up; but one of the strategies hedge funds use is called 'selling short,' in which they bet lots of money that a company's stock price will fall."

43.    The *60 Minutes* broadcast identified the conflict between SAC and Biovail as "a battle of the titans. On one side is Steven Cohen, owner of the hedge fund SAC. He lives all but secluded on a sprawling Greenwich, Connecticut estate. His salary last year was reportedly $500 million."

44.    Given the negative, critical treatment of defendant Cohen in the *60 Minutes* broadcast, Ms. Cohen became concerned for the first time that information provided to her and to the Court in the 1988 Statement and defendant Cohen's 1991 affidavits was false, deceptive and misleading. The *60 Minutes* report publicly revealed that Cohen could engage in conduct that was calculated to mislead and deceive public investors. Ms. Cohen believed, as a result of the *60 Minutes* broadcast, that such conduct could be directed at her as well.

45.    During the course of the divorce proceedings, and as Ms. Cohen first learned as a result of investigations after the March 2006 broadcast of *60 Minutes*, defendant Cohen, with the active assistance of D. Cohen and other defendants, orchestrated court filings and engaged in other conduct to conceal millions of dollars in assets from her and the Court. The fraudulent conduct in which defendants engaged to

conceal assets and make false representations to Ms. Cohen and the Supreme Court of the State of New York was perpetuated by defendants' fraudulent concealment of the underlying misconduct for many years until the *60 Minutes* broadcast first alerted plaintiff to defendants' earlier misconduct.

46.     In the aftermath of the *60 Minutes* broadcast, Ms. Cohen located an article published in *Fortune* entitled "The Shabby Side of the Street." The article described Gruntal – the firm with which defendant Cohen had been associated from the late 1970s through the early 1990s and of which he claimed to be an "employee" – as a "den of corruption" involved "in a sordid tale of greed, mismanagement, and questionable dealings that stretches back to the firm's early years."

47.     The claims made in the *Fortune* article, as well as on *60 Minutes*, led Ms. Cohen to further investigation of defendant Cohen's activities and their impact on her. Among other things, Ms. Cohen, on July 8, 2008, interviewed a former high-ranking executive of Gruntal. As previously described, defendant Cohen had for years advised Ms. Cohen that he was an employee of Gruntal. Indeed, defendant Cohen in his May 16 Affidavit described himself as "merely an employee of Gruntal."

48.     In the interview with the former high-ranking executive of Gruntal, Ms. Cohen learned that defendant Cohen had never in fact been an employee of Gruntal, as he had repeatedly claimed to her and in papers filed in the Supreme Court of the State of New York. Instead, the former executive described Cohen as both an independent contractor of Gruntal and a "proprietary trader" operating under the name "SAC Trading."

49.    Also as part of her investigation initiated after the *60 Minutes* broadcast, Ms. Cohen located and obtained the filings made in a litigation entitled *Steven A. Cohen and SAC Trading Corp.* v. *Brett K. Lurie and Conversion Funding Corp.* (the "*Lurie* Litigation") filed in 1987 in the Supreme Court of the State of New York, County of New York.

50.    Before locating the files in the *Lurie* Litigation (which were in storage), Ms. Cohen had never been advised of the existence of the case.  In fact, defendant Cohen had concealed the existence of the *Lurie* Litigation and had told Ms. Cohen in or about 1987 that filing an action against Lurie over alleged real estate losses was pointless and would not be done.

51.    Affidavits and other material filed in the *Lurie* Litigation disclosed the following facts never revealed by Cohen or his representatives to Ms. Cohen or the Court in which the divorce action between Ms. Cohen and defendant Cohen was filed:

- Before 1987, defendant Cohen and Lurie invested together in eight occupied apartments.

- On January 10, 1986, Cohen advanced $290,000 to Lurie to enable Lurie to purchase a building in Queens and to convert the apartments in that building into cooperative apartments.

- The $290,000 advance from defendant Cohen – who, upon information and belief, in part utilized Ms. Cohen's funds to make the advance without disclosing that to her –

14

was provided with no written agreement of any kind between Lurie and defendant Cohen and with merely a verbal understanding that Lurie might at some point repay Cohen or enter some other arrangement.

● Soon after the initial $290,000 advance, defendant Cohen advanced an additional $1,500,000 to Lurie with respect to the real estate in Queens, again without disclosure to Ms. Cohen that he was doing so and, upon information and belief, in part utilizing Ms. Cohen's funds to do so.

● In early February 1986, defendant Cohen advanced another $1,210,000 to Lurie for the real estate project in Queens.

● Again without disclosing these advances to Ms. Cohen – and as Ms. Cohen ultimately learned in 2008 after securing the Court filings in the *Lurie* Litigation – defendant Cohen told Lurie that the advance of $1,210,000 came from an SAC Trading account because Cohen's profits from securities trading were held in SAC Trading.

● In or about February 1986, defendant D. Cohen suggested to defendant Cohen that Lurie become a nominal employee of SAC Trading in order to obtain tax advantages for defendant Cohen, presumably to enable Cohen to take a

15

deduction for the sums advanced to Lurie in connection with the Queens real estate transaction.

- In connection with the scheme to treat Lurie as an "employee" of SAC Trading, defendant D. Cohen, at the direction of defendant Cohen, on March 6, 1986, sent a check in the amount of $1,996,997 to Lurie.

- The check was accompanied by a fraudulent letter dated March 6, 1986 addressed to Lurie and stating that the check was "your first salary check" from "S.A.C. Trading Corporation."

- Approximately one week after the first "salary check," SAC Trading issued another bogus "salary check" to Lurie for $500,000.

- By March 13, 1986, defendant Cohen, with the active assistance of defendant D. Cohen and SAC Trading, had provided Lurie with $5,496,997.

- The $5,496,997 provided by defendant Cohen and SAC Trading was not secured by any mortgage or note, contrary to representations made by defendant Cohen in his 1988 Statement and his May 1 Affidavit.

16

● In August 1986 – again without disclosing to Ms. Cohen that he was doing so – defendant Cohen invested an additional $2,750,000 on an unsecured basis with Lurie and Conversion Funding Corp. ("Conversion Funding"), an entity controlled by Lurie.

● Also in August 1986, defendant Cohen asked Lurie to return to defendant Cohen approximately $414,000 that defendant Cohen had only recently provided to Lurie, and Lurie complied with that request by sending a check in that amount with a letter from Lurie in which he emphasized that the money should be treated as income to defendant Cohen.

● On or about November 5, 1986, defendants Cohen and D. Cohen met with Lurie for the purpose of creating a bogus written employment agreement between SAC Trading and Lurie in order to enable defendant Cohen and SAC Trading to obtain illegitimate tax deductions by characterizing the $5,496,997 in payments to Lurie as salary.

● As a consequence of that meeting, defendant Cohen agreed to pay Lurie a "salary" of $2,750,000 per year for each of 1986, 1987 and 1988, or an aggregate of $8,250,000; under the scheme developed by defendants Cohen and D. Cohen, the first two years of this aggregate of $8,250,000 in

17

"employee" wages – a total of $5,500,000 – was deemed to have been paid in the earlier advances of $5,496,997.

- In January 1987, Lurie, through his controlled corporate entity, Conversion Funding, repaid SAC Trading $335,699.10, in order to reduce the loan balance of $2,335,699.10 to $2,000,000.

- On December 25, 1986, Lurie received another check in the amount of $250,000 from SAC Trading, ostensibly as the balance of Lurie's "salary" of $2,750,000 for 1986.

- Also on December 25, 1986, Lurie immediately endorsed the $250,000 SAC Trading check to defendant Cohen as partial payment of the advances for the real estate project provided to Lurie, leaving a balance of $2,750,000 on the advances.

- Likewise, in early 1987, SAC Trading provided $2,750,000 to Lurie to evidence his "salary" for 1987. That amount was immediately endorsed over to defendant Cohen as repayment of the $2,750,000 balance of the advances previously made by defendant Cohen to Lurie in connection with the Queens real estate project.

- In late 1986 and early 1987, defendant Cohen and Lurie agreed that, as repayment of the $2,000,000 loan to

18

Conversion Funding, SAC Trading would receive approximately $12,000,000 from the proceeds received from the conversion of the properties to cooperatives when and if those conversions occurred.

- On or about June 17, 1987, defendant Cohen and Lurie entered into a settlement agreement under which Lurie and Conversion Funding executed a note in the amount of $7,496,997 payable to "SAC Trading Corp." and due on January 2, 1990.

52.     As a consequence of the events identified in ¶51, *supra*, the so-called "Brett Lurie deal" was not "worthless," as defendant Cohen asserted in the 1988 Statement and the 1991 affidavits. Upon information and belief, Cohen's misrepresentations regarding the "Brett Lurie deal" enabled him to falsely understate his net worth by approximately $1 million.

53.     Moreover, Ms. Cohen, through property searches and otherwise, learned in or about December 2008 that defendant Cohen, with the active participation of defendant D. Cohen, utilized the fictitious "CPA Hedge" entities to conceal the following transactions from her and from the Supreme Court of the State of New York in defendant Cohen's 1988 Statement, in his May 1 Affidavit and in his May 16 Affidavit:

(i)     The August 10, 1987 mortgage between Melody Brown and "Donald T. Cohen, Trustee" in the amount of $60,000;

19

(ii)    The August 13, 1987 assignment to "Donald T. Cohen, Trustee" of an August 13, 1987 mortgage between George Balis and American Universal Mortgage Banking, Ltd. in the amount of $125,000;

(iii)    The August 25, 1987 assignment to "Donald T. Cohen, Trustee" of a May 29, 1987 mortgage between Liberty Funding and Francis J. Lemieux in the amount of $48,000;

(iv)    The August 25, 1987 assignment to "Donald T. Cohen, Trustee" of a mortgage between Liberty Funding and Francis J. Lemieux in the amount of $32,000.

(v)    The December 9, 1987 assignment to "Donald T. Cohen, CPA, as Trustee" of a December 9, 1987 mortgage between American Universal Mortgage Banking, Inc. and Regis Arthur Larkin in the amount of $30,000;

(vi)    The July 30, 1987 mortgage between Ozzie Accosta, Inc. and "Donald T. Cohen, Trustee" for $115,000;

(vii)    The February 26, 1988 assignment to "Donald T. Cohen, as Trustee" of a February 26, 1988 mortgage between American Universal Mortgage Banking, Inc. and Andre Sanon in the amount of $200,000;

(viii)  The December 15, 1988 mortgage between "Donald T. Cohen, Trustee" and C&S Management Corp. in the amount of $21,000;

(ix)    The December 14, 1988 mortgage between "Donald T. Cohen, Trustee" and Contractor Consulting Company, Inc. in the amount of $267,500;

(x)     The December 14, 1988 agreement between Eagle S.A. Funding Co. and "Donald T. Cohen, Trustee" relating to property at 476 Timpson Place, Bronx, New York in the amount of $267,500;

(xi)    The December 18, 1987 mortgage between Naolene Realty Corp. and "Donald T. Cohen, as Trustee" in the amount of $200,000;

(xii)   The December 28, 1988 mortgage between C&S Management Corp. and "CPA Hedgefund, A Limited Partnership[,] Donald T. Cohen, Trustee" in the amount of $35,000; and

(xiii)  The July 3, 1991 mortgage between "SAC Trading Corp." and defendant Cohen as assignor with an address at 10590 N.W. 27th Street, Miami, Florida, and "CPA Hedgefund" and defendant D. Cohen as assignee with an address at the same location as "SAC Trading Corp."

54.    Each of the documents identified in ¶53, *supra*, was sent by the United States Postal Service or transmitted by wire on or about the dates they were each executed.

## Count I
## (Violation of 18 U.S.C. §1962(c))

55.    Plaintiff realleges each and every allegation of ¶¶1-54, *supra*.

56.    Each defendant is a "person" within the meaning of 18 U.S.C. §1961(3).

57.    The corporate and entity defendants constituted an association-in-fact "enterprise" (the "SAC Enterprise") within the meaning of 18 U.S.C. §1961(4). The SAC Enterprise has an existence beyond that which is merely necessary to commit predicate acts. The SAC Enterprise was operated, managed and controlled principally by defendant Cohen with the assistance of other persons, including defendant D. Cohen.

58.    Each use of a wire communication or mailing identified in this Complaint in connection with the overall scheme and artifice to defraud Mr. Cohen constitutes a separate and distinct violation of the federal mail fraud and wire fraud statutes, 18 U.S.C. §1341 and §1343.

59.    The acts and the overall scheme and artifice identified in this Complaint were fraudulently concealed from plaintiff by defendants.

60.    Defendants Cohen and D. Cohen conducted, or participated in the conduct, of the SAC Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(5) in violation of 18 U.S.C. §1962(c).

61.    Defendants Cohen and D. Cohen committed acts of racketeering activity – specifically, violations of the mail fraud statute and the wire fraud statute, 18 U.S.C. §1341 and 1343 – as alleged in this Complaint.

62.    By reason of defendants' violation of 18 U.S.C. §1962(c), plaintiff Patricia Cohen has been damaged in an amount to be determined at trial but believed to exceed $100 million, to be trebled pursuant to 18 U.S.C. §1964.

## Count II
### (Violation of 18 U.S.C. §1962(d))

63.    Plaintiff repeats and realleges each and every allegation of ¶¶ 1-62, *supra*.

64.    Beginning in or about July 1988 and continuing until the present, defendant Cohen, defendant D. Cohen and defendants SAC Trading, SAC Capital Inc., SAC Capital LP, SAC LLC, SAC Advisors, and Sigma knowingly agreed to facilitate the scheme and artifice to defraud Ms. Cohen by managing, operating, conducting and participating in the conduct of the affairs of the SAC Enterprise and conspired to do so through a pattern of racketeering activity within the meaning of 18 U.S. C. §1962(d).

65.    In furtherance of the conspiracy and to advance the objects of the conspiracy, including the fraudulent concealment of the scheme and artifice to defraud, defendants committed the overt acts identified in this Complaint, including the transmittal and filing of the 1988 Statement, the May 1 Affidavit, and the May 16 Affidavit.

66.    By reason of defendants' violation of 18 U.S.C. §1962(d), plaintiff Patricia Cohen has been damaged in an amount to be determined at trial but believed to exceed $100 million, to be trebled in accordance with 18 U.S.C. §1964.

WHEREFORE, plaintiff Patricia Cohen demands judgment as follows:

- With respect to Count I, damages in an amount to be determined at trial but believed to exceed $100 million, to be trebled in accordance with 18 U.S.C. §1964;

- With respect to Count II, damages in an amount to be determined at trial but believed to exceed $100 million, to be trebled in accordance with 18 U.S.C. §1964; and

- Such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        December 9, 2009

PAUL BATISTA, P.C.

By _____

        Paul Batista (PB8717)
        Attorney for Plaintiff
          Patricia Cohen
        26 Broadway, Suite 1900
        New York, New York 10004
        (212) 980-0070 (T)
        (212) 344-7677 (F)
        Batista007@aol.com

24