## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATRICIA COHEN,<br><br>          Plaintiff,<br><br>     v.<br><br>STEVEN COHEN, DONALD COHEN, BRETT LURIE, EDWARD BAO, SAC CAPITAL MANAGEMENT, INC., DONALD T. COHEN C.P.A., P.A., and GRUNTAL & CO. L.L.C.,<br><br>          Defendants. | CASE NO.:  09 CV 10230 (RJH)<br><br>**ECF CASE**<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

Plaintiff Patricia Cohen, by and through her undersigned counsel, for her First Amended Complaint against Defendants Steven Cohen, Donald Cohen, Brett Lurie, Edward Bao, SAC Capital Management, Inc., Donald T. Cohen C.P.A., P.A., and Gruntal & Co. L.L.C., states as follows:

### NATURE OF THE ACTION

1.      Patricia Cohen ("Plaintiff" or "Patricia") was defrauded by and a victim of her then-husband Steven Cohen's ("Steve") illegal racketeering, and operation of an ongoing criminal enterprise, through which he concealed millions of dollars related to his ownership of and profitable trading through SAC Trading Corp. ("SAC Trading"), which Steve later surreptitiously converted into various SAC Capital entities.

2.      Patricia, for her part, was a dedicated housewife and mother to their two children. Steve had recently graduated from the University of Pennsylvania, Wharton School of Business and entered Wall Street as a trader affiliated with Gruntal & Co. Inc. ("Gruntal").

3.     With nearly $1 million that Patricia had earned from various real estate efforts, and some other funds, Steve actively traded an individual account in his name at Gruntal, and eventually started his own trading company, SAC Trading.  His brother Donald Cohen ("Donald") was a certified public accountant with his own accounting and auditing firm, and Steve engaged Donald to actively co-manage his affairs and day-to-day business activities.

4.     While Patricia trusted that her husband and brother-in-law would faithfully account for her investments, Steve and Donald conspired together and with others through a course and pattern of unlawful racketeering to conceal their activities, her investments and the profits and value they had generated through SAC Trading, which Steve started with the help of Patricia's substantial investments.

5.     Defendants' activities were a combination of legitimate trading profits, leveraged by illegal insider trading and money laundering schemes, accomplished through a coordinated enterprise of corporate and individual associates (the "SAC Criminal Syndicate"), including Gruntal, senior executives at Gruntal, SAC Trading, Marvan & Cohen, P.A. (Donald's accounting firm), Conversion Funding Corp. and its principal Brett Lurie, and other persons and entities, who all participated in schemes engineered by Steve and Donald, as one unlawful enterprise, to produce substantial profits from legal and illegal racketeering activities — activities which were concealed from Patricia.

6.     While some of the players and schemes have changed, the SAC Criminal Syndicate has continued its activities to the present, through various affiliated SAC Capital entities, engaging in various schemes and frauds, including insider trading, to create substantial profits and returns.

7.      As Steve and Donald carried out their schemes, they also sought creative and new ways to hide their profits from Patricia, should she ever divorce Steve (which she threatened as early as 1983 and without qualification demanded in 1986). As part of those efforts, Steve and Donald engaged a corrupt, and subsequently disbarred and incarcerated attorney, Brett Lurie ("Lurie"), who incorporated SAC Trading and subsequently set up a series of real estate deals that Steve and Donald used to launder money and conceal profits from the authorities, including the Internal Revenue Service ("IRS"), and the Securities and Exchange Commission ("SEC"), and from Patricia.

8.      Steve paid Lurie almost $10 million throughout 1986, as fictitious "wages" or "advances" through SAC Trading, from an undisclosed bank account in Miami established by Donald, without any written contract, agreement or other security or interest in the real estate transactions — conspicuously right around the time the SEC was seeking a deposition of Lurie regarding Steve's insider trading activity.

9.      As their relationship continued to deteriorate, Patricia and Steve separated. And in July 1988, Steve filed for divorce. In the divorce proceedings, Steve claimed to be merely an employee of Gruntal, and that he and Patricia had only $17 million in marital assets, some $9 million of which he claimed was lost because of the purported real estate transactions with Lurie. Steve insisted that SAC Trading was merely a shell company and did not conduct any trading activity. (It was only in September, however, that Steve had transferred all of SAC Trading's employees fully to Gruntal's payroll.) Based on her reliance on his representations, and Steve and Donald's significant efforts to conceal their activity from her, in 1990, Patricia accepted a settlement of only $3.5 million ($2.5 million of which was an apartment that she had to renovate and was still unable to sell).

3

10.     Only three weeks after their second round of divorce proceedings had concluded in 1992, Steve reassembled SAC Trading, with several of the employees that he had previously transferred to Gruntal's payroll, under the name SAC Capital and other entities, with some newfound $25 million. He claimed to his friends and associates that he had paid his ex-wife almost $16 million in the divorce, to account for the substantial assets he invested in SAC Capital and other entities.

11.     After extraordinary efforts in the last year and a half, Patricia first learned the truth behind Defendants' transactions with Brett Lurie and the conversion of SAC Trading, through (1) exhaustive public record searches and affidavits filed in a litigation that Steve affirmatively concealed, (2) a former Gruntal executive who only recently has disclosed Steve's activities while at Gruntal, and (3) Freedom of Information Act requests granted because of connections, which disclosed materials concerning the SEC's investigation of Steve and Gruntal. Then and only then did Patricia discover (or even have reason to suspect) that Defendants, through a deliberate, deceptive scheme, concealed from her substantial financial interests and her entitled division of the marital estate, as a result of misconduct and dissipation of assets — activities which have caused significant injury and damages to her property.

12.     Most significant, Steve concealed his conversion of SAC Trading into SAC Capital and other entities. As a consequence, Patricia has been wrongfully denied substantial, if not controlling, interests in those entities, and other assets and interests derived therefrom.

## JURISDICTION AND VENUE

13.     This action arises under Sections 1962(c) and (d), and 1964(c) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. §§ 1962(c) and (d), 1964(c), and New York common law. In connection with the acts, conduct and other wrongs

4

alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and interstate wires.

14.     This Court has subject matter jurisdiction over this action pursuant to Section 1964(a) of RICO, 18 U.S.C. § 1964(a), and 28 U.S.C. §§ 1331, 1332 and 1337. Plaintiff and Defendants Steven and Donald Cohen are citizens of different states. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. The Court also has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this District pursuant to Section 1965 of RICO, 18 U.S.C. § 1965, and 28 U.S.C. § 1391, insofar as a substantial part of the events and/or false statements and misleading omissions giving rise to this action occurred within this District, including but not limited to the use of the mails and other interstate facilities to communicate with Plaintiff and among the members of the criminal enterprise, as well as to disseminate false and fraudulent information and statements.

## PARTIES

16.     Plaintiff Patricia Cohen is an individual, and is a citizen of the State of New York.

17.     Defendant Steven Cohen ("Steve") is an individual, and is a citizen of the State of Connecticut. Steve has been the principal behind a criminal enterprise, the SAC Criminal Syndicate, which he organized with his brother Donald Cohen and has operated since at least 1984 to the present. The participants in his enterprise, including the Defendants in this action, have either been convicted of crimes involving fraud during times relevant to this action, or have been at the time or are currently under investigation for misconduct, including fraud and insider trading. Steve was under investigation by the SEC for insider trading in 1986; he pleaded his

5

Fifth Amendment right against self-incrimination in response to every question posed by the SEC.

18.     Defendant Donald Cohen ("Donald") is an individual, and is a citizen of the State of Florida. Donald is a certified public accountant and was a principal at Marvan & Cohen, P.A. (now Donald T. Cohen C.P.A., P.A.), which provided accounting and other services to Steve for his trading activities conducted through SAC Trading Corp. and Gruntal & Co. Inc.

19.     Defendant Edward Bao ("Bao") is an individual, and is a citizen of the State of New Jersey. Bao was the Executive Vice President of Gruntal & Co. Inc. until December 1994, and managed Steve's relationship and contracts with Gruntal, including his trading through SAC Trading Corp. In 1997, Bao pleaded guilty to one count of making fraudulent and misleading entries in Gruntal's books and records, for an embezzlement scheme that began in 1984. For his crimes, he was incarcerated in federal prison for approximately three years.

20.     Defendant Brett Lurie ("Lurie") is an individual, and is a citizen of the State of Florida. Lurie provided legal services to SAC Trading and helped Steve launder money through his real estate schemes. Lurie was also Steve and SAC Trading's attorney, and its Secretary. Lurie is a convicted felon, convicted on April 25, 1996 of eight counts of first degree scheme to defraud, nine counts of real estate securities fraud, three counts of first degree grand larceny, three counts of second degree grand larceny, and one count of first degree offering a false statement for filing in connect with his real estate scams. Lurie was incarcerated for almost three years in state prison. He was only recently released from his probation under the supervision of the State of New York Division of Parole, on October 28, 2009. Although he was an attorney at the time, Lurie has since been disbarred.

21.     Defendant SAC Capital Management Inc. ("SAC Capital") is a Delaware Corporation, incorporated on January 28, 1992, with its principal place of business, upon information and belief, at 72 Cummings Point Road, Stamford, Connecticut 06902.  Upon information and belief, SAC Capital and its affiliates, including SAC Advisors, L.P. ("SAC Advisors"), are currently under investigation by the Federal Bureau of Investigation ("FBI") for insider trading.

22.     Defendant Donald T. Cohen C.P.A., P.A. at all times relevant to this action was known as Marvan & Cohen, P.A. ("Marvan & Cohen"), and is a professional association with its principal place of business at 1108 East Newport Center Drive, Deerfield Beach, FL 33442.

23.     Defendant Gruntal & Co. L.L.C ("Gruntal") is a Delaware limited liability company, incorporated on March 27, 1997, upon information and belief, as part of a leveraged buyout of Gruntal & Co. Inc., the name by which Gruntal was known at all times relevant to this action.  Gruntal's principal place of business is 14 Wall Street, New York, New York 10005.  In 1996, after an extensive investigation by the federal government, Gruntal was found by the SEC — beginning in 1984 and continuing for a decade — to have intentionally diverted securities and funds totaling $11 million from customer accounts, customer and vendor checks, dividend overages, and other sources by senior executives and managers.

24.     SAC Trading Corp. ("SAC Trading") was a corporation organized under the laws of the State of New York, with its principal place of business at 14 Wall Street, New York, New York 10005, but has been dissolved since June 26, 1996.  Upon information and belief, SAC Trading was incorporated by Lurie, who also served as its secretary, legal counsel and registered process agent, but was owned by Steve.

7

25.     Conversion Funding Corporation ("Conversion Corp.") was a corporation organized under the laws of the State of New York, with its principal place of business at 82 Wall Street, New York, New York, 10005 but has been dissolved since March 24, 1993.  Upon information and belief, Conversion Corp. was incorporated and owned by Lurie.

## FACTS

26.     SAC Capital Advisors, LP ("SAC Advisors"), and related SAC entities, together one of the nation's largest and leading hedge funds, is the product of an ongoing racketeering scheme by its principal, defendant Steven Cohen ("Steve"), arising out of a pattern over several years of fraudulent misconduct, insider trading, bank fraud, mail and wire fraud, money laundering and other schemes and artifices to build a financial empire while at the same time defrauding his then-wife Plaintiff Patricia Cohen ("Patricia") out of millions, and now billions, of marital assets and independent interests, which she initially and substantially funded with approximately $1 million from her real estate efforts.

27.     Steve has successfully hidden his deceit and misconduct from Patricia, with active participation and schemes by his brother Donald Cohen, Brett Lurie, Edward Bao, Marvan & Cohen, P.C., Gruntal & Co. Inc., and Conversion Funding Corp., and others, all associated together in an ongoing criminal enterprise (the "SAC Criminal Syndicate"), preventing her from discovering his misconduct and crimes as detailed herein.

## I.     PATRICIA SUBSTANTIALLY FUNDED SAC TRADING WITH NEARLY $1 MILLION — A COMPANY STEVE LATER CONVERTED INTO SAC CAPITAL AND OTHER ENTITIES.

28.     On December 7, 1979, then-Patricia Finke married Steven Cohen.  Steve had recently graduated from the University of Pennsylvania, Wharton School of Business.  In their marriage, Patricia stayed home to take care of the children.  Steve dominated the relationship and

marriage, controlling all of their financial affairs. Virtually all of the financial assets were held in his name and controlled exclusively by him. But they never signed a prenuptial agreement.

29.     Steve began working with Gruntal through Ronald Azer, and his company Razor Securities, Inc. So that Steve could increase his trading activity, he used approximately $1 million that Patricia had earned in her real estate efforts. Steve's brother Donald was a certified public accountant, living in Florida, and Steve used Donald to actively co-manage his trading affairs at Gruntal (reconciling his accounts and daily trading transactions).

30.     Patricia trusted that Steve and Donald would honestly account for their profits and provide support for the family. They did not. Instead, Steve claimed that Patricia could not have access to the money in his trading account with Gruntal because company policy would not allow her to have access to or information concerning the account.

31.     Steve selectively informed Patricia about how much money was in the account, how the account had performed over time, as well as his income and what returns Steve produced on her nearly $1 million investment and their assets generally. In fact, Steve was so secretive and controlling that Patricia was only allowed to contact his secretary to request monthly transfers of money for their joint checking account so she could pay the family bills and buy groceries.

32.     By virtue of this setup, Steve was able to hide virtually all of his trading activities and profits from Patricia.

33.     Upon information and belief, in or about December 1985, Steve received an insider tip that General Electric would soon complete a merger with RCA. Steve discussed the information with Donald, and that month both Steve and Donald purchased significant shares and/or options of RCA, knowingly engaging in insider trading. Upon information and belief,

9

Steve shared this information with executives at Gruntal, and the traders who worked for him, including Steven Mark.

34.     Shortly after Steve and Donald engaged in the RCA trades, the merger was announced to the public. As a result, Steve earned approximately $20 million in insider trading profits; upon information and belief, $10 million was paid to Gruntal.

35.     To further expand his control over his trading activity and profits (and to provide more secrecy from Patricia), Steve used his profits from the RCA transactions to begin his own trading company. Steve and Donald retained attorney Brett Lurie ("Lurie") to create SAC Trading Corp., a New York corporation they incorporated on February 6, 1986. According to Lurie:

> ... DONALD COHEN, requested me to form SAC TRADING CORP., so that Mr. Cohen would be able to move his operations into his own company and so that Mr. Cohen would have total control over the other traders from whom he receives an override. The formation of SAC TRADING CORP., was simply to have a corporation within which Mr. Cohen could utilize his trading of securities. ... SAC TRADING CORP. was simply a corporation which would employ all of the traders under the control of Mr. Cohen in the stock market. In addition, the formation of SAC TRADING CORP., was to satisfy another purpose. It is my understanding that Mr. Cohen had accrued nearly TEN MILLION AND NO/100 ($10,000,000.00) DOLLARS in trading profits the latter half of 1985 and Mr. Cohen and his brother, DONALD COHEN, were attempting to devise strategies to legally avoid or defer paying income taxes on all of these profits.

36.     Steve used his brother Donald, and his accounting firm, then Marvan & Cohen, P.C. ("Marvan & Cohen"), to manage SAC Trading's accounts and finances. Steve engaged senior Gruntal executive Edward Bao to help him establish a trading platform and his own separate operation at Gruntal.

37.     Steve was the President of SAC Trading; Donald was the Treasurer; and Lurie was the Secretary and legal counsel. Steve employed various traders whom he controlled while

with Gruntal, including John Troubh, Steve Mark, William Nietzel, Tim Anderson, Steve Heineman and Seth Kanegis. Steve conducted substantial and highly profitable legitimate trading through SAC Trading.

38.     Steve hid virtually all of his activities from Patricia. He claimed to her that his insider trading activities were lawful, in particular the RCA transaction, because he received the information from a third party and not a direct source (and he was merely trading an account through Gruntal). This was false. Patricia, however, was not an attorney, and could only believe that Steve was being honest and faithfully managing her substantial investments and the family's assets. He told her very little about the profitability of SAC Trading. Indeed, Steve never honestly disclosed the substance of his activities through SAC Trading to Patricia.

## II.     DEFENDANTS CONCEALED MILLIONS IN PROFITS AND ASSETS FROM PATRICIA THROUGH AN ILLEGAL MONEY LAUNDERING SCHEME WITH LURIE AND CONVERSION CORP.

39.     Shortly after the GE-RCA merger, the Securities and Exchange Commission ("SEC") began investigating suspicious trading before the public announcement of the deal, among other insider trading activity in several public companies, and in particular Steve's trading activity. Steve was called to testify under oath before the SEC on June 5, 1986 concerning his trades in RCA. He never told Patricia. In response to every substantive question asked by the SEC, Steve pled his Fifth Amendment right against self-incrimination. In addition, he refused to produce any documents to the SEC.

40.     Steve testified, or more accurately refused to testify, as follows:

> Q:     [Mr. Cohen] is it your intention with respect to any question asked regarding to RCA or this investigation to invoke your Fifth Amendment privilege against self-incrimination?

A:     Upon the advice of counsel, I respectfully decline to answer the question on the ground that I'm being compelled to be a witness against myself in contravention of my Constitutional rights.

…

Q:     In December of 1985 did you purchase RCA Securities on your own behalf?

A:     Same response.

Q:     In December of 1985 did you purchase RCA Securities while in the possession of non-public information concerning RCA for your own account?

A:     Same response.

Q:     In December of 1985 did anyone tell you prior to the public announcement that RCA would be involved in a merger with General Electric that RCA would in fact be in a merger or restructuring?

A:     Same response.

…

Q:     At this time the staff -- just so the record is clear, if we ask you any more questions regarding RCA or this investigation, what will your response be?

A:     Same response.

41.    At the same time the SEC was investigating Steve, however, he was secretly

concealing his profits and assets from the IRS, SEC, and from Patricia, through a money

laundering scheme with Lurie.

42.    In addition to incorporating SAC Trading, Steve had again engaged Lurie to use

his real estate schemes to allow Steve to hide and then launder the money back when needed.

43.    In January 1996, Steve "advanced" $290K to Lurie, without a written agreement

or a repayment schedule, or any equity or security interest in any real estate deal. Shortly

thereafter, Steve "advanced" another $1.5 million to Lurie — again without any written

documentation and without any security or protection. And in February 1986, SAC Trading

advanced $1.21 million to Lurie, on the same unwritten, unsecured terms. This last transfer

brought the total of unsecured funds funneled through Lurie in only a matter of two months to $3

million.

44.     These were merely sham "advances." None of the transactions were documented
so that Steve could disguise and conceal that he was the true source of the money.

45.     In order to better facilitate the efforts to hide the $10 million, Donald created a
new scheme to account for the substantial funds that Steve was sending to Lurie under the table.
On March 6, 1986, Donald wrote to Lurie, issuing to him "your first salary check in reference to
option trading and arbitrage consultation with S.A.C. Trading Corporation." Donald issued a
check from an SAC Trading account at Pan American Bank, N.A. in Miami, FL for $1,996,997,
backdated to February 7, 1986. Lurie was not an employee of SAC Trading, however, and never
engaged in any option trading or arbitrage consultation.

46.     SAC Trading paid an additional $500,000 in "salary" to Lurie on March 13, 1986.

47.     Uncomfortable with his own individual exposure to these transactions, and to aid
the money laundering scheme, on July 10, 1986, Lurie incorporated Conversion Funding Corp.
("Conversion Corp.") to provide a corporate shield, and added layer of secrecy, from the money
laundering that Steve was seeking to conceal from the IRS, SEC and Patricia.

48.     Thereafter, in August 1986, SAC Trading began "loaning" money to Conversion
Corp., in or around that time "loaning" $2.75 million to Conversion Corp. There was no
documentation for the "loans," no agreement or contract, merely money sent from SAC Trading
to Conversion Corp. to conceal assets.

49.     And up until then, Lurie was perfectly comfortable laundering money for Steve.
But then, in or around August 1986, Lurie was contacted by the SEC, who had informed him that
Steve "was being investigated by the Securities and Exchange Commission ('SEC') concerning
insider trading transactions." Lurie was called to testify before the SEC in September 1986.
Lurie lied to the SEC concerning Steve's payments to him, testifying falsely as follows:

13

Q:     … Let me ask the reporter to label as Exhibit 200 a one-page document. It's a front and back of a check on Pan American Bank, N.A., Miami Florida. … The date of the check is -- appears to be 3-7-86.

…

Q:     Is that a check made out to you?

A:     Yes.

Q:     And it's from?

A:     SAC Trading Corp.

…

Q:     And can you read into the record the amount of the check?

A:     $1,996,997.

….

Q:     What was the check for?

A:     It was with respect to fees earned and an advance on a real estate transaction.

…

Q:     This check did not entitle to [Steve] any interest?

A:     Not at that time, no.

Q:     Was it a loan?

A:     If -- it was an advance. If -- and the exact numbers were not broken out. I know it may seem a little crazy, but he has a tremendous amount of trust in me, as do other people. And I --

Q:     Would you answer the question?

A:     What was the question?

Q:     Was it a loan?

A:     No.

…

Q:     Was there any other purpose or reason why SAC Trading Corp. or [Steve] provided you with the approximately $1.9 million check?

A:     No.

Q:     On the check, on Exhibit 200, on the front side of the check, the lower left, there's a "memo." There's a word there. It appears to be "Payroll." Do you see that?

A:     Yes.

Q:     Do you read that as reading "Payroll"?

A:     Yes, I do.

Q:     Do you know what that is relating to?

A:     No.

Q:     Do you have any understanding as to why someone put "Payroll" on that check?

A:     The only thing I could think of, now, is that it was a payroll account where the money was. It was written out of.

…

Q:     Have you ever received any other checks from SAC Trading Corp. in excess of a million dollars?

…

A:     I'm not sure. I'm not sure.

14

50.     The SEC requested documentation concerning Lurie's transactions with Steve, including his claimed bills for attorneys' fees and payments he had received.

51.     Because of the unwanted attention that Steve brought to Lurie's own real estate schemes (for which he was later convicted), their relationship became more embittered. On November 5, 1986 Lurie met with Steve and Donald to paper their transactions in a contrived attempt to legitimize the money laundering. They drafted a formal Employment Agreement in which Lurie was to be characterized as a "Senior Vice President" of SAC Trading, paying him $2.75 million a year for each of the years 1986 through 1988. They treated the first two years as already received by virtue of the prior advances and employee checks that Steve and SAC Trading had paid Lurie.

52.     Nonetheless, Lurie paid substantial amounts of the supposed employment salary back to Steve. Lurie and Conversion Corp. laundered back to Steve two checks, one in the amount of $250,000 on December 26, and another in the amount of $2,750,000 in early 1987 (supposedly to pay back the advances). Lurie and Conversion Corp. also laundered back to Steve $414,300.90 on December 8, 1986, and $335,699.10 in January 1987 (supposedly to back down part of the loans).

53.     In total, Lurie had merely laundered $3.75 million dollars and returned this money to Steve. And Steve had outstanding approximately $7.5 million still with Lurie and Conversion Corp. — $2.5 million paid to Lurie in "salary" and $5 million in advances and loans.

54.     Although they had supposedly come to an agreement regarding the nature of those transactions in November, on December 24, 1986, SAC Trading and Conversion Corp. created several new "loans" for the $2 million undocumented by any agreement, in which SAC Trading

15

would receive $12,000,000 out of the proceeds received from Lurie's real estate transactions. It was merely a further device for Lurie to launder the "salary" payments back to Steve.

55.     As part of the scam, in January 1987, Donald, through Marvan & Cohen, issued false federal W-2 forms to confirm the fictitious payment of "wages" that year to Lurie.

56.     In addition, to further the scheme, Steve engaged Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd. ("Goldberg Kohn"), a law firm, in an attempt to legitimize his transactions with Lurie. But, upon information and belief, Goldberg Kohn refused to participate in the fraud, and on February 27, 1987, forced Steve and SAC Trading to reverse the false W-2 that Donald had manufactured.

57.     After Goldberg Kohn refused to participate in the money laundering scheme, and in order to cover his misconduct in the Lurie transactions, on April 13, 1987, Steve and SAC Trading filed a false and misleading action against Lurie. For added pressure, Steve placed liens on Lurie's properties, nearly forcing him into bankruptcy. Steve and Lurie eventually "settled" the claims. In their "settlement" agreement, dated July 17, 1987, they claimed that "unreimbursed portions of the advances hereinabove made by SAC to Borrowers shall be deeded to constitute, and shall only thereafter be acknowledged to continue to constitute, loans by SAC to Borrowers intended to bear no stated rate of interest … together with contingent interest." Contingent interest was defined as the lesser of $3,200 per room in any cooperative apartment sold or the net cash proceeds from the sale of unsold shares.

58.     They agreed that the purported "loans" would "mature on January 2, 1990," and would at that time be "payable in cash by Borrowers as to the principal amount outstanding on the Loan," which they agreed was $7,496,997, and "contingent interest." Upon information and belief, the agreement had a total value to Steve and SAC Trading of $17.5 million.

16

59.     Steve never disclosed the details of these transactions, the litigation, or the real value of SAC Trading to Patricia — ever.

### III.     TO HIDE STEVE'S PROFITABLE BUSINESS AND ASSETS, DEFENDANTS FRAUDULENTLY SUSPENDED SAC TRADINGS' OPERATIONS AND CRAFTED A FALSE AND MISLEADING PICTURE OF STEVE'S ACTIVITIES AND ASSETS.

60.     In or about late 1986, Patricia received a letter from their telephone company that a state assistant district attorney had subpoenaed the family telephone records in an investigation of Steve for insider trading. Patricia questioned Steve, and he again claimed that he was being wrongfully investigated and that it would be resolved in his favor. Nonetheless, Patricia told him that "when we get through this, I want a divorce." The relationship never recovered. After they had already separated, on July 7, 1988, Steve served Patricia with a summons and notice for divorce. The marriage had been failing for years, as a consequence of Steve's physical and emotional abuse.

61.     Shortly after serving Patricia with the divorce papers, Steve began to rearrange his business affairs to further conceal from Patricia the Lurie transactions and the substantial assets and value he had developed in SAC Trading. Donald was also going through a divorce at that time, and he further aided Steve in concealing information and assets from Patricia.

62.     On September 27, 1988, Donald wrote to Bao at Gruntal, seeking to "convert [Steve's] traders to full payroll with Gruntal," as of "the October 1st. payroll checks (for payment of September services)." SAC Trading had six traders who worked directly for, and were paid substantially all of their income from Steve and SAC Trading directly, with only a nominal amount from Gruntal. At that time, Gruntal was only paying Steve's traders each $833.33 a month. However, when Steve was seeking to dismantle SAC Trading to hide its value

from Patricia, Donald requested that the Gruntal payments to Steve's traders be increased by and to the following amounts per month:

|  | INCREASE | | TOTAL |
|---|---|---|---|
| John Troubh………………………….................. | $8,333.33 | = | $9,166.67 |
| Steve Mark…………………………................... | $8,333.33 | = | $9,166.67 |
| William Nietzel……………………….......... | $5,416.67 | = | $6,250.00 |
| Tim Anderson……………………….................. | $5,416.67 | = | $6,250.00 |
| Steve Heineman……………………….......... | $3,333.33 | = | $4,166.67 |
| Seth Kanegis……………………….................. | $4,166.67 | = | $5,000.00 |

63.     Steve and Donald shifted $35,000 in monthly wages from SAC Trading over to Gruntal to give the appearance that SAC Trading was merely a shell company. Upon information and belief, Bao had knowledge that the purpose of those transfers was to create the illusion that Steve was "merely an employee" of Gruntal with no active separate trading, and that SAC Trading (a significantly profitable going concern) was merely a shell company holding losses with no profits, assets or value.

64.     Indeed, that year, in 1988, Steve earned approximately $12 million from his trading activity through SAC Trading at Gruntal. In 1989, however, as he was attempting to further conceal his wealth and business from Patricia, his income dropped dramatically to only $4 million. That amount was significantly less than what Steve reported as his income in each of the three prior years and later in 1990.

The 1988 Divorce Proceedings

65.     Steve, Donald, SAC Trading and Gruntal continued the sham, with false and misleading misrepresentations in the divorce proceedings. Steve claimed that he was merely an employee of Gruntal, and that he and Patricia had only $17 million in marital assets. While Steve disclosed a schedule of assets that included SAC Trading, and $8,745,169 in "Queens

Coop-Brett Lurie Mortgage," he represented that those were legitimate investment transactions that were now worthless.

66.     Specifically, he claimed that based on the agreements with Lurie, the investment was gone entirely and there was no legal recourse available to recover any part of the money. Steve, however, never disclosed his insider trading.  Steve never disclosed his attempts to hide assets from the IRS and SEC.  He never disclosed the circumstances of the fraudulent payments to Lurie and Conversion Corp., his money laundering scheme.  And Steve never disclosed (but affirmatively misrepresented the existence of) the litigation with Lurie and Conversion Corp., in which a substantial record of his misdealing was accounted by Lurie in affidavits.

67.     Steve did not disclose his earnings in 1989 during the divorce, even though the divorce was not final until 1990.

68.     Concerning SAC Trading, Steve claimed in the divorce proceedings that it was merely a holding company for the Lurie losses, and was not a going concern.  Steve claimed that he only had income and assets from his employment with Gruntal.  Steve never disclosed that within the last year he and Donald had transferred the traders who were working directly for Steve and SAC Capital to Gruntal in order to deceive Patricia into believing it was a defunct entity and a worthless asset.

69.     Based on Steve and Donald's false representations, Patricia agreed to a Separation Agreement on December 15, 1989, that only provided her $1 million in cash and an apartment they had purchased for $2,475,000.  Steve maintained approximately $3 million in cash and assets, and all interests in SAC trading and all "stocks, bonds, cash, bank accounts or any other assets in [his] name solely," in total, at least on paper as falsely reported by Steve and Donald, worth $4,710,368.

70.    Had Steve truthfully disclosed the circumstances of the Lurie transaction (and his deliberate attempt to conceal those assets), the $8,745,169 he claimed he lost in that transaction would have been charged to him as dissipation, and Patricia would have at least been entitled to the full remaining $8,185,368 that Steve claimed as their assets.  Had Steve truthfully disclosed his operations through SAC Trading and his temporary suspension of that company (only to restart exactly the same operations later under SAC Capital and other entities), Patricia would have been entitled to at least half of that business, which was developed with marital assets — and in particular, money from Patricia's real estate efforts.

71.    To further conceal his false and misleading representations, later to his friends and colleagues at Gruntal, Steve claimed that he paid his wife $16 million in the divorce.  Upon information and belief, Steve made these claims because in reality, SAC Trading was a substantial going concern (masked by paper transactions with Gruntal), constituting substantially more in value than Steve disclosed to Patricia.

72.    Patricia was entitled to half the true value of SAC Trading as a going concern — half of what Steve reconstituted as SAC Capital and all affiliated entities derived therefrom — but she never received.

The 1991 Divorce Proceedings

73.    In 1991, Patricia filed a motion concerning maintenance and child support and to set aside the Separation Agreement.  This action was limited, however, concerning whether Steve had failed to disclose honestly his income.  Steve himself stated in no uncertain terms that in the litigation "[t]here was no claim that I misrepresented my finances."

74.    In response, Gruntal provided Steve with W2 forms for 1989 and 1990 reporting his "income" for those years, to support his claims that he was merely an employee who could

not hide income. Moreover, in a false and misleading May 16, 1991 affidavit, Steve claimed that "I do not and cannot" "disguise my income" because "I am merely an employee of Gruntal and Co." Because of his relationship with Bao and Gruntal, however, Steve was able to negotiate the way in which Gruntal handled his profits and assets, and indeed, he had already transferred the wages of his traders from SAC Trading to Gruntal, disguising the value of that business.

75.     Steve also misrepresented the circumstances of the Lurie transaction, claiming in his May 1, 1991 affidavit that:

> Th[e July 1, 1988 statement of our financial condition] indicated a net worth of $16,930,537, $8,745,169 of which was represented by a "real estate deal with Brett Lurie" (coop mortgages) and this was so indicated on the statement. The Brett-Lurie deal is presently in bankruptcy proceedings. Even then I suspected that this would happen because the general partner was in default. I am writing it off as totally worthless.

76.     Steve omitted again, as he had before in the 1989 proceedings, the litigation with Lurie, the affidavits made by Lurie concerning Steve's misconduct, and the overall scheme they had perpetrated together to launder money, conceal assets and the wrongdoing that had injured Patricia and her interests.

77.     Based on Gruntal's submission and Steve's representations concerning his income, the part of the divorce proceedings concerning setting aside the Separation Agreement and maintenance was withdrawn and dismissed.

78.     Steve and Patricia signed an amended separation agreement on January 6, 1992. She did not receive any additional assets, but merely exchanged the apartment that she received in the 1989 Separation Agreement (which was purchased for approximately $2.5 million) in exchange for $1.44 million in cash and $1.3 million in loan forgiveness for another apartment, in total $2.75 million for the apartment, which Steve had claimed was valued at $3.8 million, and therefore she received over $1 million *less* than in the original agreement in the divorce.

IV.    **AFTER THE DIVORCE PROCEEDINGS WERE FINAL,
DEFENDANTS MERELY REASSEMBLED SAC TRADING
UNDER A NEW NAME, "SAC CAPITAL"**

79.    After the divorce proceedings were final — only three weeks later, on January 28,

1992 — Steve filed incorporation documents for S.A.C. Capital Management, Inc. ("SAC

Capital") in Delaware, with assets he concealed and wrongfully defrauded from Patricia.

80.    On its website, SAC Advisors states that "SAC is a multi-strategy, private asset

management firm founded by Steven A. Cohen in 1992 with 9 employees and $25 million in

assets under management," which, upon information and belief, were largely funds from Steve.

Steve had concealed assets from Patricia, in particular assets related to SAC Trading, and began

SAC Capital with employees that he had transferred over to Gruntal merely years before during

the divorce proceedings to deceive Patricia that SAC Trading was worthless.

81.    Steve also created several other "SAC" entities that year, including S.A.C. Capital

Management, L.P. and S.A.C. Capital Partners, L.P., upon information and belief, also from

money directly and/or derived from Patricia's $1 million investment, the defrauded marital

assets, SAC Trading and the profits and assets derived directly therefrom.

82.    The SAC entities have been used by Defendants to further their unlawful

racketeering activity to the present, and have been subject to litigation and government

investigations, including a current ongoing investigation for insider trading at SAC Capital.

## STATUTE OF LIMITATIONS

83.    All applicable statutes of limitations are subject to equitable tolling and the

doctrine of fraudulent concealment as a result of Defendants' fraud concerning the critical fraud

and racketeering elements of the causes of action.

84.     Defendants actively and fraudulently concealed their criminal enterprise, the fraudulent and criminal misdealings with Lurie and Gruntal, including but not limited to insider trading, money laundering, bank fraud, mail fraud and wire fraud, as well as the coordinated dismantling and surreptitious reassembly of SAC Trading into various SAC Capital entities. Defendants concealed these activities from Patricia with false and misleading statements engineered by Steve and aided by his cohort of racketeer and criminal associations.

85.     Steve is so secretive that it has earned him a reputation in the market as "the most powerful trader on Wall Street you've never heard of." Patricia has been unable, like the rest of the market, to penetrate the "highly secretive" operations of SAC Capital until only recently. The SAC Capital entities are not publicly traded companies with accessible public filings. Patricia had no knowledge and no reason to believe that Steve had continued to do anything other than serve as a "mere employee of Gruntal" as he and Gruntal represented to her and the Court in their last round of divorce proceedings.

86.     Patricia had no knowledge of Steve and Donald's reassembly of SAC Trading only weeks after the final divorce proceedings until recently, and had no means to know or suspect of their existence, because SAC Capital and its various related entities are private. Patricia remained unaware that Steve had concealed his business and engineered a fraudulent and misleading transfer of employees to deceive her. Nor could she have known.

87.     Only recently did she learn that Steve was not "merely an employee of Gruntal," but had for years been operating his own trading company. A Gruntal insider only recently revealed these facts to Patricia. This was critical evidence of Steve and Donald's fraud, which was previously unavailable to Patricia and necessary to her claims in this action.

88.     Patricia had no knowledge of the litigation between Steve and SAC Trading and Lurie and Conversion Corp.  Steve falsely represented that he could not bring an action against Lurie concerning the purported real estate transaction.  And Patricia had no reason to know that Steve engaged Lurie to execute an unlawful money laundering scheme to hide profits.  She only recently learned of the existence of the litigation through extraordinary public record searches. The affidavits in that action were critical evidence concerning Defendants' money laundering, bank fraud and mail and wire fraud, which was previously unknown to Patricia and necessary to her claims in this action.

89.     Prior to only recently, she had no reason to investigate Steve for operating a criminal enterprise, until allegations reported publicly concerning misconduct by him and his businesses.  Following the revelations of various allegations of misconduct, Patricia has exercised reasonable diligence in attempting to discover whether Defendants had defrauded and injured her by their misconduct.

90.     Among her efforts, on October 3, 2007, Patricia filed a Freedom of Information Act ("FOIA") request with the SEC, to obtain information concerning Gruntal.  The SEC refused to produce records, however, on April 22, 2008, claiming that:

> We are withholding nonpublic records that are responsive to your request
> under 5 U.S.C. § 552(b)(7)(A), 17 CFR § 200.80(b)(7)(i).  This exemption
> protects from disclosure records compiled for law enforcement purposes,
> the release of which could reasonably be expected to interfere with
> enforcement activities.  Since Exemption 7(A) protects the records from
> disclosure, we have not determined if any other exemptions apply.
> Therefore, we reserve the right to assert other exemptions when
> Exemption 7(A) no longer applies.

91.     Patricia was forced to seek the assistance of a friend with connections in the SEC to obtain access to the investigation materials related to Steve, SAC Trading and Gruntal.  She delivered additional FOIA requests to the SEC, facilitated by her friend, on March 7, 2009.

92.     Previously, Patricia had been unable to obtain records from the SEC.  Steve's
deposition testimony, and in particular his invocation of the Fifth Amendment was critical
evidence concerning his insider trading and subsequent money laundering activity, which was
previously unavailable to Patricia and necessary to her claims in this action.

93.     All of these facts together were necessary elements to the claims set forth herein
to establish the causes of action against Defendants, and had been previously concealed from
Patricia by Defendants.

**CAUSES OF ACTION**
**COUNT I – FRAUD**
**(Against Defendants Steven Cohen and Donald Cohen)**

94.     Plaintiff hereby incorporates by reference Paragraphs 1 through 93 as if set forth
fully herein.

95.     Defendants Donald and Steve made various false statements to Patricia in order to
conceal their misdealings with Lurie and to prevent her from discovering the value of SAC
Trading, which was converted into SAC Capital and other entities.

*Lurie Transactions*

96.     Concerning the insider trading investigations, Steve falsely claimed that he had
engaged in legitimate trades and was merely being harassed by the SEC concerning his trades in
RCA as part of a witch hunt of thousands of investors.  He falsely claimed in or about March
1986 that the SEC had dropped its investigation and apologized to him.  Concerning the Lurie
transactions, Steve falsely claimed that he had safely invested the money he received from his
trading and that regardless, the SEC could not recover the money from him because he invested
it with a third party, Lurie.  Moreover, in or about mid-1986, both Steve and Donald falsely

claimed to Patricia that all of the money in what they had represented to her as the Lurie real estate transactions had been lost.

97.     They both failed to disclose to Patricia the insider trading, money laundering, bank fraud, mail fraud and wire fraud they conducted through and with Lurie.  They failed to disclose that Steve gave the money to Lurie without any contract, agreement or other interest in the purported real estate transactions.  They both failed to disclose to Patricia the litigation against Lurie, and failed to disclose the settlement.

98.     To the contrary, in the divorce proceedings, Steve falsely claimed that (1) the Lurie real estate investment was legitimate, but virtually worthless; (2) SAC Trading was merely a holding company for the Lurie losses; and (3) there was no way to recover any money from Lurie, and that it was not possible to pursue a lawsuit.

99.     In fact, Steve had engaged in wrongful insider trading.  The SEC was actively pursuing Steve and Donald for the trades.  Steve was deposed by the SEC and pleaded his Fifth Amendment right against self-incrimination.  Steve and Donald engaged in a contrived scheme to hide the trading profits through various false and dishonest transactions with Lurie, in nothing short of money laundering.  And as the SEC's investigation turned to Lurie, he began to renege on their scheme, and claim the monies were merely "advances" and that Steve had no right or interest in the real estate transactions that Lurie had separately negotiated.  In order to conceal his misconduct, Steve and SAC Trading sued Lurie and settled out of court in a deal, which at the time of the divorce was worth well in excess of $17.5 million.

*SAC Trading*

100.    Defendants Steve and Donald falsely misrepresented the status of SAC Trading, which was a significant and valuable going concern.  Steve claimed he was merely a Gruntal employee.  Steve and Donald claimed that SAC Trading was merely a shell for the Lurie losses and was not engaged in any active trading or profitable business.

101.    In fact, Steve owned SAC Trading and operated it as a separate business affiliated with Gruntal, but employed several traders, who actively traded on behalf of SAC Trading.  SAC Trading was a significant and profitable business, including at the time of the divorce holding valuable settlement agreement interests with Lurie and his real estate transactions, as well as trading employees.

102.    However, Steve and Donald conspired with Gruntal, specifically Edward Bao, in September 1988, after Steve filed for divorce, to transfer all of SAC Trading's employees over to Gruntal, to conceal its operations and profitability from Patricia.  And only three weeks after their second and final divorce proceeding, in 1992, Steve and Donald reassembled SAC Trading into SAC Capital and other entities, using employees they had transferred to Gruntal during the pendency of the divorce.

103.    Concerning both the Lurie transactions and the conversion of SAC Trading, Steve and Donald had actual knowledge that their statements were false when they made them and made such statements intentionally so that Patricia would rely upon them.  All of the false representations were material and were reasonably and justifiably relied upon by Patricia.  She had no knowledge of Steve and Donald's fraud, nor could she have known.

104.    As a direct and proximate cause of Steve and Donald's conduct, Plaintiff suffered damages.  As a direct consequence of Defendants' misconduct, Plaintiff was defrauded out of

over $4 million, and her share of SAC Trading as well as therefore a substantial, if not

controlling, interest in SAC Capital and various related entities, now valued at over $12 billion.

### COUNT II – VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") (Against all Defendants)

105.    Plaintiff hereby incorporates by reference Paragraphs 1 through 104 as if set forth

fully herein.

106.    Defendants Steve, Donald, Bao, Lurie, Gruntal, Marvan & Cohen and SAC

Capital, and SAC Trading and Conversion Corp. are and/or were persons within the meaning of

18 U.S.C. § 1961(3), as individuals or entities capable of holding a legal or beneficial interest in

property.  They all associated together in a criminal enterprise, the "SAC Criminal Syndicate,"

within the meaning of 18 U.S.C. § 1961(4), as a group of individuals, including Defendants,

among other corporate instrumentalities and other persons, associated in fact although not a legal

entity.  The SAC Criminal Syndicate's activities were and are still engaged in and affected or

affect interstate commerce.

107.    Defendants were all associated with the SAC Criminal Syndicate and both

conducted and participated, directly or indirectly, in the conduct of the SAC Criminal

Syndicate's affairs through a pattern of racketeering activity over the course of several years

from 1984 continually through the present.

108.    Defendants committed predicate acts of racketeering activity, as that term is

defined by 18 U.S.C. § 1961(1), within ten years in a consistent and related pattern, including but

not limited to the following:

#### Bank Fraud  (18 U.S.C. § 1344)

- In or about February or March 1986, Donald and SAC Trading issued a check drawn on Pan American Bank, N.A., in the amount of $1,996,997 to Lurie, falsely

claiming it was a "Payroll" transaction.  Lurie endorsed and deposited the check on those false pretenses to obtain funds from a financial institution.

• On January 15, 1987, Lurie and Conversion Corp. issued a check drawn on Union Chelsea National Bank, for $335,699.10 to SAC Trading Corp., falsely claiming it was a "Loan-Investment Refund."  SAC Trading endorsed and deposited the check on those false pretenses to obtain funds from a financial institution.

• Upon information and belief, in at least several other related instances, Steve, Donald, SAC Trading, Lurie and Conversion Corp. issued, endorsed and deposited checks under false and fraudulent pretenses to obtain funds from a financial institution.

## Money Laundering (18 U.S.C. § 1956)

• Upon information and belief, in order to conceal and/or disguise the nature, location, source, ownership, and/or control of the proceeds of specified unlawful activity, specifically insider trading, Steve, Donald, SAC Trading, Lurie and Conversion Corp. engaged in the following transactions:

(i)     Steve transferred $290,000 to Lurie on January 10, 1986, $1.5 million to Lurie in or about late January 1986, and $1.5 million to Lurie in our about February 1986, without any contract, agreement or other security or interest concerning the transaction;

(ii)    Donald and SAC Trading sent $2 million to Lurie on March 6, 1986, and an additional $500,00 on March 13, falsely claiming that he was being paid "salary" for "option trading and arbitrage consultation";

(iii)   In or about August 1986, again without any documentation, SAC Trading "loaned" Conversion Corp. $2.75 million;

(iv)    On or about December 8, 1986, Lurie paid Steve $414,300, laundering prior funds he received from Steve and/or SAC Trading;

(v)     On December 26, 1986, SAC Trading paid $250,000 in false "salary" to Lurie, which he promptly endorsed back to SAC Trading in or about January 1986, to conceal and/or disguise the funds;

(vi)    On January 15, 1987, Lurie and Conversion Corp. paid SAC Trading $335,699.10 as a false "Loan-Investment Refund," laundering funds previously received from Steve and/or SAC Trading; and

(vii)   Donald and SAC Trading paid an additional $2.75 million in false "salary" to Lurie in or about January 1987, and in that same month, Lurie endorsed the same $2.75 million back to SAC Trading, laundering the money.

## Mail Fraud (18 U.S.C. § 1341)

• In or around January 29, 1987, Donald and Marvan & Cohen caused to be sent through the United States mail a false and fraudulent W-2 to Brett Lurie, characterizing money laundering payments as "salary."

• On December 8, 1986, upon information and belief, Lurie and Conversion Corp. caused to be sent through the United States mail a false and fraudulent confirmation letter of "loan-investment" transactions that were mere money laundering transactions.

- On January 15, 1987, upon information and belief, Lurie and Conversion Corp. caused to be sent through the United States mail a false and fraudulent "repayment of a loan-investment" that was merely a money laundering payment.
- On March 6, 1986, Donald caused to be sent through Federal Express, a commercial interstate carrier, a fraudulent and misleading money laundering payment disguised as "salary."
- Upon information and belief, on September 27, 1988, Donald caused to be sent through the United States mail, or a commercial interstate carrier, a fraudulent and misleading letter to Edward Bao at Gruntal seeking to execute a scheme and artifice to defraud Patricia concerning the status of SAC Trading and its traders.
- On or about May 6, 1991, Gruntal sent fraudulent and misleading documents to the Honorable Walter M. Schackman and to Martin Kera through Airborne, a commercial interstate carrier, as part of a scheme in connection with misrepresentations by Steve to deceive Patricia concerning the status and value of SAC Trading.
- Upon information and belief, Defendants caused to be sent through the United States mail, or a commercial interstate carrier, fraudulent and misleading documents to execute various aspects of their insider trading, money laundering, bank fraud, and other schemes and artifices, a substantial part of which was to deceive Patricia.

## Wire Fraud (18 U.S.C. § 1343)

- In or about March 1986, Donald used interstate wires in a telephone conversation with Lurie, to plan and execute a false and fraudulent "salary" scheme to launder money through Lurie and Conversion Corp.
- In our about mid-1986, Donald used interstate wires to effectuate a false and fraudulent telephone conversation with Patricia, claiming that Steve had lost all of their investment in a real estate transaction with Lurie. Donald falsely represented the circumstances of the transaction, including the purpose and design of the transactions, which was to conceal information and the funds from the IRS, SEC and Patricia.
- Upon information and belief, in a number of other instances, Defendants used interstate wires to execute various parts of their fraudulent schemes.

109.    And while not enumerated as predicate acts of racketeering activity part of

18 U.S.C. § 1961, Defendants have also committed various acts of insider trading in violation of

18 U.S.C. § 78j(b), trading on the basis of inside information in the merger of GE and RCA, and

insider trading thereafter; perjury in proceedings before the SEC and the New York Supreme

Court; as well as other violations of state and federal law in furtherance of their schemes and

artifices.

110.    In addition, Defendants conspired with each other and other co-conspirators to violate 18 U.S.C. § 1962(d).

111.    As a direct and proximate cause of Defendants' conduct, Plaintiff suffered direct injury to money and property.  As a direct consequence of Defendants' misconduct, Plaintiff was defrauded out of over $4 million and her share of SAC Trading as well as therefore a substantial, if not controlling, interest in SAC Capital and various related SAC entities, now valued at over $12 billion.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment from the Court:

a)    awarding compensatory damages in an amount to be proven at trial, together with interest thereupon;

b)    awarding treble damages under RICO;

c)    awarding reasonable attorneys' fees, expenses, and costs incurred in connection with the institution and prosecution of this action; and

d)    awarding such other and further relief the Court deems just and appropriate under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  April 5, 2010

Respectfully submitted,

KACHROO LEGAL SERVICES, P.C.

By: _____
Dr. Gaytri D. Kachroo (GK2010)
John H. Ray, III (JR1177)

Kachroo Legal Services, P.C.
Kendall Square Center
245 First Street, Suite 1800
Cambridge, MA 02142
(617) 444-8779
(617) 864-1125 (Fax)

gkachroo@kachroolegal.com
jray@kachroolegal.com

*Counsel for Plaintiff Patricia Cohen*

32