UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PATRICIA COHEN,

|  |  |  |
|---|---|---|
| | Plaintiff, | **MEMORANDUM OPINION AND ORDER** |
| v. | | 09 Civ. 10230 (RJH) |
| STEVEN COHEN, DONALD COHEN, and BRETT LURIE, | | |
| | Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Richard J. Holwell, District Judge

Plaintiff Patricia Cohen ("Patricia") brings this action seeking damages from her former husband, defendant Steven Cohen ("Steven"), his brother, Donald Cohen, ("Donald"), and their former business partner, Brett Lurie ("Lurie"), for defrauding her of a share of an investment made during her marriage to Steven. Patricia alleges claims for civil RICO, common law fraud, breach of fiduciary duty, and unjust enrichment. Steven and Donald have moved to dismiss the claims against them as time-barred and for failure to state a claim for which relief can be granted. For the reasons that follow, the motion is granted.

## BACKGROUND

Patricia's Second Amended Complaint ("2AC") alleges as follows. Patricia married Steven in 1979. (2AC ¶ 13.) At that time, Steven was a proprietary trader at Gruntal & Co. ("Gruntal"), a securities firm in New York, New York. (*Id.* ¶ 12.) By 1985, Steven had become a very successful trader, but the Cohens' marriage was far from a success, and they discussed the possibility of a divorce. (*Id.* ¶¶ 14-15.)

1

In January 1986, Steven created SAC Trading Corporation ("SAC"), a New York corporation. (*Id.* ¶16.)  Steven owned 100% of the stock of the corporation and served as President.  Donald served as SAC's Treasurer and Lurie served as SAC's Secretary and counsel. (*Id.*)  Other than the Cohens' apartment, all of the Cohens' marital assets were held by SAC. (*Id.*)  Also in January 1986, Steven told Patricia that he planned to invest "millions of dollars" held by SAC in a real estate venture headed by Lurie whereby properties in Queens, New York would be converted to co-op apartments.  (*Id.* ¶¶ 17, 59.)  This was the "Lurie Investment."

**The Lurie Investment**

According to the 2AC, the Lurie Investment was a fraud.  The properties were purchased by SAC either alone or along with Lurie.  (*Id.* ¶ 56.)  Lurie drafted fraudulent offering plans for proposed co-ops, provided them to Steven, and used the mails to send them to potential purchasers.  (*Id.* ¶ 56, 60.)  Though the 2AC does not allege that Steven affirmatively approved these offering plans, it does allege that he did not propose any "substantive changes" to them. (*Id.*)  In any event, the 2AC alleges that Steven was aware that the offering plans were fraudulent because they represented that Lurie was making required payments when he was not and failed to disclose that Lurie had fallen behind on his financial obligations regarding the conversions. (*Id.* ¶ 58.)

When Lurie could no longer make payments on the properties, they fell into bankruptcy. (*Id.* ¶ 61.)  Lurie was ultimately convicted in New York state court of crimes arising out of the project, including fraud.  (*Id.* ¶ 62.)  In 1987, Steven and SAC sued Lurie over the Lurie Investment "and related financial issues" and Lurie allegedly paid Steven $5.5 million to settle

that suit ("the 1987 Settlement").  (*Id.* ¶ 39.)  The complaint appears to allege that this sum was

paid to a "secret, unnamed company which 'held the profits' of SAC."  (*Id.*)

What Steven and Donald told (or did not tell) Patricia about all of this forms the core of

this case.  Patricia alleges that Steven and Donald told her in 1986 that Steven's entire share of

the Lurie Investment—"almost $9 million"—had been lost, but that the loss could not yet be

written off as such until the properties entered foreclosure or bankruptcy.  (2AC ¶ 20.)  Patricia

alleges that these statements were false because "Lurie had actually repaid $5.5 million to Steven

by January 1987."  (*Id.* ¶ 21.)

**The Cohens' Divorce**

In 1988, Steven and Patricia separated and began negotiating a separation agreement, a

process in which each Cohen was represented by counsel.  (*Id.* ¶ 22.)  During those negotiations,

Steven prepared a "Statement of Financial Condition" as of July 1, 1988 on which the value of

"Queens Coop—Brett Lurie Investment" was listed as $8,745,169.  (*Id.* ¶ 22; *see also* Dec. of

Martin Klotz in Supp. of Defs.' Mot. to Dismiss ("Klotz Dec.") Ex. F at 2.)  Steven directed this

statement to be sent by United States Mail in 1989.  (2AC ¶ 23.)  Also during the negotiations,

supporting his assertions with documents, Steven told Patricia and her attorney, that he still could

not declare the Lurie Investment lost because there had been no foreclosure or bankruptcy decree

regarding the property.  (*Id.* ¶ 24.)  Patricia alleges that Steven never told Patricia that he had

obtained the 1987 Settlement or that SAC's funds were held in a "secret account."  (*Id.* ¶¶ 21, 25,

29.)  Patricia alleges that, in reliance on these representations, she "agreed to a settlement in

which the investment was deemed to be lost—i.e. worthless."  (*Id.* ¶ 26.)  Thus Patricia appears

to allege that Steven and Donald committed fraud by representing that the Lurie Investment was worth nothing when, in fact, Steven had received $5.5 million from Lurie in the 1987 Settlement.

On December 15, 1989, the Cohens, still represented by counsel, entered into a "Stipulation of Settlement and Separation Agreement" (the "Separation Agreement") (*Id.* ¶ 22; Klotz Dec. Ex. D.)  In Articles 14.1, 14.2, and 14.3, the Cohens acknowledged, *inter alia*, that they each had been represented by counsel.  Article 14.4 provided as follows:

> Each party acknowledges a degree of familiarity with and knowledge of the financial circumstances of the other and each party is of the opinion that he and she are sufficiently informed of income, assets, property and financial prospects of the other.  Husband has provided wife with his net worth statement and the statement of financial condition dated as of July 1, 1988, *provided, however, that Husband* makes no representation as to the value of the interest in a second and third mortgage on various properties involved in cooperative conversions in Queens, New York in which the investment was listed on his statement of financial condition dated as of July 1, 1988 at a value of $8,745,169.

(Klotz Dec. Ex. D at 43-44.)  Article 14.5 provided as follows:

> Each party acknowledges that respective counsel have advised that under the Equitable Distribution Law of the State they are each entitled to a full disclosure and valuation of all property owned by the other party and that the complete financial disclosure which could be required if this matter continued in litigation has not been obtained, but both parties have advised their counsel that they are aware of these facts and desire to curtail discovery, are unwilling to litigate the issues and desire to proceed with this Agreement on the limited financial data supplied to date and their own knowledge of the other party's financial affairs.

(*Id.* at 44.)  And Article 19 provided in relevant part as follows:

> 19.3    This agreement is entire and complete and embodies all understandings and agreements between the parties.

> 19.4    No representations or warranties have been made by either party to the other, or by anyone else, except as expressly set forth in this Agreement.  This Agreement is not being executed in reliance upon any representation or warranty not expressly set forth herein.

(*Id.* at 50.)  Patricia alleges that the representations in Article 14 were "fraudulently made to induce [her] to sign the Separation Agreement" and that she "relied on [Steven's] representations [in the Separation Agreement] and in the Financial Statement that he had 'fully disclosed' all his property to her, in consenting to the Separation Agreement."  (2AC ¶ 29.)

At Steven's direction, the Settlement Agreement was sent to Patricia and her attorney by United States Mail.  (2AC ¶ 29.)  By judgment dated March 13, 1990, into which the Separation Agreement was incorporated but not merged, Steven and Patricia were divorced.  (*Id.* ¶ 22; Klotz Dec. Ex. E.)

**The 1991 Action**

In 1991, Patricia brought an action in the Supreme Court of New York, New York County to increase the child support and maintenance owed to her under the Separation Agreement.  (2AC ¶ 30.)  In her motion, Patricia asked the court to set "aside the Separation Agreement between the parties upon the grounds that it is unconscionable and was procured by fraud and economic duress."  (Klotz Dec. Ex. G at 2.)  Patricia also submitted an affidavit dated March 20, 1991 in which she affirmed as follows:

> Although the Separation Agreement was executed on December 15, 1989, plaintiff would not disclose his income for 1989 and insisted upon filing a separate income tax return. Because we were still married, and there were fifteen days left in the year, plaintiff could have filed a joint return with me.  However, he chose to file under married filing separately even though it meant paying a higher tax.  I must assume that he did this because he did not want to disclose his substantially increased income.

(*Id.* at 2-3.)  Steven submitted his own affidavit on May 1, 1991 (Dec. of Howard Foster in Supp. of Pl.'s Opp. to Defs.' Mot. to Dismiss ("Foster Dec.") Ex. B") in which he affirmed as follows:

> 15. The reason I did not file a joint income tax return with my wife for 1989 was not that I did not want to disclose my income.  Why would I hide the fact that my

5

income had decreased so drastically?  The simple reason I filed separately is that when the tax returns were due defendant was making things difficult for me and was very uncooperative.  I did not want to have to ask her to sign extensions of time to file, since I was not ready to file on April 15.  Rather than get involved with her deductions and her problems, I chose to file separately.

16.  Prior to entering into the Agreement defendant was furnished with a copy of a statement of our financial condition as of July 1, 1988.  This statement indicated a net worth of $16,930,537, $8,745,169 of which was represented by a real estate deal with Brett Lurie (coop mortgages) and this was so indicated on the statement. The Brett-Lurie deal is presently involved in bankruptcy proceedings.  Even then I suspected that this would happen because the general partner was in default. I am writing it off as totally worthless.  Subtracting the value of Brett-Lurie from my net assets at that time means that my net worth was $8,185,368.  Defendant's equitable distribution award pursuant to the Agreement was close to $5 million, or more than 50% of my net worth in the real world.  Obviously, it was not unconscionable.

(Foster Dec. Ex. B. at 8-9 (emphasis in original).)  At Steven's direction, his signed affidavit was mailed to Patricia's counsel by U.S. Mail.  (2AC ¶ 33.)  Patricia alleges that this affidavit was false because Steven had received the 1987 Settlement and that the affidavit "succeed[ed] in preventing [her] from investigating the Lurie real estate deal."  (*Id.* ¶¶ 32, 34.)

In response to Steven's affidavit, Patricia's counsel in the 1991 action, Martin S. Kera, submitted an affidavit dated August 9, 1991 in which he averred as follows:

3.  Mr. Cohen's affidavit is most remarkable for what it doesn't contain. Conspicuously absent is his 1990 income tax information, his 1991 year to date income information and his official form Net Worth Affidavit which is required under the Uniform Court Rules.  Defendant is entitled to an inference that plaintiff did not disclose his finances because it would reveal that he had made more money than he is stating in his affidavit in opposition.  This clearly indicates the problem that Mrs. Cohen had with Mr. Cohen both during the matrimonial negotiations and the present time.  He does not want to truthfully disclose his income.  He didn't want to disclose it during the matrimonial proceedings and he is refusing to disclose it now before the Court.

4.  Defendant and I believe that Mr. Cohen has not truthfully stated his income. Upon information and belief, Mr. Cohen did one of the following: (1) had payments of his income made to his wholly owned corporation, S.A.C. Trading

> Corp., (2) had payments of his income made directly to his brother Donald, who
> is his accountant, or (3) deferred payment of his compensation to a later year so
> that his income tax return during 1989 did not show his true income.  In fact his
> 1989 tax return shows an address in Miami, Florida which I believe is his
> brother's office.  It is believed that a true showing of Mr. Cohen's income and
> earnings for 1990 and 1991 will pick up some of the deferment of his
> compensation and give a true picture of his finances.

(Klotz Dec. Ex. I at 1-2.)  Patricia's brief before the Court also argued that Steven "misled

[Patricia] into believing that he would not receive certain moneys from his employer Gruntal &

Company, because they were needed to pay commissions to his employees.  In fact, the

commissions were less than anticipated.  Plaintiff did in fact receive these moneys."  (Foster

Dec. Ex. A at 7.)

On August 6, 1991, Justice Schackman issued a decision in which he held, *inter alia*, that

Patricia's "motion to set aside the separation agreement on the grounds it was procured by fraud

and economic duress is permitted to be withdrawn without prejudice to institute a separate

plenary action on this basis if [Patricia] is so advised."  (Klotz Dec. Ex. J. at 1.)   On January 6,

1992, Patricia and Steven signed an amendment to the Separation Agreement that modified some

of the payments owed to Patricia but did not change Article XIV or otherwise refer to the Lurie

Investment.  (Klotz Dec. Ex. K.)

In 2006, Patricia read an article about Gruntal "which depicted the firm as less than an

honorable institution" and stated that one Edward Bao, who had signed documents produced in

the Settlement Agreement negotiations, had been convicted of fraud.  (2AC ¶ 35.)  As a result,

Patricia began to question the circumstances of the divorce settlement.  (*Id.* ¶ 36.)  In August

2008, Patricia "inadvertently found the court file in *Steven Cohen and SAC Trading Corp. v.*

*Brett Lurie and Conversion Funding Corp.*, No. 8981/87" in which she discovered the 1987

Settlement and the alleged secret SAC accounts.  (*Id.* ¶ 39.)

**Procedural History**

On April 5, 2010, Patricia filed the original complaint [1] in this action.  (Klotz Dec. Ex.

B.)  Following a motion [2] by her counsel to withdraw, Patricia voluntarily withdrew [10] the

original complaint on January 12, 2010.  Represented by new counsel, Patricia filed an amended

complaint [19] on April 7, 2010 against Steven, Donald, Lurie, Edward Bao, Gruntal, and SAC.

(Klotz Dec. Ex. C.)  On May 7, 2010, Defendants moved [29] to dismiss the amended complaint.

Before Patricia filed an opposition to that motion, her new counsel moved [35] to withdraw on

June 9, 2010.  Represented by yet another new counsel, Patricia moved [48] on July 29, 2010 for

leave to file a second amended complaint and to vacate briefing of defendants' motion to dismiss

the first amended complaint.  Steven and Donald having agreed to that request, the Court granted

[51] Patricia leave to amend.  Patricia soon after voluntarily dismissed [50] the action against

Bao and Gruntal.

The 2AC alleges four causes of action.  First, the 2AC alleges a civil RICO claim.  The

2AC alleges that SAC and Gruntal constituted RICO enterprises, that Steven participated in the

Gruntal enterprise and that Steven, Donald, and Lurie participated in the SAC enterprise; and

that through their participation in these enterprises, Steven, Donald, and/or Lurie committed four

RICO predicate offenses: (1) the "Scheme Against Patricia" in which Steven and Donald

employed mail fraud to deprive Patricia of her share of the 1987 Settlement under the Settlement

Agreement; (2) the Co-Op Scheme in which Steven and Lurie conspired to commit the Lurie

Investment fraud; (3) a 1985 insider trading scheme in which Steven and Donald traded in their

8

capacity at Gruntal on the basis of inside information regarding RCA (2AC ¶¶ 46-52); and (4) a 1991 stock manipulation scheme that Steven allegedly perpetrated at Gruntal.  (*Id.* ¶¶ 64-67.) In addition, the 2AC alleges claims of both fraud and breach of fiduciary duty against Steven, Donald, and Lurie as well as unjust enrichment against Steven alone.

Steven and Donald moved [52] under Federal Rule of Civil Procedure 12(b) to dismiss the 2AC as time-barred and for failure to state a claim for which relief can be granted.

## LEGAL STANDARD

"Courts ruling on motions to dismiss must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor."  *Dickerson v. Mut. of Am.*, 703 F. Supp. 2d 283, 290 (S.D.N.Y. 2010).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" and courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 1949.  Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S.Ct. at 1949.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'"  *Id.*  (quoting *Twombly*, 550 U.S. at 557).

9

"In considering a motion under Fed. R. Civ. P. 12(b)(6) to dismiss a complaint for failure to state a claim on which relief can be granted, the district court is normally required to look only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).   In this case, however, the 2AC refers to several documents not annexed to or formally incorporated into the pleadings and the parties have both submitted many of these documents to the Court in their briefing of this motion.  That raises the question of whether the Court may appropriately consider those documents in resolving Steven and Donald's motion to dismiss.[1]

"If, on such a motion, 'matters outside the pleading are presented to and not excluded by the court,' the court should normally treat the motion as one for summary judgment pursuant to Fed. R. Civ. P. 56." *Id.* (quoting *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154-55 (2d Cir. 2006)).   However, "[w]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992).  Hence, "[i]n certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6)" and "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint*'" may be considered by the court in ruling on such a motion." *Roth*, 489

---

[1] The question is not purely academic with respect to whether Patricia's claim is time-barred based on her 1991 allegations.  The 2AC merely indicates that Patricia brought an action in 1991 seeking to increase the payments due to her.  (2AC ¶ 30.)  That alone would be insufficient to show that Patricia was on notice of the fraud she alleges in this case.  However, Steven and Donald argue that documents evincing Patricia's affirmations and allegations in the 1991 action show that she was on inquiry notice of the fraud she alleges here.  (Defs.' Br. at 4, 10-11.)

10

F.3d at 509 (quoting *Cortec*, 949 F.2d at 47) (emphasis in original). "This principle has its greatest applicability in cases alleging fraud." *Id.* Thus "where public records that are integral to a fraud complaint are not attached to it, the court, in considering a Rule 12(b)(6) motion, is permitted to take judicial notice of those records." *Id.* Indeed, "a court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation but rather to establish the fact of such litigation and related filings." *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 157 (2d Cir. 2006); *see also Marshall v. Milberg LLP*, No. 07-CV-6950, 2009 WL 5177975, at *3 (S.D.N.Y. Dec. 23, 2009) ("[A] court also may take judicial notice of . . . prior lawsuits without converting a motion to dismiss into a motion for summary judgment.  The court simply notes the existence of the information without considering it for the truth of the matters asserted therein.").

These principles plainly endorse consideration of the documents the parties have placed before the Court.  Patricia refers to several of these documents in the 2AC.  At the heart of her complaint are the allegations that Steven and Donald schemed to defraud her of her share of the 1987 Settlement by making oral and written misrepresentations during the course of the divorce negotiations and the 1991 proceedings as well as by sending via United States Mail various documents connected to those misrepresentations. At the heart of such allegations are the agreements that Patricia was allegedly fraudulently induced to sign, the documents containing the false representations, and the documents submitted in the 1991 proceeding.  Accordingly, the Court will consider those documents in disposing of this motion to dismiss.

## DISCUSSION

### A.  Failure to State a Claim

Each of the claims alleged in the 2AC sounds in fraud.  Accordingly, they are subject to

the heightened pleading standards of Rule 9(b).  "[I]n order to comply with Rule 9(b), the

complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006)

(quotation marks omitted).  The same is true of RICO predicate acts.  *See First Capital Asset*

*Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 178 (2d Cir. 2004).  ("[A]ll allegations of

fraudulent predicate acts are subject to the heightened pleading requirements of Federal Rule of

Civil Procedure 9(b).").  Thus "[a]llegations of predicate mail and wire fraud acts 'should state

the contents of the communications, who was involved, [and] where and when they took place,

and [should] explain why they were fraudulent.'"  *Spool v. World Child Int'l Adoption Agency*,

520 F.3d 178, 185 (2d Cir. 2008) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176

(2d Cir. 1993)).  Moreover, while fraudulent intent can be alleged generally, long-standing case

law in this Circuit requires plaintiffs alleging claims sounding in fraud, including RICO claims,

to "allege facts that give rise to a strong inference of fraudulent intent."  *Moore v. PaineWebber,*

*Inc.*, 189 F.3d 165, 173 (2d Cir. 1999).  Patricia has not done so here.

Patricia appears to allege at least three fraudulent statements.  First, Patricia alleges that

"in 1986 Steven and Donald told [her] that Steven had lost the entire value of the Lurie

[I]nvestment which they stated was 'almost $9 million.'" (2AC ¶ 20.)  Patricia alleges that

"Steven's statements . . . indicating that her had lost the entire Lurie [I]nvestment were false"

because "Lurie had actually repaid $5.5 million to Steven by January 1987." (2AC ¶ 21.) That

allegation makes no sense. The truth of a statement about the value of an asset in 1986 cannot

possibly turn on income received in or by 1987. Accordingly, far from giving rise to strong

inference that Steven made the statement with fraudulent intent, the 2AC does not state a claim

that the 1986 statement was fraudulent at all.

Second, Patricia alleges that, in 1988 and 1989, "[d]uring the discussions surrounding the

Separation Agreement at Patricia's lawyer's office, Steven told Patricia and her lawyer that he

was still not able to declare the [L]urie [I]nvestment lost because there was still no bankruptcy or

foreclosure decree" and that "Steven's lawyer also told her that the money was lost – a 'losing

trade.'" (2AC ¶ 24.) Patricia alleges that, by relying on these statements, she "was fraudulently

induced to accept the Separation Agreement." (*Id.* ¶ 27.) The 2AC does not explicitly state why

these statements were false, but the allegation appears to be that statements in 1988 and 1989

that the Lurie Investment was "lost" were false because Steven had received the 1987

Settlement. In other words, Patricia appears to allege that when Steven and Donald told her that

the $8,745,169 item on the July 1, 1988 Financial Statement was really zero, those statements

were false because the item should have read $5.5 million.

This, too, makes little sense. The 2AC alleges that "Steven had sued Lurie in 1987 over

his investment in the real estate and related financial issues and that Steven received $5.5 million

of this money back from Lurie as part of a settlement executed that same year." (2AC ¶ 39.)

This bare allegation says nothing about the value of the real estate underlying the Lurie

Investment. Indeed, given that the $5.5 million was allegedly paid as a settlement, there is

simply no way to tie the 1987 Settlement to the financial condition of the Lurie Investment.

Rather, the possibility that the 1987 Settlement reflected Lurie's desire to avoid litigation is equally plausible as the possibility that the $5.5 million represented some portion of Steven's investment in or income from the Lurie Investment.

Yet even assuming that the 1987 Settlement represented income from the Lurie Investment, it makes no more sense to assess the truth of a statement regarding an asset's value in 1988 based on income the owner received a year before than to assess the statement based on income the owner received a year later.  There is no logical inconsistency between the fact that the owner of a real estate asset received $5.5 million in income from it at one time and a statement that the value of the asset as a going concern one year later is zero.  The latter is simply a statement that the asset had no net worth at that time.  To treat such a statement as an actionable fraud would mean that a statement of current value is also an implicit representation about prior income, which also must be disclosed to prevent the statement from being misleading.  Patricia points to no authority for that proposition and the Court is aware of none.

Finally, Patricia also appears to allege that Steven falsely represented "that he had 'fully disclosed' all his property to her" because he had not disclosed the 1987 Settlement on the July 1, 1988 Financial Statement. (2AC ¶ 29.)   Indeed, at oral argument, counsel for Patricia argued that the "$5.5 million in cash that's at issue in this case could not have been listed anywhere else on the financial statement."  (Tr. of Hr'g, Jan. 31, 2011, at 23:19-21.)  As an initial matter, that is hardly obvious, since the Financial Statement lists more than $5.5 million in personal assets. (*See* Klotz Dec. Ex. F. at 1.)   But in any event, Patricia's complaint is bereft of any explanation as to why, on a Financial Statement titled "*as of* July 1, 1988" (Klotz Dec. Ex. F. at 1), Steven had an obligation to disclose funds he had received more than one year before that date.  A

financial statement is "[a] balance sheet, income statement, or annual report that summarizes an individual's or organization's financial condition *on a specified date* or for a specified period by reporting assets and liabilities."  Black's Law Dictionary (9th ed. 2009) (emphasis added).  Yet as counsel acknowledged, the fact that Steven had received the 1987 Settlement in or by January 1987 says nothing about his assets as of the specified date—July 1, 1988 or whenever he represented in the negotiations that the Financial Statement was complete.  The 1987 Settlement "could have been paid to [Steven] in January 1987 and he could have . . . spent it, or something, or it was just gone by the time he prepared his financial statement in July of 1988."  (Tr. of Hr'g, Jan. 31, 2011, at 23:25-24:3.)  Counsel contended that this is "a question of fact," that he and Patricia "don't believe that occurred," and that they instead "think that [Steven] had that $5.5 million and he didn't list it on his financial statement."  (*Id.* 24:3-7.)  But Patricia's mere belief that Steven still had the $5.5 million when he represented that he had fully disclosed his assets raises nothing "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 129 S.Ct. at 1949.  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 556.  Accordingly, the 2AC fails to state a claim sounding in fraud.  Since all four claims sound in fraud, all four of those claims must be dismissed.

### B.  Statute of Limitations

Steven and Donald also move to dismiss the claims against them as barred by the applicable statutes of limitations.  The Court will consider each claim in turn.

### 1.  RICO

There is a four year statute of limitations for RICO actions.  *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).  In a civil RICO action, "a plaintiff's

action accrues against a defendant for a specific injury on the date that plaintiff discovers *or should have discovered* that injury." *Bankers Trust v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir. 1988) (emphasis added).  "The limitations period for a fraud-based RICO action commences when Plaintiffs are placed on notice of facts which should arouse suspicion." *In re Integrated Res., Inc. Real Estate Ltd. P'Ships Sec. Litig.*, 851 F. Supp. 556, 567 (S.D.N.Y. 1994).  Indeed, "the limitations period does not begin to run until [plaintiffs] have actual or inquiry notice of the injury." *In re Merrill Lynch Ltd. P'Ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998).

The notion of inquiry notice encapsulates the principle that "[t]he means of knowledge are the same thing in effect as knowledge itself." *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983).  And "[w]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." *Id.*  Similarly, "[i]n the case of a RICO claim predicated on fraud, a plaintiff should have discovered his injury when he has received information sufficient to alert a reasonable person to the probability that he has been misled." *Takeuchi v. Sakhai*, No. 05-CV-6925, 2006 WL 119749, at *2 (S.D.N.Y. Jan. 17, 2006).  In a fraud-based RICO action, "[k]nowledge of an injury is imputed on the basis of inquiry notice in two ways:  (1) if the plaintiff 'makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose;' but (2) if 'some inquiry is made [after the duty arises], we will impute knowledge of what [a plaintiff] in the exercise of reasonable diligence should have discovered concerning the [injury], and in such cases the limitations period begins to run from the date such inquiry should have revealed the [injury].'" *Marshall*, 2009 WL 5177975,

at *3 (quoting *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 167-68 (2d Cir. 2005)).

"Therefore, on a motion to dismiss, a RICO claim will be time-barred if the facts alleged in the complaint indicate that the plaintiff, with reasonable diligence, should have uncovered the alleged fraud prior to the limitations period." *Butala v. Agashiwala*, No. 95-CV-936, 1997 WL 79845, at *3 (S.D.N.Y.  Feb. 24, 1997).

"A court may determine as a matter of law whether plaintiffs were on inquiry notice. Such a determination is appropriate when the facts from which knowledge may be imputed are clear from the complaint and papers integral to the complaint." *Ezra Charitable Trust v. Frontier Ins. Group, Inc.*, No. 00-CV-5361, 2002 WL 87723, at *2 (S.D.N.Y. Jan. 23, 2002) (internal citation omitted).  The Court "recognize[s] that whether a plaintiff had sufficient facts to place it on inquiry notice is 'often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6).'" *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 156 (2d Cir. 2003) (quoting *Marks v. CDW Computer Centers, Inc.,* 122 F.3d 363, 367 (7th Cir. 1997)). But "[w] here, the facts needed for determination . . . can be gleaned from the complaint and papers . . . that are integral to the complaint, resolution of the issue on a motion to dismiss is appropriate." *Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 352 n. 3 (2d Cir. 1993); *see also In re Gen. Dev. Corp. Bond Litig.*, 800 F. Supp. 1128, 1136 (S.D.N.Y. 1992) ("Because the test as to when fraud should with reasonable diligence should have been discovered is an objective one, a court's determination that the information available to a plaintiff in a given instance should (or should not) have given him reason to consider and investigate the probability of fraud is surely warranted in appropriate cases.") (internal citation omitted).   Hence the Second Circuit has rejected the "suggestion that the question of constructive notice is an improper subject for

17

resolution as a matter of law" and has noted that there are "a vast number of cases in this circuit resolving these issues at the pleading stage." *Dodds*, 12 F.3d at 352 n.3. "Once the facts on the face of the complaint and related documents give rise to a duty of inquiry, it is appropriate to require a plaintiff, resisting a motion to dismiss on limitations grounds, at least to allege that inquiry was made." *LC Capital Partners*, 318 F.3d at 156.

Here, Patricia's injury seems to have occurred on December 15, 1989 when she signed the Settlement Agreement which, because of Steven and Donald's RICO predicate offense of mail fraud, she alleges she was fraudulently induced to sign. Patricia, however, alleges that, because of Steven and Donald's fraud, she did not know and could not have discovered the fraud before August 2008 when she "inadvertently" came across the court file detailing the 1987 Settlement. (2AC ¶ 34.) In their motion to dismiss, Steven and Donald argue that Patricia's 1991 action demonstrates that she was on notice that Steven and Donald had misrepresented the value of the Lurie Investment. (*See* Defs.' Br. at 10-15; Defs.' Reply at 1-5.) The question, then, is whether Patricia's 1991 allegation that Steven had defrauded her with regard to the Settlement Agreement indicated that she was on inquiry notice in 1991 of the fraud she complains of here.

"[I]n this Circuit, awareness of other lawsuits . . . involving a defendant puts a plaintiff on inquiry notice of the probability of fraud within another transaction involving the defendant." *Lenz v. Associated Inns and Restaurants Co. of Am.*, 833 F. Supp. 362, 375 (S.D.N.Y. 1993); *see also Weiss v. La Suisse, Societe D'Assurance Sur La Vie*, 381 F. Supp. 2d 334, 339 ("It is well settled that the filing of a lawsuit by private parties puts plaintiffs with identical claims on notice of their potential claims."); *Korwek v. Hunt*, 646 F. Supp. 953, 958 (S.D.N.Y. 1986) ("The filing

of lawsuits by private parties has been held in this circuit to put plaintiffs on notice of their potential claims."). Indeed, courts in this Circuit have found fraud actions time-barred where a plaintiff's allegations are similar to those that have been previously made in writing either by the plaintiff herself or by others. *See, e.g.*, *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 410 (2d Cir. 1975) (affirming dismissal where "[m]uch of the fraud alleged here was also alleged" in a prior fraud action against twenty of the same defendants); *Calzaturifico Rangoni S.p.A. v. United States Shoe Corp.*, 868 F. Supp. 1414, 1416, 1420-21 (S.D.N.Y. 1994) (dismissing false trademark registration claim as time-barred under applicable six-year statute of limitations where, seven years before the plaintiff filed suit, plaintiff's counsel wrote a letter accusing the defendant of fraud in registering the trademark); *Weiss*, 381 F. Supp. 2d at 339 (dismissing claims where other plaintiffs in the same community had filed nearly identical claims "because the filing of that lawsuit is sufficient evidence that the alleged bad acts were discoverable by the date of the filing of the first lawsuit"); *Korwek*, 646 F. Supp. at 958 (dismissing claim as time-barred where "[p]laintiffs had the opportunity to learn of the general fraudulent scheme which is at the heart of their complaint" because "there were . . . several lawsuits filed . . . alleging the same conspiracy against many of the same defendants as plaintiffs charge in this case").

Two cases provide examples. In *Aibinder v. Kelleher*, No. 92-CV-7315, 1997 WL 420279 (S.D.N.Y. July 25, 1997) (Sotomayor, J.), the plaintiff alleged that the defendants, who were employees of a clearing broker, were responsible for executing unauthorized trades on his brokerage account and for fraudulently inducing him into signing a promissory note indemnifying the clearing broker for losses on the trades. When the plaintiff had defaulted on

the promissory note, the broker brought a claim to recover on the note.  In that proceeding, the plaintiff submitted a signed affidavit alleging that the trades and the "promissory note were acts of fraud."  *Id.* at *5.  With respect to the later suit, the court found that "the plaintiff's own words indicate[d] that he had actual knowledge of the alleged fraud" outside the statute of limitations period.  *Id.*

In *Ezra Charitable Trust v. Frontier Insurance Group, Inc.*, No. 00-CV-5361, 2002 WL 87723 (S.D.N.Y. Jan. 23, 2002), the plaintiff filed a securities fraud action similar to one that had been filed in the Eastern District of New York by plaintiffs represented by the same counsel. "The complaints in both lawsuits involve[d] similar allegations that [the defendant] failed to disclose its inadequate loss reserves and did not sufficiently monitor its operations."  *Id.* at *5. The court found that "the mere existence of the Eastern District litigation should have alerted plaintiffs to possible fraud."  *Id.*  Thus, where a plaintiff either alleged or should have been aware that others had alleged a fraud in a prior suit, a subsequent suit alleging the same fraud is time-barred.

Does the instant suit allege the same fraud as Patricia alleged in 1991?  Certainly Patricia's allegations in 1991 seem similar to those she has made here.  In 1991, she asked a court to set "aside the Separation Agreement between the parties upon the grounds that it is unconscionable and was procured by fraud and economic duress."  (Klotz Dec. Ex. G at 2.)  Here Patricia alleges that she "was fraudulently induced to accept the Separation Agreement" because she "relied on Steven and Donald's misrepresentations about the Lurie [I]nvestment . . . ."  (2AC ¶¶ 26-27.)  However, Patricia argues that the 1991 action did not relate to the Lurie Investment. (Pl.' Opp'n at 8-9.)  And, indeed, on closer inspection, the allegations are not identical.

20

Patricia's 1991 affidavit alleged that Steven "would not disclose his income for 1989 and insisted upon filing a separate income tax return." (Klotz Dec. Ex. G at 2.) Rather, "he chose to file under married filing separately even though it meant paying a higher tax. [Patricia felt she] must assume that he did this because he did not want to disclose his substantially increased income." (*Id.* at 2-3.) Patricia's counsel in the 1991 action did allege she was "entitled to an inference that [Steven] did not disclose his finances because it would reveal that he had made more money than he is stating in his affidavit in opposition." However, like Patricia's reference to Steven's "income for 1989", her counsel went on to specify that Steven directed payments to SAC or Donald or "deferred payment of his compensation to a later year so that his income tax return during 1989 did not show his true income." (Klotz Dec. Ex. I at 1-2.) And Patricia's brief in the 1991 action alleges that Steven "misled [Patricia] into believing that he would not receive certain moneys from his employer Gruntal & Company, because they were needed to pay commissions to his employees." (Foster Dec. Ex. A at 7.) The 1987 Settlement, however, was allegedly paid in 1987, not 1989. Thus, there is some merit to Patricia's argument that "the dispute over Steven's income was limited to . . . income from his *employer*." (Pl.'s Opp'n at 8 (emphasis added).) *See Dietrich v. Bauer*, 76 F. Supp. 2d 312, 345 (S.D.N.Y. 1999) ("[T]here is no absolute rule in the Second Circuit that the filing of a lawsuit alleging fraud against a defendant is sufficient to place a plaintiff on inquiry notice of other fraudulent acts by the same defendant.").

But it is also true that one "does not have to have notice of the entire fraud being perpetrated to be on inquiry notice." *Dodds*, 12 F.3d at 352; *see also Brimo v. Corporate Express, Inc.*, 229 F.3d 1135, 2000 WL 1506083 at *2 (2d Cir. Oct. 6, 2000) ("It is not necessary

that this information put a plaintiff on notice of the entire wrongdoing.").  And where a plaintiff "alleges various frauds," the plaintiff "need not know the details of each fraud in order to be placed on inquiry notice."  *Staehr v. Hartford Fin. Serv. Group, Inc.*, 547 F.3d 406, 434 (2d Cir. 2008).   Indeed, where a plaintiff's own affidavit indicates that she was suspicious of activity in connection with a transaction that the plaintiff now contends was fraudulent, "[i]t is of no moment" that a plaintiff did not discover until later "the full enormity" of the alleged fraudulent scheme.  *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir. 1970).  Rather, such a plaintiff "had by [her] own admission sufficient knowledge [at that time] to put [her] on notice as to *any* alleged fraud. Therefore, the statutory period began to run then and did not await appellant's leisurely discovery of the full details of the alleged scheme."  *Id.* (emphasis added).

Accordingly, the particular question here is whether the complaint and documents attached or integral to it establish that Patricia's 1991 allegation of fraud with respect to Steven's Gruntal income placed her on inquiry notice of any fraud with respect to the 1987 Settlement. On that question, several cases from this Circuit are instructive.

The first is *Staehr*, a securities fraud suit in which the plaintiff alleged (a) "that The Hartford entered into contingent commission kickback arrangements with insurance brokers in order to increase The Hartford's market share and artificially inflate its insurance prices"; (b) "that The Hartford . . . engaged in 'bid rigging' with insurance brokers, to eliminate competition and artificially inflate the price of insurance products"; and (c) that "The Hartford and its senior officers misled investors by failing to disclose The Hartford's participation in the insurer-broker contingent commission kickback and bid-rigging schemes."  *Staehr*, 547 F.3d at 409.  The defendants moved to dismiss the claim as time-barred on the ground that, *inter alia*, third-parties

had filed a complaint in California state court against several Harford subsidiaries that "contained many allegations that appear in the instant complaint concerning the broker-insurer commission scheme (*though no allegations about bid rigging or price manipulation*)."  *Id.* at 418 (emphasis added).  "Although [the prior suit did] not allege that The Hartford's subsidiaries misled investors by touting The Hartford's business success without disclosing that this success was premised on bid-rigging and revenue inflation schemes," the Second Circuit found that its prior "decisions would not prevent us from finding that [the prior complaint] triggered inquiry notice, even though that complaint did not discuss the bid-rigging scheme that is one of the bases of their complaint."  *Id.* at 434-35.  Rather, "[s]pecific allegations that The Hartford's subsidiaries failed to disclose kickback schemes, which [we]re made in [the prior complaint] should alert a reasonable investor that something is wrong, and thus would trigger a duty to inquire further."  *Id.* at 435 (internal citation omitted).

It is true that the *Staehr* court ultimately reversed the district court's decision that the claim was time-barred because it "ha[d] not been demonstrated that this obscure and unpublicized lawsuit was reasonably accessible . . . ."  *Id.*  And it is tempting to draw an analogy between that "unpublicized lawsuit" and the court file for Steven's lawsuit against Lurie.  But that comparison would be apples to oranges.  The question here is not whether Patricia was aware of the 1987 Settlement but rather whether her own 1991 suit against Steven—of which she was certainly aware—put her on inquiry notice of other frauds by Steven in connection with their divorce settlement.  Hence the proper analogy is between the prior lawsuit in *Staehr* and Patricia's 1991 lawsuit.  And if a prior lawsuit by a *third party* alleging that the defendant fraudulently failed to disclose one piece of information places a plaintiff on inquiry notice that

"something is wrong," and imposes a duty to investigate not only the fraud previously alleged but other related frauds, Patricia's *own* prior lawsuit alleging that Steven hid some assets in connection with the divorce settlement placed her on inquiry notice that "something was wrong" and required her to investigate Steven's other representations regarding his assets in the settlement negotiations.  Patricia's allegation that Steven hid his income from 1989 placed her on inquiry notice that Steven did not disclose income from 1987 in the form of the 1987 Settlement.  *Cf. Domenikos v. Roth*, 288 Fed.Appx. 718, 720 (2d Cir. 2008) (affirming dismissal of complaint alleging fraud as to financial statements in 1999 and the first half of 2000 because "class-action allegations, while pertaining explicitly only to financial reporting for the second half of 2000, would have alerted an investor of ordinary intelligence that financial statements issued earlier in 2000 and in 1999 may have suffered from the same infirmities").

  Patricia quotes the Second Circuit's statement in *Staehr* that "[f]or inquiry notice to exist, the triggering information must relate directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants."  (Pl.'s Opp'n at 11 (quoting *Staehr*, 547 F.3d at 427).)  Of course, the fraud related to Steven's Gruntal income that Patricia alleged in 1991 was not exactly the same as the fraud she alleges in the instant suit regarding the Lurie Investment, but that does not mean that the prior allegation does not establish inquiry notice. The Second Circuit in *Staehr* made the just quoted statement in referring to news reports, not the prior lawsuit discussed above.  And the *Staehr* court, like the Second Circuit in other cases, was contrasting allegations of company-specific fraud with "non-specific public pronouncements" regarding market-wide events or activity.  *Staehr*, 547 F.3d at 428 ((quoting *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 171 (2d Cir. 2005)).  *Cf. id.*  ("The articles cited by the district court

describe the conflicted situation of Wall Street's research analysts; but evidence of the outright falsity of Merrill Lynch's investment recommendations is stray and indiscriminate at best, and is insufficient to put plaintiffs on inquiry notice of the specific frauds alleged."); *Staehr*, 547 F.3d at 428 ("As we have noted, none of the other three mainstream press stories in the record mentions The Hartford, either.  Nor do twelve of the thirteen articles from industry newsletters.").  But this is not a case where Patricia was only generally aware that husbands sometimes hide assets from their soon to be ex-wives.  Nor is this a case where Patricia was aware of one fraud in one part of a large corporation and now alleges unrelated fraud at a different division of the same company.  Rather, this is a case where, some twenty years ago, Patricia alleged the same kind of fraud—hiding assets—by the same person—Steven—in the same negotiations at the same time.  With respect to that transaction, treating fraud as to one asset as entirely separate from fraud as to another asset is slicing things too thin.

For that reason, this case is distinguishable from *Dietrich*, 76 F. Supp. 2d at 345, in which the court emphasized that "there is no absolute rule in the Second Circuit that the filing of a lawsuit alleging fraud against a defendant is sufficient to place a plaintiff on inquiry notice of other fraudulent acts by the same defendant."  *Id.  Dietrich* was similar to *Ezra Charitable Trust*: plaintiffs' counsel had filed a securities fraud action against the same defendant whom the plaintiff now sued for fraud.  *See id.* at 344.  Yet unlike in *Ezra Charitable Trust*, the prior suit in *Dietrich* and the plaintiff's suit involved different frauds at different times:  the prior suit alleged fictitious sales whereas the suit at bar related to market manipulation and the illegal sale of unregistered stock.  *See id.*  Accordingly, the court found that the plaintiff's suit was not time-barred.  *See id.* at 345; *see also In re Alstom SA*, 406 F. Supp. 2d 402, 424 (S.D.N.Y. 2005)

("[T]hat Plaintiffs allege the same motive behind both the . . . [f]rauds does not automatically mean that when Plaintiffs received notice of one aspect of that scheme, they were on notice of the entire scope of the alleged deception where, as here, the fraud involved entirely separate courses of conduct relating to different products of different divisions of the company.").

But where a plaintiff has made prior allegations regarding a very similar fraud, courts in this district have found subsequent suits time-barred even where the plaintiff alleges fraud with respect to a different set of assets. *Klein v. H.N. Whitney, Goadby & Co.*, 341 F. Supp. 699 (S.D.N.Y. 1971), for example, involved "claims of fraudulent transactions involving 80 shares of Superior Oil stock during 1962 and 1963." *Id.* at 700. The plaintiff commenced the action in 1970, but had filed three prior actions, one in 1965 and two in 1968, "in which he also complained about asserted fraudulent trades of Superior Oil stock . . . ." *Id.* at 701. In one of the 1968 actions, the plaintiff submitted a verified affidavit stating that in 1966 "during the course of another action against [the defendants] he became suspicious of the 'manipulations' of [the] defendants in Superior Oil stock 'generally.''" *Id.* When defendants moved to dismiss the 1970 action as time-barred, plaintiff argued "that the 80 shares of Superior Oil involved in this lawsuit are entirely different shares than those involved in some of his prior litigations . . . ." *Id.* at 702. Taking that representation as true, the court nevertheless dismissed the 1970 action on the ground that, even "[i]f these suspicions did not constitute actual discovery, they surely would have prompted a man of reasonable diligence to conduct further investigations" in 1966. *Id.*

Further, another court in this district has found that a plaintiff who has reason to believe that a third-party is a fraudster has a duty to investigate whether the third-party has committed frauds other than those the plaintiff knows about. In *Lenz v. Associated Inns and Restaurants*

*Company of America*, 833 F. Supp. 362, 375 (S.D.N.Y. 1993), a fraud action against a real estate venture, the plaintiff became aware through news reports that a principal of the venture had been convicted of a fraud entirely unrelated to the plaintiff's investment in the venture.  The court found that "this should have set off alarm bells" because the convict had "made the representations concerning [the venture] that [the plaintiff] had relied upon in the face of contradictory written partnership agreements, reliance predicated at least in part upon [the plaintiff's] regard for [the convict] as an investment expert who, along with the rest of the general partnership would 'take care of' [the plaintiff] notwithstanding the written disclaimers." *Id*.  The court found it particularly notable that the plaintiff became aware that the third-party had been convicted of fraud "at a time almost simultaneous with his receipt of [information] which flew in the face of the [convict's] original claims."  *Id*.

Here, Patricia's argument is essentially that she suspected that Steven had defrauded her during the divorce negotiations but never suspected the extent of the fraud.  Patricia was not aware that Steven had concealed the 1987 Settlement but she was suspicious that Steven had concealed his true income—indeed, suspicious enough to file a claim and submit a sworn affidavit making precisely that accusation.  Specifically, Patricia suspected that Steven had misled her regarding his assets during the negotiations leading to the Settlement Agreement and that he had used SAC to divert and conceal some of his assets from her.  Today, too, she alleges that Steven misled her regarding an asset—the Lurie Investment—during the negotiations leading to the Settlement Agreement when he had in fact recovered $5.5 million in the 1987 Settlement and concealed it in a secret SAC fund.

True, the 1991 allegations seem to have referred to Gruntal income rather than the Lurie

Investment.   But the 2AC alleges that, at precisely the time that Patricia accused Steven of fraud,

Patricia was aware that (a) Steven and Donald had told her that the Lurie Investment was

worthless but could not yet be written down, but also that (b) Steven refused to make any

representation regarding the value of the Lurie Investment.  That is, in 1991, Patricia both

suspected that Steven had defrauded her and was in possession of documented discrepancies

between Steven and Donald's various statements regarding the most valuable and important part

of Steven's assets.  Since those circumstances "should have set off alarm bells," *Lenz*, 833 F.

Supp. at 375, Patricia was "placed on notice of facts which should arouse suspicion", *In re*

*Integrated Res*., 851 F. Supp. at 567, and had "received information sufficient to alert a

reasonable person to the probability that [s]he ha[d] been misled."  *Takeuchi*, 2006 WL 119749

at *2.  Patricia therefore had a duty in 1991 to investigate what Steven was hiding.  As the court

presiding over her 1991 action made clear, Patricia was free to do so.  But she did not.  That is

fatal to her fraud claim here.  *Cf.  Klein v. Shields & Co.*, 470 F.2d 1344, 1347 (2d Cir. 1972)

(dismissing fraud claim as time-barred where plaintiff had brought contract counterclaim making

essentially the same allegations but did not take depositions of defendant's employees).

Indeed, it is apparent from the 2AC itself that Patricia "should have uncovered the

alleged fraud prior to the limitations period."  *Butala*, 1997 WL 79845, at *4.  The 2AC alleges

that Patricia's investigation of Steven's Gruntal income led her to discover an alleged fraud

regarding the Lurie Investment.  Patricia alleges that she began an investigation after reading an

article regarding fraud by Bao who signed documents from Gruntal produced during the

Settlement Negotiations.  (2AC ¶ 35.)   "*The result of Patricia's investigation* was that in

28

August 2008 she inadvertently found the court file" detailing the 1987 Settlement and secret

SAC accounts.  (*Id.* ¶ 39 (emphasis added).)  Patricia alleges that this discovery was

"inadvertent."  But the issue is not whether Patricia anticipated discovering the 1987 Settlement.

The issue is whether Patricia had reason to undertake an investigation by which she would have

discovered the 1987 Settlement.  For the reasons set forth above, that is the case here.  And

where Patricia's own complaint alleges that investigating Gruntal led to the discovery of the

1987 Settlement, the Court has every reason to conclude that Patricia was in a position to make

the same discovery in 1991 when she had even more reason, to investigate Gruntal and the file

detailing the 1987 Settlement was as publicly available as it was in 2008.[2]

Patricia makes several other arguments as to why the principle that a prior allegation of

fraud shows that the plaintiff was on inquiry notice is not controlling here.  First, Patricia appears

to argue that such a principle should not apply to an action between former spouses related to

negotiations regarding their separation.  This argument amounts to nothing more than the

---

[2] The latter fact distinguishes this case from *Perlberger v. Perlberger*, No. CIV. A. 97-4105,
1999 WL 79503 (E.D. Pa. Feb. 12, 1999), which appears to be the closest case on point, albeit
not controlling.  In that case, the plaintiff brought RICO, fraud, and emotional distress claims
against her former husband alleging "a fraudulent scheme to conceal the true value of [her
husband's] income . . . during [their] divorce proceedings."  *Id.* at *1.  The plaintiff alleged that
"she first learned of the fraudulent scheme perpetrated against her and her children in 1996 when
she discovered the court file" of a lawsuit filed by Diane Strausser against her former husband
after the conclusion of their divorce proceedings.  *Id.* at * 3.  In those proceedings, the plaintiff's
"divorce counsel advanced the position that [the defendant] was using Diane Strausser as a
conduit to fraudulently conceal [the defendant's] assets and true income from Plaintiffs and the
divorce court."  *Id.*  In the subsequent RICO suit, "[a] key part of the alleged RICO scheme" was
that "during the Perlbergers' divorce  proceedings, Strausser was allegedly an active participant
in the scheme by aligning herself squarely with Perlberger and thwarting Plaintiff's discovery
efforts."  *Id.* at *4.  For that reason, plaintiff and her divorce attorneys "were unable to secure
direct evidence to support their belief that funds were diverted by Perlberger through Strausser."
*Id.*  Here, however, the court file was available at the time Patricia made the fraud allegations but
Patricia made no "discovery efforts."

recitation of the legal principle that spouses owe each other a fiduciary duty.  That is true, but

Patricia fails to cite any case in which a court has found that the fact that a defendant owed a

plaintiff a fiduciary duty renders inquiry notice inapplicable.  *Sargiss v. Magarell*, 909 N.E.2d

573, 12 N.Y.3d 527 (N.Y. 2009) is not such a case.  As Patricia's own brief indicates, the New

York Court of Appeals in that case held that a divorced wife's claim against her former

husband's estate alleging fraud in representations the husband made during divorce negotiations

was not time-barred where "there [wa]s no indication that plaintiff had knowledge of the alleged

fraud prior to her daughter's discovery of certain financial documents" and "it [wa]s unclear how

plaintiff could have discovered the alleged fraud earlier than she did."  12 N.Y.3d. at 532.  As

discussed above, that is not the case here, since the 2AC alleges that an investigation into the

same allegations that Patricia made in 1991 led her to discover the fraud she now alleges.

On the contrary, "it is not reasonable to rely on fiduciaries once the plaintiff is aware of

facts that would lead a reasonable person to no longer trust its fiduciary."  *World Wrestling

Entm't, Inc. v. Jakks Pacific, Inc.*, 530 F. Supp. 2d 486, 528 (S.D.N.Y. 2007), *aff'd* 328

Fed.Appx. 695 (2d Cir. 2009); *see also Addeo v. Braver,* 956 F. Supp. 443, 451-52 (S.D.N.Y.

1997) ("Once plaintiffs were thereby left with reason to be suspicious of [their fiduciary], it was

no longer reasonable for them to defer to his representations."); *Butala v. Agashiwala,* 916 F.

Supp. 314, 320 (S.D.N.Y. 1996) ("Whatever duties the defendants owed to the plaintiffs, their

alleged failure to disclose facts would not excuse the plaintiffs' lack of diligence in investigating

the facts of which they were unquestionably aware.") (internal citations omitted).  And several

New York courts applying similar principles have found claims for fraud in connection with

divorce negotiations time-barred despite the existence of a fiduciary relationship.  *See, e.g.,*

*Fixler v. Fixler*, 736 N.Y.S.2d 111, 112 (2d. Dep't 2002) (dismissing husband's fraud claim against former wife where husband "could reasonably have discovered the defendant's true financial condition by reviewing their 1987 joint tax returns"); *Hoffman v. Cannone*, 614 N.Y.S.2d 799, 800 (3d Dep't 1994) (dismissing claim by wife against former husband where "alleged representation by defendant's attorney was directly contravened by the separation agreement" such that "plaintiff possessed sufficient information to prompt an inquiry that would have led to the discovery of the alleged fraud"); *Garguilio v. Garguilio*, 608 N.Y.S.2d 238, 239 (2d Dep't 1994) (affirming dismissal as time-barred of wife's claim that husband fraudulently induced her to sign separation agreement "since the wife must have been aware of the alleged fraud or coercion which would have occurred in 1967, many years before she raised that contention for the first time in 1983").

Second, Patricia argues that "she was blameless in the delay" because Steven reiterated that the Lurie Investment was worthless in his 1991 affidavit.  (Pl.'s Opp'n at 9-10, 12.)  This amounts to a claim of fraudulent concealment.[3]  "A statute of limitations for RICO claims may be tolled due to the defendant's fraudulent concealment if the plaintiff establishes that: 1) the defendants wrongfully concealed material facts relating to their wrongdoing; 2) the concealment

---

[3] Patricia argues that she "does not rely upon 'fraudulent concealment' or any other rule to *toll* the accrual date."  (Pl.'s Opp'n at 12.)  However, it is hard to distinguish an argument that fraudulent concealment tolled the accrual date from Patricia's argument that Steven's fraudulent concealment is "the reason for Patricia's long delay between the fraud and when Patricia's claims accrued (*i.e.* when she discovered the fraud)."  (*Id.*)  Rather, that statement seems to rest on a mistaken premise that Patricia's claim accrued "when she discovered the fraud."  (*Id.*; *see also id.* at 10 ("[A]ccrual did not occur until she knew that she was injured.").)  Patricia's claim accrued when she was on inquiry notice of her injury, that is, when she alleged in 1991 that Steven had defrauded her in the divorce negotiations.  To prevent the statute of limitations period from running at that time, Patricia must show why the statute was tolled.  For the reasons set forth below, she has failed to do so.

prevented plaintiff's discovery of the nature of the claim within the limitations period; and 3) the plaintiff exercised due diligence in pursuing discovery of the claim during the period plaintiff seeks to have tolled." *131 Maine Street Assocs. v. Manko*, 54 Fed.Appx. 507, 512 (2d Cir. 2002).   Thus "[f]raudulent concealment does not lessen a plaintiff's duty of diligence; it merely measures what a reasonably diligent plaintiff would or could have known regarding the claim." *Stone v. Williams*, 970 F.2d 1043, 1048-49 (2d Cir. 1992); *see also id.* at 1049 ("The fact that it was fraudulently concealed from plaintiff that Williams, Sr. was her natural father therefore tolls the statute only up to the time when, despite the fraud, plaintiff had notice of this possibility.).

Patricia argues that, "[r]elying on this contention [that the Lurie Investment was worthless], [she] agreed to a settlement of the claims brought in the 1991 proceeding, which did not involve the Lurie Investment."  (*Id.* at 10.)  But Patricia cannot have it both ways.  It cannot be, on the one hand, that Patricia was not on inquiry notice of fraud regarding the Lurie Investment because her allegations only involved Gruntal, and yet, one the other, that she chose not to pursue those allegations in reliance on Steven's representation regarding the Lurie Investment and a denial that he misrepresented his finances.  And, in any event, "neither reassurances accompanying the relevant notice nor the continued failure to disclose the facts allegedly misrepresented in the first place, relieves the plaintiff of [the] duty to undertake reasonable inquiry or tolls the statute of limitations."  *In re Integrated Res. Inc. Real Estate Ltd. P'ships Sec. Litig.*, 815 F. Supp. 620, 640 (S.D.N.Y. 1993); *see also Falik v. Parker Duryee Rosoff & Haft*, 869 F. Supp. 228, 233 (S.D.N.Y. 1994) ("[O]nce a plaintiff has constructive notice of a fraud, neither reassurances from the defendants nor fraudulent concealment on their part will relieve the plaintiff of this duty of reasonable diligence.").  Thus the fact that Patricia

continued to rely on Steven's representations regarding the Lurie Investment even when she

believed he had committed or was committing fraud does not explain her failure to investigate.[4]

Rather, "for [a] plaintiff[] to assert fraudulent concealment and toll the statute of limitations,

[she] must demonstrate that the defendants prevented [her] from investigating the fraud *in spite

of* [her] exercise of due diligence." *Butala*, 916 F. Supp. at 319-20; *see also Lenz*, 833 F. Supp.

at 376 n. 12 ("[P]laintiff here cannot argue that, for example, the reassurances contained in

Rose's letter of February 7, 1985 tolls the statute of limitations.  Nor do any alleged efforts by

defendants to conceal the original misrepresentations after March 1986 have any effect on Lenz's

duty to investigate diligently the potential fraud.").  Patricia alleges no facts that would enable

her to make such a showing.  *See, e.g.*, *Griffin v. McNiff*, 744 F. Supp. 1237, 1256 (S.D.N.Y.

1990) ("Plaintiffs have wholly failed to allege that they did anything to investigate the possibility

of fraud.  Accordingly, the RICO claim . . . is barred by the four year statute of limitations.").

---

[4] That distinguishes *G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521, 542 (S.D.N.Y.
2002).  That case was a RICO action by asbestos manufacturers alleging that various law firms
"engaged in a scheme to inundate the judicial system . . . with hundreds of thousands of asbestos
cases without regard to their merit, and in various illegal acts in connection with such litigation
including suborning false testimony."  *Id.* at 527.  The plaintiffs argued that their claim was not
time-barred because they had no way of discovering that defendants had submitted numerous
fraudulent affidavits in connection with asbestos litigation settlements.  *See id.* at 539.  The court
rejected the defendant's argument that plaintiffs "could have pursued depositions, written
interrogatories, and other similar tactics to ensure that the affidavits were correct" because "there
was no perceived need to determine the verity of each and every affidavit. In fact, to do so would
obviate the rationale behind the mass settlements."  *Id.* at 541.  The court also rejected
defendants' argument that "a party to litigation may not as a matter of law reasonably rely on
deliberate untruths in a sworn affidavit."  *Id.* at 542.  However, the court noted that "[i]n certain
fact-specific circumstances, of course, even sworn affidavits may not as a matter of law be
reasonably relied upon", such as "some 'red flag,' such as  . . . the fact that the affiant is a known
'scoundrel . . . .'"  *Id.*  Here, where Patricia believed that Steven was defrauding her and had
essentially alleged that he was a "scoundrel", she shouldI have "perceived [a] need to determine
the verity of [his] affidavit."

Third, Patricia argues that whether Patricia was "placed on notice of facts which should arouse suspicion", *In re Integrated Res*., 851 F. Supp. at 567, is an improper standard because it "is confined to securities fraud litigation" and is no longer binding after the Supreme Court's recent decision in *Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010) which "reject[ed] the 'inquiry notice' standard in securities fraud cases." (Pl.'s Opp'n at 11.)  That argument misstates the law.  "[T]he limitations period for a fraud-based *RICO action* commences when Plaintiffs are placed on notice of facts which should arouse suspicion." *In re Integrated Res., Inc. Real Estate Ltd. P'Ships Sec. Litig.*, 851 F. Supp. 556, 567 (S.D.N.Y. 1994) (emphasis added).  Indeed, the Second Circuit has held in a case involving a fraud-based RICO claim that "[i]nquiry notice is notice such that a 'reasonable investor of ordinary intelligence would have discovered the existence of the fraud.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d at 60 (quoting *Dodds*, 12 F.3d at 350 (recognizing inquiry notice standard in a case alleging fraud under the federal securities laws)); *see also Jakks Pacific, Inc.*, 328 Fed.Appx at 697 (affirming dismissal of claim as time-barred given ""storm warnings' that put plaintiff on inquiry notice of a possible RICO claim"); *Marshall*, 2009 WL 5177975, at *3 (holding in a fraud-based RICO claim that "[a] plaintiff should discover an injury if there are sufficient 'storm warnings' of the wrongful conduct forming the basis of the plaintiff's claims.").  Thus it is not correct that the inquiry notice standard the Court applied above "has never been applied in a non-securities fraud case."  (Pl.'s Opp'n at 11.)  Nor is it correct that the Supreme Court in *Merck* rejected inquiry notice.  On the contrary, the Supreme Court explicitly reaffirmed that doctrine: "We consequently hold that 'discovery' as used in this statute encompasses not only those facts the plaintiff actually knew,

but also those facts a reasonably diligent plaintiff would have known." *Merck*, 130 S.Ct. at 1796.[5]

Finally, Patricia argues that documents related to the 1991 action cannot bind her in this action because they do not satisfy the requirements of judicial admissions. (Pl.'s Opp'n at 9.) That argument is unpersuasive. In the aforementioned cases discussing whether prior pleadings or affidavits put a plaintiff inquiry notice, the courts found the pleadings or affidavits relevant not because they were formal judicial admissions but because they demonstrated, on the face of either the complaint, documents annexed or integral thereto, or documents attached to the parties' papers, that the plaintiff was on notice of the fraud now being alleged.[6] The same is true of plaintiff's 1991 complaints and affidavits here.

---

[5] What the Supreme Court in *Merck* did hold is that, with respect to claims under the federal securities laws, inquiry notice referred to the time at which a reasonably diligent would have actually discovered the fraud, not when a reasonably diligent plaintiff should have begun investigating. *See id.* at 1798. That holding is not controlling here because it is an interpretation of a statute of limitations under the federal securities laws and Patricia has not alleged any claims under those laws. But even if the holding did apply to this case, it would not avail Patricia. The 1987 Settlement was as publicly available in 1991 as it was in 2008. The 2AC alleges that Patricia discovered the 1987 Settlement within two years of investigating Steven's representations as to his assets that he made during the divorce negotiations. There is no reason to believe that Patricia would not have made the same discovery until almost twenty years later had she begun the same investigation in 1991.

[6] The difference is apparent from *Banks v. Yokemick*, 214 F. Supp. 2d 401 (S.D.N.Y. 2002), cited by Patricia. That case—in which the plaintiff alleged excessive force in an arrest, not fraud—involved whether a defendant's answer to an allegation in the plaintiff's complaint that the defendant acted "willfully, wantonly, maliciously and/or with such reckless disregard of the consequences as to reveal a conscious indifference to the clear risk of death or serious bodily injury" was a "judicial admission[] that [the defendant's] actions were neither intentional nor reckless." *Id.* at 404-5. But whether a party has conceded something by its actions in the same case is different from whether a party's actions in a prior case demonstrate notice of the alleged fraud in the present case. The former is conclusive on the issue allegedly conceded; the latter is one indicator of notice that, as noted above, the Court can consider in the circumstances of this case.

### 2.   Common Law Fraud

The parties generally concede that application of the statute of limitations to Patricia's RICO claim goes hand-in-hand with application of the statute of limitations to Patricia's common law fraud claim. Indeed, Patricia's common law fraud claims are time-barred for the same reason that her RICO fraud claim is time-barred.

Under New York law, the statute of limitations for a fraud claim is the greater of (a) six years from the commission of the fraud or (b) "two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213[8]; *id.* § 203(g). "Generally, the question of when the plaintiff discovered, or should have discovered, the alleged fraud is a mixed question of law and fact which should not be resolved summarily unless it conclusively appears that the plaintiff had knowledge of facts which should have caused him or her to inquire and discover the alleged fraud." *Hoffman*, 614 N.Y.S.2d at 800. "'[W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him.'" *Prestandrea v. Stein*, 692 N.Y.S.2d 689, 691 (2d Dep't 1999) (quoting *Higgins v. Crouse*, 147 N.Y. 411, 416 (1895)). "The inquiry as to whether a plaintiff could, with reasonable diligence, have discovered the fraud turns on whether the plaintiff was 'possessed of knowledge of facts from which [the fraud] could be reasonably inferred.'" *Sargiss*, 12 N.Y.3d at 532 (brackets in original) (quoting *Erbe v. Lincoln Rochester Trust Co.*, 3 N.Y.2d 321, 326 (1957)).

For the reasons set forth above, Patricia's complaint and other court documents she has filed demonstrate that Patricia brought this action well more than two years after she had reason to begin an investigation that, based on her own complaint, would have revealed the fraud she now alleges. Accordingly, her common law fraud claim is time-barred. *See, e.g.*, *Fixler*, 736 N.Y.S.2d at 112; *Hoffman*, 614 N.Y.S.2d at 800-801; *Cucchiaro v. Cucchiaro*, 627 N.Y.S.2d 224, 230 (Sup. Ct. Orange County 1995) (dismissing wife's fraud claim against former husband where "[b]y her own admission, plaintiff knew of the existence of the pension benefits" and "should have made inquiry as to why these benefits were not listed as marital property in the separation agreement").

### 3.  Breach of Fiduciary Duty

"New York law does not provide any single limitations period for breach of fiduciary duty claims. Breach of fiduciary duty claims arise in many different forms, and the applicable statute of limitations under the CPLR may vary depending on the basis for liability, the type of remedy sought or the relationship of the parties." *Whitney Holdings, Ltd. v. Givotovsky*, 988 F. Supp. 732, 741 (S.D.N.Y. 1997) (quotation marks omitted). However, "the case law in New York clearly holds that a cause of action for breach of fiduciary duty based on allegations of actual fraud is subject to a six-year limitations period." *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 164 (1st Dep't 2003) (citations omitted). And, under New York law, "[a] claim for breach of fiduciary duty based on fraud does not accrue until the plaintiff's actual or constructive discovery of the facts constituting the fraud." *King v. Fox*, 28 Fed.Appx. 95, 99 (2d Cir. 2002) (citing *Elghanayan v. Victory,* 596 N.Y.S.2d 35 (1st Dep't 1993)); *see also Transasero, Inc. v. Biri Assocs. Corp.*, 834 N.Y.S.2d 293, 294 (2d Dep't 2007) (applying discovery rule to breach of

fiduciary duty claim alleging fraud); *Dinger v. Kling Agency, Inc.*, 654 N.Y.S.2d 415, 416 (2d

Dep't 1997) ("Therefore, since the instant action was commenced more than six years after the

alleged fraud and more than two years after its discovery, it was properly dismissed as time-

barred.  To the extent that the plaintiff now attempts to characterize these claims as alleging

breaches of the defendants' fiduciary obligations based upon the identical conduct, they are

likewise untimely.")  Therefore, Patricia's breach of fiduciary duty claims are barred by the

statute of limitations for the same reasons that her RICO and common law fraud claims are time-

barred.

### 4.  Unjust Enrichment

"The statute of limitations in New York for claims of unjust enrichment . . . is generally

six years."  *Golden Pac. Bancorp v. FDIC,* 273 F.3d 509, 518 (2d Cir. 2001) (citing N.Y.

C.P.L.R. §§ 213(1), (7); *Loengard v. Santa Fe Indus., Inc.,* 514 N.E.2d 113 (1987)).  "The statute

of limitations for a claim of unjust enrichment begins to run 'upon the occurrence of the

wrongful act giving rise to a duty of restitution,'" *Golden Pac. Bancorp* at 520 (quoting

*Congregation Yetev Lev D'Satmar, Inc. v. 26 Adar N.B. Corp.,* 596 N.Y.S.2d 435 (2d Dep't

1993)), and not from the time when the facts constituting the fraud are discovered."  *Kaufman*,

760 N.Y.S.2d at 171.  Thus, unlike Patricia's RICO, common law fraud, and fiduciary duty

claims, her unjust enrichment claim is not subject to the discovery rule.  Rather, that claim

occurred at the time of Steven and Donald's fraud in 1989 and became time-barred six years later

in 1995.

## CONCLUSION

For the reasons given above, defendants Steven and Donald Cohen's motion **[52]** to dismiss the Second Amended Complaint is GRANTED with prejudice.  Amendment would not be fruitful where Plaintiff has already had three opportunities to state a claim.

SO ORDERED.

Dated: New York, New York
       March 24, 2011

                                        Richard J. Holwell
                                        United States District Judge