# WILENTZ

## WILENTZ, GOLDMAN & SPITZER P.A.

**ATTORNEYS AT LAW**

90 Woodbridge Center Drive
Suite 900 Box 10
Woodbridge, NJ 07095-0958
732.636.8000
Fax 732.855.6117

Meridian Center I
Two Industrial Way West
Eatontown, NJ 07724-2265
732.542.4500
Fax 732.493.8387

110 William Street
26th Floor
New York, NY 10038-3927
212.267.3091
Fax 212.267.3828

Two Penn Center Plaza
Suite 910
Philadelphia, PA 19102
215.940.4000
Fax 215.636.3999

www.wilentz.com

Please reply to:
Woodbridge
Direct Dial: (732) 855-6402
Direct Fax: (732) 726-6686
Email: kroddy@wilentz.com

DAVID T. WILENTZ (1919-1988)
G. GEORGE GOLDMAN (1922-1959)
HENRY M. SPITZER (1928-1988)
WARREN W. WILENTZ (1949-2010)

FREDERIC K. BECKER²
RICHARD F. LERT²
JOHN A. HOFFMAN
STEPHEN E. BARCAN
VINCENT P. MALTESE
DAVID M. WILDSTEIN
GORDON J. GOLUM
MARVIN J. BRAUTH⁴
STUART A. HOBERMAN²³
STEPHEN A. SPITZER
ANNE S. BABINEAU²
CHRISTINE D. PETRUZZELL
BRIAN J. MOLLOY
RANDALL J. RICHARDS
JOSEPH J. JANKOWSKI
DAVID S. GORDON
FREDERICK J. DENNEHY
ROY H. TANZMAN²
STEVEN J. TRIPP
JAY J. ZIZNEWSKI
JAMES E. TRABILSY
MAUREEN S. BINETTI⁴
ANTHONY J. PANNELLA, JR.
MICHAEL J. BARRETT⁴
MICHAEL F. SCHAFF²
ANGELO JOHN CIFALDI
KEVIN M. BERRY²
JOHN T. KELLY²
C. KENNETH SHANK²
EDWIN LEAVITT-GRUBERGER²
BARRY A. COOKE
JON G. KUPILIK

PETER R. HERMAN²
EDWARD T. KOLE
HESSER G. McBRIDE, JR.
ERIC JOHN MARCY²
ROBERT C. KAUTZ²⁸
VIOLA S. LORDI ²
LYNNE M. KIZIS
KEVIN P. RODDY²⁸⁹
DANIEL S. BERNHEIM 3d ¹³
DAVID H. STEIN
DOUGLAS WATSON LUBIC²
DOMINICK J. BRATTI
LISA A. GORAB²
LAWRENCE F. JACOBS²
BETH HINKDALE-PILLER
FRED HOPKE²
DONALD E. TAYLOR³
BRETT R. HARRIS²
JEFFREY W. CAPPOLA
ALFRED M. ANTHONY²
DARREN M. GELBER²³
WILLIAM J. LINTON
DONNA M. JENNINGS
GIOVANNI ANZALONE
PETER A. GREENBAUM²
WILLARD C. SHIH²
LAWRENCE C. WEINER²
LAURIE E. MEYERS ²⁴
JOHN M. CANTALUPO²
DAVID P. PEPE
JOHN E. HOGAN²
EVERETT M. JOHNSON²
DANIEL R. LAPINSKI²³
TODD E. LEHDER²
PHILIP A. TORTORETI ¹¹,¹²
KELLY A. ERHARDT-WOJIE ³
ALEX LYUBARSKY²
ELLEN TORREGROSSA-O'CONNOR

OF COUNSEL
ALAN B. HANDLER ⁵
FRANCIS V. BONELLO
BRUCE M. KLEINMAN²⁵

COUNSEL
RUTH D. MARCUS ¹,²
RICHARD J. BYRNES
JAMES E. TONREY, JR.²
DEIRDRE WOULFE PACHECO²
ROBERTO BENITES
JONATHAN J. BART¹,²,³
YVONNE MARCUSE
ABBY RESNICK-PARIGIAN²,³
BARBARA J. KOONZ¹⁰
FRANCINE E. TAJFEL²
EDWARD J. ALBOWICZ²
ELIZABETH C. DELL²
ROBERT L. SELVERS²
MICHAEL J. WEISSLITZ
JOHN P. MURDOCH II

ASSOCIATES
LINDA LASHBROOK
ALBERTINA WEBB²
MARY H. SMITH
STEPHANIE D. GIRONDA
GREGORY D. SHAFFER²⁹
LOUIS J. SEMINSKI, JR.
MICHAEL F. FRIED²
MATTHEW SKOLNIK²
ALYSON M. LEONE²
VINCENT CHENG²
JAMIE M. BENNETT²
KEITH L. HOVEY²³
JOSEPH J. RUSSELL, JR.²
EMILY D. VAIL²⁴

CHERYL E. CONNORS
ANTHONY WILKINSON²
JAY B. FELDMAN²
JAMES TRACY
DANIEL J. KLUSKA
KARIN K. SAGE
CORINNE L. McCANN
SATISH V. POONDI
KUSH GHUKLA²,¹⁰
RACHEL C. HEINRICH²
GLENN P. PRIVES²
ANNEMARIE T. GREENAN²
ERIC M. FINKLESTEIN²
NANOR L. TERJANIAN²
ANDREW GROUS²³
MEGAN E. BEDELL²
BRIDGET V. KANE
EMILY M. PHELAN²

◁ Certified Civil Trial Attorney
☐ Certified Criminal Trial Attorney
† Certified Workers Comp. Attorney
1 Not admitted NJ
2 Admitted NY
3 Admitted PA
4 Admitted CT
5 Admitted DC
6 Admitted MA
7 Admitted MD
8 Admitted VA
9 Admitted CA
10 Admitted FL
11 Admitted PR
12 Admitted VI

September 5, 2013

**VIA ECF & UPS OVERNIGHT DELIVERY**

Honorable William H. Pauley, III
Judge
United States District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 2210, Courtroom 11D
New York, NY 10007

    Re:    *Patricia Cohen v. Steven A. Cohen et. al.,* Case No. 09 Civ 10230 (WHP)

Dear Judge Pauley:

    We have been advised that during the Case Management Conference held on June 21, 2013, Your Honor *sua sponte* identified a defect in Plaintiff's pleading of subject matter jurisdiction based upon diversity of citizenship. In accordance with Rule 3A of the Court's Individual Practices, we respectfully advise the Court of Plaintiff's intention to seek leave to amend the Second Amended Complaint (Dkt. No. 48-1) for the limited purpose of clarifying and curing the allegations of subject matter jurisdiction in ¶ 10. The only change to the Second Amended Complaint is the substitution of the following paragraph for existing ¶ 10:

    10.    This Court has subject matter jurisdiction of the case as a federal question arising under RICO, pursuant to 18 U.S.C. §1964(c) and 28 U.S.C. §1331. The Court has supplemental jurisdiction over the state law claims, which arise from the same nucleus of facts, pursuant to 28 U.S.C. §1367. This Court also has subject matter jurisdiction under diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a), because the amount in controversy exceeds $75,000.00,

# WILENTZ

WILENTZ, GOLDMAN & SPITZER P.A.

VIA ECF & UPS OVERNIGHT DELIVERY
Honorable William H. Pauley, U.S.D.J.
September 5, 2013
Page 2

exclusive of interest and costs, and the Plaintiff and the Defendants are citizens of, and domiciled in, different states.

We are attaching a redlined version showing the change from the Second Amended Complaint. Because the request for the amendment is for the limited purpose of curing a defect in the prior pleading that Your Honor identified at the Case Management Conference, we are submitting this for Your Honor's consideration. If such amendment requires application by way of formal motion Plaintiff is prepared to file a formal motion.

We also note that the paragraph numbering used by predecessor counsel in Counts II-V of the Second Amended Complaint, start with ¶ 1 and then, under each new count, repeats prior paragraph numbers, beginning with ¶ 68. So that the citations to the Second Amended Complaint for purposes of responding to Defendants' pending Renewed Motion to Dismiss will not be affected, and so that the redlined [Proposed] Third Amended Complaint will show only our limited track changes, Plaintiff has retained the identical document previously filed as Dkt. No. 48-1. If the Court prefers that Plaintiff properly renumber all paragraphs consecutively, Plaintiff is prepared to reformat the paragraph numbers as part of filing the [Proposed] Third Amended Complaint.

With the Court's permission, Plaintiff respectfully requests that the limited amendment requested be permitted by way of this informal application at this time.

Respectfully submitted,

WILENTZ, GOLDMAN & SPITZER, P.A.



KEVIN P. RODDY

Counsel for Plaintiff

Enclosure

Cc:   Joshua L. Dratel, Esq.
      John Balestriere, Esq.
      Martin B. Klotz, Esq.
      (all via electronic mail and first-class mail with enclosure)

#7104066.1(144084.002)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| PATRICIA COHEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hon. Richard J. Holwell |
| v. | ) | |
| | ) | Case No. 09 CV 10230 (RJH) |
| STEVEN COHEN, DONALD COHEN, BRETT LURIE,, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

### THIRD AMENDED COMPLAINT

Deleted: SECOND

Plaintiff, Patricia Cohen, by undersigned counsel, complains of the Defendants, Steven Cohen, Donald Cohen and Brett Lurie, as follows:

### NATURE OF THE ACTION

Patricia Cohen (hereafter "Patricia") asserts this action against her former husband, Steven A. Cohen (hereafter "Steven"), and his co-conspirators, for defrauding her of millions of dollars.

1. Like many rich people in deteriorating marriages headed for divorce, Steven hid millions of dollars from his spouse, Patricia. She did not learn of his misconduct, in which his brother (who was also their accountant) and their lawyer (now a disbarred felon) played prominent roles, until years later. When Patricia learned in 2006 that Steven's former employer, Gruntal & Co. was implicated in criminal conduct, she began investigating.

1

Her subsequent digging into old court records finally established the fraudulent concealment of assets.

2.  Patricia's investigation also uncovered that their former lawyer, Brett Lurie, went to jail for defrauding New Yorkers in a series of co-op conversions which Steven was financing with the proceeds of insider trading.

3.  She learned that Steven had been censured by the New York Stock Exchange for illegal securities trading practices and had made at least $10 million from insider trading.

4.  All of these illegal acts occurred within a five year period, victimized others in addition to Patricia, and constitute a pattern of racketeering activity.

5.  Thus, Patricia asserts RICO claims against Steven, his brother Donald Cohen and Brett Lurie (the latter two having conspired with Steven to conceal assets from her).

<u>PARTIES, JURISDICTION AND VENUE</u>

6.  Patricia Cohen is a citizen of New York State.

7.  Steven Cohen is a citizen of Connecticut.

8.  Donald Cohen is a citizen of Florida.

9.  Brett Lurie is a citizen of Florida.

10.  This Court has subject matter jurisdiction of the case as a federal question arising under RICO, pursuant to 18 U.S.C. §1964(c)[1] and therefore, 28 U.S.C. §1331. The Court has supplemental jurisdiction over the state law claims, which arise from the same nucleus of facts, pursuant to 28 U.S.C. §1367.  This Court also has subject matter jurisdiction under diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a), because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and the Plaintiff and the Defendants are citizens of, and domiciled in, different states.

| | Deleted: 2 |

11.  Venue is proper in this district because the RICO violations occurred here.

---

[1] Hereafter references to sections to RICO will be cited as "§___ " omitting Title 18.

#7103633.1

<u>FACTS</u>

A.    <u>The Scheme Against Patricia</u>

12.    In 1978 Steven became affiliated with Gruntal & Co. (hereafter "Gruntal"), a securities

and brokerage firm in New York, New York. He conducted proprietary trading in which

his compensation was 30% of net profits. That percentage was increased to 50% in 1981.

13.    Patricia and Steven were married in 1979.

14.    By 1985 Steven had become a very successful trader and headed a proprietary trading

group of four junior traders and support personnel at Gruntal.

15.    Also, by 1985 the marriage had deteriorated, and they had discussed the possibility of a

divorce.

16.    In January 1986 Steven created SAC Trading Corporation, a New York corporation

(hereafter "SAC"), of which he owned 100% of the stock. Steven was also President of

SAC, his brother, Donald Cohen (hereafter "Donald"), an accountant, its Treasurer and

Brett Lurie (hereafter "Lurie") its Secretary and lawyer. Lurie prepared the corporate

documents to create the entity. All marital assets, with the exception of the Cohens'

apartment, were held by SAC.

17.    That month Steven told Patricia he wanted to invest "millions of dollars" from SAC with

Lurie in order to purchase real estate in New York City for the conversion to co-op

apartments (hereafter "the Lurie investment"). Steven and Donald told Patricia that they

had prepared a contract for the investment and anticipated making a huge profit.

18.    Lurie had represented both Steven and Patricia in various legal matters. Patricia trusted

his judgment. He was, accordingly, Patricia's attorney and fiduciary. Donald was their

3

#7103633.1

personal accountant and financial advisor since 1983, and also had a fiduciary
relationship with Patricia.

19.    However, during the next several months Steven told Patricia that the Lurie investment
was "going sour."

20.    Later in 1986 Steven and Donald told Patricia that Steven had lost the entire value of the
Lurie investment which they stated was "almost $9 million." Steven was distraught.
Moreover, they told Patricia that the loss could not be written off until the "properties
went into foreclosure or bankruptcy."

21.    Steven's statements to Patricia indicating he had lost the entire Lurie investment were
false. Lurie had actually repaid $5.5 million to Steven by January 1987. Steven,
anticipating he and Patricia would soon get a divorce, never told her of the repayment.

22.    In 1988 Steven and Patricia separated. In the negotiations leading up to their 1989
Separation Agreement (which was incorporated in a judgment of divorce dated March 13,
1990, hereafter "the Separation Agreement"), Donald and Steven prepared a "Statement
of Financial Condition" which purported to disclose all of their marital assets (hereafter
"the Financial Statement"). The Financial Statement listed the entire Lurie investment as
an asset valued at $8,745,169 million.

23.    Donald and Steven directed Steven's lawyer to mail the Financial Statement to Patricia's
lawyer in 1989. It was mailed to Patricia's lawyer through the U.S. mail.

24.    During the discussions surrounding the Separation Agreement at Patricia's lawyer's
office, Steven told Patricia and her lawyer that he was still not able to declare the Lurie
investment lost because there was still no bankruptcy or foreclosure decree. Moreover, he
stated it "could be years" until this happened. Steven supported his assertions with

4

#7103633.1

written documents. Steven's lawyer also told her that the money was lost- "a losing trade."

25. Steven also did not disclose to Patricia the existence of an entity which held the profits of SAC on the Financial Statement or verbally thereafter.

26. Patricia and her lawyer relied on Steven and Donald's representations about the Lurie investment because Donald had been her accountant and never gave her any reason to doubt he was still looking out for her interests. She thus agreed to a settlement in which the investment was deemed to be lost - i.e., worthless.

27. Therefore, Patricia was fraudulently induced to accept the Separation Agreement.

28. Additionally, at Steven's request, the Separation Agreement provided, in relevant part, that "Each party has acknowledged a degree familiarity with the knowledge of the financial circumstances of the other and each party is of the opinion that he and she are sufficiently informed of the income, assets, property and financial prospects of the other. Husband has provided wife with his net worth statement and the statement of financial condition dated as of July 1, 1988..."

29. Steven's statement, above, was fraudulently made to induce Patricia to sign the Separation Agreement. She relied on his representations both above, and in the Financial Statement that he had "fully disclosed" all his property to her, in consenting to the Separation Agreement. Therefore, Steven fraudulently induced Patricia to sign the Separation Agreement. Steven also directed that the Separation Agreement be mailed to Patricia's lawyer, which it was, in 1989, through the U.S. Mail.

5

30.    In 1991 Patricia brought a motion in the Supreme Court of New York seeking to increase

maintenance, child support and other relief from the Separation Agreement and divorce

decree.

31.    In opposing Patricia's motion, Steven signed an Affidavit under the penalties of perjury

stating, in relevant part, "The Brett-Lurie deal is presently involved in bankruptcy

proceedings. Even then I suspected that this would happen because the general partner

[Lurie] was in default. I am writing it off as totally worthless. Subtracting the value of

Brett-Lurie from my net assets at that time means that my net worth was $8,185,368.

Defendant's [Patricia's] equitable distribution award pursuant to the Agreement was

close to $5 million, or more than 50% of my net worth in the real world."

32.    This statement was false. Steven knew then, as he had in 1988, that the Lurie investment

was not "worthless." He had actually lost less than half his investment. He made this

false statement to further the scheme to defraud Patricia of money she was entitled to and

to prevent her from discovering the truth. Steven also omitted to disclose the entity

holding the SAC profits then or earlier.

33.    Steven directed his lawyer to mail his signed Affidavit to Patricia's lawyer. It was mailed

to her lawyer through the U.S. Mail.

34.    The signed Affidavit succeeded in preventing Patricia from investigating the Lurie real

estate deal.

35.    Patricia had no reason to doubt the truthfulness of Steven and Donald's representations

about the Lurie investment until 2006 when she read an article about Gruntal which

depicted the firm as less than an honorable institution. Additionally, the article indicated

that Edward Bao, who signed documents from Gruntal produced in the discovery process

6

leading up to the Separation Agreement, had been convicted of fraud which had been committed at Gruntal.

36.    Since Steven had a proprietary trading relationship with Gruntal during their entire ten year marriage, Patricia began to question the representations Gruntal had made to her during the separation negotiations and the subsequent 1991 proceeding to modify the decree.

37.    Patricia called Ron Aizer, Steven's former boss at Gruntal, in September 2007.  She asked him what Steven's arrangement with Gruntal had been.

38.    A few days later Patricia received a call from a relative telling her that Steven received a call from Ron Aizer and that she should not "dig into things that happened 20 years ago." He also related that Steven said he planned to provide some ongoing financial support to Patricia, so she should not "bite the hand that feeds her."

39.    The result of Patricia's investigation was that in August 2008 she inadvertently found the court file in *Steven Cohen and SAC Trading Corp. v. Brett Lurie and Conversion Funding Corp.*, No. 8981/87 (New York Supreme Court, New York County) ( hereafter "*Cohen v. Lurie*"). The file disclosed, as stated above in ¶21, that Steven had sued Lurie in 1987 over his investment in the real estate and related financial issues and that Steven received $5.5 million of this money back from Lurie as part of a settlement executed that same year. In addition, the litigation papers revealed the existence of a secret, unnamed company which "held the profits" of SAC. Patricia does not know the extent of holdings in that company.

40.    In 2009 Patricia retained counsel to sue Steven for fraud.

7

B.      Steven Fraudulently Concealed His Scheme Against Patricia

41.     As indicated, Steven actively concealed the fact that he had obtained $5.5 million back from Lurie. He never told that to Patricia and falsely stated the opposite- that the investment was a total loss.

42.     Steven issued the false and misleading Financial Statement and the 1991 Affidavit in order to conceal this money from her. He also concealed the existence of the entity which held the assets of SAC.

43.     These efforts prevented Patricia from learning that Steven had received the $5.5 million from Lurie within the statute of limitations for asserting an action against Steven for fraud or violating RICO.

44.     Patricia did not learn of the scheme to hide the $5.5 million until August 2008, when she saw the *Cohen v. Lurie* court file.

45.     Upon learning these facts in 2008, Patricia diligently pursued her legal claims, filing this case in 2009.

C.      The Insider Trading Scheme

46.     In 1985 Steven was informed of the imminent acquisition of RCA Co. by General Electric Co. by Bruce Newberg, a securities trader at Drexel Burnham Lambert.

47.     Mr. Newberg provided the information to Steven in furtherance of their long-standing friendship which began at Wharton Business School. Mr. Newberg also hoped to enhance his standing with Steven, who was by then an up and coming trader on Wall Street.

8

48. Steven knew that Mr. Newberg had obtained the information from Dennis Levine, one of Newberg's superiors at Drexel Burnham Lambert, and that Mr. Levine had been provided with the information from an RCA insider. Such privileged information was provided to Steven as part of his relationship with Mr. Newberg and as part of an effort to "take care of one another." They sometimes referred to their group of Wharton friends as "the Wharton mafia."

49. Steven passed on the inside information to Donald and colleagues at Gruntal.

50. While in possession of the material, non-public information from Mr. Newberg, Steven and Donald each purchased RCA stock with the intent of profiting from the inside information. Neither Steven nor Donald disclosed the material, non-public information to the public prior to their purchases.

51. Shortly thereafter, the acquisition was publicly announced, and the price of RCA stock rose significantly, and Steven and Donald then sold their stock. Steven obtained a profit of at least $10 million on his trade. Patricia also believes Steven's insider trading enriched Gruntal. Donald also profited.

52. Steven and Donald's trading with non-public inside information for the purpose of profiting constituted a manipulative or deceptive device in connection with the purchase or sale of a security, violating §10b of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) (hereafter §78j(b)") and S.E.C. Rule 10(b)(5), 17 C.F.R. §240.10b-5 (hereafter "Rule 10(b)(5)").

53. Steven then invested the $10 million, which he knew was illegally obtained, with Lurie in 1986 so that he could avoid reporting it to the I.R.S. as income.

9

#7103633.1

54.    Steven's transfer of the $10 million to Lurie for investment in acquiring real estate

violated the anti-money laundering statute, 18 U.S.C. §1956(a)(1)(A)(i).

D.    The Co-Op Scheme

55.    As indicated in ¶16, Lurie was an officer of SAC. The real estate purchases made as part

of the Lurie investment were conducted through SAC in 1986-1988.

56.    SAC held title to some of the properties and held an interest in those where title was held

by Lurie. When the apartments were ready to be sold to the public as co-op units, Lurie

prepared a co-op offering plan and provided Steven with a copy for his review. This plan

was provided to potential purchasers, and as indicated below, was fraudulent. Lurie also

provided Steven with copies of the amendments to the plan. Steven did not make

substantive changes to the plan documents.

57.    Lurie had devised a scheme to illegally obtain profits from the co-op conversions.

Patricia believes Steven agreed with the scheme because Lurie and Steven were

exceptionally close friends and sought to maximize the profits from his investment.

Steven was aware of the fraudulent representations in the co-op offering plans because

they had spoken freely and in great detail about Steven's finances and the co-op

conversions, Steven was extremely interested in his investments with Lurie, and as a

sophisticated investor actively oversaw the investment, and Lurie was required to provide

Steven with regular reports of the details of the financing of the co-op conversions and

the amendments to the offering plans when filed.

58.    Lurie, with Steven's approval, and using SAC, carried out the Scheme by filing with New

York State and mailing fraudulent offering plans and amendments which omitted to

inform buyers that Lurie, the "sponsor" of the co-operatives, had defaulted on multiple

#7103633.1

obligations in connection with these projects and was engaged in discriminatory management practices to benefit himself, Steven and other owners at the co-op buyers' expense. Lurie also fraudulently represented to co-op buyers that he was making maintenance and mortgage payments and meeting other financial obligations. This Scheme was carried out in 1989-91. The object of the scheme was to induce potential co-op buyers to purchase shares in the deals by providing a false picture of their finances, and to mislead owners from knowing the truth about the perilous financial state of their investments.

59.   These co-operative projects were located in Sunnyside and Jackson Heights, Queens, New York City.

60.   The U.S mails were used at least 100 times in furtherance of this Scheme to defraud the co-op buyers, both in mailing materials and statements to the co-op owners from Lurie's management office and in requesting the co-op owners remit payments to his office.

61.   Ultimately, the Scheme collapsed as Lurie could not maintain the properties, despite reaping unearned fees from the owners. The properties were forced into bankruptcy, and many co-op owners were damaged by the loss in value of their investments. Also, renters had to live in buildings with substandard conditions and safety violations.

62.   Lurie was subsequently prosecuted, convicted and incarcerated by New York State for these crimes, which included fraud. At his trial, several co-op owners testified they relied on Lurie's misrepresentations of the co-op's financial strength in purchasing their shares or in making their monthly maintenance payments.

63.   Therefore, this Scheme, perpetrated through SAC, and using the U.S. Mail, victimized numerous co-op investors and owners, causing them financial loss.

11

#7103633.1

E.    The Second Securities Fraud Scheme

64.    In 1995 Steven was censured by the New York Stock Exchange for manipulating the price of securities while the head of a proprietary trading group at Gruntal in 1991.

65.    Specifically, he was found to have artificially inflated the price of an undisclosed common stock by "manipulating his buy orders on the plus tick," conduct "inconsistent with the equitable principles of trade."

66.    This caused the price of the manipulated securities to be artificially inflated, making the securities more expensive for long buyers while earning for himself an additional $100,000 in profits.

67.    Steven's intentional misconduct violated §78j(b) and Rule 10(b)(5).

## COUNT I
## CONSPIRACY TO VIOLATE RICO AGAINST
## STEVEN, DONALD AND LURIE

A.    The Racketeering Acts

1.    Paragraphs 1-67 are incorporated herein as though set forth in full.

68.    Steven, Donald and Lurie are "persons" pursuant to §1961(3).

69.    SAC and Gruntal were each an "enterprise" pursuant to §1961(4), which affected interstate commerce through their trading and other activities. (No association-in-fact enterprise is alleged.)

70.    Steven, Donald and Lurie agreed to the Scheme to Defraud Patricia and the uses of the U.S. Mail to execute it.

71.    Steven and Lurie agreed to the Co-Op Scheme, including the uses of the U.S. Mail to execute it.

12

#7103633.1

72. Each of these three Defendants agreed that one of them would send the mailings at issue to the victims of the Schemes, Patricia and the co-op owners.

73. One of them did cause the mailings to be sent via U.S. Mail, and the victims who received them, Patricia and the co-op owners, relied upon them to their detriment.

74. Each of the three Defendants thus conspired to commit a pattern of mail fraud, in violation of 18 U.S.C. §1341.

75. Each of the three Defendants, officers in SAC, perpetrated the mail fraud violations in participating in the affairs of SAC.

76. Mail fraud is a form of racketeering activity pursuant to §1961(1)(B).

77. Additionally, Steven committed securities fraud in 1985 and 1991, which, pursuant to§1961(1)(D), is a form of racketeering activity.

78. Steven also laundered his illegally obtained $10 million from the 1985 securities fraud in violation of 18 U.S.C. §1956(a)(1)(A)(i), which, pursuant to §1961(1)(B), is a form of racketeering activity

79. Donald committed insider trading, securities fraud in 1985.


B.    The Racketeering Acts Are Related

80. The securities fraud and mail fraud racketeering acts are related in that the Schemes were undertaken by Steven and Donald to enrich themselves at the expense of innocent victims. And Steven's 1985 money laundering was undertaken to conceal his ill-gotten gains from the insider trading scheme.

C.    Each Defendant Agreed to a Pattern of Racketeering Acts


13

#7103633.1

81.   Steven personally committed and agreed to commit a "pattern of racketeering activity" beginning in 1985, with the First Securities Fraud Scheme and continuing until late 1991, culminating with the Second Securities Fraud Scheme.

82.   Donald committed racketeering activity beginning in 1985 with the Insider Trading Scheme and then agreed to commit the Scheme against Patricia.

83.   Lurie agreed to commit a pattern of racketeering activity in 1989-91 with the Co-op Scheme and the Scheme against Patricia.

84.   Each Defendant thus conspired to violate §1962(c), which prohibits a person from participating in an enterprise's affairs through a pattern of racketeering activity, by agreeing to the Schemes, as alleged.

85.   Thus, to reiterate, Steven personally committed at least four racketeering acts: the Insider Trading Scheme (consisting of securities fraud and money laundering) and the Second Securities Fraud Scheme (consisting of a number of illegal trades, each one of which is a separate racketeering act). These racketeering acts violated §1962(c). Steven also conspired to commit many more racketeering acts as part of the Scheme Against Patricia and the Co-op Scheme. His agreement to commit these Schemes violated §1962(d), an agreement to violate §1962(c).

D.   The Enterprises

86.   Steven committed the Insider Trading Scheme as a manager of Gruntal, which was a corporation affecting interstate commerce. He then laundered the proceeds of his insider trading through SAC, a corporation affecting interstate commerce. He was a principal and officer of SAC.

14

#7103633.1

87.    Steven, Donald and Lurie committed the Scheme against Patricia through their roles as officers in SAC.

88.    Steven and Lurie also committed the co-op Scheme through the SAC enterprise.

E.    Prayer for Relief

89.    Patricia therefore asserts claims against each Defendant for violating §1962(d) by conspiring to violate §1962(c) in carrying out the Scheme Against Patricia . This conspiracy to violate §1962(d) proximately caused her damages of at least $2.75 million. The other schemes are pleaded in order to establish a pattern of racketeering activity.

WHEREFORE, Patricia Cohen demands a judgment against Defendants Steven Cohen, Donald Cohen, and Brett Lurie for damages of at least $2.7 million, jointly and severally, for their conspiracy to violate §1962(d), that these damages be trebled pursuant to §1964(c), for her attorneys' fees, the costs of bringing this action, for prejudgment interest, and any other relief to which she is entitled.

**COUNT II**
**COMMON LAW FRAUD AND CONSPIRACY TO COMMIT**
**COMMON LAW FRAUD AGAINST STEVEN, DONALD AND LURIE**

1.    Paragraphs 1-67 are incorporated herein as though set forth in full.

68.    Steven falsely represented to Patricia the value of the Lurie investment in 1989-1991.

69.    Steven made these false representations with the intent that Patricia would not know or learn of the true value of the Lurie investment and so that he could claim his net worth was less than it really was during their divorce and settlement proceedings.

70.    Patricia relied on these false representations at all relevant times and was induced by them to agree to the Settlement Agreement.

15

#7103633.1

71.    As a direct result of these false representations, Patricia was injured in the amount of at least $2.75 million, half of the amount of the value of the Lurie investment, a sum she would have been entitled to from the divorce and Settlement Agreement.

72.    Steven's false representations also prevented Patricia from further investigating the true value of the Laurie real estate deal at all relevant times.

73.    Additionally, at all relevant times, Steven, Donald and Lurie conspired to defraud Patricia by concealing the true value of the Laurie investment, thereby preventing Patricia from learning of its value and/or further investigating it.

WHEREFORE, Patricia demands judgment against Steven, Donald and Lurie on Count II for the amount she was damaged by their conspiracy to defraud her, at least $2.75 million, jointly and severally, prejudgment interest, punitive damages, that a constructive trust be imposed on their assets, and that they be ordered to convey to her any gains they have earned on her money over the years they have wrongfully held it.

### COUNT III
### CLAIM FOR BREACH OF FIDUCIARY DUTY
### AGAINST STEVEN, DONALD AND LURIE

1.    Paragraphs 1-67 are incorporated herein as though set forth in full.

68.    Steven, as Patricia's husband, had a fiduciary duty to Patricia.

69.    Donald, as Patricia's accountant, had a fiduciary duty to Patricia.

70.    Lurie, as Patricia's lawyer, had a fiduciary duty to Patricia.

71.    At all relevant times, Steven, Donald and Lurie breached their fiduciary duties to Patricia by conspiring with Steven to falsely misrepresent financial information to her relating to the Laurie investment..

16

72. This breach of fiduciary duty induced Patricia to sign the Separation Agreement and successfully prevented her from investigating the Laurie investment any further.

73. As a result of this breach, Patricia was injured in the amount of at least $2.7 million, half of the amount of the value of the Lurie investment that she would have been entitled from the divorce and settlement agreements.

WHEREFORE, Patricia demands judgment against Steven, Donald and Lurie on Count III for prejudgment interest, compensatory damages of at least $2.75 million, a constructive trust be imposed on their assets, and punitive damages, and any other relief to which she is entitled.

### COUNT IV
### UNJUST ENRICHMENT AGAINST STEVEN

1. Paragraphs 1-67 are incorporated herein as though set forth in full.

68. In the alternative, the Separation Agreement, and all other relevant agreements between Steven and Patricia, were induced by fraud, are unenforceable, and/or are otherwise abrogated, in whole or in part.

69. Steven accepted and retained approximately $5.5 million, the value he received from the Lurie investment, while not compensating Patricia for half of this amount (approximately $2.75 million) and the value of the secret entity holding SAC proceeds.

70. The acceptance by Steven of this benefit under the circumstances makes it inequitable for him to retain this amount without paying half to Patricia.

71. Rules of equity and good conscience require that Steven pay Patricia half the value of the Lurie real estate deal, which is approximately $2.7 million.

#7103633.1

WHEREFORE, Patricia demands a judgment on Count IV against Steven for damages of at least $2.75 million and any other relief to which she is entitled in equity and good conscience.

Dated: September 4, 2013

> **Deleted:** July 29, 2010

WILENTZ, GOLDMAN & SPITZER, P.A.

> **Deleted:** . . . . FOSTER PC¶
> ¶
> ¶
> . . . . . . By: . /s/ Howard W. Foster¶
> Howard Foster ¶
> Matthew Galin¶
> ¶
> Foster PC¶
> 150 N. Wacker Drive ¶
> Suite 150¶
> Chicago, Illinois 60606¶
> (312) 726-1600¶
> (866) 470-5738 (Fax)¶
> ¶
> Christopher S. Hinton, Esq.¶
> The Hinton Law Firm¶
> 350 Fifth Avenue, Suite 5508¶
> New York, NY 10118 Tel: (646) 723-3377 Fax: (212) 202-3827¶
> ¶
> *Counsel for Plaintiff Patricia Cohen*

By    *Kevin P. Roddy*
    KEVIN P. RODDY
110 William Street, 26th Floor
New York, NY  10038
Telephone:  (212) 267-3091
      -and-
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000

Joshua L. Dratel
LAW OFFICES OF JOSHUA L. DRATEL, P.C.
2 Wall Street, 3rd Floor
New York, NY  10005
Telephone:  (212) 732-0707

John Balestriere
BALLESTRIERE, P.L.L.C.
225 Broadway, Suite 2700
New York, NY  10007
Telephone:  (212) 374-5400

> **Deleted:** Professor Bruce Green¶
> Fordham University School of Law¶
> 140 West 62nd Street¶
> New York, NY  10023¶
> Telephone: (212) 636-6851¶
> ¶
> G. Robert Blakey, Professor Emeritus¶
> Notre Dame Law School¶
> 7002 East San Miguel Avenue¶
> Paradise Valley, AZ  85253¶
> Telephone: (574) 514-8220¶

**Attorneys for Plaintiff**

> **Formatted:** Font: Not Italic, Underline

> **Formatted:** Tabs:  3.48", Left + 6.49", Right