**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| PATRICIA COHEN, | : | |
| | : | Hon. William H. Pauley III |
| Plaintiff | : | |
| | : | Case No. 09 CV 10230 (WHP) |
| -against- | : | |
| | : | **ECF Case** |
| STEVEN COHEN, DONALD COHEN and | : | |
| BRETT LURIE, | : | **Oral Argument Requested** |
| Defendants | : | |

## OPPOSITION TO DEFENDANTS' RENEWED
## MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

WILENTZ, GOLDMAN & SPITZER, P.A.
Kevin P. Roddy
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000

LAW OFFICES OF JOSHUA L. DRATEL, P.C.
Joshua L. Dratel
2 Wall Street, 3rd Floor
New York, NY 10005
Telephone: (212) 732-0707

BALESTRIERE, FARIELLO & ABRAMS, LLP
John G. Balestriere
225 Broadway, Suite 2900
New York, NY 10007
Telephone: (212) 374-5401

**Attorneys for Plaintiff**
[Additional Counsel Listed on Signature Page]

7103960.3

## TABLE OF CONTENTS

**PAGE**

I.    STATEMENT OF FACTS ....................................................................................1

    A.    The Marriage And Formation Of SAC Trading Corp. ................................1

    B.    The Lurie Investment ................................................................................1

    C.    Negotiation Of The Separation Agreement And Subsequent Divorce ......................2

    D.    Continued Misrepresentations In Steven's Affidavit Induce Patricia To Agree To The 1991 Amendments To The Separation Agreement ........................................3

    E.    Patricia Uncovers Steven's Fraud And Files This Action ..........................................4

II.    ARGUMENT ...................................................................................................4

    A.    Plaintiff Asserts Plausible Claims Against Defendants .............................4

    B.    Plaintiff Plausibly Asserts RICO Claims Against Defendants ...................5

        1.    Plaintiffs Properly Allege Each Element Of Their RICO Claims .................6

        2.    Defendants' Improper Attempt To Limit RICO's Application In This Case ........................................................................................6

        3.    Plaintiff Alleges Proprietary (Monetary) Injury .............................8

        4.    Plaintiff Identifies RICO Enterprise(s) And Relationship Between Predicate Acts And Enterprise(s) .................................................10

        5.    Plaintiff Properly Alleges A Pattern Of Racketeering Activity ....................12

    C.    Plaintiff Properly Alleges A RICO Conspiracy Claim ............................16

    D.    Plaintiff Properly Alleges A Claim For Common Law Fraud (Count II) ...............16

        1.    The Second Circuit Held That Plaintiff Properly Alleged At Least Three Fraudulent Statements ........................................................16

        2.    The Putative Disclaimer Only Addresses The Value Of The Lurie Investment ........................................................................16

        3.    Steven Cannot Rely On His "Disclaimer" When He Defrauded Patricia Regarding The Agreement Itself ....................................................18

i

## TABLE OF CONTENTS

**PAGE**

4.    Because Steven Lied In The Agreement, He Cannot Rely On The Agreement To Absolve Himself Of Liability ............................................... 18

E.    Plaintiff Properly Alleges A Claim For Breach Of Fiduciary Duty (Count III) ....... 19

    1.    Introduction .................................................................................... 19

    2.    As Patricia's Spouse, Steven Had Fiduciary Duties To Patricia Even When Negotiating The Agreement ......................................................... 20

    3.    Steven's Fiduciary Duties Were Ongoing While Negotiating The Settlement Agreement .................................................................... 21

    4.    Defendants' Assertions Of Fact That The Separation Was Contentious, And Steven Thus Was No Longer A Fiduciary, Have No Basis In Law ... 22

    5.    As Patricia's Accountant, Donald Owed A Fiduciary Duty To Patricia, Which Count III Alleges He Breached ......................................... 23

    6.    In The Alternative, Donald Aided And Abetted Steven's Breach of His Own Fiduciary Duties To Patricia .............................................. 24

III.    CONCLUSION ................................................................................................ 25

## TABLE OF AUTHORITIES

**PAGE**

### Cases

*Bankers Trust Co. v. Rhoades,*
    859 F.2d 1096 (2d Cir. 1988) ............................................................................. 9

*Barchella v. Barchella,*
    44 A.D.3d 696, 844 N.Y.S.2d 78 (2d Dep't 2007) ......................................... 21

*Blue Chip Emerald LLC v. Allied Partners,*
    299 A.D.2d 278 N.Y.S.2d 291 (1st Dep't 2002) ............................................ 21

*Bridge v. Phoenix Bond & Indem. Co.,*
    553 U.S. 639 (2008) ............................................................................................ 7

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,*
    36 F. Supp. 2d 560 (E.D.N.Y. 1999) ................................................................. 8

*Cadle Co. v. Flanagan,*
    271 F. Supp. 2d 379  (D. Conn. 2003) ............................................................... 9

*Capasso v. CIGNA, Ins. Co.,*
    765 F. Supp. 839 (S.D.N.Y. 1991) ............................................................. 9, 22

*Caprer v. Nussbaum,*
    36 A.D.3d 176, 825 N.Y.S.2d 55 (2d Dep't 2006) ........................................ 24

*Carlinger v. Carlinger,*
    21 A.D.2d 656, 249 N.Y.S.2d 761 (1st Dep't 1964) ...................................... 17

*Christian v. Christian,*
    42 N.Y.2d 63, 365 N.Y.S.2d 849 (1977) ........................................ 19, 20, 21, 22

*Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.,*
    187 F.3d 229 (2d Cir. 1999) ....................................................................... 13, 14

*Cohen v. Cohen,*
    711 F.3d 353 (2d Cir. 2013) .................................................... 4, 5, 13, 16, 18

*Cohen v. Cohen,*
    1 A.D.2d 586, 151 N.Y.S. 2d 949 (1st Dep't 1956) ....................................... 18

*Crowell-Collier Pub. Co. v. Josefowitz,*
    9 Misc.2d 613, 170 N.Y.S.2d 373 (Sup. Ct. 1957) ........................................ 18

### TABLE OF AUTHORITIES

**PAGE**

*DeFalco v. Bernas,*
    244 F.3d 286, 321 (2d Cir. 2001) ......................................................... 13, 14

*DeMauro v. DeMauro,*
    115 F.3d 94  (1st Cir. 1997)............................................................. 10

*Etzion v. Etzion,*
    62 A.D.3d 646, 880 N.Y.S.2d 79 (2d Dep't 1989) .......................... 23

*Farkas v. D'Oca,*
    857 F. Supp. 300 (S.D.N.Y. 1994) ........................................... 10

*First Interregional Advisors Corp. v. Wolff,*
    956 F. Supp. 480 (S.D.N.Y. 1997) ........................................... 14

*Fresh Meadow Food Svcs., LLC v. RB 175 Corp.,*
    282 Fed. Appx. 94 (2d Cir. 2008).................................... 8, 13, 14

*Furman v. Cirrito,*
    741 F.2d 524 (2d Cir. 1984), *vacated and remanded on other grounds,*
    473 U.S. 922 (1985) ..............................................................8

*GICC Capital Corp. v. Tech. Fin. Grp., Inc.,*
    67 F.3d 463 (2d Cir. 1995) ................................................ 13

*Gross v. Waywell,*
    628 F. Supp. 2d 475 (S.D.N.Y. 2009) ................................... 8

*H.J., Inc. v. Nw. Bell Tel. Co.,*
    492 U.S. 229, 239 (1989)......................................... 10, 13

*Ideal Steel Supply Corp. v. Anza,*
    652 F.3d 310 (2d Cir. 2011) ............................................ 7

*In re Crude Oil Commod. Futures Litig.,*
    913 F. Supp. 2d 41 (S.D.N.Y. 2012) ............................... 1, 4

*In re Food Mgmt. Grp., LLC,*
    380 B.R. 677 (Bankr. S.D.N.Y. 2008)........................... 17

*In re MTC Elec. Tech. Shareholder Litig.,*
    74 F. Supp. 2d 276 (E.D.N.Y. 1999) ............................. 16

*In re Sharp Int'l Corp.,*
    403 F.3d 43 (2d Cir. 2005) .......................................... 24

iv

<u>**TABLE OF AUTHORITIES**</u>

<u>**PAGE**</u>

*In re Steven A. Cohen,*
  No. 3-15382 ............................................................................................... 8

*Kabir v Kabir,*
  85 A.D.3d 1127, 926 N.Y.S.2d 158 (2d Dep't 2011) .............................. 21

*Kurins v. Silverman,*
  2009 U.S. Dist. LEXIS 21301 (S.D.N.Y. Feb. 13, 2009) ........................ 11

*Lavin v. Kaufman, Greenhut, Lebowitz & Forman,*
  226 A.D.2d 107, 640 N.Y.S.2d 57 (1st Dep't 1996) .............................. 19

*Lurie v. Wittner,*
  228 F.3d 113 (2d Cir. 2000) ...................................................................... 2

*Manes v Manes,*
  277 A.D.2d 359, 717 N.Y.S.2d 185 (2d Dep't 2000) ............................. 21

*Meisel v. Grunberg,*
  651 F. Supp. 2d 98 (S.D.N.Y. 2009) ....................................................... 19

*Metromedia Co. v. Fugazy,*
  983 F.2d 350 (2d Cir. 1992) .................................................................... 13

*Morin v. Trupin,*
  747 F. Supp. 1051, (S.D.N.Y. 1990) ....................................................... 15

*Moses v. Carver,*
  164 Misc. 204, 298 N.Y.S. 378 (Sup. Ct. 1937).................................... 18

*Moses v. Martin,*
  360 F. Supp. 2d 533 (S.D.N.Y. 2004) ..................................................... 15

*NOW v. Scheidler,*
  510 U.S. 249 (1994)................................................................................... 8

*People v. Lurie,*
  249 A.D.2d 119, 673 N.Y.S. 2d 60 (1st Dep't 1998)................................ 2

*Perlberger v. Perlberger,*
  1998 U.S. Dist. LEXIS 1964 (E.D. Pa. Feb. 25, 1998) ........................... 13

*Petracca v Petracca,*
  101 A.D.3d 695, 956 N.Y.S.2d 77 (2d Dep't 2012).............................. 20

*Pieper v. Benerin, LLC,*
  2013 U.S. Dist. LEXIS 119521 (E.D.N.Y. Aug. 22, 2013)...................... 12

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE</u>

*Pohlot v. Pohlot,*
  664 F. Supp. 112 (S.D.N.Y. 1987) ........................................................ 9

*Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.,*
  879 F.2d 10 (2d Cir. 1989) ............................................................... 14

*Reiter v. Sonotone Corp.,*
  442 U.S. 330 (1979) ........................................................................ 8

*Rosenson v. Mordowitz,*
  2012 U.S. Dist. LEXIS 120077 (S.D.N.Y. Aug. 23, 2012) ..................... 11

*Sedima, S.P.R.L. v. Imrex Co.,*
  473 U.S. 479 (1985) ........................................................................ 7

*Sheridan v. Mariuz,*
  2008 U.S. Dist. LEXIS 123409 (S.D.N.Y. Apr. 4, 2008), *adopted by* 2009 U.S. Dist. LEXIS
  28984 (S.D.N.Y. Apr. 6, 2009) ......................................................... 9

*SKS Constructors, Inc. v. Drinkwine,*
  458 F. Supp. 2d 68 (E.D.N.Y. 2006) ................................................ 13

*Solutia, Inc. v. FMC Corp.,*
  456 F. Supp. 2d 429 (S.D.N.Y. 2006) .............................................. 19

*Staffenberg v. Fairfield Pagma Assoc., LP,*
  2011 N.Y. Misc. LEXIS 920 (Sup. Ct. Mar. 7, 2011) .......................... 24

*State Farm Mut. Auto. Ins. Co. v. CPT Med. Svcs., P.C.,*
  375 F. Supp. 2d 141 (E.D.N.Y. 2005) .............................................. 16

*Sykes v. Mel Harris & Assocs.,*
  757 F. Supp. 2d 413 (S.D.N.Y. 2010) .............................................. 16

*Terminate Control Corp. v. Horowitz,*
  28 F.3d 1335 (2d Cir. 1994) ........................................................... 15

*Town of West Hartford v. Operation Rescue,*
  915 F.2d 92 (2d Cir. 1990) ............................................................... 8

*U.S. v. Daidone,*
  471 F.3d 371 (2d Cir. 2006) ........................................................... 10

*U.S. v. S.A.C. Capital Advisors, L.P.,*
  No. 13 Crim. 541 .......................................................................... 8

## TABLE OF AUTHORITIES

**PAGE**

*UFCW Local 1776 v. Eli Lilly & Co.,*
   620 F.3d 121 (2d Cir. 2010) .......................................................... 6

*Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker,*
   56 A.D.3d 1, 865 N.Y.S.2d 14 (1st Dep't 2008) ...................... 19

*Verschell v. Pike,*
   85 A.D.2d 690, 445 N.Y.S.2d 489 (2d Dep't 1981) ................. 20

*Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.,*
   149 F.3d 134 (2d Cir. 1998) ....................................................... 19

**Statutes**

18 U.S.C. § 1961(1) ......................................................................... 5

18 U.S.C. § 1961(4) ......................................................................... 5

18 U.S.C. § 1961(5) .................................................................... 6, 13

18 U.S.C. §1962 ...................................................................... 6, 7, 16

18 U.S.C. §1962(c) ........................................................................... 6

18 U.S.C. §1962(d) ........................................................................... 5

18 U.S.C. §1964(c) ................................................................... passim

**Other Authorities**

Douglas E. Abrams, THE LAW OF CIVIL RICO § 3.2 (1991) ......................................................... 15

Plaintiff, Patricia Cohen ("Patricia"), files her Opposition to the Renewed Motion to Dismiss (Doc. 85) filed by Defendants, Steven Cohen ("Steven") and Donald Cohen ("Donald") ("Br. at ___"). Plaintiff's Second Amended Complaint (Doc. 48) ("2AC, ¶__" or "¶__") plausibly states claims against Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), common law fraud and breach of fiduciary duty. Defendants' motion should be denied and this case should proceed to discovery and other pretrial proceedings.

## I.    STATEMENT OF FACTS

For purposes of Defendants' motion, the following allegations are deemed to be true. *In re Crude Oil Commod. Futures Litig.*, 913 F. Supp. 2d 41, 50-51 (S.D.N.Y. 2012) (Pauley, J.).

### A.    The Marriage And Formation Of SAC Trading Corp.

Steven and Patricia were married in 1979. ¶13. At the time, Steven was affiliated with Gruntal & Co. ("Gruntal"), a securities brokerage firm. ¶12. During the first years of their marriage, Steven became a successful trader and headed a proprietary trading group at Gruntal. ¶14. In early 1986, Steven created SAC Trading Corp. ("SAC") and was its sole shareholder. ¶16. Steven appointed himself President of SAC; his brother, Donald, an accountant, its Treasurer; and Brett Lurie ("Lurie") its Secretary and lawyer. Steven placed all of the marital assets, save the Cohens' apartment, into SAC. *Id.*

### B.    The Lurie Investment

Shortly thereafter, Steven, exercising his control over the Cohens' assets, invested $8,745,169 in marital assets from SAC with Lurie to purchase real estate in New York City for conversion to co-op apartments (the "Lurie Investment"). Steven and Donald assured Patricia that they anticipated making a huge profit from the Lurie Investment. ¶17. During 1986-1988, as

1

part of the Lurie Investment, Lurie made real estate purchases through SAC. ¶55. SAC held title to certain properties and held an interest in those where title was held by Lurie alone. ¶56.

These real estate purchases were actually part of a scheme by Steven, Donald and Lurie to defraud co-op buyers. ¶¶55-63. Lurie provided co-op buyers, often through the U.S. mails, offering plans misrepresenting the condition of the properties, and failed to inform buyers that he had defaulted on multiple obligations in connection to the projects. *Id.* Steven was at all times aware of this scheme and gave his approval by allowing Lurie to conduct the scheme through SAC, overseeing the investment itself, and approving the fraudulent offering plans. ¶57. The scheme collapsed because Lurie could not maintain the properties, despite reaping unearned fees from the owners. The properties were forced into bankruptcy; many co-op owners were damaged by the loss in value of their investments and were forced to live in buildings with substandard conditions. ¶61. Lurie was prosecuted, convicted and incarcerated for his involvement in the scheme. *See Lurie v. Wittner,* 228 F.3d 113, 118-119 (2d Cir. 2000); *People v. Lurie*, 249 A.D.2d 119, 673 N.Y.S.2d 60 (1st Dep't 1998).

In late 1986, Steven and Donald (the Cohens' and SAC's accountant) told Patricia that Steven had lost the entire value of the Lurie Investment, and that the loss could not be written off until the properties went into foreclosure or bankruptcy. ¶20. Steven represented to Patricia that the Lurie Investment was a complete loss for the next several years. ¶21. However, in 1987, Lurie actually repaid over one-half of the investment – $5.5 million – to Steven. But Steven never told Patricia that he had recovered this sum from the Lurie Investment and affirmatively represented to the contrary. *Id.*

C.   **Negotiation Of The Separation Agreement And Subsequent Divorce**

Steven and Patricia separated in 1988. ¶22. As part of the negotiations leading up to their 1989 Separation Agreement (later incorporated in a judgment of divorce dated March 13, 1990),

Donald and Steven prepared a "Statement of Financial Condition," dated "as of July 1, 1988," which purported to disclose all of the Cohens' marital assets, and listed the Lurie Investment as "Mortgages" valued at $8,745,169. ¶23; Decl. of Martin Klotz (Doc. 87) ("Klotz Decl."), Ex. D.

While negotiating the Separation Agreement at Patricia's lawyer's office, Steven told Patricia and her lawyer that he was unable to declare the Lurie Investment lost because there was still no bankruptcy or foreclosure decree, a prerequisite to declaring the asset valueless. Steven reaffirmed that the nearly $9 million investment of marital assets was completely lost. ¶24. Patricia and her lawyer relied on Steven's and Donald's representations about the Lurie Investment and agreed to the Separation Agreement, which distributed the marital assets *without* the $5.5 million Steven had received from Lurie in 1987. ¶26.[1] Patricia only agreed to the settlement, as valued in the Separation Agreement, because she was told by her husband and their accountant (Donald) the entire Lurie Investment had been lost. *Id.* In addition, Steven and Donald hid from Patricia the existence of an entity or bank account that held the substantial profits of SAC, both on the financial statement and thereafter. ¶¶25, 32.

### D. Continued Misrepresentations In Steven's Affidavit Induce Patricia To Agree To The 1991 Amendments To The Separation Agreement

In 1991, Patricia brought an action in New York Supreme Court seeking to increase spousal maintenance and child support. ¶30. Opposing Patricia's motion, Steven signed an affidavit in which he reaffirmed that the Lurie Investment was a complete loss. ¶31; Decl. of Kevin P. Roddy ("Roddy Decl."), Ex. 1, ¶16. (Attached as Exhibit 'B' to Steven's 1991

---

[1]      At that time, a $5.5 million repayment to the Cohens would have represented more than 40% of the marital estate, and one-half of that amount ($2.75 million) would have meant to Patricia almost three times the cash she received from Steven in the Settlement Agreement. Klotz Decl., Ex. B, §3.5(b). Without disclosing the Lurie repayment, Steven represented that he was giving Patricia 54% of the marital estate, and she believed him; she even waived spousal support to which she was otherwise entitled.

affidavit was the July 1988 financial statement.)   When Steven made that sworn statement in 1991, he knew, just as he knew in 1988, 1989 and 1990, that the Lurie Investment was not "worthless," and he continued to conceal the return of more than one-half of their investment. ¶32. Steven's affidavit was part of the reason why Patricia agreed to settle the 1991 proceeding on the terms that she did, and prevented her from investigating the Lurie Investment. ¶34.

**E.      Patricia Uncovers Steven's Fraud And Files This Action**

In 2006, after reading a news article in which Gruntal was depicted as a less than honorable institution, Patricia began to doubt the truthfulness of Steven and Donald's representations about the Lurie Investment. ¶35. As a result of her investigation, Patricia discovered that Steven had sued Lurie in 1987 over the Lurie Investment and had received $5.5 million of their money back from Lurie. ¶39. (Also, documents in that litigation revealed the existence of a secret unnamed entity or account which "holds the profits" of SAC. *Id.*) Because at least one-half of this $5.5 million should have been awarded to Patricia in the Separation Agreement, Patricia retained counsel and sued Steven, Donald and Lurie for fraud in 2009.

## II.      ARGUMENT

**A.      Plaintiff Asserts Plausible Claims Against Defendants**

Plaintiff asserts claims against Defendants for conspiracy to violate RICO (Count I), common law fraud (Count II), and breach of fiduciary duty (Count III). Plaintiff's unjust enrichment claim (Count IV), was dismissed by the district court as time-barred.   While that ruling was affirmed on appeal, the Second Circuit also found that Patricia had sufficiently alleged Defendants' fraudulent statements and that the district court's reasons for dismissing her fraud-based claims were erroneous. *Cohen v. Cohen,* 711 F.3d 353, 356, 358-361 (2d Cir. 2013).

Counts I-III contain sufficient factual matter, accepted as true, to state claims for relief that are plausible on their face. *Crude Oil Commod.,* 913 F. Supp. 2d at 50. In Count I, Patricia's

allegations plausibly give rise to an entitlement of relief under §1964(c) of RICO. Each element of Plaintiff's substantive and conspiracy claims is properly pled, in accordance with Supreme Court and Second Circuit precedent, and Defendants' limited pleading challenges do not suffice to defeat the RICO claims as a matter of law. *Compare* pp. 5-16, *infra, with* Br. at 2-3, 10-18.  In Count II, each element of Patricia's common law fraud and conspiracy claims is properly pled. The sufficiency of the allegations of fraudulent statements has already been established; those allegations are "sufficient to go forward to be tested at trial." *Cohen*, 711 F.3d at 361 n.2. Defendants' challenges to Count II are insufficient to defeat it as a matter of law. *Compare* pp. 16-19, *infra, with* Br. at 3-4, 19-21. Each element of Patricia's claims for breach of fiduciary duty is properly pled in Count III. Plaintiff plausibly asserts claims against her husband, their accountant and their lawyer for breach of fiduciary duty.  Defendants' pleading challenges cannot defeat these claims as a matter of law. *Compare* pp. 19-25, *infra, with* Br. at 4, 21-22.

**B.    Plaintiff Plausibly Asserts RICO Claims Against Defendants**

In violation of §1962(d), Defendants conspired to violate §1962(c) in carrying out the Scheme Against Patricia. ¶¶12-45, 68-89. Each of the Defendants is a RICO "person." ¶68; 18 U.S.C. §1961(3). SAC and Gruntal are each a legal entity "enterprise." ¶69; 18 U.S.C. §1961(4). Defendants agreed to use and used the U.S. mails to perpetrate the Scheme Against Patricia, committing violations of the federal mail fraud statute, 18 U.S.C. §1341, which constitutes "racketeering activity." ¶¶72-76; 18 U.S.C. §1961(1).

The mailings were made to Plaintiff in furtherance of the scheme to defraud her during 1986-1991. ¶¶23, 29, 33. During a ten-year period (1985-1995), Steven also committed predicate acts injuring other victims, including the Insider Trading Scheme, ¶¶46-54; the Co-Op Scheme, ¶¶55-63; and the Second Securities Fraud Scheme, ¶¶64-67. These four schemes constitute a "pattern of racketeering activity" perpetrated by Steven both personally (Insider Trading Scheme

and Second Securities Fraud Scheme), and by conspiring with Donald and Lurie (Scheme Against Patricia), and just with Lurie (Co-Op Scheme). ¶85; 18 U.S.C. §1961(5).

Steven committed his first racketeering act (Insider Trading Scheme) in 1985, ¶52, and, as currently pled, his last racketeering act in 1995 (Second Securities Fraud Scheme). ¶¶33, 58, 64. Donald committed a pattern of racketeering activity beginning in 1985 with the Insider Trading Scheme, which he personally committed in addition to Steven, and then agreed to commit the Scheme Against Patricia. ¶82. Lurie agreed to commit the Co-Op Scheme and the Scheme Against Patricia. ¶83. Plaintiff suffered monetary injury by reason of the Scheme Against Patricia and she has standing to sue Defendants under 18 U.S.C. §1964(c).

### 1.    **Plaintiffs Properly Allege Each Element Of Their RICO Claims**

To state a claim for damages, Plaintiff must allege a substantive RICO violation under §1962, injury to her business or property, and that such injury was by reason of the RICO violation. *UFCW Local 1776 v. Eli Lilly & Co.,* 620 F.3d 121, 131 (2d Cir. 2010). Contrary to Defendants' assertion (Br. at 2-3, 10), Plaintiff plausibly alleges each element of her RICO claims. Defendants' commission of the four schemes to defraud through SAC and Gruntal constitutes the "conduct" of such enterprises' affairs "through a pattern of racketeering activity." 18 U.S.C. §1962(c). The agreement between Steven, Donald and Lurie to commit the Scheme Against Patricia and the Co-Op Scheme by and through the U.S. mails, and subsequent uses of the U.S. mails causing injuries to co-op owners and Plaintiff, properly alleges a RICO conspiracy to perpetrate these schemes.

### 2.    **Defendants' Improper Attempt To Limit RICO's Application In This Case**

In advancing supposedly policy-based arguments to defeat Patricia's assertion of RICO claims against the fiduciaries who defrauded her, Defendants ignore the public policies recognized by the Supreme Court and this Court:

6

> *RICO is to be read broadly.* This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to "be liberally construed to effectuate its remedial purposes," Pub. L. 91-452, § 904(a), 84 Stat. 947. *The statute's "remedial purposes" are nowhere more evident than in the provision of a private action for those injured by racketeering activity.*

*Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497-498 (1985) (emphasis added; citation omitted).

*Accord Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 660 (2008) ("We have repeatedly refused to adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of what Congress intended to proscribe.") (citations omitted); *Ideal Steel Supply Corp. v. Anza,* 652 F.3d 310, 322 (2d Cir. 2011) (same). Defendants' assertion that they are not subject to liability to Patricia because they engaged in so-called "garden variety" fraud (Br. at 2, 10) was long ago rejected by the Second Circuit:

> When congress provided severe sanctions, both civil and criminal, for conducting the affairs of an "enterprise" through a "pattern of racketeering activity", it provided no exception for businessmen, for white collar workers, for bankers, or for stockbrokers. *If the conduct of such people can sometimes fairly be characterized as "garden variety fraud", we can only conclude that by the RICO statute congress has provided an additional means to weed that "garden" of its fraud.*
>
> *It seems almost too obvious to require statement, but fraud is fraud, whether it is committed by a hit man for organized crime or by the president of a Wall Street brokerage firm.*

*Furman v. Cirrito,* 741 F.2d 524, 529 (2d Cir. 1984) (emphasis added), *vacated and remanded on other grounds,* 473 U.S. 922 (1985).

Recently filed U.S. Government enforcement actions characterize SAC and related entities as illegitimate business enterprise(s) and directly implicate Steven in their wrongdoing. On July 19, 2013, the SEC charged Steven with failing to supervise two senior employees and prevent them from insider trading. *In re Steven A. Cohen,* No. 3-15382. On July 23, 2013, a grand jury in this District returned an Indictment charging SAC-related entities with wire fraud

and securities fraud. *U.S. v. S.A.C. Capital Advisors, L.P.,* No. 13 Crim. 541. On July 25, 2013, the Government filed a civil forfeiture action seeking to seize Steven's assets. *U.S. v. S.A.C. Capital Advisors, L.P.,* Case No. 13 CV 5182. *See* Plaintiff's Request for Judicial Notice, Exhibits 1, 2 and 3. Upon information and belief, the complaint and indictment identify Steven as the "SAC owner," detailing his involvement in schemes carried out during 1999-2010.

When Plaintiff's allegations are read in the context of these Government enforcement actions, we think it clear that Steven, Donald and Lurie engaged in anything but "garden variety" fraud. Patricia was an early victim of Steven's long-running schemes, but she was far from the only victim. This case represents the point along the "measure of continuity" of Steven's wrongdoing, which stretches from 1985 to at least 2010, at which the "quantum of injury" he has caused rises to a level at which it has produced "larger societal impacts," thereby transforming this case "from a mostly private affair to one that justifies the extraordinary legislative response RICO provides." *Gross v. Waywell,* 628 F. Supp. 2d 475, 490 (S.D.N.Y. 2009); *see also Fresh Meadow Food Svcs., LLC v. RB 175 Corp.,* 282 Fed. Appx. 94, 100 (2d Cir. 2008).

### 3. Plaintiff Alleges Proprietary (Monetary) Injury

Contrary to Defendants' assertion (Br. at 11-12), Plaintiff plausibly alleges a monetary injury. Patricia was injured *at least* in the amount of $2.75 million – one-half the value of the Lurie Investment – to which she was entitled as a shared marital asset. ¶¶21, 31, 89. Money is "property" under RICO, *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,* 36 F. Supp. 2d 560, 569 (E.D.N.Y. 1999), and §4 of the Clayton Act, *Reiter v. Sonotone Corp.,* 442 U.S. 330, 338 (1979), upon which RICO's remedial provisions were modeled. *Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 103 (2d Cir. 1990). Given Patricia's specific allegations, ¶89, Defendants' "injury" argument fails. *NOW v. Scheidler,* 510 U.S. 249, 256 (1994) (sufficiency of

allegations); *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1101 (2d Cir. 1988) (concealment of assets from creditors); *Cadle Co. v. Flanagan,* 271 F. Supp. 2d 379, 386 (D. Conn. 2003) (same).

Defendants mischaracterize Plaintiff's claim as an "expectancy interest" (Br. at 11), arguing that her injury is not monetary but, rather, an indeterminate reduced share with unknown value (*i.e.,* Plaintiff was injured by not receiving a "greater share" of assets than she was otherwise entitled to receive). That description is inaccurate because, at the very least, Patricia seeks *her share* of the Lurie Investment she was entitled to as part of her agreement with Steven to divide marital assets equally. ¶31. This case is not about altering the terms of the agreement to be more favorable to Patricia; rather, it is about Steven--a financial wizard and Wharton Business School graduate--concealing the fact that a multi-million dollar marital asset had *any* value so that he would not have to pay Patricia, a housewife who completed one year of college, one-half of its already realized value, as they had agreed. *Id.*

Defendants' cases actually illustrate Plaintiff's point. In *Sheridan* and *Pohlot*, plaintiffs alleged injuries in the form of less favorable divorce terms than they were entitled to, awarded to them *by a third party* purportedly acting in reliance on defendants' fraud. *Sheridan v. Mariuz,* 2008 U.S. Dist. LEXIS 123409, *19-20 (S.D.N.Y. Apr. 4, 2008), *adopted by* 2009 U.S. Dist. LEXIS 28984 (S.D.N.Y. Apr. 6, 2009); *Pohlot v. Pohlot,* 664 F. Supp. 112, 116 (S.D.N.Y. 1987). In *Capasso v. CIGNA Ins. Co.,* 765 F. Supp. 839 (S.D.N.Y. 1991), plaintiff sought a future *unknown* share in *her husband's* asserts: "[E]ven assuming evil motivation on the part of the defendants, their conduct is not actionable because until Nancy Capasso had a property interest, they could not have injured it. [Her] mere expectation that she might be awarded some share *in her husband's property* is too speculative to support a RICO claim." *Id.* at 842 (emphasis added). Here, the concealed property is *Patricia's share* of the Lurie Investment that

she was already entitled to and, importantly, had already been monetized. *DeMauro v. DeMauro,* 115 F.3d 94, 98 (1st Cir. 1997); *Farkas v. D'Oca,* 857 F. Supp. 300, 304 (S.D.N.Y. 1994).

### 4.   Plaintiff Identifies RICO Enterprise(s) And Relationship Between Predicate Acts And Enterprise(s)

Contrary to Defendants' assertions (Br. at 16-18), Plaintiff properly identifies RICO enterprise(s) and allege that their affairs were conducted through a pattern of racketeering activity. Steven perpetrated the Insider Trading Scheme through Gruntal, and the Scheme Against Patricia and the Co-Op Scheme through SAC – a corporation he established in January 1986, owned in its entirety, served as President, and used to hold all of the marital assets (with the exception of the Cohens' apartment). ¶¶16, 87-88. Steven perpetrated the Scheme Against Patricia by investing $9 million of their money, held at SAC, with Lurie. ¶20. Later, Steven fraudulently told Patricia that the money had been lost, even though he had secretly received $5.5 million back from Lurie. ¶21. Additionally, Steven transferred SAC's profits to a secret entity or account to hide them from Patricia and fraudulently omitted this material fact from his financial disclosures. ¶¶25, 32, 39, 42.

As in *H.J., Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 239 (1989), a pattern of racketeering activity requires that "the predicate acts are related, and that they amount to or pose a threat of continued criminal activity." Predicate acts are "related" if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240. The Second Circuit defines this as "horizontal" relatedness (predicate acts related to each other) and "vertical" relatedness (predicate acts are related to the enterprise). *U.S. v. Daidone,* 471 F.3d 371, 375 (2d Cir. 2006). Both horizontal and vertical relatedness are generally satisfied by a showing *either* that defendant "was enabled to commit the predicate offenses solely by virtue of his position in

10

the enterprise or involvement in or control over the affairs of the enterprise" *or* "the predicate offenses are related to the activities of that enterprise." *Id.* (citation omitted).

Patricia's allegations that Steven committed predicate acts in the Scheme Against Patricia by using money (marital assets) and disbursing them from SAC to Lurie satisfy *both* criteria. Steven was "enabled" to commit the predicate acts "solely by virtue of his position in the [SAC] enterprise" and/or his "involvement in or control over the affairs of th[at] enterprise." *Id.* This case is similar to *Kurins v. Silverman,* 2009 U.S. Dist. LEXIS 21301 (S.D.N.Y. Feb. 13, 2009), where plaintiff, who owned 49% of the stock of Silverseal, alleged that Silverman, the company's president who owned 51% of its stock, assisted by outside counsel, diverted company funds for improper purposes. Plaintiff satisfied the "relatedness" test because the predicate acts of mail and wire fraud involved deposits, invoices, checks and authorizations on a single escrow account "in furtherance of Defendants' alleged scheme to funnel money out of Silverseal," which defendants were able to commit by virtue of their corporate positions and their access to that account. *Id.* at *11.

Contrary to Defendants' assertion (Br. at 17-18), *Rosenson v. Mordowitz*, 2012 U.S. Dist. LEXIS 120077 (S.D.N.Y. Aug. 23, 2012), is distinguishable and should not be followed. Plaintiffs and defendants jointly owned an apartment building. Plaintiffs alleged that defendant Mordowitz, the property manager who was also an attorney, misappropriated money from an account used to collect income from the building and pay its expenses. Plaintiffs asserted that M&L, Mordowitz's law firm, was a RICO enterprise, and that Mordowitz used his authority as a partner to commit the law firm's resources to commission of racketeering activity, sending fraudulent statements about the building by mail fraud (using stationery and secretarial services) and wire fraud (using the firm's fax machine). The court found that the "merely incidental" use of the law firm's resources was not sufficient to satisfy the "relatedness" tests. *Id.* at *23-24.

11

However, the court acknowledged that "the use of an enterprise's resources may be central to the commission of the racketeering activities," such as where "particular resources" are "crucial to the pattern of racketeering activities," or "use of those resources was ... indispensable to the alleged racketeering activities." *Id.* at *22-24. Mordowitz "would not have been hindered in the commission of the [predicate] acts... without access to M&L's resources or facilities" because "the fraudulent acts could have just as well been committed in any other office with standard office supplies." *Id.* at *23. In this case, Steven invested with Lurie $9 million of the Cohens' marital assets, which were held by SAC. Steven was capable of funneling that money out of SAC solely by virtue of his ownership and executive position at SAC. Contrary to *Rosenson,* this is not the "mere incidental" use of the RICO enterprise's resources but, rather, the use of "particular resources" that were "indispensable" to the Scheme to Defraud Patricia.

As to the second prong (predicate acts are related to the enterprise's activities), *Rosenson* found that "there is no allegation that anyone at M&L" apart from Mordowitz "participated in the fraud or benefitted from the fraud." *Id.* at *24. Here, Patricia alleges that Donald, SAC's treasurer, participated in the scheme to defraud her. ¶¶16-17, 20, 23, 26, 70, 82. Thus, under either prong, Plaintiff has satisfied the "relatedness" pleading requirement. *See Pieper v. Benerin, LLC*, 2013 U.S. Dist. LEXIS 119521, *22-23 (E.D.N.Y. Aug. 22, 2013).[2]

### 5. Plaintiff Alleges A Pattern Of Racketeering Activity

Contrary to Defendants' assertions (Br. at 12-16), Plaintiff properly alleges a "pattern of racketeering activity." Nothing in RICO's statutory language precludes its application to

---

[2]   The same result obtains as to the Co-Op Scheme, which Steven and Lurie carried out through their positions as officers of SAC. ¶¶55-63, 71. *See Pieper,* 2013 U.S. Dist. LEXIS 119521, *22-23. Defendants' assertion that predicate acts committed during the Co-Op Scheme are not "related" and are "irrelevant" to Patricia's claim (Br. at 15-16) is discussed on p. 15, *infra.*

Defendants' scheme to conceal assets from Patricia, even if it was carried out during and following a divorce proceeding. *Perlberger v. Perlberger,* 1998 U.S. Dist. LEXIS 1964 (E.D. Pa. Feb. 25, 1998) (wife's RICO claim based upon concealment of assets permitted against ex-husband, accountants and attorneys). Cases cited by Defendants (Br. at 12) involved short-lived and finite schemes to defraud a spouse (a "single victim"), rather than multiple schemes to defraud committed by Defendant(s) causing monetary injury to Patricia *and* other victims. The Second Circuit recognizes RICO's intended applicability to cases like this one. *Fresh Meadow,* 282 Fed. Appx. at 99-100.

To plead a "pattern of racketeering activity," Plaintiff alleges at least two related predicate acts of racketeering in a ten-year period that pose a threat of continuing criminal activity." 18 U.S.C. §1961(5); *GICC Capital Corp. v. Tech. Fin. Grp., Inc.,* 67 F.3d 463, 465 (2d Cir. 1995). Plaintiff shows "continuity," alleging both a "closed-ended" and an "open-ended" pattern. *H.J.,* 492 U.S. at 241-242. While fraud-based predicate acts must be alleged with particularity, Defendants do not challenge the RICO claims on that basis (Br. at 12-14), and the Second Circuit has already upheld the fraud-based allegations. *Cohen,* 711 F.3d at 356, 359-361.

Although "closed-ended" continuity is "primarily a temporal concept," *Spool,* 520 F.3d at 184, this Court may also consider the number of participants and victims and the presence of separate schemes. *DeFalco v. Bernas,* 244 F.3d 286, 321 (2d Cir. 2001). The temporal benchmark is two years. *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 242 (2d Cir. 1999). The Scheme Against Patricia was carried out during 1986-1991, a five-year period, and was concealed from her for years thereafter. ¶¶16-34, 41-43. Thus, closed-ended continuity has been alleged, *see DeFalco,* 244 F.3d at 321; *Metromedia Co. v. Fugazy,* 983 F.2d 350, 369 (2d Cir. 1992) (two-year period suffices), especially given Defendants' engagement in at least three other schemes. *Fresh Meadows,* 282 Fed. Appx. at 99-100; *SKS Constructors, Inc.*

*v. Drinkwine,* 458 F. Supp. 2d 68, 80 (E.D.N.Y. 2006) (other schemes perpetrated by defendants show closed-ended continuity); *First Interregional Advisors Corp. v. Wolff,* 956 F. Supp. 480, 486 (S.D.N.Y. 1997) (same).  The four schemes involved multiple victims, including Patricia, the New York courts to which Steven submitted misleading financial information, investors and co-op owners. *See* pp. 1-2, 5-6, *supra.*

To establish "open-ended" continuity, Patricia need not allege that the predicate acts extended over a substantial period of time, but may show there was a threat of continuing criminal activity beyond the period when they were performed. *DeFalco,* 244 F.3d at 323. Even if a RICO enterprise (such as SAC) primarily conducts a "legitimate" business, Plaintiff can offer "evidence from which it be inferred that the predicate acts were the regular way of operating that business...." *Cofacrèdit,* 187 F.3d at 243. Here, the four schemes to defraud identified in the 2AC, ¶¶12-67, and Steven's apparent willingness to engage in criminal acts as recently as 2010 (as alleged in the Government's recent enforcement actions), demonstrate open-ended continuity.[3] Although *H.J.* rejected the notion that "multiple schemes" are required, 492 U.S. at 235, 240, if a RICO defendant "has been involved in multiple criminal schemes [it] would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering activity." *Id.* at 240. Even before *H.J.,* predicate acts occurring over a "period of nearly two years" as part of defendants' multiple "fraudulent schemes" were held sufficient. *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.,* 879 F.2d 10, 18 (2d Cir. 1989) (defendants "engaged in at least five separate fraudulent schemes"; "whether defendants' actions

---

[3]    This case is unlike *Nat'l Union Fire Ins. Co. v. Archway Ins. Svcs.,* 2012 U.S. Dist. LEXIS 48735 (S.D.N.Y. Mar. 23, 2012) (Br. at 13), where this Court found no facts from which it could be inferred that defendants' businesses were "inherently or primarily unlawful." *Id.* at *15. The Government enforcement actions (*see* pp. 7-8, *supra*) mean that Steven and SAC can no longer hide behind the cloak of presumptive legitimacy.

are continuing in nature or isolated or sporadic will be the subject of proof at trial"); *accord Fresh Meadow*, 282 Fed. Appx. at 99.

Defendants' argument that the three other schemes (the Co-Op Scheme, Insider Trading Scheme and Second Securities Fraud Scheme) are "irrelevant" because they did not cause monetary injury to Patricia (Br. at 15-16) contradicts *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335 (2d Cir. 1994): under a "correct reading" of §1964(c), "a pattern of racketeering activity may be based upon predicate acts directed at nonplaintiffs as long as one act injures the plaintiff so as to create standing for that plaintiff." *Id.* at 1347 (citations omitted). *See also Morin v. Trupin*, 747 F. Supp. 1051, 1067 (S.D.N.Y. 1990) ("it is sufficient for proximate cause purposes under [§]1962(c) that a plaintiff show injury by reason of one (and not each and every) of a defendant's racketeering acts") (citing *Sedima*, 473 U.S. at 495).

> Civil RICO does not require allegation that the plaintiff suffered proprietary injury from all the predicate acts or even from sufficient predicate acts to constitute a pattern. Indeed, it has been held that where the plaintiff proves the violation [of §1962], a civil RICO judgment may be sustained where only one predicate act caused the plaintiff proprietary injury. The plaintiff would recover damages for whatever proprietary injury is caused by any predicate act that helps constitute the pattern.

Douglas E. Abrams, THE LAW OF CIVIL RICO § 3.2, at 122 (1991). *Accord Moses v. Martin*, 360 F. Supp. 2d 533, 549 (S.D.N.Y. 2004) ("While it is true that plaintiff may not recover *damages* as a result of the misconduct directed toward third-parties, plaintiff *may* allege predicate acts involving others to establish a pattern of racketeering activity.") (emphasis in original).

Defendants ask this Court to ignore allegations as to the Insider Trading Scheme in 1985-1986, ¶¶46-54, and the Second Securities Fraud Scheme in 1995, ¶¶64-67, contending that securities law violations cannot be pled as RICO predicate acts following enactment of the Private Securities Litigation Reform Act (Br. at 14-15). Even though Patricia's lawsuit was filed in 2009. this case involves wrongful conduct by Steven and Donald preceding the statute's

enactment, meaning that exclusion of those predicate acts results in an inappropriate retroactive application of the amendments to §1964(c). *In re MTC Elec. Tech. Shareholder Litig.,* 74 F. Supp. 2d 276, 278-280 (E.D.N.Y. 1999). The acts of securities fraud may be considered in determining whether a "pattern" has been pled.

**C.    Plaintiff Properly Alleges A RICO Conspiracy Claim**

To plead conspiracy, Patricia must allege an agreement to commit predicate acts, knowledge that the acts are part of a pattern, overt acts in furtherance of the conspiracy that must also be predicate acts, causing injury to Plaintiff's business or property. *State Farm Mut. Auto. Ins. Co. v. CPT Med. Svcs., P.C.,* 375 F. Supp. 2d 141, 150 (E.D.N.Y. 2005). In Count I, each element is properly pled. *Sykes v. Mel Harris & Assocs.,* 757 F. Supp. 2d 413, 428 (S.D.N.Y. 2010). Because Defendants do not contend otherwise (Br. at 18), the RICO conspiracy claim should not be dismissed.

**D.    Plaintiff Properly Alleges A Claim For Common Law Fraud (Count II)**

**1.    The Second Circuit Held That Plaintiff Properly Alleged At Least Three Fraudulent Statements**

In reversing the district court's dismissal of this case, the Second Circuit held that Patricia properly alleged at least three fraudulent statements. *Cohen,* 711 F.3d at 356, 358-361 & n.2. To the extent that Defendants seek to relitigate that issue (Br. at 3-4, 19-22), their arguments must be rejected.

**2.    The Putative Disclaimer Only Addresses The Value Of The Lurie Investment**

Defendants' argument regarding the disclaimer in the 1989 Separation Agreement (Defs. Br. at 19-21) is a red herring lacking persuasiveness because it *only* addresses the amount initially invested in the Lurie Investment and does *not* disclaim Patricia's reasonable reliance on Steven's and Donald's lies that the Lurie Investment was a total loss to the Cohens' marital estate. The purported disclaimer reads:

14.4.  Each party has acknowledged a degree of familiarity with and knowledge of the financial circumstances of the other and each party is of the opinion that he and she are sufficiently informed of income, assets, property and financial prospects of the other. Husband has provided wife with his net worth statement and the statement of financial condition dated July 1, 1988, provided, however, *that Husband makes no representation as to the value of the interest in a second and third mortgage on various properties involved in the cooperative conversions in Queens, New York [the Lurie Investment]* in which the investment was listed on his statement of financial condition dated as of July 1, 1988 at a value of $8,745,169.

Br. at 19; Klotz Decl., Ex. B, ¶14.4 (emphasis added).

Steven could have eliminated any question of Patricia's reliance on his fraudulent representations by inserting language into the agreement that specifically said so.  He could have negotiated for such language or even paid for it.  However, nothing in their agreement specifically disavowed Patricia's reasonable reliance on Steven's earlier claims that he received no money back from the Lurie Investment. ¶¶20-21; 24-26; *Carlinger v. Carlinger*, 21 A.D.2d 656, 657, 249 N.Y.S.2d 761 (1st Dep't 1964) (disclaimers in settlement agreement did not destroy allegations as to fraudulent misrepresentations). Presumably, he did not want to raise any red flags. A plain reading of the disclaimer shows that it does not disclaim Patricia's reliance, an issue that this Court cannot determine on a pleading but must be adjudicated as an issue of fact at trial. *In re Food Mgmt. Grp., LLC*, 380 B.R. 677, 702 (Bankr. S.D.N.Y. 2008). Patricia could reasonably have assumed that Steven "makes no representation" in the Separation Agreement as to this subject precisely because he had already done so in 1986 and 1989, when he represented the Lurie Investment to be valueless and, therefore, any claimed value would be meaningless. ¶¶20-21, 24-25. Based on Patricia's knowledge, which was wholly reliant on Steven's and Donald's false and misleading representations that the Lurie Investment was lost, it did not matter whether the Separation Agreement accurately recorded the sum of the initial investment. Far from making Patricia's reliance on the misrepresentations unreasonable, the language of the agreement reinforced Steven's and Donald's misrepresentations.

17

### 3. Steven Cannot Rely On His "Disclaimer" When He Defrauded Patricia Regarding The Agreement Itself

Steven cannot rely on his own fraud to assert that Patricia did not reasonably rely on his misrepresentations. The agreement, including the purported disclaimer, should be set aside because Steven's deliberate misrepresentations induced Patricia to agree to it. "'Merger' clauses in a contract, whereby a party attempts to exempt himself from liability for misrepresentation, do not bar one from showing he has been defrauded." *Crowell-Collier Pub. Co. v. Josefowitz*, 9 Misc.2d 613, 614-615, 170 N.Y.S.2d 373 (Sup. Ct. 1957) (citations omitted) (misrepresentation claim was not negated by provision that "[t]his Agreement . . . was not induced by any representations, warranties or covenants not contained therein"). Steven's affirmative concealment of the $5.5 million repayment from Lurie relates to the nature of the contract such that, if she had known of it, Patricia would not have entered into the agreement. Indeed, the contract itself was based on the premise that each party was "sufficiently informed of income, assets, property and financial prospects of the other." Klotz Decl., Ex. B, ¶14.4. There can be no meeting of the minds sufficient to uphold a contract when one of the parties was fraudulently induced into entering into it by the other. *Moses v. Carver*, 164 Misc. 204, 213, 214, 298 N.Y.S. 378 (Sup. Ct. 1937).

### 4. Because Steven Lied In The Agreement, He Cannot Rely On The Agreement To Absolve Himself Of Liability

Defendants' attempt to invoke the narrowly drawn exception recognized in *Cohen v. Cohen*, 1 A.D.2d 586, 151 N.Y.S.2d 949 (1st Dep't 1956), is misplaced because Patricia relied upon misrepresentations relating to matters peculiarly within Steven's knowledge: "[I]f the allegedly misrepresented facts are peculiarly within the misrepresenting party's knowledge, even a specific disclaimer will not undermine another party's allegation of reasonable reliance on the misrepresentations." *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 149 F.3d 134,

136 (2d Cir. 1998) (citations omitted).  This Court agrees. *Solutia, Inc. v. FMC Corp.*, 456 F.
Supp. 2d 429, 448 (S.D.N.Y. 2006). Anything that Patricia knew about the Lurie Investment
(from the initial investment of their marital assets to the write-off) she learned from Steven and
Donald. ¶¶17, 19, 20-21, 24-26. Knowledge of Steven's receipt of $5.5 million from Lurie in
1987 was within Defendants' knowledge alone, thereby precluding them from relying on the
disclaimer Steven included in the agreement.

     **E.**     **Plaintiff Properly Alleges A Claim For Breach Of Fiduciary Duty (Count III)**

          **1.**     **Introduction**

     In Count III, Plaintiff alleges that each of the Defendants owed her a fiduciary duty when
the agreement was negotiated, which they breached when they failed to disclose the return of
money on the Lurie Investment and affirmatively deceived her regarding Steven's finances.
Patricia plausibly alleges that a fiduciary duty existed between her and each Defendant, that
Defendant(s) breached that duty, and she was damaged as a result of the breach. *Meisel v.
Grunberg*, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009). Husbands owe fiduciary duties to their
wives; further, accountants (in some circumstances) and attorneys owe fiduciary duties to their
clients. *See Christian v. Christian*, 42 N.Y.2d 63, 72, 365 N.Y.S.2d 849 (1977) ("Agreements
between spouses, unlike ordinary business contracts, involve a fiduciary relationship requiring
the utmost of good faith."); *Lavin v. Kaufman, Greenhut, Lebowitz & Forman,* 226 A.D.2d 107,
109, 640 N.Y.S.2d 57 (1st Dep't 1996) (accountant and client); *Ulico Cas. Co. v. Wilson, Elser,
Moskowitz, Edelman & Dicker*, 56 A.D.3d 1, 9, 865 N.Y.S.2d 14 (1st Dep't 2008) (attorney and
client).

     Each of the Defendants breached his fiduciary duty when he failed to disclose to her that
Steven received $5.5 million from the Lurie Investment, and affirmatively deceived her by
stating that the entire investment was lost. ¶26. Patricia was damaged because she received

substantially less than she was due from the agreed-upon distribution of marital property upon entering into the agreement. ¶31. *See* note 1, *supra*. This is more than sufficient to state a claim of breach of fiduciary duty.

### 2. As Patricia's Spouse, Steven Had Fiduciary Duties To Patricia Even When Negotiating The Agreement

Steven breached his fiduciary duty to Patricia by failing to disclose material information when negotiating the Separation Agreement, misrepresenting financial information relating to the Lurie Investment, inducing her to sign the agreement in 1989 and the amendment to the Separation Agreement in 1992, and successfully preventing her from investigating the Lurie Investment. *Christian*, 42 N.Y.2d at 72 (because spouses owe one another fiduciary duties, "[t]here is a strict surveillance of all transactions between married persons, especially separation agreements.... Equity is so zealous in this respect that a separation agreement may be set aside on grounds that would be insufficient to vitiate an ordinary contract...."); *see also Petracca v Petracca*, 101 A.D.3d 695, 698, 956 N.Y.S.2d 77 (2d Dep't 2012) (fiduciary duty exists between spouses including during negotiation of separation agreement).

Steven violated his duties to disclose material information and to avoid deliberately misleading Patricia regarding their finances. ¶20. When he was negotiating the Separation Agreement, by hiding the material information that he had received $5.5 million back from the Lurie Investment, and by misrepresenting the truth regarding that investment's status and value, ¶¶21-26, Steven breached his affirmative duty of "utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading" Patricia. *Manes v Manes*, 277 A.D.2d 359, 361, 717 N.Y.S.2d 185 (2d Dep't 2000) (upholding wife's breach of fiduciary duty claim; in negotiating separation agreement, husband and lawyer concealed sale of businesses). The duty to disclose material information and to be

truthful is particularly applicable when negotiating a separation agreement. *Kabir v Kabir*, 85 A.D.3d 1127, 1128, 926 N.Y.S.2d 158 (2d Dep't 2011) (separation agreement set aside because husband concealed assets). Regarding the above-referenced disclaimer, Steven could not "by contract" relieve himself of the fiduciary obligation of full disclosure to Patricia "by withholding the very information [she needed] in order to make a reasoned judgment whether to agree to the proposed contract." *Blue Chip Emerald LLC v. Allied Partners*, 299 A.D.2d 278, 280, 750 N.Y.S.2d 291 (1st Dep't 2002).

### 3.   Steven's Fiduciary Duties Were Ongoing While Negotiating The Settlement Agreement

The fiduciary relationship between Steven and Patricia existed as a matter of law at least through the conclusion of the Separation Agreement, and perhaps beyond that date. Even when a marriage is headed toward divorce and the couple is negotiating the terms of their separation, fiduciary obligations remain. *Christian*, 42 N.Y.2d at 72. The fact, in and of itself, that one or both spouses retain counsel does not mean the fiduciary relationship is over; nor does it preclude the fact that one spouse relied on the other spouse's exercise of his fiduciary duties. *Barchella v. Barchella*, 44 A.D.3d 696, 697, 844 N.Y.S.2d (2d Dep't 2007). When Steven made misrepresentations or failed to disclose information that was material to the agreement, he breached his fiduciary duty to Patricia. That duty did not end when the marriage was not perfect. Here, Defendants seek a rule that would encourage a spouse to hire an attorney simply so he could be relieved of his fiduciary obligations to his spouse.  Br. at 21. Their position also ignores the fact that separation of spouses does not mean an end to a dependent relationship or a loss of trust. Despite Defendants' protestations, *Christian* makes plain that even as they began to separate and negotiate the Separation Agreement (and perhaps even *especially* as they began to separate and negotiate that agreement), Steven's fiduciary duty to Patricia remained intact.

4.     **Defendants' Assertions Of Fact That The Separation Was Contentious, And Steven Thus Was No Longer A Fiduciary, Have No Basis In Law**

While Defendants maintain that Patricia's accusations of fraud in the 1991 application for increased support were inconsistent with the trust and confidence necessary to establish a fiduciary relationship and, thus, vitiated Steven's continuing fiduciary duties (Br. at 4, 21), that is not the law. Defendants' argument is wrong on three levels. First, a fiduciary duty exists between spouses at least until divorce as a matter of law. Second, Steven's breach of his fiduciary duty predates the divorce proceeding. ¶¶20-26. Nothing alleged in the 2AC shows any end of trust between Steven and Patricia that could trigger any purported exception. Third, the existence of a fiduciary relationship between spouses presents a question of fact that must be established by indicia of mutual trust and reliance and, in this case, sufficient facts have been pled. In fact, Patricia alleges that she continued to rely on and trust statements made by Steven throughout the dissolution of their marriage, and even in the years immediately following.

Defendants cite no New York authority for the proposition that spouses' fiduciary duties end when they become involved in divorce proceedings, contentious or otherwise (Br. at 21), and reliance on *Capasso*, 765 F. Supp. 839, is misplaced. In that case, the husband allegedly lied about his assets in a deposition taken in divorce proceedings. After trial and judgment in the divorce proceeding, the wife filed a RICO claim, alleging that the husband's non-disclosures and lies during their adversarial litigation constituted the predicate act of fraud (not a breach of fiduciary duty). In circumstances not present here (*i.e.,* there was no pending litigation when Patricia and Steven negotiated their separation), the district court described the couple's adversary relationship (including the wife asking the court to hold her husband in contempt) as inconsistent with the trust and confidence required of a fiduciary relationship. *Id.* at 841. But in that case the wife never alleged or argued otherwise and she never asserted a claim for breach of

22

fiduciary duty. At most, *Capasso* suggests that spouses' fiduciary duties *may* end prior to completion of their divorce *if* and *when* they undertake contentious divorce litigation. *Capasso* provides no support for the proposition that as a matter of law, Steven and Patricia's fiduciary relationship ended prior to the termination of their marriage in 1990, much less during 1986-1989 when Steven lied to Patricia and withheld information from her leading up to the Separation Agreement. ¶¶20-26. Unlike the wife in *Capasso*, Patricia did not accuse Steven of fraud until years after negotiation of that agreement and subsequent divorce. ¶35.

Reliance on *Etzion v. Etzion*, 62 A.D.3d 646, 880 N.Y.S.2d 79 (2d Dep't 1989) (Br. at 21), is also misplaced because it reaffirmed the rule warranting denial of the instant motion. Defendants quote out of context *Etzion*'s observation, in dismissing the wife's breach of fiduciary duty claim, that the husband "did not have a duty arising out of the marital relationship to volunteer information freely available in the public domain" regarding possible rezoning that might increase the value of marital property. 62 A.D.2d at 654. The court's point was that *even as a fiduciary*, the husband had no duty to disclose this particular information, but *only* because it was public information. The court reaffirmed that because "spouses stand in a fiduciary relationship to each other, agreements between them require the utmost of good faith.... Thus, if the plaintiff is ultimately able to substantiate her claim that the defendant concealed an existing agreement to sell the warehouse property, she may be able to succeed on the fraudulent misrepresentation cause of action." *Id.* at 651 (citations omitted).

### 5. As Patricia's Accountant, Donald Owed A Fiduciary Duty To Patricia, Which She Alleges He Breached

Patricia also alleges that her accountant, Donald, breached his fiduciary duty by affirmatively deceiving her about the Lurie Investment. A claim for breach of fiduciary duty may be based on affirmative deception by one's accountant: "The duty owed by an accountant to

a client is generally not fiduciary in nature ... except in certain limited circumstances ... such as where the accountant engages in *affirmative fraud* on the client." *Staffenberg v. Fairfield Pagma Assoc., LP*, 2011 N.Y. Misc. LEXIS 920, *11-12 (Sup. Ct. Mar. 7, 2011) (emphasis added) (citations omitted). Plaintiff alleges that Donald joined in the Scheme Against Patricia and deliberately concealed the $5.5 million paid by Lurie. ¶¶20-23. Donald supported Steven's assertions regarding the Lurie Investment by telling Patricia that the millions of dollars invested with Lurie was "lost." *Id.* Donald's misconduct falls squarely into the above-referenced "affirmative fraud" exception.

### 6.   In The Alternative, Donald Aided And Abetted Steven's Breach of His Fiduciary Duties To Patricia

In the alternative, Plaintiff alleges sufficient facts to establish Donald's liability for aiding and abetting Steven's breach of fiduciary duty. *Caprer v. Nussbaum*, 36 A.D.3d 176, 194, 825 N.Y.S.2d 55 (2d Dep't 2006) (because accountants had complete knowledge of misuse of condominium funds and were indispensable to board-member defendants in efforts to conceal misuse of funds, "accountants may be held liable for aiding and abetting the breach of fiduciary duty by the board-member defendants"). This claim requires allegations of a breach of fiduciary obligations to another, that defendant knowingly induced or participated in the breach, and that plaintiff suffered damage as a result of the breach. *In re Sharp Int'l Corp.*, 403 F.3d 43, 49-50 (2d Cir. 2005).

Plaintiff can plausibly allege an aiding and abetting claim against Donald. ¶¶20, 22. Steven owed a fiduciary duty to Patricia and he breached that duty by falsely representing his financial information. Donald knowingly participated in Steven's breach. ¶¶20-26. Patricia alleges that she was damaged as a result. ¶71. Even if this Court grants the motion to dismiss as

to Donald's breach of fiduciary duty, Plaintiff seeks leave to amend to assert an aiding and abetting claim against Donald.[4]

### III.   CONCLUSION

For the reasons stated herein, Defendants' Renewed Motion to Dismiss Plaintiff's Second Amended Complaint should be denied.

DATED:  September 12, 2013

WILENTZ, GOLDMAN & SPITZER, P.A.

By____/s/Kevin P. Roddy_____
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000

LAW OFFICES OF JOSHUA L. DRATEL, P.C.
Joshua L. Dratel
2 Wall Street, 3rd Floor
New York, NY  10005
Telephone:  (212) 732-0707

BALESTRIERE, FARIELLO & ABRAMS, LLP
John G. Balestriere
225 Broadway, Suite 2900
New York, NY  10007
Telephone:  (212) 374-5401

**Attorneys for Plaintiff**

---

[4]      Finally, Defendants assert that Plaintiff's 2AC only alleges federal question jurisdiction. Br. at 18 n.7 (citing ¶10). By letter dated Sept. 5, 2013 (Doc. 91), Plaintiff sought a Rule 3A pre-motion conference prefatory to seeking leave to amend ¶10 to more clearly allege that diversity jurisdiction exists under 28 U.S.C. §1332(a). Plaintiff should be afforded an opportunity to amend to cure any defective jurisdictional allegations. 28 U.S.C. §1653; *Durant, Nichols, Houston, Hodgson & Cortese-Costa, P.C. v. Dupont,* 565 F.3d 56, 65 (2d Cir. 2009); *Shields v. Murdoch,* 891 F. Supp. 2d 567, 587 (S.D.N.Y. 2012).

G. Robert Blakey, Professor Emeritus
Notre Dame Law School
7002 East San Miguel Avenue
Paradise Valley, AZ  85253
Telephone:  (574) 514-8220

**Of Counsel**