# Exhibit 1

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------X

STEVEN A. COHEN,                    :    Index No. 62593/90

                    Plaintiff,      :    IAS Part 17
                                         Hon. Walter Schackman,
       - against -                  :    Presiding

PATRICIA COHEN,                     :    AFFIDAVIT IN
                                         OPPOSITION
                    Defendant.      :

------------------------------------------X

STATE OF NEW YORK   )
                    )  ss.:
COUNTY OF NEW YORK  )

               STEVEN A. COHEN, being duly sworn, deposes and says:

          1.    I am the plaintiff in the above captioned
matter.  I submit this affidavit in opposition to the meritless
application of defendant in which she seeks to: set aside our
separation agreement; increase the amount of support and
maintenance I pay to $100,000 per week; severely restrict my
agreed upon visitation periods with my children; and compel me
to pay her counsel fees in connection with this motion.

          2.    On December 15, 1989, after approximately a year
and a half of extensive and expensive negotiations, defendant
and I entered into a stipulation of settlement and separation
agreement ("Agreement") resolving our marital difficulties.
This Agreement was incorporated in a judgment of divorce dated
March 13, 1990.  Pursuant to the Agreement and judgment
defendant received cash and other assets worth approximately

Five Million Dollars as equitable distribution of the marital
estate.  I also pay her approximately $4,000 per month child
support as well as every other expense of the children other
than food, clothing and shelter.  Now, slightly more than a
year after entry of judgment, defendant has the chutzpah to
come before this court claiming she is destitute and seeks to
set aside the Agreement into which she voluntarily entered, on
the basis of her unspecified and unsubstantiated charges of
fraud, duress and unconscionability.  Throughout the
negotiation process she was represented by qualified and indeed
eminent counsel.  Defendant presents no support for any of the
relief she seeks.  Her motion should be denied.

### THE SEPARATION AGREEMENT

3.   In or about July, 1988 defendant and I began
negotiations to resolve our marital difficulties.  At the
outset defendant was represented by Avron I. Brog, Esq. of
Javits, Robinson, Brog, Leinwand & Reich who represented her
until approximately May, 1989 when she changed counsel and was
represented by Martin S. Kera, Esq., of Kera and Graubard (her
present counsel).  She was represented by Mr. Kera until
approximately mid June, 1989 when she discharged him and
retained Joan Ellenbogen, Esq. of Ellenbogen & Goldstein, P.C.
Marcia Goldstein then took over the representation and
continued through the execution of the Agreement in December,
1989 and the entry of judgment of divorce dated March 13, 1990.

- 2 -

4.   From the first day of negotiations until the entry of the divorce judgment defendant was represented by highly capable and at the last stage by one of the most eminent matrimonial firms in this state.  The Agreement was entered into after an exhaustive voluntary discovery process. Defendant's counsel repeatedly requested information, more information, clarification and documentation concerning my finances.  They received whatever they requested.  It was only after a year and a half of negotiations and the exchange of numerous drafts of the proposed agreement, that an agreement was reached and a document executed.

5.   Defendant and I (and our counsel) agreed upon a non-taxable equitable distribution of the marital estate; she received the marital residence, a twenty-eight room, 5,500 square feet apartment located on East End Avenue, mortgage free and completely furnished, valued at $3.8 million plus one million dollars in cash.  Thus only about sixteen months ago her assets (when the value of the furnishings, jewelry and clothing which she retained is included) totalled approximately five million dollars.  Defendant conveniently neglects to inform the court that it was she who insisted that she receive the marital residence as part of her equitable distribution award.  During our negotiations I had proposed that she convey her interest in our co-op in return for three million dollars cash plus maintenance of $100,000 per year for eight years. She rejected this proposal; she said she did not trust me to

- 3 -

make the payments!  She eventually proposed I give her sole
ownership of the apartment, $1,000,000 and said she would not
need and did not want any maintenance.  I distinctly remember
her telling me she was writing a book and was getting job
offers.

6.   Article XIV of the Agreement provides in relevant

part:

14.1  Each party acknowledges that he or
she has sought and obtained legal advice from
counsel of his or her own selection; that each
has been fully informed of his or her legal
rights and obligations with respect to this
Agreement and the subject matter thereof; that
all of the provisions hereof as well as all
related questions and implications have been
duly and satisfactorily explained to each of
them and that each has read this Agreement and
understands and assents to its provisions; that
this Agreement is fair and reasonable; and that
each of them is entering into this Agreement
freely and voluntarily.

14.2  Wife has been represented by the
firm of Ellenbogen & Goldstein, P.C., and Wife
represents that she will pay to said firm any
sums due for their legal fees.

14.4  Each party has acknowledged a degree
of familiarity with and knowledge of the
financial circumstances of the other and each
party is of the opinion that he and she are
sufficiently informed of income, assets,
property and financial prospects of the other.
Husband has provided wife with his net worth
statement and the statement of financial
condition dated as of July 1, 1988, provided,
however, that Husband makes no representation
as to the value of the interest in a second and
third mortgage on various properties involved
in cooperative conversions in Queens, New York
in which the investment was listed on his
statement of financial condition dated as of
July 1, 1988 at a value of $8,745,169.

- 4

14.5   Each party acknowledges that
respective counsel have advised that under the
Equitable Distribution Law of the State they
are each entitled to a full disclosure and
valuation of all property owned by the other
party and that the complete financial
disclosure which could be required if this
matter continued in litigation has not been
obtained, but both parties have advised their
counsel that they are aware of these facts and
desire to curtail discovery, are unwilling to
litigate the issues and desire to proceed with
this Agreement on the limited financial data
supplied to date and their own knowledge of the
other party's financial affairs.

14.6   Each party acknowledges that this
Agreement has not been the result of any duress
or undue influence exercised by either party
upon the other or by any other persons upon the
other.

14.7   Each party acknowledges that this
Agreement has been achieved after what they
consider to be sufficient disclosure,
consultation with legal representatives and
bona fide negotiations; that this Agreement is
fair and reasonable; that each of them clearly
understands and asserts to all of the
provisions hereof; and that each of them is
entering this Agreement freely and voluntarily.

14.8   Each party acknowledges that they
are both in good health, and capable of being
gainfully employed.   Wife believes that the
provisions herein made for the support and
maintenance of the Children and for the
distribution of marital property are fair,
adequate, reasonable and satisfactory.

14.9  Each party hereby accepts performance
of the terms, covenants and provisions of this
Agreement in lieu of any other claims or
provisions for distribution of marital property
and maintenance or support, and the provisions
hereof shall be and constitute a full, complete
and final settlement of the parties obligations
for maintenance and support and division of
marital property, now and hereafter, and in all
jurisdictions, as well as the satisfaction of
each and every chose in action or property

- 5 -

claim each party may have against the
other arising out of their marriage.

14.10  Each party mutually releases and
discharges the other of and from any claim or
cause of action against the other, except as to
any obligations provided for or arising out of
this Agreement and any cause of action for
divorce.  Nothing herein contained shall be
deemed to prevent either party from enforcing
the terms of this Agreement or from asserting
such claims as are reserved to each party by
this Agreement against the estate of the other.

(emphasis added)

7.  Article XIX of the Agreement provides in

pertinent part:

19.4  This Agreement is entire and
complete and embodies all understandings and
agreements between the parties.

19.5  No representations or warranties
have been made by either party to the other, or
by anyone else, except as expressly set forth
in this Agreement.  This Agreement is not being
executed in reliance upon any representation or
warranty not expressly set forth herein.

DEFENDANT'S APPLICATION TO SET
ASIDE THE SEPARATION AGREEMENT
IS PROCEDURALLY DEFECTIVE

8.  I have been advised by my attorney that it is

well established black letter law that, if and only if an

agreement was executed under conditions of fraud or duress or

its terms are unfair and unconscionable, which this Agreement

is not, it may be set aside under principles of equity but then

only in an action in which such relief is sought by the

compliant, but not where such relief is sought merely by

motion.  (See attached memorandum of law in opposition of

defendant's motion).

9.   Defendant has not started a plenary suit.  She has not served a summons and complaint.  She seeks this extraordinary relief by motion.  This is improper.  That portion of her motion which seeks to set aside the Agreement must be denied.

DEFENDANT HAS PRESENTED
NO GROUNDS TO SET ASIDE
THE AGREEMENT AND STIPULATION

10.   Defendant claims the Agreement is "unfair, unconscionable and procured by fraud and duress."  She asserts neither one fact nor any of the elements of fraud to support her outrageous demand.  She recites a litany of excessive spending and incredibly poor judgment on her part, but otherwise sets forth only preposterous, untrue, and unsubstantiated allegations as to my wealth.

11.   As more fully set forth above (pp. 4-6) the Agreement expressly acknowledges there was no duress or undue influence (¶ 14.6), that it is fair and reasonable and freely and voluntarily entered into (¶ 14.1).  This or similar language appeared in the earliest drafts of the Agreement which were prepared by defendant's own counsel.

12.   Defendant argues that my insistence on filing an individual return for 1989 is reason enough to set aside the maintenance and support provisions of the Agreement.  This is absurd.  Firstly, the Agreement was executed prior to the end of the year; my income for 1989 was not yet determined.

- 7 -

Secondly, there was exhaustive disclosure of my income and assets during the negotiation process. Repeated requests for information and documentation from defendant's attorney were complied with. My former wife was completely informed of my financial situation and so stated in ¶ 14.4 of the Agreement.

13.   There is no claim that I misrepresented my finances, which my attorneys advise is necessary to invalidate an agreement on the basis of fraud. Thus, even if I did not disclose my income (which I did disclose) this would not be legally sufficient grounds to set aside the Agreement.

14.   It is true that I am financially successful but defendant has always known that. She knew my 1987 and 1988 income prior to signing the Agreement. Indeed I could not have otherwise transferred assets of almost $5,000,000 in a marriage of less than nine years when settlement negotiation began. However, her statement that I earned $20 million in 1989 is ridiculous. My gross income in that year in fact decreased to $4,303,965 (Exhibit "A"), a decrease of more than $7.5 million from my 1988 income.

15.   The reason I did not file a joint income tax return with my wife for 1989 was not that I did not want to disclose my income. Why would I hide the fact that my income had decreased so drastically? The simple reason I filed separately is that when the tax returns were due defendant was making things difficult for me and was very uncooperative. I did not want to have to ask her to sign extensions of time to

- 8 -

file, since I was not ready to file on April 15. Rather than
get involved with her deductions and her problems, I chose to
file separately.

16. Prior to entering into the Agreement defendant
was furnished with a copy of a statement of our financial
condition as of July 1, 1988. (Exhibit "B"). This statement
indicated a net worth of $16,930,537, $8,745,169 of which was
represented by a "real estate deal with Brett Lurie" (coop
mortgages) and this was so indicated on the statement. The
Brett-Lurie deal is presently involved in bankruptcy
proceedings. Even then I suspected that this would happen
because the general partner was in default. I am writing it
off as totally worthless. Subtracting the value of Brett-Lurie
from my net assets at that time means that my net worth was
$8,185,368. Defendant's equitable distribution award pursuant
to the Agreement was close to $5 million, or more than 50% of
my net worth in the real world. Obviously, it was not
unconscionable.

17. Defendant's statements regarding the furnishings
in the marital residence are irrelevant. Even if the furniture
in the marital residence is not readily saleable, retaining the
furniture saved her the expense of having to purchase new
furniture and furnishings, an expense which I had to incur when
when I moved from the marital residence into a rental
apartment. Defendant's expenditure of $160,000 for furnishing
and decorating the East End Avenue apartment (which she intends

9

to sell) was a colossal waste of her resources.  Even assuming
the apartment was not fully furnished; she was planning to move
from a 28-room apartment to a three bedroom apartment; thus she
had more than sufficient furniture for her purposes.

18.  Certainly she had no need to purchase additional
furniture until after she had sold the East End Avenue
apartment and moved into her new residence.  To purchase
furniture and furnishings as she did was the height of
financial irresponsibility.

19.  I did not engage in economic or emotional warfare
with defendant.  Our apartment was large enough for me to live
in with my children and defendant and I had every right to do
so.  I paid all the expenses during negotiations and if
defendant felt I wasn't, she could have and would have moved
for temporary support; she didn't.  She never claimed I was not
supporting her.  I did not constantly verbally abuse her in
front of the children and the one physical confrontation we had
during this entire period was provoked by defendant, which she
well know how to do; although she called the police, it was not
necessary that she do so, and neither she nor they pursued the
matter.

### DEFENDANT AND THE MARITAL RESIDENCE

20.  Since early 1989 I wanted to put the marital
residence up for sale.  Defendant steadfastly refused to do so;
she wanted the apartment as part of what she received as
equitable distribution.

21.   Defendant states that throughout the marriage she remodeled seven different homes in which we lived and was "a general contractor in every residence." She claims as a result of her efforts I earned "substantial profits outperforming the relative market" and that "she did not participate in the profits." Her claim that she did not participate in the profits is ridiculous. She enjoyed a lavish lifestyle throughout our marriage. In fact her outrageous spending during our marriage was a source of serious controversy while were together. One example of her uncontrolled spending, while we were separated: I authorized her to go to the Beverly Hills Hotel for three weeks; she ran up a bill in the hundreds of thousands of dollars, which I paid.

22.   It was because of defendant's professed expertise as a "general contractor" that she wanted the marital residence rather than additional cash as equitable distribution. She, not I, is the one who anticipated using the profits she derived from this endeavor for her support.

23.   Her statement that the Agreement cannot be read alone and must be read together with a separate letter agreement (which is not attached to her moving papers) is legally invalid. The Agreement she signed expressly provides in paragraphs 19.4 and 19.5 that the Agreement embodies all understanding and agreements between the parties and that the Agreement is not being executed in reliance upon anything not expressly set forth in the agreement.

- 11 -

24. Defendant has not exercised her best efforts to sell the marital apartment. When she insisted upon receiving the apartment rather than cash she had to know that there were only a limited number of buyers for an apartment of this size and value. Under no stretch of the imagination was this fact sudden or unforeseen.

25. Why did she take the apartment off the market in the summer if she truly wanted to sell it? An apartment of this size would be purchased by a family who undoubtedly would want to be settled in by the beginning of the school year in September and would choose or at least look for an apartment during the summer. Defendant's statement that purchasers of multi-million dollar apartments do not spend their summers in New York is both incredibly elitist and untrue. I for one spent last summer and many others in New York City to preserve my earning capacity. Perhaps defendant, who chose not to work after we signed the Agreement, but managed to spend the $1 million she received, spent the summer outside the City. Defendant kept the apartment off the market in the fall, claiming she couldn't keep the apartment presentable because she was too busy with the children! Considering how important it was for her to sell the apartment she made virtually no effort to do so.

26. Defendant does not set forth with which brokers the apartment is currently listed or with which brokers it was formerly listed. She does not state what price it was formerly

- 12

listed at or what it is currently listed at.  Perhaps most
troubling about her half-hearted attempts to sell the apartment
is why she did not list it in "as is" condition, especially in
light of the fact that during the period that we were
negotiating the Agreement I spent approximately $200,000
renovating the apartment.  Why did she spend so much money
fixing up the apartment when she had just purchased a new
apartment which needed, as she states, "substantial work"?  In
addition, she was now responsible for maintenance on two
apartments?

### DEFENDANT'S DISSIPATION OF THE SETTLEMENT:
#### PURCHASE OF THE MAJESTIC APARTMENT

27.  I did agree to lend defendant money to purchase
the apartment at the Majestic in order to help her out.  She
now equates that as some sort of financial duress on my part.
Needless to say she has not paid me any of the interest she is
obligated to under the loan.

28.  Defendant's professed additional reason for
buying the second apartment before selling  the first apartment
is that she "could not risk being in a situation where I had to
move out of my apartment and not have another place to live" is
outrageous, particularly as the plethora of available
apartments is well known.  Moreover she could have rented an
apartment (as I did) until she found an appropriate apartment
to purchase.  Defendant's attempt to justify the purchase of an

- 13 -

apartment which needed extensive renovations and which she could not move into for an extended period of time is ridiculous. She admits she paid $53,000 to an architect for plans and she says she is not even sure the Co-op Board will approve the plans. She assumed a $2,250 per month obligation to maintain a vacant apartment.

29. I did not, as she asserts, approve of her purchase of the Majestic apartment. My advice to her was to first sell the East End Avenue apartment and live on the income the cash I had given her and the proceeds would yield. I further advised her to see how much she needs to live on and that she should rent until she decides what sort of a home she could reasonably afford. Defendant chose to ignore me to do this. She somehow transmutes her improvident behavior into grounds to set aside a more than generous and equitable agreement.

### DEFENDANT'S WASTEFUL DISSIPATION OF THE MILLION DOLLARS SHE RECEIVED

30. Defendant has the audacity to come before this Court and say she is penniless and has no funds and I should pay her maintenance and support of $100,000 per week. Less than eighteen months ago she had a million dollars and a $3.8 million apartment with no mortgage. An examination of what she did with the money clearly establishes that I should pay her no more than the Agreement requires.

31. (a) When she purchased the Majestic apartment she knew its condition. She professes much experience in

- 14 -

remodeling homes, thus she knew the work required to renovate it to her purposes. Her decision to purchase an apartment which needed so much work was hers alone. I am not responsible for her decision. She knew or should have known the problems she would have with the purchase. I submit she went ahead with the deal with full knowledge of the consequences and that I have no obligation to underwrite her folly.

(b) The money she spent finishing and furnishing the East End apartment was unnecessary and was dealt with infra.

(c) The $80,000 pre-divorce Bergdorf Goodman bill which she paid was neither unanticipated nor my responsibility. Article X of the Agreement provides that I was only responsible for her debts listed on Schedule B attached to the Agreement. This debt was not on the schedule and was hers to pay, a fact she knew when she agreed to accept the $1,000,000.

(d) Her decision to obligate herself to pay the second maintenance on the Majestic was hers alone. Furthermore, the maintenance on this apartment since February, 1990 was only $31,500.

(e) As defendant admits, the payment of her lawyer's fees were, pursuant to the Agreement, her responsibility. It was part of the deal she negotiated.

(f) Her personal medical and dental bills are not unforeseen. She was aware I pay all the children's expenses. She, not I, undertook to pay for her own medical expenses under the Agreement.

- 1⁵ -

(g)  Defendant states she gave her mother $50,000 to aid in her retirement!  If defendant is in as bad financial shape as she claims she should get this money back from her mother.  If she wants to help her mother out after she sells the East End Avenue apartment and can better afford to do so that is her business.  However, to ask me for more money because she helped out her mother is without any support in the law.

(h)  Defendant's claimed expenses for the children of $230,500 is outrageously high and grossly overstated.  Examples of the absurdity of these numbers are: $100,000 for travel expenses of the children; parties and gifts $26,000; household food for two children of $27,000 (if this amount was spent in the fifteen months since December, 1989, it averages out to approximately $30 per day per child for household food); clothing expense for the children of $37,000 is in excess of $1,200 per month per child.  Her other claimed expenses for the children are equally overstated.

CHILD SUPPORT WHICH I AM
PAYING IS APPROPRIATE
AND MEETS THE CHILDREN'S NEEDS

32.  In 1990 I paid, on behalf of the children, either directly or to defendant the sum of $95,619.31 plus $30,000 which defendant acknowledges I paid her for Jessie's ballet expenses.  This is comprised of payments I made to defendant of $44,074, $9,526 was set off by agreement with defendant for

- 16 -

sums she owed to me and the balance of the money was for school, medical and other expenditures I paid directly on the children's behalf. (Exhibit "C").

33. Pursuant to the Agreement I pay the following as child support payments:

(a) $1,115 per month per child subject to a cost of living adjustment;

(b) $750 per month toward her maintenance and $750 per month toward her housemaid expense subject to a cost of living adjustment;

(c) summer camp expenses, private school expenses, special tutoring and extracurricular expenses which are defined to include "tutors in academic subjects or instruction in music, arts or sports ... purchase of related equipment, transportation ... other supplies and ... other reasonable fees as may be required;

(d) medical insurance and unreimbursed medical expenses.

(See Articles V and VI of Exhibit "B" to defendant's moving papers).

34. Thus except for food, clothing and shelter I pay for virtually every other expense of the children directly and by defendant's own admission I pay her $48,000 a year just to cover the children's food, shelter and clothing costs.

35. It should be noted that this application seeks to increase my obligation to $100,000 per week as unallocated

- 17 -

maintenance and child support.  However, defendant has not established that the children have increased needs or that their reasonable needs are not presently being met and as set forth above she waived maintenance.

36.  I have been advised by my attorneys that the Court should consider the following factors in reviewing an application for modification of child support:

(a)  increased needs of the children due to the special circumstances or additional activities of growing children – the children are only one year older than when the Agreement was signed.  Furthermore, every activity defendant mentions in her moving papers, i.e., ice skating, softball, baseball, dancing, karate, Suzuki violin lessons, etc., I already pay for pursuant to the Agreement.

(b)  an increase in the cost of living insofar as it results in greater expenses for the children – the Agreement provides that the amount I pay to defendant are subject to a cost of living adjustment pursuant to the Consumer Price Index so an inflation factor is already built into the Agreement;

(c)  loss of income or assets by one parent or a substantial improvement in the financial condition of a party; defendant had no income when the Agreement was signed so she lost no income.  She still has the East End Avenue apartment and by her own statement owns a second apartment which she purchased for approximately $1 million below its value.  The only asset she doesn't have is the cash she received, but that

- 18 -

she irresponsibly dissipated.  My income rather than increasing decreased by approximately 66% between 1988 and 1989.

37.  In the event this Court shall find that the children have any increased needs which are not being met it is respectfully submitted that this Court must set this matter down for a full evidentiary hearing.

<u>DEFENDANT'S WAIVER OF MAINTENANCE IS VALID</u>

38.  In exchange for almost $5 million worth of assets and the other provisions for her behalf in the Agreement defendant waived her right to maintenance.  She made this waiver with the advice of counsel and acknowledged under oath that the Agreement was fair and reasonable, freely and voluntarily entered into and that there was no fraud, duress or undue influence exerted by either party.

39.  She now comes into this Court, after getting the benefit of her equitable distribution award and says I demand more.  She is not seeking to <u>increase</u> maintenance, rather she seeks to set aside her voluntary and informed waiver of maintenance.  No grounds exist for her to do so.  As discussed <u>infra</u>, I originally offered defendant maintenance and <u>she</u> refused it, aiming for more property in equitable distribution; <u>she</u> was the one who wanted no maintenance.

40.  Defendant, by her own admission and statements in her moving affidavit shows that she is qualified to earn a living and support herself.  She boasts she successfully

- 19 -

remodeled various residences and sold them at a profit. She could utilize these skills for other people and earn a living at it.

41. Her intentions, which she expressed to me, as to her earning a living were, in addition to renovating homes and selling them at a profit, that she would write a book or a script. Defendant has done none of this and has made no effort whatsoever to provide for herself.

42. In addition, defendant has not established that she cannot sell the East End Avenue apartment and invest the proceeds for her benefit and support. Rather she made unsubstantiated conclusions that she can't sell the apartment. Certainly she can mortgage it. Furthermore, when she decided she wanted the apartment instead of cash and maintenance she assumed the responsibilities of asset ownership.

<u>VISITATION</u>

43. Defendant has the children all of the time other than when I exercise my visitation. She has brainwashed the children against me. Prior to defendant's campaign to get more money from me I had a wonderful relationship with my children. As her efforts to extract money from me escalated my relationship with the children, as manipulated by defendant, deteriorated. All of my problems with visitation have developed in the last two months.

44. Defendant has told the children and Jessie has repeated to me that I don't give her mother enough money. The

- 20 -

children have no place in this dispute over money, especially when I do pay for all of their needs and they want for nothing.

45. Defendant has violated the visitation provisions of the Agreement. She has refused to allow me to visit with the children at times when I am entitled to do so under the guise that the children have something else to do. She has taken the children on vacations without notifying me where they are, as she is required to do by Paragraph 7.6 of the Agreement. The children go away on vacation and she does not have them telephone me. For the last two months whenever I telephone the children the defendant has one excuse after another why they are not able to talk to me a violation of paragraph 7.10 of the agreement. Despite my heavy work load defendant is totally inflexible about my periods of visitation and holds me to the absolute letter of the Agreement.

46. Defendant is obviously using the children as pawns in her battle against me. Because I will not succumb to her monetary demands and knowing how much I care about the children, she has determined to poison my relationship with them. I love my children very much and want to have a full and meaningful relationship. Defendant on the other hand is intent on creating obstacles to this.

47. The reason Jessie does not want to visit with me recently is not that I am inattentive, neglectful or abusive, I am none of these. Defendant makes these allegations as a smokescreen to distract from the real reason, which is she has

- 21 -

poisoned my relationship with Jessie by her untrue allegations about my economic wrongdoing. It is obvious that it is not good for the children for them to be told untrue and distorted facts which do not concern them. They are only children.

48. Defendant attempts to alarm and inflame the Court by saying that I do not have window guards on my apartment. This is a lie. There are window guards in my apartment.

49. If defendant was so concerned about my occasionally leaving the children (for an hour or so) while I go to the health club which is located in my building, why didn't she discuss this with me earlier, rather than wait to raise it for the first time in this proceeding? I have always been and still remain willing to discuss with her anything concerning the children. Although I do not feel the children are in danger because they are left together for short periods of time, if it is that upsetting to defendant, I will not do this anymore. Discussion rather than litigation would have solved the "problem" earlier.

50. Surely defendant does not contend that I should have my overnight visitation denied to me because I let the children watch some TV when they are with me.

51. The allegations concerning my girl friend (not fiancee) Alex are both inflammatory and untrue. They especially ring hollow considering the fact that defendant has a new boyfriend, Bob Petak, with whom she and the children have stayed overnight at his vacation home, and with whom she and

- 22 -

the children have gone on vacations. My plans are not that Alex will care for my children. Defendant has no right to condition my right to visitation with my children on Alex or any other respectable person not being there.

52. In the past nine months Jessie has met Alex only three times. One time we all went to a ball game together and another time she saw Alex only a few minutes. Jessie does not know Alex well enough to dislike her. If Jessie does not like Alex it is because her mother tells her so. I am not abusive to Jessie.

53. It is true that Robert fell into a swimming pool last summer. However, I was right there watching Robert and because of my attentiveness, I was able to pull him out easily. Defendant's complaints about the children getting sunburned on a ski trip is silly. The children had a marvelous time skiing.

54. I do not <u>always</u> bring the children home late after visitation as defendant claims. Further, if they were coming home late or defendant had a complaint that I wasn't allowing time for their homework, she had only to discuss it with me prior to this motion. I am confident this Court sees through her attempt to bootstrap minor complaints into a reason to restrict my visitation rights with my children.

55. Since our divorce defendant, has become an expert on the effects of prescription drugs. She offers the incredible opinion that Prozac, which I take pursuant to

doctor's orders, has affected my personality.  She offers her "expert" opinion that I suffer from mental illness.  The absurdity of these statements speak for itself.  The Court should give them the consideration they merit.

56.  Defendant has offered not one reason to restrict my visitation.  She has created such problems as I have with Jessie and rather than helping to solve them, she exacerbates them.  Defendant should be admonished about involving the children in her quest to extort more money from me.  Her actions are needlessly causing them harm.

## COUNSEL FEES

57.  I have been advised by my attorneys that counsel fees can only be awarded when authorized by statute or by agreement between the parties.  Defendant is not entitled to counsel fees for that portion of this motion which seeks to set aside the separation agreement.  Such an award is not permitted by statute and, even if so permitted, she has chosen the wrong forum to seek such relief.

58.  Furthermore, defendant is not entitled to counsel fees for that portion of this application which seeks an order of maintenance.  I have been advised that while Domestic Relation Law § 237(b), under proper circumstances, might allow for counsel fees upon an application to modify a judgment for alimony or child support, such is not the case herein.

- 24 -

59.   Defendant is not seeking to modify a judgment of
maintenance.   The judgment herein provides for no maintenance;
there is nothing to modify.

60.   ¶ 13.1 of the Agreement expressly provides that
counsel fees will only be awarded to the successful spouse in
an action to enforce the Agreement and indeed the Agreement
requires a defaulting party to pay counsel fees.   However, I am
in total compliance with the Agreement; and defendant makes no
claim of default.   She seeks to enforce nothing.   My attorneys
advise me that when an Agreement limits the circumstances
(i.e., as here, only in case of default) where counsel fees can
be awarded, the provisions of that valid agreement should be
respected.   The Agreement is valid until proven otherwise.
Thus this is a bar to her present application for legal fees.

61.   Note that defendant is not seeking additional
support for our children.   I pay everything already.   What she
is seeking, in the guise of child support, is spousal
maintenance which she waived in return for five million dollars.

62.   It is the height of absurdity to ask me to pay
for her legal fees considering her financial position.   Even if
she has no liquid funds available to her now, eventually she
will sell the East End Avenue apartment and will have millions
of dollars at her disposal to pay her own fees.

63.   Defendant's application is frivolous and without
merit.   It is bad enough that I have incurred thousands of
dollars in legal fees to oppose this motion, but to ask me to

- 25 -

pay her legal fees adds insult to injury. She should not be rewarded for engaging in time wasting litigation.

CONCLUSION

64. For the reasons set forth herein defendant's application should be denied. she cannot be granted the relief she seeks on a motion. She cannot, in any event ever establish that the Agreement is unconscionable or that it was procured by fraud or duress. She has not established that the children have any increased needs or that I am not meeting their needs. She presents no grounds to set aside her waiver of maintenance. She entered into this Agreement with full knowledge of all the facts and got the deal that she and her lawyers wanted. The only thing she has established, is that as a result of her outrageous spending and poor judgment she has spent over a million dollars, in addition to all of the other money I have given her for the support of the children, in just over a year.

65. Her attempts to limit my visitation are sought to punish me because she feels I have financially wronged her. It is punitive in nature and she does not have the children's best interests at heart.

Steven A. Cohen

Sworn to before me this
15+ day of May, 1991

Notary Public

JAY D. SILVERSTEIN
Notary Public, State of New York
No. 24-3671950
Qualified in Kings County
Commission Expires Jan. 31, 19 __

- 26 -

FORM 4868 ATTACHED

# Form 1040

Department of the Treasury—Internal Revenue Service

**U.S. Individual Income Tax Return 1989**

For the year January 1–December 31, 1989, or other tax year beginning _____, 1989, ending _____ , 19____ | OMB No. 1545–0074

**Label**

Use IRS label. Otherwise, please print or type.

STEVEN A. COHEN

C/O COHEN PA 10590 NW 27TH. ST
MIAMI                    FL   33172

Your social security number: **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**

Spouse's social security number:

For Privacy Act and Paperwork Reduction Act Notice, see Instructions.

**Presidential Election Campaign** — Do you want $1 to go to this fund? . . . . . . . . . Yes [ ] No [X] | Note: Checking 'Yes' will not change your tax or reduce your refund.
If joint return, does your spouse want $1 to go to this fund? . . . . Yes [ ] No [ ]

**Filing Status**

Check only one box.

1. [X] Single
2. [ ] Married filing joint return (even if only one had income)
3. [ ] Married filing separate return. Enter spouse's SSN above and full name here. _____
4. [ ] Head of household. If qualifying person is your child but not your dependent, enter child's name here. _____
5. [ ] Qualifying widow(er) with dependent child (year spouse died ▶ 19___ ).

**Exemptions**

6a [X] Yourself   If someone can claim you as a dependent, do not check box 6a. Check the box on line 33b
b  [ ] Spouse

| c Dependents: (1) Name (first, initial, and last name) | (2) Check if under age 2 | (3) If age 2 or older, dependent's SSN | (4) Relationship | (5) No. of mos lived in your home in 1989 |
|---|---|---|---|---|
| JESSICA COHEN | X | | Daughter | |
| ROBERT COHEN | X | | Son | |

No. of boxes checked on 6a and 6b: **1**

No. of your children on 6c who:
• lived with you
• didn't live with you due to divorce or separation: **2**

No. of other dependents listed on 6c

Add numbers entered on lines above ▶ **3**

d If your child didn't live with you but is claimed as your dependent under a pre-1985 agreement, check here . . . . . . ▶ [ ]
e Total number of exemptions claimed . . . . . . . . . . . . .

**Income**

Please attach Copy B of your Forms W-2, W-2G, and W-2P here.

| | | |
|---|---|---|
| 7 Wages, salaries, tips, etc. (attach Form(s) W-2) | 7 | 4,009,999. |
| 8 a Taxable interest income | 8a | 355,251. |
| b Tax-exempt interest income  8b  58,795. | | |
| 9 Dividend income | 9 | 3,251. |
| 10 Taxable refunds of state and local income taxes, if any | 10 | 8,886. |
| 11 Alimony received | 11 | |
| 12 Business income or (loss) (attach Schedule C) | 12 | |
| 13 Capital gain or (loss) (attach Schedule D) | 13 | <3,000.> |
| 14 Capital gain distributions not reported on line 13 | 14 | |
| 15 Other gains or (losses) (attach Form 4797) | 15 | |
| 16a Total IRA distributions  16a  b Taxable amount | 16b | |
| 17a Total pensions and annuities  17a  b Taxable amount | 17b | |
| 18 Rents, royalties, partnerships, estates, trusts, etc. (attach Schedule E) | 18 | <70,692.> |
| 19 Farm income or (loss) (attach Schedule F) | 19 | |
| 20 Unemployment compensation (insurance) | 20 | |
| 21a Social Security benefits . . .  21a  b Taxable amount | 21b | |
| 22 Other income | 22 | |
| 23 Add the amounts shown in the far right column for lines 7-22. Your total income ▶ | 23 | 4,303,695. |

TAXPAYERS COPY

Please attach check or money order here.

**Adjustments to Income**

| | | |
|---|---|---|
| 24 Your IRA deduction | 24 | |
| 25 Spouse's IRA deduction | 25 | |
| 26 Self-employed health insurance deduction | 26 | |
| 27 Keogh retirement plan and self-employed SEP deduction | 27 | |
| 28 Penalty on early withdrawal of savings | 28 | |
| 29 Alimony paid (recipient's name _____ and social security no. _____ ) | 29 | |
| 30 Add lines 24 through 29. These are your total adjustments | 30 | |

**Adj Gr Income** 31 Subtract line 30 from line 23. This is your adjusted gross income ▶ | 31 | 4,303,695.

The TAX MACHINE – AMI H773

1

| Form 1040 (1989) | STEVEN A. COHEN | | 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 | Page 2 |

| | | | | | |
|---|---|---|---|---|---|
| | **32** | Amount from line 31 (adjusted gross income) . . . . . . . . . . . . . . . . . . | **32** | 4,303,695. |
| **Tax Computation** | **33a** | Check if: ☐ You were 65 or older ☐ Blind; ☐ Spouse was 65 or older ☐ Blind. | | |
| | | Add the number of boxes checked and enter the total here ▶ | **33a** | |
| | **b** | If someone (such as your parent) can claim you as a dependent, check here . . ▶ | **33b** ☐ | |
| | **c** | If you are married filing a separate return and your spouse itemizes deductions, | | |
| | | or you are a dual-status alien, check here . . . . . . . . . . . . . . . . ▶ | **33c** ☐ | |
| | **34** | Enter the   • Your standard deduction, OR | | |
| | | larger   • Your itemized deductions. | | |
| | | of:   If you itemize, attach Schedule A and check here ▶ ☒ | **34** | 874,104. |
| | **35** | Subtract line 34 from line 32. Enter the result here . . . . . . . . . . . . | **35** | 3,429,591. |
| | **36** | Multiply $2,000 by the total number of exemptions claimed on line 6e . . . . . | **36** | 2,000. |
| | **37** | Taxable income. Subtract line 36 from line 35. Enter the result . . . . . . . | **37** | 3,427,591. |
| | | Caution: If under age 14 and you have more than $1,000 of investment income, check here ▶ ☐ | | |
| | | and see page 17 to see if you have to use Form 8615 to figure your tax. | | |
| | **38** | Enter tax. Check if from: ☐ Tax Table, ☒ Tax Rate Schedules, or ☐ Form 8615 | | |
| | | (If any is from Form (s) 8814 enter that amount here ▶             ) | **38** | 960,285. |
| | **39** | Additional taxes. Check if from: ☐ Form 4970 or ☐ Form 4972 . . . . . . . | **39** | |
| | **40** | Add lines 38 and 39. Enter the total . . . . . . . . . . . . . . . . . . ▶ | **40** | 960,285. |
| **Credits** | **41** | Credit for child and dependent care expenses . . . . . . . . | **41** | |
| | **42** | Credit for the elderly or the disabled . . . . . . . . . . . . | **42** | |
| | **43** | Foreign tax credit (attach Form 1116) . . . . . . . . . . . . | **43** | |
| | **44** | General business credit. Check if from: ☐ Form 3800, or ☐ Form | **44** | |
| | **45** | Credit for prior year minimum tax . . . . . . . . . . . . . . | **45** | |
| | **46** | Add lines 41 through 45. Enter the total . . . . . . . . . . . . . . . . | **46** | 0. |
| | **47** | Subtract line 46 from line 40. Enter the result (if less than zero, enter zero) . . ▶ | **47** | 960,285. |
| **Other Taxes** | **48** | Self-employment tax (attach Schedule SE) . . . . . . . . . . . . . . . . . | **48** | |
| | **49** | Alternative minimum tax (attach Form 6251) . . . . . . . . . . . . . . . . | **49** | |
| **(Including Advance EIC Payments)** | **50** | Recapture taxes. Check if from: ☐ Form 4255 or ☐ Form 8611 . . . . . . | **50** | |
| | **51** | Social security or tip income not reported to employer (attach Form 4137) . . . . | **51** | |
| | **52** | Tax on an IRA or a qualified retirement plan (attach Form 5329) . . . . . . . | **52** | |
| | **53** | Add lines 47 through 52. Enter the total . . . . . . . . . . . . . . . . ▶ | **53** | 960,285. |
| **Medicare Premium** | **54** | Supplemental Medicare premium (attach Form 8808) . . . . . . . . . . . . | **54** | |
| | **55** | Add lines 53 and 54. This is your total tax and any supplemental Medicare premium ▶ | **55** | 960,285. |
| **Payments** | **56** | Federal income tax withheld (if any from Form(s) 1099, check ▶ ☐) | **56** 1,082,379. | |
| | **57** | 1989 estimated tax payments and amount applied from 1988 | **57** | |
| **Attach Forms W-2, W-2G, and W-2P to front.** | **58** | Earned income credit | **58** | |
| | **59** | Amount paid with Form 4868 (extension request) | **59** | |
| | **60** | Excess social security and RRTA tax withheld | **60** | |
| | **61** | Credit for Federal tax on fuels (attach Form 4136) | **61** | |
| | **62** | Regulated investment company credit . . . . . | **62** | |
| | **63** | Add lines 56 through 62. These are your total payments . . . . . . . . . . ▶ | **63** | 1,082,379. |
| **Refund or Amount You Owe** | **64** | If line 63 is larger than line 55, enter amount OVERPAID . . . . . . . . . . | **64** | 122,094. |
| | **65** | Amount of line 64 to be REFUNDED TO YOU . . . . . . . . . . . . . . ▶ | **65** | 122,094. |
| | **66** | Amount of line 64 to be applied to your 1990 estimated tax ▶ | **66** | |
| | **67** | If line 55 is larger than line 63, enter AMOUNT YOU OWE. Attach check or money order for full amount payable to 'Internal Revenue Service.' Write your social security number, daytime phone number, and '1989 Form 1040' on it . . . . . . . . . . . . . ▶ | **67** | |
| | **68** | Penalty for underpayment of estimated tax. . . . . . . | **68** | |

**Please Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date | Your occupation   STOCK ARBITRAGE |
| Spouse's signature (if joint return, BOTH must sign) | Date | Spouse's occupation |

| **Paid Preparer's Use Only** | Preparer's signature ▶ *(signature)* | Date 07/31/90 | Check if self-employed ☐ | Preparer's social security no. 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 |
| | Firm's name (or yours, if self-employed) and address | Marvan & Cohen, P.A. 10590 N.W. 27th. Street 102 Miami, Florida | E.I. No. 59-2365216   ZIP code 33172 |

PAYERS COPY

```
                      MR. & MRS. STEVEN A. COHEN
                    STATEMENT OF FINANCIAL CONDITION
                    SEE ACCOUNTANT'S COMPILATION REPORT
                         AS OF JULY 1, 1988
```

NON-MARKETABLE SECURITIES:
S.A.C. TRADING CORP. CASH & MARKETABLE AMOUNTS:

| | |
|---|---:|
| Cash In Bank-N.C.N.B. | $124,515 |
| Cash In Bank-Irving Trust | 3,345 |
| Short Term Daily Callable Notes | 200,000 |
| Home Group Tax Free Moneymarket | 848,058 |
| | --------- |
| | $1,175,918 |
| | ========= |

S.A.C. TRADING CORP. NON-LIQUID ASSETS:

| | |
|---|---:|
| Queens Coop-Brett Lurie Mortgages | $8,745,169 |
| Gruntal Sub-Ordinated Note | 800,000 |
| Loans To Empolyees | 20,000 |
| Due From Haagen Dazs, Inc. | 25,207 |
| | --------- |
| | $9,590,376 |
| | ========= |

PAYABLES:

| | |
|---|---:|
| Gruntal & Co.-Payout Owed To Traders | |
|     John Troubh | $596,229 |
|     Steve Heineman | 107,254 |
|     Steve Mark | 34,314 |
|     William Nietzel | 102,580 |
|     Seth Kanegis | 3,250 |
| Gruntal & Co-Trading Room Improvements | 200,000 |
| Gruntal & Co.-Trading Bonuses Clerical | 40,000 |
| | --------- |
| | $1,083,627 |
| | ========= |

MR. & MRS. STEVEN A. COHEN
STATEMENT OF FINANCIAL CONDITION
SEE ACCOUNTANT'S COMPILATION REPORT
AS OF JULY 1, 1988

ASSETS:

| | |
|---|---:|
| Cash In Banks-Irving Trust (2 Accounts) | $83,000 |
| Investments-money market accounts-Home Group Tax Free | 2,832,863 |
|        -marketable securities | 3,000 |
| Receivables-Gruntal & Co. Trading Profit As of 6/1/88 | 804,145 |
| Non Marketable Privately Held Companies: | |
|   -S.A.C. Trading Corp-Cash & Marketable Assets-see att. | 1,175,918 |
|   -S.A.C. Trading Corp-Non Liquid Assets (at cost)-see att. | 9,590,376 |
|   -Partnerships & Private Investments | 100,000 |
| Real Estate Owned-Personal Residence (cost 2.475 million) | 2,975,000 |
| Pension Plan Assets-S.A.C. Trading Corp. Retirement Plan | 410,725 |
| Individual Retirement Account | 14,500 |
| Art Work-Terry Winters, Joan Mitchell | 100,000 |
| Personal Property -Including 1986 Mercedes Benz. | 140,000 |

TOTAL ASSETS   $18,229,527

LIABILITES AND NET WORTH:

| | |
|---|---:|
| Misc. Installment Debt. | $10,000 |
| Payables-Gruntal Traders & Accrued Expenses-see attached | 1,083,627 |

ESTIMATED INCOME TAXES, on the difference between
the estimated current values of assets and the
estimated current amounts of liabilities and their
tax bases.                                                         205,363

TOTAL LIABILITIES   1,298,990

NET WORTH $16,930,537

1990 Checkbook Expenses.

| CHECK # | DATE | PAYEE | MEDICAL | EDUCATION | HOUSEHOLD | FOOD | MISC |
|---|---|---|---|---|---|---|---|
| 971 | JAN 3 | BEETHOVEN PAINOS | | | 162.40 | | |
| 973 | JAN 3 | PHYLLIS SIEGEL | 1310.00 | | | | |
| 977 | JAN 3 | BREARLEY SCHOOL | | 3083.00 | | | |
| 1027 | APR 17 | PARK AVE METHODIST | | 1720.00 | | | |
| 1028 | ARP 17 | PARK AVE METHODIST | | 1000.00 | | | |
| 1031 | APR 17 | PATRICIA COHEN | | | | | 5674.00 |
| 1044 | MAY 10 | PATRICIA COHEN | | | | | 3800.00 |
| 1047 | MAY 15 | BREARLEY SCHOOL | | 1000.00 | | | |
| 1051 | MAY 16 | AFTER SCHOOL WKSHOP | | 900.00 | | | |
| 1052 | MAY 16 | MOHAWK DAY CAMPS | | 2895.00 | | | |
| 1053 | MAY 16 | MOWHAK DAY CAMPS | | 2895.00 | | | |
| 1054 | MAY 16 | BREARLEY (CONT) | | 2000.00 | | | |
| 1057 | MAY 24 | THE MANOLD COMPANY | | 1464.42 | | | |
| 1068 | JUN 5 | PATRICIA COHEN | | | | | 3800.00 |
| 1082 | JUN 25 | PATRICIA COHEN | | | | | 3800.00 |
| 1220 | JUL 23 | METHODIST (CONT) | | 1820.00 | | | |
| 1224 | JUL 24 | BREARLEY SCHOOL | | 6397.50 | | | |
| 1228 | JUL 26 | PATRICIA COHEN | | | | | 3800.00 |
| 1264 | SEP 14 | PATRICIA COHEN | | | | | 3800.00 |
| 1270 | SEP 24 | PARTICIA COHEN | | | | | 3800.00 |
| 1271 | SEP 28 | MULTIMEDIA SCHOOL | | 3040.00 | | | |
| 1273 | OCT 5 | PATRICIA COHEN | | | | | 500.00 |
| 1281 | OCT 5 | PATRICIA COHEN | | | | | 1200.00 |
| 1287 | OCT 11 | AMER. BALLET | | 360.00 | | | |
| 1292 | OCT 24 | PATRICIA COHEN | | | | | 3800.00 |
| 1301 | NOV 6 | PHYLLIS SIEGEL | 120.00 | | | | |
| 1307 | NOV 9 | PATRICIA COHEN | | | | | 2500.00 |
| 1311 | NOV 26 | PATRICIA COHEN | | | | | 3800.00 |
| 1324 | DEC 17 | PHYLLIS SIEGEL | 375.00 | | | | |
| 1327 | DEC 17 | PATRICIA COHEN | | | | | 3800.00 |

========================================================

| TOTAL FOR 1990 | | | 1805.00 | 28574.92 | 162.40 | 0.00 | 44074.00 |

AMEX/GREEN                          AMEX/PLAT

*Agreement between Steve & Pat. where they owed each another a sum, which they settled.*

AMERICAN EXPRESS        1990

| DATE   | ITEM                    | AMOUNT  |
|--------|-------------------------|---------|
| JAN 18 | UNITED AIRLINES (ASPEN) | 530.00  |
| JAN 18 | UNITED AIRLINES (ASPEN) | 530.00  |
| JAN 19 | HARD ROCK CAFE          | 80.58   |
| MAR 18 | ASPEN SKI CO.           | 644.09  |
| MAR 18 | ASPEN SKI CO.           | 494.00  |
| MAR 18 | ASPEN SKI CO.           | 235.00  |
| MAR 18 | ASPEN SKI CO.           | 240.00  |
| MAR 18 | SILVERTREE HOTEL        | 2963.80 |
| MAR 19 | SHORT SPORT             | 96.17   |
| MAR 19 | SHORT SPORT             | 19.37   |
| MAR 21 | SHORT SPORT             | 39.19   |
|        |                         | ======= |
| TOTAL  |                         | 5872.20 |

```
AMERICAN EXPRESS (PLATINUM)      1990

DATE        ITEM                          AMOUNT
FEB 24      PRNCTN SKTE & SKI SHOP          105.81
MAR 3       YOUTH AT PLAY                    92.76
MAR 8       GALLERY OF GRAPHIC ARTS         596.40
JUL 21      TOYS 'R' US                     340.09
DEC 12      AMERICAN GIRLS COLLEMIDD.       257.90
DEC 12      AMERICAN GIRLS COLLEMIDD.       124.90
DEC 18      SHARPER IMAGE                   262.66
DEC 18      SHARPER IMAGE                   786.2
JAN 13/91F.A.O. SCHWARTZ                    471.55
                                          =========
TOTAL                                      5604.99
```