# Exhibit 1

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

INVESTMENT ADVISERS ACT OF 1940
Release No. 3634 / July 19, 2013

ADMINISTRATIVE PROCEEDING
File No. 3-15382

In the Matter of

STEVEN A. COHEN,

Respondent.

CORRECTED ORDER INSTITUTING
ADMINISTRATIVE PROCEEDINGS
PURSUANT TO SECTION 203(f) OF THE
INVESTMENT ADVISERS ACT OF 1940
AND NOTICE OF HEARING

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted pursuant to Section 203(f) of the Investment Advisers Act of 1940 ("Advisers Act") against Steven A. Cohen ("Cohen" or "Respondent").

II.

After an investigation, the Division of Enforcement (the "Division") alleges that:

A.   **SUMMARY**

1.   Cohen — the founder and owner of hedge fund investment advisers that bear his initials (S.A.C.) and that until recently managed portfolios of over $15 billion — failed reasonably to supervise two of his senior employees, who engaged in insider trading under his watch.

2.   On at least two separate occasions in 2008, two portfolio managers who reported to Cohen obtained material nonpublic information about three different publicly traded companies. Both portfolio managers provided information to Cohen indicating that they may have had access to inside information to support their trading. Based on that information, both portfolio managers engaged in unlawful insider trading.

3.   In each case, Cohen received highly suspicious information that should have caused any reasonable hedge fund manager in Cohen's position to take prompt action to determine whether employees under his supervision were engaged in unlawful conduct and to prevent violations of the federal securities laws. Cohen failed to take reasonable steps to investigate and prevent such violations. Instead, faced with red flags of potentially unlawful conduct by employees under his supervision, Cohen allowed his traders to execute the recommended trades and stood by while the portfolio managers traded in the portfolios they managed.

4.      Based on these trades, and Cohen's failure reasonably to supervise his portfolio managers who executed the trades, Cohen's hedge funds earned profits and avoided losses totaling more than $275 million.

5.      Cohen later praised one of the portfolio managers for his role in one of the trades and rewarded the other with a $9 million bonus for his work.

6.      Both portfolio managers have been criminally charged with insider trading. An analyst who reported to one of those portfolio managers has pleaded guilty to criminal insider trading charges.

**B.      RESPONDENT**

7.      **Cohen**, age 57, lives in Greenwich, Connecticut and New York, New York. He founded, owns, and controls investment advisers whose names bear his initials, including S.A.C. Capital Advisors, LLC ("SAC"). Before entering the hedge fund business in 1992, Cohen held a Series 3 license while working at Gruntal & Co.

**C.      RELEVANT ENTITIES AND PERSONS AFFILIATED WITH COHEN**

8.      **SAC** is an unregistered investment adviser based in Stamford, Connecticut. SAC managed certain affiliated hedge funds until the end of 2008, when another entity that Cohen owned assumed SAC's role.[1]

9.      **CR Intrinsic Investors, LLC ("CR Intrinsic")** is an investment adviser based in Stamford, Connecticut. In 2008, it was a wholly-owned subsidiary of SAC. Since January 1, 2009, it has been a wholly-owned subsidiary of SAC LP, a registered investment adviser since February 2012. CR Intrinsic advises hedge funds with approximately $2.8 billion in assets under management.

10.     **Sigma Capital Management, LLC ("Sigma Capital")** is an investment adviser based in New York, New York. In 2008, it was a wholly-owned subsidiary of SAC. Since January 1, 2009, it has been a wholly-owned subsidiary of SAC LP, a registered investment adviser since February 2012. Sigma Capital advises hedge funds with approximately $2 billion of assets under management.

11.     **Mathew Martoma**, age 39, lives in Boca Raton, Florida. Martoma worked at CR Intrinsic between 2006 and 2010. From at least January 1, 2008 until his departure in 2010, Martoma served as a portfolio manager. In December 2012, the United States Attorney's Office for the Southern District of New York (the "USAO"), filed an indictment against Martoma charging him with two counts of securities fraud and one count of conspiracy to commit securities fraud based on certain of the securities trades alleged here.

---

[1]      At approximately the end of 2008, SAC's role was assumed by S.A.C. Capital Advisors, L.P. ("SAC LP"), an investment adviser also founded, owned and controlled by Cohen. SAC LP has been registered with the Commission since February 2012. In early 2013, SAC LP had approximately $15 billion in assets under management.

2

12. **Michael Steinberg**, age 40, lives in New York, New York. Steinberg has worked at Sigma Capital since 1996. In 2008, Steinberg was a portfolio manager responsible for a portfolio of at least $100 million and a team of analysts and traders. On March 29, 2013, the USAO charged Steinberg with securities fraud and conspiracy to commit securities fraud in a criminal proceeding based in part on certain of the securities trades alleged here. Shortly thereafter, Sigma Capital placed Steinberg on paid leave.

13. **Jon Horvath**, age 43, lives in San Francisco, California. From September 2006 to September 2012, Horvath was a research analyst at Sigma Capital and reported to Steinberg. On September 28, 2012, Horvath pleaded guilty to two counts of securities fraud and one count of conspiracy to commit securities fraud.

14. **Hedge Fund Manager A** lives in New York, New York. From approximately 2003 to 2006, Hedge Fund Manager A was an employee of Sigma Capital and worked for Cohen. In 2006, Hedge Fund Manager A left and founded an unregistered investment adviser that SAC funded. Hedge Fund Manager A ran this investment adviser.

15. **Portfolio Manager A** resides in New York, New York. Portfolio Manager A has worked at Sigma Capital since December 2006. In 2008, he managed a portfolio of approximately one billion dollars.

### D. THE RELEVANT SECURITIES ISSUERS AND THE INSIDERS

16. **Elan Corporation, plc ("Elan")** is a biotechnology company incorporated in Ireland, with its principal place of business in Dublin, Ireland. Elan's Ordinary Shares trade on the Irish Stock Exchange and the London Stock Exchange. Its American Depositary Receipts ("ADRs") — each representing one Ordinary Share — trade on the New York Stock Exchange under the symbol "ELN." Elan has reported as a foreign issuer since at least 1996.

17. **Wyeth ("Wyeth")** was a pharmaceutical company incorporated in Delaware with its principal place of business in Madison, New Jersey in 2008. Until Wyeth was acquired by Pfizer Inc. in 2009, Wyeth's securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act and its stock traded on the NYSE under the symbol "WYE."

18. **Dell Inc. ("Dell")** is a Delaware corporation headquartered in Round Rock, Texas. Dell develops and sells computers and related products and services. Dell securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act and its stock is traded on the Nasdaq under the symbol "DELL."

19. **Dr. Sidney Gilman**, age 80, lives in Ann Arbor, Michigan and is a former professor at the University of Michigan Medical School. Gilman served as a consultant to Elan and Wyeth. At the same time, he served as a paid consultant for an expert network firm.

20. **The Dell Insider** was an employee in the investor relations department at Dell during the relevant time.

### E. OTHER RELEVANT ENTITY AND PERSONS

21. **Sandeep Goyal**, age 40, lives in Princeton, New Jersey. From July 2007 to January 2012, he was an analyst for Neuberger Berman. From 2003 to 2006, Goyal was a manager of

3

corporate planning at Dell. On November 3, 2011, Goyal pleaded guilty to one count of securities fraud and one count of conspiracy to commit securities fraud.

22. **Diamondback Capital Management LLC** ("Diamondback") was an investment adviser based in Stamford, Connecticut at all relevant times. Diamondback was founded by former employees of SAC LLC. Diamondback registered with the Commission in January 2006 and served as an investment adviser to hedge funds with approximately $4 billion worth of assets under management. On December 6, 2012, Diamondback announced that it would cease investment operations and return the assets it managed to its investors.

23. **Jesse Tortora**, age 35, lives in Pembroke Pines, Florida. From late 2007 until early 2010, Tortora was an analyst at Diamondback. Before that, he worked with Goyal at a prior employer. On May 18, 2011, Tortora pleaded guilty to one count of securities fraud and one count of conspiracy to commit securities fraud.

## F. FACTS

### 1. Cohen's Supervision of Martoma and Steinberg

24. Cohen was the chief executive officer of SAC and owned 100 percent of SAC, which in turn wholly owned Sigma Capital and CR Intrinsic.

25. At all relevant times, Cohen, along with others, directly supervised Martoma and Steinberg.

26. Cohen had the authority to hire and fire Martoma and Steinberg and the authority and ability to affect all aspects of their conduct as portfolio managers.

27. Cohen helped determine Martoma's and Steinberg's compensation, including periodic decisions about whether Martoma and Steinberg deserved discretionary compensation in addition to a percentage of the profits on their trading.

28. Cohen also "tagged" some of the positions in his own portfolio with the name of the portfolio manager who had recommended it. "Tagged" portfolio managers received additional compensation based on profits and losses from these "tagged" positions. When he took a portfolio manager's trading recommendation, Cohen generally determined whether to "tag" that portfolio manager with the position and therefore with more potential compensation.

29. Cohen exercised his authority over Martoma and Steinberg by, among other things, requiring them to update Cohen on their stock trading and to convey to him the reasons for their trades.

### 2. The Elan and Wyeth Trades

#### a. Overview

30. In the first half of 2008, Cohen watched Martoma build a massive long position in Elan and Wyeth stock based on the two companies' joint clinical trial of a drug with the potential to treat Alzheimer's disease (the "Drug"). In portfolios for which Cohen had exclusive or shared trading authority, SAC and CR Intrinsic held additional long positions of more than half a billion dollars.

31.     Cohen speculated that Martoma might have access to material nonpublic information about the clinical trial. By April 2008, Cohen was aware that Martoma and another CR Intrinsic employee had spoken to a doctor who implied he had access to material, nonpublic information about the clinical trial.

32.     Martoma in fact had access to material nonpublic information through another doctor, Gilman, who worked on the clinical trial of the Drug. On July 17 and 18, 2008, Martoma received material, nonpublic information from Gilman, a paid consultant to CR Intrinsic through Gilman's expert network firm, that the clinical trial results were worse than expected.

33.     Two days later, on Sunday, July 20, 2008, after months of building up a massive position and being bullish on both Elan and Wyeth, Martoma had a twenty-minute phone conversation with Cohen. Despite receiving red flags that Martoma was unlawfully in possession of material nonpublic information, Cohen failed to take prompt action to determine whether an employee under his supervision was engaged in unlawful conduct and failed to take reasonable steps to prevent violations of the federal securities laws. Instead, starting the next morning, Cohen oversaw the liquidation of his and Martoma's positions in Elan and Wyeth and the accumulation of a short position instead. These trades earned the firm approximately $275 million in illicit profits and avoided losses.

   b. *Background*

34.     Before a pharmaceutical company can release a new drug, it must conduct clinical trials to demonstrate the safety and efficacy of the drug.

35.     Clinical trials generally proceed in phases. In Phase I, a trial typically tests the drug on a small group of people (generally, 20 to 80 people) to determine its safety, determine a safe dosage range, and identify side-effects. In Phase II, a trial typically tests the drug on a larger group of people (generally, 200 to 300 people) to further evaluate its safety and efficacy. In Phase III, a trial typically tests the drug on large groups of people to more conclusively demonstrate its safety and efficacy and monitor any side-effects.

36.     Between 2006 and 2008, Elan and Wyeth jointly conducted a Phase II clinical trial (the "Phase II Trial") for the Drug. The Phase II Trial was designed to assess the Drug's safety and tolerability in mild-to-moderate Alzheimer's disease patients and to explore the Drug's efficacy at a range of doses.

37.     On June 17, 2008, Elan and Wyeth released top-line results of the Phase II Trial (the "June 17 Announcement") and announced plans to release detailed final results of the trial on July 29, 2008.

38.     The market reacted positively to the June 17 Announcement: on June 18, the stock prices of Elan and Wyeth rose more than 10% and 4%, respectively.

39.     Yet just afterwards, investors started looking ahead to the expected release of the detailed results on July 29 (the "July 29 Announcement"). As one analyst put it, the "[p]resentation of more complete data at [a scheduled conference on Alzheimer's disease] at the end of July will be a much anticipated event as investors should gain much greater insight into the drug's safety and efficacy profile as well as whether there may be the possibility for an accelerated registration strategy."

5

40. The more detailed July 29 Announcement failed to meet the market's expectations. On July 30, Elan's closing stock price plummeted by more than 40% and Wyeth's closing stock price dropped almost 12% from the previous day's close.

### c. Gilman's Material Nonpublic Information and Duty of Confidentiality

41. Gilman, a consultant to Elan, had continuing access to material nonpublic information about the Phase II Trial.

42. Gilman served as the chairman of the Phase II Trial's Safety Monitoring Committee ("Safety Committee"), which met regularly between 2006 and 2008 to discuss the health of the trial participants.

43. Gilman also agreed to present, on behalf of Elan and Wyeth, the Phase II Trial results at the International Conference on Alzheimer's Disease (the "Conference"), a medical conference scheduled for July 29, 2008. As a presenter, Gilman received access to the full Phase II Trial results approximately two weeks before the July 29 Announcement.

44. In 2007 and 2008, Elan paid Gilman approximately $79,000 for his consultations on the Drug.

45. Based on his roles in the Phase II Trial and under the terms of his contract with Elan, Gilman owed Elan a duty to hold in strict confidence all information he learned from his participation in the clinical trial and to use such information only for Elan's benefit.

46. The expert network firm for which Gilman moonlighted also trained him on the prohibitions of the federal securities laws. Specifically, the firm repeatedly reminded Gilman not to share nonpublic information with clients and listed the Drug as a topic that Gilman was "not allowed to discuss."

### d. Gilman Gives Martoma Material Nonpublic Information on the Drug Trial

47. Gilman first met Martoma through paid consultations arranged by Gilman's expert network firm. Between 2006 and 2009, Gilman earned approximately $108,000 from fifty-nine consultations with portfolio managers and analysts at CR Intrinsic and SAC, including forty-two consultations just with Martoma.

48. SAC's own records show payments from SAC to Gilman through his expert network firm. SAC also had emails between Gilman and Martoma (at Martoma's CR Intrinsic email address) reflecting that Gilman was a consultant for Elan and that Gilman could not discuss the Drug.

49. Over time, Gilman developed a personal relationship with Martoma and considered Martoma a friend and pupil.

50. Beginning in at least 2007, Gilman provided Martoma with material nonpublic information concerning the Phase II Trial. As a member of the Safety Committee, Gilman received periodic updates from Elan concerning nonpublic safety data for the ongoing trial. For example, in advance of each Safety Committee meeting, Elan sent Gilman a PowerPoint presentation that included information about dosages and side-effects experienced by Phase II Trial patients.

6

51.     Starting in at least 2007, Gilman regularly called Martoma just after Safety Committee meetings to share information from the meetings with Martoma. During these calls, Gilman discussed the PowerPoint presentations and provided Martoma with his perspective on the results.

52.     Martoma and Gilman coordinated their expert network consultations around scheduled Safety Committee meetings.

53.     On at least one occasion prior to July 2008, Gilman emailed Martoma concerning specific — and as yet nonpublic — data from the Phase II Trial. On March 18, 2008, Gilman attended a Safety Committee meeting in which Elan presented PowerPoint slides. Shortly thereafter, Gilman emailed Martoma. Labeling his email "For Your Eyes Only" and "High Priority," Gilman gave Martoma the dropout rate for the Phase II Trial. Gilman took the figures in his email (including certain mathematical errors) directly from Elan's PowerPoint slides.

   e.  *Prior to July 2008, the SAC Funds Held Long Positions in Elan and Wyeth*

54.     Martoma and Cohen respectively controlled the CR Intrinsic and SAC portfolios that held most of the Elan and Wyeth positions.

55.     Throughout 2007 and up to July 2008, the CR Intrinsic and SAC portfolios established substantial long positions in Elan and Wyeth securities. As of June 30, 2008, the CR Intrinsic portfolios owned over $233 million worth of Elan securities and over $80 million of Wyeth stock. The combined holdings in Elan and Wyeth securities represented approximately 14% of CR Intrinsic's entire equity position at that time. Similarly, as of June 30, 2008, the SAC portfolios owned over $293 million of Wyeth stock and over $95 million of Elan securities — totaling over 4% of SAC's entire equity position at that time. In addition, SAC also held an equity swap position with respect to 12 million shares of Wyeth stock.[2]

56.     Between January 1, 2008 and early July 2008, Martoma included Elan and Wyeth as "long ideas" in his weekly portfolio updates to Cohen and others and listed the release of the Phase II Trial results as an "[u]pcoming catalyst."

57.     Cohen invested in Elan and Wyeth securities based at least in part on Martoma's advice.

58.     Cohen also received input on Elan and Wyeth from Hedge Fund Manager A. In the first half of 2008, Hedge Fund Manager A generally advocated a long position in Wyeth, but not Elan.

59.     Martoma and Cohen maintained their bullish positions in Elan and Wyeth despite significant dissent within CR Intrinsic and SAC on the wisdom of a large, unhedged investment in Elan and Wyeth.

---

[2]     An equity swap is a transaction, typically with a broker-dealer, in which a party receives cash flow based on the performance of the underlying equity for a specified period of time in exchange for paying a premium. Generally, a party will sell its equity position and buy the economic interest on the shares it sold via an equity swap in order to free up cash.

### f. Cohen Encourages Martoma to Talk to a Doctor About Nonpublic Trial Results

60. In March and April 2008, two analysts at CR Intrinsic (the "Analysts") repeatedly sent emails to Cohen advocating against the Elan and Wyeth positions and suggesting trading strategies to hedge them.

61. Within CR Intrinsic, Martoma claimed to have unique insight into the Phase II Trial. In the words of the Analysts, Martoma claimed to have "black edge" — illicit, nonpublic information.

62. The Analysts grew frustrated with Martoma's claims that he had information about the outcome of the Phase II Trial. They believed it was impossible for anyone, even an insider, to have such information before the trial concluded.

63. The Analysts exchanged a number of emails and instant messages with Cohen about whether Martoma's advice on Elan and Wyeth was sound. On March 28, 2008, one of the Analysts told Cohen in an instant message that he did not think anyone could yet know the Phase II Trial data, because the trial was not over yet. Cohen responded by saying he would follow Martoma's and Hedge Fund Manager A's advice, because "they are closer to it than you." Later in the same message, the Analyst asked Cohen: "[I] don't know if [Hedge Fund Manager A] or mat [Martoma] will answer, but do you think they know something or do they have a very strong feeling." Cohen replied: "[T]ough one . . . i think mat [Martoma] is the closest to it." The Analyst responded: "[T]he question that I would ask is if it[']s possible to know the data yet – i could be wrong, but i don't think it is yet."

64. A few days later, on April 6, 2008, Cohen exchanged instant messages with the other Analyst about the Drug. Cohen remarked that it "seems like mat [Martoma] has a lot of good relationships in this arena."

65. On April 11 and 12, 2008, the Analysts relayed to Cohen their conversation with another doctor, who according to the Analysts, implied that he had seen some confidential Phase II Trial data. Like Gilman, this doctor was a paid consultant to SAC, through an expert networking firm, and simultaneously participated in confidential clinical trials conducted by Elan and Wyeth. The Analysts informed Cohen that this doctor had told one of them that the Drug did not have a statistically significant effect on patients and that the Phase II Trial data were not as good as Elan's public statements might suggest. The Analyst summarized this conversation in an email to Cohen and dismissed Martoma's claim that he had informational "edge" on the Phase II Trial data. The Analyst told Cohen that if Martoma really had "edge," it contradicted the Analyst's conversation with this doctor.

66. During his email exchanges with the Analysts, Cohen displayed no concern about the apparent disclosure of nonpublic information by the doctor to the Analysts or about the Analysts' use of such information to inform their investment decisions on the firm's behalf.

67. Instead, Cohen tried to discover whether the doctor had access to nonpublic information and the weight any such information should be given for investment purposes. Cohen wrote to one of the CR Intrinsic Analysts that it "[s]eems strange that [the doctor] would have seen the [interim] data when other investigators haven't." The Analyst responded, "Some small # of [people] have seen the data, otherwise they would not have been able to design the phase 3s. Was

8

[the doctor] one of those ppl, I have no idea.... But he said he saw the data before agreeing to be in the study, which isn't totally unreasonable...."

68. Cohen also forwarded the Analyst's email to Martoma to have him follow up with the same doctor. About an hour after receiving Cohen's email, Martoma emailed the doctor to schedule a consultation. A few days later, Martoma reported back to Cohen to tell him he had spoken with the doctor himself and that it was a "[n]on issue." Cohen replied: "How come[?]"

69. Cohen encouraged Martoma to speak with the doctor who Cohen had been told may have seen Phase II Trial results — information that any reasonable hedge fund manager should have known might be material and nonpublic. Cohen also knew, based on his communications with the Analysts, that Martoma possibly had another inside source on the Phase II Trial.

70. Cohen failed to take prompt action to determine whether employees under his supervision were engaged in unlawful conduct and failed to take reasonable steps to prevent violations of the federal securities laws.

71. Cohen's failure to do so was inconsistent with the instructions of SAC's then-applicable Code of Ethics. The Code of Ethics warned that "[e]mployees should also be conscious of the prohibitions of trading on or the misuse of material nonpublic information when communicating with potential sources of market information such as . . . doctors conducting clinical trials . . . . Questions concerning the propriety or advisability of contacting such sources should be discussed with the [Chief Compliance Officer] or the General Counsel prior to doing so." SAC's compliance officers also provided training to employees about the potential for doctors participating in drug trials to have access to material nonpublic information.

  g.  *In July 2008, Gilman Tells Martoma about the Phase II Trial Results*

72. After the June 17 Announcement, Martoma maintained his bullish view of Elan. On June 30, 2008, when Elan securities were trading at about $35 per share, Martoma told Cohen that he intended to increase the Elan position and predicted that the stock would rise past $40 per share after the July 29 Announcement.

73. In late June, Gilman learned that he likely would be selected to present the Phase II Trial results at the Conference on July 29. Soon after, Gilman told Martoma. When later designated as the presenter, Gilman arranged to travel to Elan's offices on July 15 and 16, 2008, to obtain the full results of the Phase II Trial.

74. In the weeks leading up to the July 29 Announcement, Gilman had several telephone calls with Martoma. He provided Martoma with material nonpublic information not only on the safety results, but also on the efficacy results for the Phase II Trial.

75. For example, on Friday, July 11, 2008, Gilman participated in a Safety Committee meeting where the safety results for the completed Phase II Trial as a whole were discussed. Two days later, on Sunday, July 13, Gilman spoke with Martoma for more than 1 hour and 40 minutes and provided Martoma with confidential information about the completed Phase II Trial safety results. Towards the end of the call, Martoma and Gilman scheduled another call on July 17, 2008 — the day after Gilman returned from his anticipated two-day meetings with Elan.

9

76. On July 15, 2008, Gilman traveled to San Francisco in a private plane arranged by Elan to participate in two days of meetings about the Phase II Trial efficacy results. Gilman received the complete efficacy results of the trial and reviewed and commented on a draft PowerPoint presentation that he would use to present the results at the Conference.

77. On July 17, 2008, after Gilman returned to his home in Michigan, an Elan officer sent Gilman an updated Conference PowerPoint presentation in an email labeled "Confidential, Do Not Distribute." The twenty-four page PowerPoint included summaries of the detailed efficacy results and safety results for the Phase II Trial as well as additional commentary on Elan's and Wyeth's interpretation of the data.

78. Later in the afternoon of July 17, 2008, Gilman and Martoma spoke again by phone. During a call that lasted for almost two hours, Gilman provided Martoma with confidential information about the detailed results of the Phase II Trial, including all the information contained in the revised PowerPoint presentation. Shortly afterward, Gilman sent the revised PowerPoint presentation to Martoma and then gave Martoma a password for the encrypted file.

79. On July 18, 2008, Martoma and Gilman spoke again by phone at least three times.

### h. *Martoma, CR Intrinsic, and SAC Trade Based on the Material Nonpublic Information from Gilman and Cohen Fails Reasonably To Supervise*

80. After his July 17 and July 18 communications with Gilman, Martoma reached out to Cohen on the morning of Sunday, July 20, 2008. Martoma told Cohen "[i]t's important" they speak.

81. Later that morning, Cohen and Martoma spoke for nearly 20 minutes. According to Cohen, Martoma said that he was no longer "comfortable" with the Elan investments that CR Intrinsic and SAC held. Despite being informed of Martoma's abrupt change in view on the Elan investments and red flags that Martoma may have unlawfully been in possession of material nonpublic information, Cohen failed to take prompt action to determine whether an employee under his supervision was engaged in unlawful conduct and failed to take reasonable steps to prevent violations of the federal securities laws.

82. Before the market opened on Monday, July 21, 2008, CR Intrinsic and SAC held over 10.5 million Elan securities worth over $365 million and over 7.1 million Wyeth shares worth over $335 million in the portfolios Cohen and Martoma controlled.

83. On July 21, 2008, Cohen's head trader at SAC (the "Head Trader") began selling Elan and Wyeth securities held in those portfolios.

84. Between July 21 and July 29, 2008 (the last trading day before the post-market July 29 Announcement), the CR Intrinsic and SAC portfolios sold over 15 million Elan securities for gross proceeds of more than $500 million. Although the investment advisers' portfolios achieved a zero balance in Elan securities by July 25, 2008, they continued to sell short Elan securities until the July 29 Announcement.[3] By the close of the market on July 29, 2008, the CR Intrinsic and

---

[3] To "sell short" is to sell a security that one does not own, but rather has arranged to borrow from a third party, with the intention of purchasing (also called "covering") the security at a later date to deliver to the lender. A short seller stands to gain if the price of the security

SAC portfolios had a combined short position of approximately 4.5 million Elan securities. CR Intrinsic's and SAC's trading in Elan made up over 20% of the reported market trading volume in Elan during the seven days before the July 29 Announcement.

85. Between July 21 and July 29, 2008, the CR Intrinsic and SAC portfolios also sold over 10.4 million shares of Wyeth for gross proceeds of more than $460 million, including over 6.1 million Wyeth shares worth more than $270 million on July 29 before the announcement. During the day on July 29, the CR Intrinsic and SAC portfolios briefly had a zero balance in Wyeth stock but then continued to place short sales that day. By the close of the market on July 29, the portfolios had a combined short position of approximately 3.3 million Wyeth shares. CR Intrinsic's and SAC's trading in Elan made up over 11% of the reported market trading volume in Wyeth during the seven days before the July 29 Announcement.

86. CR Intrinsic and SAC also placed options trades in Elan ADRs that bet on the ADRs' share price going down. For example, on July 28 and July 29, the CR Intrinsic and SAC portfolios purchased over $1 million worth of Elan put options with strike prices below the Elan ADR share price on those trading days.[4]

87. Martoma urged Cohen and the Head Trader to sell the Elan securities in the CR Intrinsic and SAC portfolios quickly. For example, on July 22, ten minutes after the Head Trader called Martoma, Martoma sent Cohen an instant message at 1:22:34 p.m., saying, "would do more today if possible[,]" suggesting that Cohen sell more Elan ADRs. At 1:22:50 p.m., Cohen responded, in relevant part, "we are done on 2.3 today[.]" Martoma replied, "my sense is today-thurs are best days so if possible to do more, would do so[.]" After receiving Martoma's message, Cohen sold over 2.2 million more Elan ADRs on July 22.

i.  *On July 29, Elan and Wyeth Announce Bad News About the Phase II Trial*

88. On July 29, 2008, after the close of U.S. securities markets, Gilman presented the results of the Phase II Trial at the Conference, and Elan and Wyeth issued a press release summarizing the results. Although Elan and Wyeth emphasized the positive aspects of the trial, the press release and Gilman's presentation included details not in the June 17 Announcement. The market reacted negatively to the full results.

89. On July 30, 2008, the first trading day after the July 29 Announcement, Elan's share price fell from $33.75 (the closing price on the day of the announcement) to $19.63 (the closing price on the day after the announcement), a decline of approximately 42%. Wyeth's stock price fell from $45.11 (the closing price on the day of the announcement) to $39.74 (the closing price the day after the announcement), a decline of approximately 12%.

90. Cohen's and Martoma's CR Intrinsic and SAC portfolios collectively reaped profits

---

drops between the short sale and the purchase because the short seller has sold the security at a price higher than the purchase price.

[4]     A put option is a financial contract between two parties that gives the buyer the right, but not the obligation, to sell an agreed quantity of stock during a specified time period at a specified price. A buyer of a put option pays a premium to purchase this right and generally stands to gain if the stock price drops.

and avoided losses of approximately $275 million based on the trades Martoma and Cohen placed after Martoma received material, nonpublic information from Gilman about the Phase II Trial results and Cohen failed reasonably to supervise Martoma.

### j. Cohen Pays Martoma a Big Bonus Before Firing Him Two Years Later

91. At the end of 2008, Martoma received a bonus of over $9.3 million. The bonus included a percentage of the Elan trading profits in the CR Intrinsic portfolios, as well as a share of the Elan profits in certain SAC portfolios.

92. 2008 was a banner year for Martoma. Martoma was never again able to generate such outsized returns.

93. In 2009 and 2010, Martoma did not earn a bonus.

94. In 2010, Cohen and others decided to fire Martoma for poor performance. In a 2010 email suggesting that Martoma be fired, a firm officer said that Martoma had been a "one trick pony with Elan."

### 3. The Dell Trades

#### a. Overview

95. In August 2008, as in several previous quarters, Horvath received material nonpublic information about Dell's quarterly financial results before Dell announced them. Horvath received the information from a friend at another hedge fund but knew the ultimate source was a Dell insider.

96. As he had done in prior quarters, Horvath shared the information and the fact that it came from a Dell insider with Steinberg, Horvath's supervisor at Sigma Capital. While in possession of this material nonpublic information, Steinberg unlawfully traded in the portfolio he managed.

97. Two days before Dell was to announce its financial results, Horvath sent Steinberg and Portfolio Manager A an email. He said he had received a gross profit margin range for Dell indirectly from "someone at the company," that Dell's gross margins would fall significantly below what analysts expected, and that Horvath expected Dell's stock price would therefore drop.

98. That email was forwarded to Cohen. Minutes afterward, Cohen began selling his entire $11 million long position in Dell.

99. Despite red flags in the email, Cohen failed to take prompt action to determine whether an employee under his supervision was engaged in unlawful conduct and failed to take reasonable steps to prevent violations of the federal securities laws. Instead, Cohen traded — and stood by knowing Steinberg had traded and might continue to trade — after receiving the email. As a result, SAC's funds profited or avoided losses totaling at least $1.7 million.

### b. Background

100. During at least 2008 and 2009, a Dell investor relations employee, the Dell Insider, regularly provided material nonpublic information about Dell's quarterly financial results to Goyal, an analyst at an investment advisory firm and a former colleague of the Dell Insider's at Dell.

101. Goyal and the Dell Insider were friends. While the Dell Insider provided Goyal with inside information about Dell, the Dell Insider sought and received career advice from Goyal in return.

102. The Dell Insider provided specific information on quarterly financial results, such as revenues and gross margins, that Dell had not yet publicly released.[5] Because they are key measures of a company's sales and profitability, revenue and gross margin figures are important to investors.

103. Only a few people within Dell, including certain investor relations employees like the Dell Insider, had access to such confidential financial results before their public release. The Dell Insider's supervisor had informed the Dell Insider and others that this sort of financial information was not to be disseminated prior to its public release.

104. The Dell Insider's provision of this information to Goyal violated the Dell Code of Conduct.

105. Goyal passed the information he received from the Dell Insider to his friend Tortora, an analyst at Diamondback. In exchange, Tortora and his supervisor at Diamondback arranged for Diamondback to make payments totaling over $175,000 to a brokerage account maintained by Goyal's wife. Goyal's wife never provided any goods or services to Diamondback.

106. After receiving the Dell information from Goyal, Tortora passed the information to several other hedge fund analysts — including Horvath — with whom Tortora regularly exchanged information about certain technology companies.

107. Tortora informed Horvath that the information had come from a source within Dell, as was obvious from the specificity of the information. Horvath then passed the information to Steinberg, his supervisor at Sigma Capital, and told Steinberg that the information had come from a Dell employee.

108. Shortly after receiving the information from Horvath, Steinberg executed trades in Dell securities on behalf of hedge funds that Sigma Capital managed.

### c. Dell's August 2008 Earnings Announcement

109. In advance of Dell's August 28, 2008 announcement of financial results for its second quarter (May 3, 2008 to August 1, 2008), the Dell Insider provided Goyal with inside information about Dell's revenues and gross profit margin.

---

[5] Revenues are the proceeds from a company's sales of its products or services. Gross margins are a company's gross profits — the profit the company earns after deducting the costs of goods sold from the company's revenues. Gross margins are usually expressed as a percentage of revenue.

110. In the weeks leading up to the announcement, as Dell got closer to finalizing its financial results and revised its initial calculations, Goyal received updates from the Dell Insider on the numbers.

111. Goyal then provided the Dell inside information to Tortora, who passed it to Horvath, who then passed it to Steinberg.

112. On the evening of August 4, 2008, the Dell Insider and Goyal spoke on the phone for 40 minutes. The Dell Insider provided Goyal with inside information about Dell's second quarter financial results.

113. Early the next morning, Goyal called Tortora. They spoke for approximately ten minutes. Goyal gave Tortora the inside information Goyal had received from the Dell Insider.

114. A few minutes later, Tortora emailed Horvath and conveyed the inside information he had just received, including Dell's calculation of its revenues and gross margins.

115. In his email, Tortora told Horvath that Dell's then-current calculation of its gross profit margin for the second quarter was 17.5 percent, which was significantly worse than the 18.3-percent figure that analysts expected.

116. On the evening of August 14, the Dell Insider again called Goyal. They spoke for fifty minutes. The Dell Insider told Goyal that Dell's second quarter gross margin was still expected to be lower than analysts were predicting, among other things. The next day, Tortora spoke with Goyal again.

117. On the next trading day, Monday, August 18, Tortora passed the update concerning Dell's disappointing gross margin results to Horvath during a ten-minute call.

118. Three minutes after Horvath's call with Tortora ended, Horvath called Steinberg. They spoke for approximately two minutes. About a minute later, Horvath emailed Steinberg and asked him to "Pls keep the DELL info on the down low. [J]ust mentioning that because JT [Tortora] specifically asked me to be extra sensitive with the info." Steinberg replied, "I will."

119. Steinberg immediately began short-selling Dell stock. The same day, he amassed a short position of over 167,000 shares for a hedge fund that Sigma Capital managed. Over the next few trading days, Steinberg also purchased Dell put options and sold short Dell call options — trades that, like the short sales, would pay off if Dell's stock price declined, as Horvath and Steinberg expected based on the inside information from Tortora.

120. On the evening of August 24, Goyal received another update from the Dell Insider. The next day, Goyal called Tortora and told him that Dell was still planning to announce a worse-than-expected gross margin.

121. Approximately 20 minutes after that call, Tortora sent an email to Horvath indicating that Tortora had done a new "[D]ell check" and that it was the "same as before" and sounded bad for Dell.

  d. *Cohen Receives the Dell Information and Trades On It*

122. On August 25 and 26, Cohen was working at his vacation home on Long Island, where he had a home office set-up virtually identical to the one in his corporate office.

14

123. On August 25 at 9:30 a.m., Cohen began purchasing shares of Dell in one of the portfolios he controlled at SAC. By 12:01 p.m., he held a long position of 450,000 shares, at a cost of more than $11 million.

124. At 12:31 p.m. that day, Horvath received an automatically-generated email. The email alerted Horvath that Cohen had a long position in Dell, which Horvath knew ran counter to the short position in Steinberg's portfolio. Two minutes later, Horvath forwarded the email to Steinberg and noted that "Steve [Cohen] is long Dell." Steinberg responded that he assumed Cohen took his long position on advice from Portfolio Manager A, who had taken a long position in Dell.

125. Later that day, Steinberg and Horvath exchanged emails. They discussed whether to tell Cohen their view that Dell's stock price would decrease after the earnings announcement based on Dell's disappointing gross margins.

126. At 9:31 a.m. the next day, August 26, Cohen bought 50,000 more shares of Dell, bringing his total long position to 500,000 shares.

127. About three hours later, at 12:37 p.m., Steinberg emailed Horvath and Portfolio Manager A. Steinberg told them that he had talked to Cohen about Dell earlier that day and that Cohen wanted Horvath and Portfolio Manager A, who were on opposite sides of Dell, to compare notes before the markets closed that day. Steinberg added, for Portfolio Manager A's benefit, that he and Horvath thought gross margins were "at risk this [quarter]," among other things, and that he and Horvath expected that the earnings per share would miss analysts' estimates and cause the stock price to drop.

128. At 12:54 p.m., Portfolio Manager A replied that, while he agreed gross margins were "the biggest risk," he estimated gross margins of 18.1% (significantly higher than the figure Horvath had received from Tortora). Portfolio Manager A asked Horvath how he was modeling gross margins.

129. Also at 12:54 p.m., Portfolio Manager A spoke with Cohen on the phone for approximately seven minutes.

130. Just minutes later, at 1:09 p.m., Horvath replied to Portfolio Manager A and copied Steinberg:

> I have a 2nd hand read *from someone at the company* – this is 3rd quarter I have gotten this read from them and it has been very good in the last quarters. They are seeing G[ross] M[argin]s miss by 50-80 [basis points] due to poor mix, op[erating] ex[penses] in-line and a little revenue upside netting out to an [earnings per share] miss. . . . Please keep to yourself as obviously not well known.

(emphasis added).

131. Four minutes later, at 1:13 p.m., Portfolio Manager A forwarded this email to a SAC employee whose duties included forwarding to Cohen trading-related information worthy of Cohen's attention (the "Research Trader").

132. At 1:29 p.m., this employee forwarded Horvath's email to Cohen at two email addresses Cohen maintained at SAC, one designated "Office" and the other designated "Home."

15

133. From 1:17 p.m. to 1:36 p.m., Cohen spoke on his cell phone to another SAC employee.

134. At 1:37 p.m., the Research Trader called Cohen on his cell phone. The call lasted 48 seconds.

135. At 1:39 p.m., Cohen began selling shares of Dell. By 3:49 p.m., Cohen had sold his entire Dell position.

136. After receiving Horvath's highly suspicious email, which reflected the clear possibility that Steinberg and Horvath were unlawfully in possession of material nonpublic information and that Steinberg had traded or might trade on that information, Cohen failed to take prompt action to determine whether an employee under his supervision was engaged in unlawful conduct and failed to take reasonable steps to prevent violations of the federal securities laws. Instead, Cohen liquidated his Dell shares.

137. Through August 28, Steinberg continued to sell short Dell shares in his Sigma Capital portfolio while in knowing possession of material nonpublic information about Dell.

      e. *Dell's Stock Price Drops After Its August 28 Earnings Announcement*

138. After the markets closed on August 28, Dell announced its second quarter financial results, including a gross margin of 17.2 percent. That figure was substantially worse than the 18.4 percent that analysts had expected.

139. Three hours after Dell's announcement, Cohen emailed Steinberg: "Nice job on Dell."

140. The following day, Dell's share price dropped more than 13 percent, from a closing price of $25.21 on August 28 to a closing price of $21.73 on August 29.

141. Over the next few days, Steinberg closed out his positions and reaped profits of approximately $1 million.

142. By selling shares in his portfolio after receiving Horvath's email, Cohen avoided losses of over $1.7 million.

**G.**    **<u>Violations</u>**

143. As a result of the conduct described above, Cohen failed reasonably to supervise Martoma and Steinberg with a view to preventing their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### III.

In view of the allegations made by the Division of Enforcement, the Commission deems it necessary and appropriate in the public interest that public administrative proceedings be instituted to determine:

A. Whether the allegations set forth in Section II are true and, in connection therewith, to afford Respondent an opportunity to establish any defenses to such allegations;

B. What, if any, remedial action is appropriate in the public interest against Respondent pursuant to Section 203(f) of the Advisers Act including, but not limited to, civil penalties pursuant to Section 203(i) of the Advisers Act;

### IV.

IT IS ORDERED that a public hearing for the purpose of taking evidence on the questions set forth in Section III hereof shall be convened at a time and place to be fixed, and before an Administrative Law Judge to be designated by further order as provided by Rule 110 of the Commission's Rules of Practice, 17 C.F.R. § 201.110.

IT IS FURTHER ORDERED that Respondent shall file an Answer to the allegations contained in this Order within twenty (20) days after service of this Order, as provided by Rule 220 of the Commission's Rules of Practice, 17 C.F.R. § 201.220.

If Respondent fails to file the directed answer, or fails to appear at a hearing after being duly notified, the Respondent may be deemed in default and the proceedings may be determined against him upon consideration of this Order, the allegations of which may be deemed to be true as provided by Rules 155(a), 220(f), 221(f) and 310 of the Commission's Rules of Practice, 17 C.F.R. §§ 201.155(a), 201.220(f), 201.221(f) and 201.310.

This Order shall be served forthwith upon Respondent personally or by certified mail.

IT IS FURTHER ORDERED that the Administrative Law Judge shall issue an initial decision no later than 300 days from the date of service of this Order, pursuant to Rule 360(a)(2) of the Commission's Rules of Practice.

In the absence of an appropriate waiver, no officer or employee of the Commission engaged in the performance of investigative or prosecuting functions in this or any factually related proceeding will be permitted to participate or advise in the decision of this matter, except as witness or counsel in proceedings held pursuant to notice. Since this proceeding is not "rule making" within the meaning of Section 551 of the Administrative Procedure Act, it is not deemed subject to the provisions of Section 553 delaying the effective date of any final Commission action.

By the Commission.

Elizabeth M. Murphy
Secretary