USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/27/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
PATRICIA COHEN,                            :

                Plaintiff,          :

      -against-                         :

STEVEN COHEN *et al.*,                      :

             Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

09 Civ. 10230 (WHP)

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

        Plaintiff Patricia Cohen brings this action for fraud, breach of fiduciary duty, and

violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act against her ex-

husband, Steven Cohen, his brother, Donald Cohen, and Steven's former business partner Brett

Lurie. Defendants Steven and Donald Cohen move to dismiss the third amended complaint ("the

complaint") under Federal Rule of Civil Procedure 12(b)(6). As the caption of this case

suggests, this is a family dispute. The only thing that distinguishes it from countless others is the

seemingly inexhaustible legal resources that each side has brought to bear. For the following

reasons, Steven and Donald's motion is granted in part and denied in part.

BACKGROUND

I.    Facts

        The following facts are gleaned from the complaint and assumed to be true for the

purposes of this motion. Patricia and Steven Cohen were married in 1979 and separated in 1988.

(Third Amended Complaint ("Compl."), dated Oct. 2, 2013, ECF No. 99, ¶¶ 13, 22.) Before

separating, but after they had discussed the possibility of divorce, Steven founded SAC Trading

1

Corporation ("SAC") and served as its president and sole owner. (Compl. ¶¶ 13, 16.) He named his brother Donald as SAC's accountant and treasurer. (Compl. ¶ 16.) Donald had acted as Patricia and Steven's personal accountant and financial advisor. (Compl. ¶ 18.) Steven also appointed his attorney Brett Lurie as SAC's secretary and counsel. (Compl. ¶ 16.) Lurie had represented both Patricia and Steven in various legal matters. (Compl. ¶ 18.) SAC held all of Patricia and Steven's marital assets, except their apartment. (Compl. ¶ 16.)

Shortly after SAC's formation, Steven invested $8,745,169 with Lurie in various cooperative apartment conversions in Queens, New York ("the Lurie Investment"). (Compl. ¶ 17.) The project failed. In late 1986, Steven and Donald told Patricia that the Lurie Investment was lost, although the loss could not be recognized until the "properties went into foreclosure or bankruptcy." (Compl. ¶ 20.) Steven sued Lurie over that real estate investment. In 1987, Steven received a $5.5 million settlement from Lurie but never informed Patricia. (Compl. ¶ 39.)

When Patricia and Steven separated in 1988, Steven—with Donald's assistance—prepared a "Statement of Financial Condition" in connection with the separation agreement. (Compl. ¶ 22.) The statement listed the couple's marital assets as totaling approximately $17 million, including $8,745,169 representing the Lurie Investment. (Compl. ¶ 22.) During negotiations over the separation agreement, with both parties represented by counsel, Steven reiterated that the Lurie Investment was lost, but the loss could not be recognized until the properties went into bankruptcy or foreclosure. (Compl. ¶ 24.) He buttressed his representation regarding the Lurie Investment with documents and an acknowledgment by his lawyer that the money was lost. (Compl. ¶ 24.)

In December 1989, Patricia and Steven executed a separation agreement in which

each of them "acknowledged a degree of familiarity with and knowledge of the financial circumstances of the other . . . ." (Decl. of Martin Klotz, dated Oct. 16, 2013 ("Klotz Decl."), ECF No. 104, Ex. B at ¶ 14.4.) The agreement also provided that Steven "makes no representation as to the value of [the Lurie Investment.]" (Klotz Decl. Ex. B. at ¶ 14.4.) They also acknowledged that "complete financial disclosure . . . ha[d] not been obtained, but both parties . . . advised their counsel that they [were] . . . unwilling to litigate the issues . . . ." (Klotz Decl. Ex. B at ¶ 14.5.) In a belt-and-suspenders approach, Patricia and Steven's separation agreement also provided that "[it] ha[d] been achieved after what [Patricia and Steven] consider[ed] to be sufficient disclosure, consultation with legal representatives and bona fide negotiations." (Klotz Decl. Ex. B at ¶ 14.7.) Finally, the separation agreement provided a merger clause stating that the agreement "embodie[d] all understandings and agreements between the parties" and that "[n]o representations or warranties ha[d] been made by either party to the other, or by anyone else, except as expressly set forth in [the agreement]." (Klotz Decl. Ex. B at ¶¶ 19.3–19.4.) A judgment of divorce incorporating the terms of the separation agreement was entered March 13, 1990. (Klotz Decl. Ex. C.)

On March 21, 1991, Patricia moved for increased child support, maintenance, and other relief on grounds of economic duress, fraud, and unconscionability. (Klotz Decl. Ex. F at ¶ 2.) Patricia claimed she could not support the children in the style they were accustomed to during her marriage to Steven. (Klotz Decl. Ex. E at ¶¶ 14, 19.) At that time, Patricia alleged that Steven had filed a separate income tax return in 1989 to hide substantial income during negotiation of the separation agreement. (Klotz Decl. Ex. E at ¶ 4.)

Steven denied Patricia's allegations and insisted she had received more than her

distributive share under the separation agreement. He asserted that when the $8,745,169 nominal value of the "totally worthless" Lurie Investment was subtracted, their marital assets at the time of separation were approximately $8,185,368 and that Patricia received "close to $5 million." (Compl. ¶ 31.) Patricia withdrew her motion for increased support and maintenance. In January 1992 she and Steven amended their separation agreement to increase child support but did not revoke or alter any of the prior representations. (See Klotz Decl. Ex. I.)

The Cohen family discord lay dormant until 2006 when Patricia read a disparaging article about Steven's former employer, Gruntal & Co. (Compl. ¶ 35.) Patricia learned that a Gruntal employee who had signed corporate documents relating to Steven's financial condition during the separation negotiations had been convicted of fraud. (Compl. ¶ 35.) She began to suspect that Gruntal and Steven had dissembled during the separation negotiations. (Compl. ¶ 36.) Patricia investigated further and discovered the existence of a lawsuit in New York county titled Cohen v. Lurie, No. 8981/87 (N.Y. Sup. Ct.). She learned for the first time that Steven had received $5.5 million in a settlement with Lurie. (Compl. ¶ 39.)

II.    Procedural History

Patricia filed this action in December 2009. After changing counsel, she amended her complaint in April 2010. (First Amended Complaint, dated Apr. 7, 2010, ECF No. 19.) In the wake of a motion to dismiss, Patricia changed counsel again and amended her complaint for a second time. Then, Steven and Donald filed a new motion to dismiss.

On March 29, 2011, Judge Richard Holwell granted the motion and dismissed the second amended complaint. Cohen v. Cohen, 773 F. Supp. 2d 373, 397 (S.D.N.Y. 2011), vacated in part by Cohen v. SAC Trading Corp., 711 F.3d 353 (2d Cir. 2013). Patricia appealed.

4

On April 3, 2013, the Second Circuit affirmed Judge Holwell's dismissal of Patricia's unjust enrichment claim[1] but vacated his dismissal of her fraud, breach of fiduciary duty, and RICO claims. Cohen v. SAC Trading Corp., 711 F.3d at 363–64. On remand the case was reassigned to this Court. (Notice of Case Reassignment, dated Apr. 24, 2013, ECF No. 65.)

On July 12, 2013, Steven and Donald renewed their motion to dismiss. (Mot. Dismiss Pl.'s Second Amended Compl. (Renewed), dated July 12, 2013, ECF No. 85.) Patricia, represented by yet another attorney, obtained leave to amend and filed a third amended complaint. Steven and Donald move to dismiss the third amended complaint. (Mot. Dismiss Pl.'s Compl., dated Oct. 16, 2013, ECF No. 102.)

## DISCUSSION

### I.  Legal Standard

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To determine plausibility, courts follow a "two-pronged approach." Iqbal, 556 U.S. at 679. "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009). Second, a court determines "whether the 'well-pleaded factual allegations,'

---

[1] The unjust enrichment claim resurfaces in the third amended complaint. (Compl. ¶¶ 104–08.) But in colloquy with the Court, Patricia's counsel explained that Patricia was not attempting to reassert the claim and took no issue with the Second Circuit's conclusion. (See Tr. of Oral Arg., dated Dec. 10, 2013 ("Dec. 10 Tr."), at 28.)

assumed to be true, 'plausibly give rise to an entitlement to relief.'" Hayden v. Paterson, 594

F.3d 150, 161 (2d Cir. 2010) (quoting Iqbal, 556 U.S. at 679). Iqbal "requires assertions of facts

supporting a plausible inference . . . not of facts which can have no conceivable other

explanation, no matter how improbable that explanation may be." Cohen v. SAC Trading Corp.,

711 F.3d at 360. On a motion to dismiss, courts may consider "facts stated on the face of the

complaint, in the documents appended to the complaint or incorporated in the complaint by

reference, and . . . matters of which judicial notice may be taken." Allen v. WestPoint–Pepperell,

Inc., 945 F.2d 40, 44 (2d Cir. 1991).

In addition, the Federal Rules of Civil Procedure impose a heightened pleading

standard on complaints charging common law fraud and civil RICO claims sounding in fraud.

See Fed. R. Civ. P. 9(b); First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 178

(2d Cir. 2004) ("[A]ll allegations of fraudulent [RICO] predicate acts are subject to the

heightened pleading requirements of Federal Rule of Civil Procedure 9(b)."); Beck v. Mfrs.

Hanover Trust Co., 820 F.2d 46, 50 (1987). Under Rule 9(b), claims of fraud must be plead with

particularity and "(1) specify the statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).

II.    Fraud

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1)

a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3)

which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff

reasonably relied; and (5) which caused injury to the plaintiff." Wynn v. AC Rochester, 273

F.3d 153, 156 (2d Cir. 2001). Patricia alleges four fraudulent statements: (1) Steven and

Donald's statement in 1986 that the entire Lurie Investment had been lost;[2] (2) Steven and his

attorney's explanation during the 1989 separation negotiations that the Lurie Investment was lost

and was only on the books until bankruptcy or foreclosure; (3) Steven's financial statement

produced as part of the 1989 Separation Agreement, which omitted the $5.5 million Lurie

Investment settlement; and (4) Steven's declaration in 1991 that the Lurie Investment was

worthless and that his true net worth in 1988 was $8,185,368. (See Compl. ¶¶ 20, 22, 24, 31.)

According to Patricia, these statements concealed the true value of the Lurie Investment and

induced her to accept $2.75 million less than she was otherwise entitled to receive. (See Compl.

¶¶ 90–96.)

On their renewed motion to dismiss, Steven and Donald shift their focus from

whether the statements were false to whether Patricia could reasonably have relied on them.

They contend that Patricia cannot plead reasonable reliance when she signed a separation

agreement acknowledging (1) that she had not received full financial disclosure, (Klotz Decl. Ex.

B at ¶ 14.5), (2) that Steven "makes no representation as to the value of the interest in a second

and third mortgage on various properties involved in [the Lurie investment,]" (Klotz Decl. Ex. B

at ¶ 14.4), and (3) that the agreement "is not being executed in reliance upon any representation

or warranty not expressly set forth herein." (Klotz Decl. Ex. B at ¶ 19.4.)

The question of reliance is a close one and should not be resolved on a motion to

dismiss. In Danann Realty Corp. v. Harris, the New York Court of Appeals held that a purchaser

---

[2] The Second Circuit expressly found this allegation to be insufficient because there was no
allegation that Steven and Donald knew or had reason to know at the time that Lurie would repay
approximately 63% of the investment in 1987. Cohen v. SAC Trading Corp., 711 F.3d at 359.

could not plead reliance on a seller's statements about a building's expenses and profits when the sale contract specifically disavowed any representations as to expenses and profits and provided that the purchaser was not relying on any representation not embodied in the contract. 157 N.E.2d 597, 598 (N.Y. 1959). In Harsco Corp. v. Segui, the Second Circuit applied the Danann Realty rule to a securities fraud action: "[W]here a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon." 91 F.3d 337, 345 (2d Cir. 1996).

In the context of another proceeding bearing the unhappy and confusing moniker Cohen v. Cohen (no relation to the present parties or this lawsuit), a woman claimed her ex-husband had induced her to enter a settlement agreement discontinuing three pending lawsuits and assigning to him her interests in a partnership and in certain corporations with the promise that he would return home. 1 A.D.2d 586, 586–87 (1st Dep't 1956) [hereinafter "Cohen '56"]. The First Department found that a provision stipulating that "neither [party] has made any warranties or representations to the other, including any representations or warranties as to the continuation of the marital status . . . outside of those expressed in this agreement" was a disclaimer as "broad as the alleged representation and completely refute[d] it." Cohen '56, 1 A.D.2d at 587. While it was true, the court said, that "a person cannot exempt himself from liability for fraud by inserting in his contract a blanket or merger clause[,]" Cohen '56, 1 A.D.2d at 587 (quoting Ernst Iron Works v. Duralith Corp., 270 N.Y. 165, 169 (1936)), a specific disclaimer "destroys [her] allegation that she executed the agreement in reliance upon defendant's representation." Cohen '56, 1 A.D.2d at 587.

Here, the separation agreement specifically disclaimed that Steven had made any representation "as to the value of the interest in [the Lurie investment.]" (Klotz Decl. Ex. B at ¶ 14.4.) However, unlike the disclaimer in Cohen '56, this disclaimer does not fully eclipse the representation on which Patricia allegedly relied. Patricia's allegation is not just that Steven misrepresented the value of the real estate, but that he led Patricia to believe the invested money was lost. (Compl. ¶ 20–21.) See also Cohen v. SAC Trading Corp., 711 F.3d at 359. Further, neither the acknowledgment that full financial disclosure was lacking nor the general merger provision nullifies the possibility that Patricia reasonably relied on Steven's statements that the Lurie Investment was lost. See Carlinger v. Carlinger, 249 N.Y.2d, 788, 788 (1st Dep't 1964) ("A general merger clause in a contract is ineffective to bar a claim of fraud in the inducement of a contract.") Patricia has sufficiently pled her fraud claim.

III.   RICO

Patricia asserts civil RICO claims under 18 U.S.C. sections 1962(c) and 1962(d). She alleges that through SAC and Gruntal, Steven and Donald participated in racketeering activity including a scheme to commit insider trading, a scheme to defraud Patricia ("the Scheme against Patricia"), a scheme to illegally obtain profits from the Lurie Investment, and a second securities fraud scheme. (Compl. ¶¶ 68–79.) She further alleges that Steven and Donald executed these schemes through use of the United States mail, thus committing mail fraud in violation of 18 U.S.C. section 1341. (Compl. ¶¶ 71–79.)

To state a civil RICO claim under section 1962(c), a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Cintas Corp. v. Unite Here, 601 F. Supp. 2d 571, 577 (S.D.N.Y. 2009) (citing Sedima S.P.R.L. v. Imrex Co., 473

U.S. 479, 496 (1985)). "Mere common-law fraud does not constitute racketeering activity for RICO purposes." Cofacrèdit S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999). Thus, in analyzing a claim, "courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb." Goldfine v. Sichenzia, 118 F. Supp. 2d 392, 397 (S.D.N.Y. 2000) (citing Schmidt v. Fleetbank, 16 F. Supp. 340, 346 (S.D.N.Y. 1998)); see also Gross v. Waywell, 628 F. Supp. 2d 475, 481 (S.D.N.Y. 2009) ("[E]xperience reveals that many plaintiffs, rather than fostering RICO's mission as private attorneys general aiding public law enforcement, actually appear as private prospectors digging for RICO's elusive gold, and more often than not generating substantial costs rather than net gains to the public."). "Allegations merit particular scrutiny where . . . the predicate acts are mail and wire fraud, and where the use of mail or wires to communicate is not in and of itself illegal, unlike other predicate acts such as murder or extortion." Rosenson v. Mordowitz, No. 11 Civ. 6145 (JPO), 2012 WL 3631308, at *5 n.3 (S.D.N.Y. Aug 23, 2012). "Exercise of federal court jurisdiction in . . . cases . . . that rely on nothing more than incidental use of mails or wires in furtherance of a simple fraudulent scheme with few victims and narrow impacts, would threaten to federalize garden-variety state common law claims, and offer a remedy grossly out of proportion to any public harm or larger societal interests associated with localized wrongful conduct ordinarily involved in such actions." Gross, 628 F. Supp. 2d at 482.

Finally, domestic relations disputes are rarely the nebulae from which viable civil RICO claims coalesce. They tend to involve private concerns as opposed to matters of public importance. Cf. Sheridan v. Mariuz, No. 07 Civ. 3313 (SCR), 2009 WL 920431, at *6 (S.D.N.Y.

Apr. 6, 2009) ("[W]hile there is no de jure bar to asserting domestic relations disputes as civil RICO claims under 18 U.S.C. § 1964(c), meeting the . . . required RICO pleading elements in such a factual context is quite difficult.").

A.    Standing

Steven and Donald argue there is no need to reach the elements of a section 1962(c) claim because Patricia lacks standing to bring a RICO claim. "The RICO statute grants standing to [a]ny person injured in his business or property by reason of a violation of section 1962 . . . . To demonstrate standing, a plaintiff must plead, at a minimum, (1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation." Lerner v. Fleet Bank, N.A., 318 F.3d 113, 120 (2d Cir. 2003) (internal quotation marks and citations omitted). "This third requirement is satisfied if the defendant's injurious conduct is both the factual and the proximate cause of the injury alleged." Lerner, 318 F.3d at 120 (quoting Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992)).

Here, Steven and Donald argue that Patricia has not suffered any injury to her property as a result of their activity. (Mem. Supp. Mot. Dismiss Pl.'s Compl., dated Oct. 16, 2013, ECF No. 103 ("Def. Mem.") at 11.) The property she allegedly lost as a result of the fraudulent statements was $2.75 million, one half of the $5.5 million settlement with Lurie. (See Compl. ¶ 89.) Steven and Donald insist that because the separation agreement did not impose a fifty-fifty division of assets, Patricia does not have an established right to half of the $5.5 million but rather a mere expectation that she would have received more money but for the alleged RICO violations. (Def. Mem. at 11.) They cite Pohlot v. Pohlot for the proposition that "mere expectation of a favorable decree . . . does not constitute a property interest protected under

11

RICO." 664 F. Supp. 112, 116 (S.D.N.Y. 1987); see also Capasso v. CIGNA Ins. Co., 765 F. Supp. 839, 842 (S.D.N.Y. 1991) ("[M]ere expectation that [one] might be awarded some share in [a spouse's] property is too speculative to support a RICO claim.")

But Steven and Donald's reliance on Pohlot is misplaced. In Pohlot, the plaintiff had not pled "that the property allegedly injured belonged to [her]." See 664 F. Supp. at 116. Here, by contrast, the $8,745,169 million Lurie Investment and the $5.5 million settlement were undoubtedly marital property. Patricia alleges her entitlement to a portion of the Lurie investment was injured when Steven fraudulently concealed it in order to trick her into waiving her right under the separation agreement.

In a similar vein, Defendants cannot rely on Capasso. There, the property at issue—the husband's company—was separate property. Capasso, 765 F. Supp. at 842. Upon divorce, the Appellate Division awarded the plaintiff a 20% interest in the appreciation of the company during the life of the marriage. Capasso, 765 F. Supp. at 842; cf. Price v. Price, 69 N.Y.2d 8, 17–18 (1986) ("Where separate property of one spouse has appreciated during the marriage . . . and where such appreciation was 'due in part' to the contributions or efforts of the nontitled spouse as parent and homemaker, the amount of that appreciation should be added to the sum of marital property for equitable distribution . . . .") (citing N.Y. Dom. Rel. Law § 236(B)(5)). Here, however, the Lurie Investment was marital property, so there is no question of Patricia's interest accruing only upon divorce.

While not controlling here, the First Circuit applied a logical rule in DeMauro v. DeMauro: injury to a spouse's separate property does not confer RICO standing because a plaintiff's interest is speculative until divorce; however, injury to marital property does confer

12

standing because the plaintiff has a "present ownership interest" in it. 115 F.3d 94, 98 (1st Cir. 1997); Farkas v. D'Oca, 857 F. Supp. 300, 304 (S.D.N.Y. 1994) (same). The First Circuit held that to the extent plaintiff's complaint alleged her husband had concealed marital property, she had standing to bring a RICO claim. DeMauro, 115 F.3d at 98. Patricia alleges Steven concealed marital property from her. She therefore has standing to bring a RICO claim.

B. Pattern of Racketeering Activity

Defendants also argue the complaint should be dismissed because it fails to allege a pattern of racketeering activity. To plead a pattern of racketeering activity, a plaintiff must allege two or more related predicate acts of racketeering occurring within a ten-year period that "amount to, or . . . otherwise constitute a threat of, continuing racketeering activity." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989); see also GICC Cap. Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 465 (2d Cir. 1995). Patricia's complaint describes five purported RICO predicates: first, Steven and Donald concealed the Lurie settlement award from Patricia ("the Scheme against Patricia") beginning in 1987; second, Steven and Donald, while employed by Gruntal, committed insider trading in 1985; third, Steven, Donald, and Lurie plotted to obtain illegal profits from the Lurie Investment in 1986; fourth, Steven, as head of a proprietary trading group at Gruntal, committed securities fraud in 1991. (Compl. ¶¶ 41–67.) Finally, Patricia alleges that Steven and Donald committed mail fraud as part of the various schemes. (Compl. ¶ 74.)

1. Relatedness

"The requirement of relatedness embodies two different concepts. The racketeering acts must be related to each other (horizontal relatedness), and they must be related to the enterprise (vertical relatedness)." United States v. Minicone, 960 F.2d 1099, 1106 (2d Cir.

1992) (internal quotation marks and citation omitted). "To show that the predicate acts are vertically related to the RICO enterprise, the [plaintiff] must establish (1) that the defendant was enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) that the predicate offenses are related to the activities of that enterprise." Rosenson v. Mordowitz, No. 11 Civ. 6145 (JPO), 2012 WL 3631308, at *5 (S.D.N.Y. Aug 23, 2012) (quoting United States v. Daidone, 471 F.3d 371, 375 (2d Cir. 2006) (internal quotation marks and citations omitted)). The latter showing generally suffices to prove horizontal relatedness as well. See Daidone, 471 F.3d at 375 ("One way to show that predicate acts are horizontally related to each other is to show that each predicate act is related to the RICO enterprise." (internal quotation marks and citations omitted)); Rosenson, 2012 WL 3631308, at *5 ("Horizontal and vertical relatedness are generally satisfied by linking each predicate act to the enterprise." (internal citation omitted)).

The relatedness test ensures that the alleged predicate acts "share the same or similar purposes, results, participants, victims or methods, or otherwise are interrelated by distinguishing characteristics and are not isolated events." H.J., 492 U.S. at 240. RICO was not designed to punish isolated instances of lawbreaking, and the test prevents plaintiffs from pleading "unrelated predicate acts allegedly committed against [other] victims . . . to extend the scope of the pattern of racketeering activity." See Westgate Fin. Corp. v. Beinoni of N.Y. Inc., No. 10 Civ. 8102 (TPG), 2012 WL 219334, at *3 (S.D.N.Y. Jan. 25, 2012) (citing Burdick v. Am. Express, 865 F.2d 527, 529 (2d Cir.1990)); Ray Larsen Assocs., Inc. v. Nikko Am., Inc., No. 89 Civ. 2809 (BSJ), 1996 WL 442799, at *7 (S.D.N.Y. Aug. 6, 1996)).

Here, the relatedness analysis centers on the so-called "Scheme against Patricia," because that is the only scheme she alleges injured her property. If the scheme to defraud her is

not part of a pattern of racketeering activity, then Patricia's RICO claim fails. The alleged RICO enterprise in the complaint is SAC. (Compl. ¶ 17.)[3] And the so-called "Scheme against Patricia" was to conceal the $5.5 million settlement award. (Compl. ¶ 41.) Therefore, Patricia must allege that concealment of the settlement was either (1) possible solely by virtue of Steven's position in the enterprise or (2) related to the activities of SAC. She pleads neither.

Plaintiff's theory that Steven's position in the enterprise allowed him to make the Lurie Investment, the settlement of which he then concealed from her, is a bridge too far. Any number of a defendant's activities or affiliations might create the circumstances for a RICO predicate act, but the legal question is whether the predicate act could rationally be ascribed to the enterprise such that it was conduct of an enterprise within the meaning of the RICO act.

Although Patricia alleges Steven and Donald "committed the Scheme against Patricia" through their roles as officers in SAC, (Compl. ¶ 87), she does not plead facts suggesting that SAC was involved in the scheme. Nor does she allege that SAC benefitted from the scheme. The absence of any benefit to SAC is significant because "defendants who allegedly constitute an illegal enterprise and engage in predicate offenses in furtherance of the defendants' own affairs or purposes, as opposed to the affairs or purposes of their common 'enterprise,' . . . fail to satisfy the requirements of RICO." Gross, 628 F. Supp. 2d at 498 (citing Reves v. Ernst & Young, 507 U.S. 170, 185 (1993) (noting that RICO liability "depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs")); see also Elsevier Inc. v. W.H.P.R., Inc., 692 F. Supp. 2d 297, 308 (S.D.N.Y. 2010) (finding no RICO pattern where there was no allegation that RICO enterprise "realized any portion of the illicit profits from the scheme"). With no alleged benefit to SAC or necessary

---

[3] Asked to clarify if SAC was the RICO enterprise, Patricia's counsel responded, "Yes, absolutely." (Dec. 10 Tr., at 21.)

connection between the Scheme against Patricia and the activities of SAC, Patricia's RICO claim fails for lack of vertical relatedness between the predicate act and the enterprise.

The complaint also fails to allege any horizontal relationship among the different schemes. Patricia argues that "the securities fraud and mail fraud racketeering acts are related in that the Schemes were undertaken by Steven and Donald to enrich themselves." (Compl. ¶ 80.) However, she omits any mention of the "Scheme against Patricia," and in any case the fact that two acts "both have the effect of generally increasing defendants' funds" is not enough to support a RICO claim. Ray Larsen Assocs., 1996 WL 442799, at *7 (warning that the relatedness requirement would be meaningless if two acts were "related" just because they tended to enrich the defendant). Patricia Cohen cannot take on the mantle of a private attorney general just because her ex-husband is a public figure and SAC is in prosecutors' cross-hairs.[4] Having alleged no relation between the Scheme against Patricia and SAC, Patricia fails to plead a pattern of racketeering activity.

C.    Conspiracy

"To establish the existence of a RICO conspiracy, a plaintiff must prove the existence of an agreement to violate RICO's substantive provisions" and "prove that if the agreed-upon predicate acts had been carried out, they would have constituted a pattern of racketeering activity." Cofacrèdit, 187 F.3d at 244–45 (internal quotation marks and citations

---

[4] There are additional reasons to disregard the other alleged schemes. For example, the securities fraud schemes are irrelevant because "[u]nder § 107 of the PSLRA, a civil RICO claim may not be premised on conduct that would have been actionable under the securities laws as fraud in the purchase or sale of securities[,]" Gilmore v. Gilmore, No. 9 Civ. 6230 (WHP), 2011 WL 3874880, at *4 (S.D.N.Y. Sept. 1, 2011) (internal quotation marks omitted), aff'd, 503 F. App'x 97 (2d Cir. 2012), and this is so even if the securities fraud violations occurred before the relevant amendment to the PSLRA. ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P., 957 F. Supp. 1308, 1320–21 (S.D.N.Y. 1997).

omitted).  Because Steven and Donald's acts, as pled, do not constitute a pattern of racketeering

activity, Patricia cannot adequately plead a conspiracy to violate RICO under 18 U.S.C. §

1962(d).  See First Capital, 385 F.3d at 182 (affirming dismissal of conspiracy claim where no

substantive RICO claim was established); see also Discon, Inc. v. NYNEX Corp., 93 F.3d 1055,

1064 (2d Cir. 1996),  ("Since we have held that the prior claims do not state a cause of action for

substantive violations of RICO, the present claim does not set forth a conspiracy to commit such

violations."), vacated on other grounds, 525 U.S. 128 (1998).  The conspiracy claim must

therefore be dismissed.

IV.    Breach of Fiduciary Duty

        Patricia alleges that Steven and Donald breached fiduciary duties owed to her as

her husband and accountant, respectively, in concealing the $5.5 million settlement.  (Compl. ¶¶

98–103.)  Patricia further alleges that Donald aided and abetted Steven's breach of fiduciary duty

by knowingly preparing false financial statements for Steven and misleading Patricia about the

fate of the Lurie Investment.  (Compl. ¶¶ 98–103.)

        To prevail on a claim for breach of fiduciary duty under New York law, a plaintiff

must prove "(1) a breach by a fiduciary of obligations to another, (2) that the defendant

knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a

result of the breach."  Whitney v. Citibank, N.A., 782 F.2d 1106, 1115 (2d Cir. 1986).  The

existence of a fiduciary relationship—characterized by "confidence . . . reposed on one side and

. . . resulting superiority and influence on the other[,]"  United States v. Chestman, 947 F.2d 551,

568 (2d Cir. 1991) (internal quotation marks and citation omitted)—is "often a fact-specific

inquiry reserved for a jury."  Goldin Assocs., L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp.,

No. 00 Civ. 8688 (WHP), 2003 WL 22218643, at *9 (S.D.N.Y. Sept. 25, 2003) (citation
omitted).

Under New York law "it is axiomatic that transactions between spouses 'involve
a fiduciary relationship requiring the utmost of good faith' meriting 'strict surveillance' by
courts." KS v. ES, No. 303920/102013, 2013 WL 1799039, at *6 (N.Y. Sup. Ct. Apr. 3, 2013)
(quoting Christian v. Christian, 42 N.Y.2d 63, 72 (1977)); Levine v. Levine 56 N.Y.2d 42, 47
(1982) ("[B]ecause of the fiduciary relationship between husband and wife, . . . [separation]
agreements are more readily set aside in equity under circumstances that would be insufficient to
nullify an ordinary contract." ); Petracca v. Petracca, 956 N.Y.S.2d 77, 77 (2d Dep't 2012)
(scrutinizing postnuptial agreement because of fiduciary relationship among spouses).  The
Christian court put the point most forcefully:

> Agreements between spouses, unlike ordinary business contracts, involve a fiduciary
> relationship requiring the utmost of good faith.  There is a strict surveillance of all
> transactions between married persons, especially separation agreements.  Equity is so
> zealous in this respect that a separation agreement may be set aside on grounds that
> would be insufficient to vitiate an ordinary contract. These principles in mind, courts
> have thrown their cloak of protection about separation agreements and made it their
> business, when confronted, to see to it that they are arrived at fairly and equitably, in a
> manner so as to be free from the taint of fraud and duress, and to set aside or refuse to
> enforce those born of and subsisting in inequity.

42 N.Y.2d 63, 72 (1977); cf. Chestman, 947 F.2d at 568 ("[T]he marriage relationship alone does
not impose fiduciary status.").

Though the existence of a fiduciary duty is a fact-specific inquiry, Patricia and
Steven's marriage raises a plausible inference that Steven owed Patricia a fiduciary duty during
negotiation of the separation agreement.  And given the allegation that Steven defrauded her of
$2.7 million, Patricia has pled a breach of fiduciary duty claim against Steven.

The breach of fiduciary duty claim against Donald is different. "The duty owed by an accountant to a client is generally not fiduciary in nature." Bitter v. Renzo, 101 A.D.3d 465, 465 (1st Dep't 2012). The exception is "where the accountants are directly involved in managing the client's investments." Caprer v. Nussbaum, 825 N.Y.S.2d 55, 55 (2d Dep't 2006) (citations omitted).

Here, Patricia alleges that Donald acted as personal accountant and financial advisor, (Compl. ¶ 18,) and was deeply involved in the Lurie Investment, (Compl. ¶ 17.) The complaint alleges that Patricia relied on Donald's statements during negotiation of the separation agreement because "Donald had been her accountant . . . ." (Compl. ¶ 26.) But at the time of the alleged misrepresentations, Donald was not Patricia's accountant, let alone managing her investments. The complaint does not plead sufficiently that Donald owed Patricia a fiduciary duty at the time of the alleged fraud.

Patricia also asserts an aiding and abetting breach of fiduciary duty claim against Donald. (Compl. ¶ 101.) Under New York law, there are three elements for aiding and abetting a breach of fiduciary duty: the defendant must (1) have actual knowledge of a breach of fiduciary duty; (2) knowingly participate in or induce the breach; (3) and so injure the plaintiff. In re Sharp Int'l Corp., 403 F.3d 43, 49 (2d Cir. 2005).

Patricia has alleged that Donald knew Steven was breaching his fiduciary obligation to Patricia by concealing the $5.5 million settlement, that he participated in the breach by making false representations about the Lurie Investment and preparing Steven's misleading financial statement, and that, as a result, Patricia was injured "in the amount of at least $2.7 million." (Compl. ¶ 101(b).) Thus, Patricia states a claim against Donald for aiding and abetting

Steven's breach of fiduciary duty.

## CONCLUSION

This is a case to restore faith in the old-fashioned idea that divorce is something that lasts forever. Indeed, factoring in Patricia's 1991 motion, the Cohens' legal battles have covered a span over twice the length of their marriage. But though treble damages are a tempting way to spice things up, civil RICO and marriage do not go together like a horse and carriage. For the foregoing reasons, Steven Cohen and Donald Cohen's motions to dismiss Patricia Cohen's RICO claim are granted, and their motions to dismiss the common law fraud claims are denied. The motions to dismiss the breach of fiduciary duty claims are denied as to Steven Cohen and granted as to Donald Cohen. Finally, Donald Cohen's motion to dismiss the aiding and abetting breach of fiduciary duty claim is denied. The Clerk of Court is directed to terminate the motions pending at ECF No. 102.

Dated: January 27, 2014
     New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record*:

Joshua Lewis Dratel
Law Offices of Joshua L. Dratel, P.C.
2 Wall Street, 3rd Floor
New York, NY 10005

Kevin Peter Roddy
Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095
*Counsel for Plaintiff*

Martin B. Klotz
Willkie Farr & Gallagher LLP (NY)
787 Seventh Avenue
New York, NY 10019
*Counsel for Defendants*