**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

........................................................................ X

PATRICIA COHEN,

                     *Plaintiff*,

      -against-

STEVEN A. COHEN, DONALD COHEN, and
BRETT LURIE,

                 *Defendants*.

........................................................................ X

Hon. Loretta A. Preska

No. 09 CV 10230 (LAP)

**ECF Case**

**Oral Argument Requested**


# MEMORANDUM OF LAW IN SUPPORT OF THE COHEN DEFENDANTS' <u>MOTION FOR SUMMARY JUDGMENT</u>


**WILLKIE FARR & GALLAGHER LLP**
Martin Klotz
Jeffrey B. Korn
Alison R. Levine
Loreal T. Monroe
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Attorneys for Defendants*
*Steven Cohen and Donald Cohen*

## Table of Contents

**Page**

PRELIMINARY STATEMENT ..................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................ 2

    A.    The Cohen Marriage ................................................................................. 2

    B.    The Lurie Investment .............................................................................. 3

    C.    The Lurie Litigation ................................................................................ 5

    D.    The Divorce Negotiations And Settlement ............................................... 7

    E.    Patricia's Investigation In 2006 ............................................................. 10

    F.    The Evolution of Patricia's Allegations ................................................. 11

ARGUMENT ............................................................................................................................. 11

I.     THERE IS NO ADMISSIBLE EVIDENCE THAT STEVEN HID ANYTHING
      FROM PATRICIA IN THE 1989 DIVORCE ACTION. ..................................... 12

    A.    There Is No Admissible Evidence That Lurie "Repaid" Steven Any
          Money. .................................................................................................. 12

    B.    Even If SAC Paid Lurie an Additional $3 Million in December 1986 and
          January 1987, Steven Accurately Reported His Net Investment With
          Lurie. .................................................................................................... 14

    C.    Even If Steven Received $5.5 Million Back From Lurie, There Is No
          Evidence That Any Money Was Hidden From Patricia. ......................... 15

II.    PATRICIA COULD NOT REASONABLY HAVE RELIED ON ANY
      MISSTATEMENT OR OMISSION STEVEN MADE ABOUT THE LURIE
      INVESTMENT. .............................................................................................. 16

III.   PATRICIA'S CLAIMS ARE BARRED BY THE STATUTE OF
      LIMITATIONS. .............................................................................................. 18

IV.   THERE IS NO EVIDENCE TO SUPPORT A CLAIM AGAINST DONALD
      COHEN. ......................................................................................................... 23

CONCLUSION .......................................................................................................................... 24

## Table of Authorities

**Case**       **Page**

*Ainbinder v. Kelleher*,
    97-CV-7315 (SS), 1997 WL 420279 (S.D.N.Y. July 25, 1997)........................21

*Babaev v. Grossman*,
    312 F. Supp. 2d 407 (E.D.N.Y. 2004) ............................................................21

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*,
    769 F.2d 919 (2d Cir. 1985)...........................................................................13

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).......................................................................................11

*Century Pac., Inc. v. Hilton Hotels Corp.*,
    528 F. Supp. 2d 206 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009)..........12, 15

*CIFG Assur. N. Am., Inc. v. Credit Suisse Securities (USA) LLC*,
    11 N.Y.S.3d 563 (N.Y. App. Div. 2015) .......................................................23

*Cohen v. S.A.C. Trading Corp.*,
    711 F.3d 353 (2d Cir. 2013).............................................................19, 20, 21, 22

*Danann Realty Corp. v. Harris*,
    157 N.E.2d 597 (N.Y. 1959)..........................................................................18

*Dinger v. Kling Agency, Inc.*,
    654 N.Y.S.2d 415 (N.Y. App. Div.1997) ......................................................19

*Etzion v. Etzion*,
    62 A.D.3d 646 (N.Y. App. Div. 2009) .....................................................17, 18

*Ezra Charitable Trust v. Frontier Ins. Grp., Inc.*,
    No. 00-CV-5361 (LMM), 2002 WL 87723 (S.D.N.Y. Jan. 23, 2002) .............21

*Greenberg v. Chrust*,
    282 F. Supp. 2d 112 (S.D.N.Y. 2003)............................................................15

*Harding v. Naseman*,
    No. 07 CV. 8767 (RPP), 2009 WL 1953041 (S.D.N.Y. July 8, 2009), *aff'd*,
    377 F. App'x 48 (2d Cir. 2010) ...............................................................17, 18

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
    907 N.E.2d 268 (N.Y. 2009)..........................................................................19

*Kojovic v. Goldman*,
    823 N.Y.S.2d 35 (N.Y. App. Div. 2006) .......................................................17

*Korngold v. Korngold*,
    810 N.Y.S.2d 206 (N.Y. App. Div. 2006) ........................................................15

*Kulak v. City of New York*,
    88 F.3d 63 (2d Cir. 1996)...............................................................................12

*LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*,
    318 F.3d 148 (2d Cir. 2003).......................................................................19, 22

*Luftig v. Luftig*,
    657 N.Y.S.2d 658 (N.Y. App. Div. 1997) ...................................................16, 18

*Marshall v. Milberg LLP*,
    No. 07-CV-6950 (LAP), 2009 WL 5177975 (S.D.N.Y. Dec. 23, 2009) ...........23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)......................................................................................11

*In re Merrill Lynch Ltd. P'ships Litig.*,
    154 F.3d 56 (2d Cir. 1998).............................................................................19

*Sado v. Ellis*,
    882 F. Supp. 1401 (S.D.N.Y. 1995)...............................................................15

*Salinger v. Projectavision, Inc.*,
    934 F. Supp. 1402 (S.D.N.Y. 1996)...............................................................19

*Santos v. Murdock*,
    243 F.3d 681 (2d Cir. 2001)...........................................................................13

*Shah v. Meeker*,
    435 F.3d 244 (2d Cir. 2006), *abrogated on other grounds by Merck & Co. v.*
    *Reynolds*, 559 U.S. 633 (2010) ....................................................................22

*Smith v. Smith*,
    29 Misc. 3d 1226(A) (N.Y. Sup. Ct. 2010).....................................................18

*Stoerchle v. Stoerchle*,
    475 N.Y.S.2d 489 (N.Y. App. Div. 1984) ......................................................15

*In re Ultrafem Inc. Sec. Litig.*,
    91 F. Supp. 2d 678 (S.D.N.Y. 2000)..............................................................23

*Veal v. Geraci*,
    23 F.3d 722 (2d Cir. 1994).............................................................................20

*Wynn v. AC Rochester*,
    273 F.3d 153 (2d Cir. 2001)...........................................................................16

**Rules**

Fed. R. Civ. P. 56(c)(1) ..................................................................................................11

Fed. R. Civ. P. 56(e) ......................................................................................................13

Fed. R. Evid. 802 ...........................................................................................................13

Local Civil Rule 56.1 .....................................................................................................13

N.Y. C.P.L.R. § 213(8) (McKinney 2004) ....................................................................19

N.Y. C.P.L.R. § 203(g) (McKinney 2001) ....................................................................19

Defendants Steven A. Cohen ("Steven") and Donald Cohen ("Donald") (together, "Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment on all of Plaintiff Patricia Cohen's ("Patricia" or "Plaintiff") claims pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules.

## PRELIMINARY STATEMENT

This case is about whether Steven, assisted by his brother Donald, hid marital assets from Steven's ex-wife, Patricia, during their divorce negotiations in the late 1980s. Patricia first asserted that Steven defrauded her in the divorce in 1991, then abandoned that claim for almost two decades, and now seeks to revive it in this litigation.

After more than five years of litigation and thousands of attorney work hours, discovery has now conclusively established that Patricia does not have a shred of evidence that any asset was hidden from her during the divorce. Patricia and her attorneys are left to rely solely upon a misreading of inadmissible hearsay affidavits by Brett Lurie, a subsequently convicted felon, who was trying to avoid financial responsibility for what he owed Steven at the time. We respectfully submit that these inadmissible hearsay affidavits are an insufficient basis for allowing Patricia's meritless and vexatious lawsuit to continue, and that, given the absence of any admissible evidence that any assets were hidden, summary judgment should be awarded in Defendants' favor.

Patricia's claim also fails as a matter of law because she could not reasonably have relied on any representations made by Steven about his investment with Lurie. Patricia, represented by counsel, expressly agreed in the divorce settlement that full disclosure had not been made, she waived any discovery, and she acknowledged that Steven was making no representations as to the value of the Lurie investment for purposes of the divorce settlement. Accordingly, under well-settled New York law, Patricia cannot now claim that she was misled by Steven about the Lurie investment in yet another belated and futile attempt to reopen their divorce, twenty years later.

-1-

Merits aside, the record also now makes unmistakably clear that Patricia's claims are time-barred.  When the Second Circuit reversed Judge Holwell's decision dismissing this action as untimely, the Court premised its determination on Patricia's representations that she did not know about Steven's lawsuit against Lurie (and its publicly available litigation filings) and had no reason to investigate Lurie's involvement in any fraud against her more than two years prior to the time this case was filed in December 2009.

We now know that Patricia's representations to this Court and the Second Circuit were false.  The Lurie lawsuit was expressly and repeatedly disclosed to Patricia and her lawyers in 1988, when they were provided with, among other things, the Settlement Agreement that terminated it.  Moreover, even crediting Patricia's improbable denial that she was aware of the lawsuit in 1988, she personally referred to it during her own investigation of Lurie and his participation in Steven's "scheme" in late 2006 and early 2007 – more than two years before filing this lawsuit.  Her meritless claims, in short, are therefore also time-barred.

Finally, there is no evidence that Donald Cohen played any knowing role in any course of conduct that Patricia now claims caused her injury, and all claims against him should be dismissed from the case in any event.

## STATEMENT OF FACTS

### A.    The Cohen Marriage

Patricia and Steven Cohen were married in 1979.  (SF ¶ 25.)[1]  After years of marital difficulties, Steven filed for divorce on July 7, 1988.  (SF ¶ 32.)  Patricia and Steven and their respective counsels then spent the next 15 months negotiating the terms of their divorce and division of assets, which were ultimately reflected in a Stipulation of Settlement and Separation

---

[1] "SF ¶ __" refers to paragraphs in the Cohen Defendants' Rule 56.1 Statement of Material Facts, dated September 18, 2015.

Agreement dated December 15, 1989 ("1989 Separation Agreement"). (SF ¶¶ 93-109; Klotz Decl. Ex. 4.) On March 13, 1990, a Judgment of Divorce was entered. (SF ¶ 111; Klotz Decl. Ex. 86.)

### B.   The Lurie Investment

In connection with divorce settlement negotiations, Steven's counsel provided to Patricia's counsel at the time, Avron Brog, various documents reflecting the couple's net worth. (SF ¶¶ 93-99.) Among other things, Brog received copies of Patricia and Steven's joint tax returns for the years 1982 through 1986; a pro forma joint return for 1987 reflecting Steven's income of approximately $13 million, tax returns for Steven's wholly owned company, SAC Trading Corporation ("SAC"), for 1986 and 1987, an April 31, 1986 SAC statement of operations, and a 1988 Statement of Financial Condition as of July 1, 1988 ("1988 Financial Statement"), listing the couple's net worth at approximately $17 million. (SF ¶¶ 93-99.) The 1988 Financial Statement disclosed "Queens Coop-Brett Lurie Mortgages" as the couple's largest asset, listed at cost as $8,745,169 (Klotz Decl. Ex. 65 at PC11598), and stated that "Mr. Cohen has been involved in litigation with Mr. Brett Lurie with reference to this investment" (*id.* at PC11599).[2]

The "Lurie Investment" was the brainchild of Brett Lurie, a personal friend of Steven's who had also served as Steven's and Patricia's attorney in several residential real estate transactions. (SF ¶¶ 50-52.)[3] In early 1986, Lurie approached Steven to invest in real estate in Queens for conversion to cooperative apartments. (SF ¶ 54.) Steven had recently made approximately $10 million in connection with trading in the stock of RCA Corporation ("RCA"). (SF ¶¶ 33-36.) Patricia believed at the time that Steven, who was under investigation by the SEC, had engaged in illegal insider trading in RCA stock and invested with Lurie in part to protect their

---

[2] "Klotz Decl. Ex. __" refers to the documents and testimony annexed to the Declaration of Martin Klotz, executed on September 18, 2015.

[3] Brett Lurie is a convicted felon who defrauded investors in connection with the Queens Coop project. (SF ¶ 85.) He is also a named defendant in this lawsuit, but was never served by Patricia. (SF ¶¶ 9-10.) His location is currently unknown.

assets from seizure by the government in connection with the insider trading investigation.  (SF ¶¶ 37-43.)  Neither Steven, nor anyone he was associated with, engaged in insider trading and no one was ever charged criminally or civilly with wrongdoing in connection with trading in RCA. (SF ¶ 44.)

Between January and July of 1986, Steven and SAC made a number of payments to Lurie and Conversion Funding Corp. ("CFC"), Lurie's wholly owned corporation, for the Lurie Investment, totaling approximately $8.25 million.  (SF ¶ 56.)  By January 1987, Lurie had returned approximately $750,000 to Steven or SAC, leaving the net amount paid to Lurie at approximately $7.5 million.  (SF ¶¶ 57-59.)  In January 1988, after litigation (discussed below) over this investment had settled, Steven invested an additional $1.3 million in the project to try to help salvage it – bringing Steven's net investment to the total amount reflected on the 1988 Financial Statement, $8,745,169.  (SF ¶ 82.)

Steven and Lurie initially planned to treat Lurie as an "employee" of SAC who earned a "salary" for providing investment advice.  (SF ¶ 63.)  In connection with this plan, approximately $2.5 million of the Lurie Investment was originally characterized as "salary," and Donald issued two checks to Lurie reflecting this characterization in early 1986.  (SF ¶¶ 64-65.)  Lurie subsequently drafted an "Employment Agreement," which was executed in November 1986, naming Lurie as "Senior Vice President" of SAC with a base salary of $2.75 million per year for 1986 through 1988.  (SF ¶ 66; Klotz Decl. Ex. 39.)  Donald provided Lurie with a W-2 from SAC for $2.75 million for his 1986 salary.  (SF ¶ 67; Klotz Decl. Ex. 40.)

By the start of 1987, Steven and Lurie had had a falling out, and Steven became worried about the Lurie Investment, the terms of which had not been adequately documented.  (SF ¶ 73.)  Patricia knew that things were "going sour" with Lurie at the time.  (Klotz Dec. Ex. 2 at 180:2-9.)  In January 1987, Steven turned to Scott Lederman – his friend, former roommate, and a Chicago-

-4-

based attorney – for advice.  (SF ¶ 68.)  Among other things, Lederman reviewed the Employment

Agreement and advised Steven that the payments to Lurie for the Lurie Investment could not

properly be characterized as salary from SAC.  (SF ¶ 69.)  In February 1987, Lederman wrote to

Lurie and explained that "the treatment of the transfer of $5.5 million from S.A.C. to [Lurie] in

installments of $2.75 million in 1986 and $2.75 million in 1987 as a deductible business expense

would be an improper characterization of such transfer . . . ."  (Klotz Decl. Ex. 22.)  Lederman

also enclosed a corrected 1986 W-2 showing no salary from SAC.  (*Id.*; SF ¶ 70.)  Steven and

SAC filed a corrected W-2 for Lurie and never followed through on the prior, unconsummated

plan to treat some payments to Lurie as salary for purposes of avoiding or reducing taxes.

### C.     The Lurie Litigation

In April 1987, Steven and SAC sued Lurie and CFC in New York Supreme Court to

recover their investment (the "Lurie Litigation" or "*Cohen v. Lurie*").  (SF ¶ 75.)  The *Cohen v.*

*Lurie* Complaint alleged that Steven and SAC had paid Lurie and CFC a net amount of $7.5

million, and requested the return of that amount plus interest.  (Klotz Decl. Ex. 41 ¶¶ 43, 69.)

Lurie responded to the *Cohen v. Lurie* Complaint with affidavits in May 1987 and June

1987, and an Answer in June 1987.  (SF ¶ 78.)  In these filings, Lurie agreed that Steven had paid

to him a net amount of $7.5 million.  (Klotz Decl. Ex. 50 ¶¶ 35, 57, 59.)  He contended, however,

that $5.5 million of this amount was provided as his "salary" for 1986 and 1987 and did not need

to be "repaid."  (*Id.* ¶¶ 19, 24, 26-28, 35, 39, 48, 49; *see also* Klotz Decl. Ex. 49 at 8-9, 15-16.)  Of

the $5.5 million, $2.5 million had originally been characterized as "salary" when it was paid to

Lurie in March 1986, before Lederman informed Lurie that this characterization was "improper."

(Klotz Decl. Ex. 50 ¶ 19; SF ¶¶ 64-65, 69; *see also* Klotz Decl. Ex. 49 at 8-9, 15, 17.)  Lurie

asserted that, in December 1986 and January 1987, Donald gave him additional "salary" checks

for $250,000 and $2.75 million from SAC, which he immediately endorsed back to Steven as

-5-

"repayment" for $3 million of the money advanced to him and previously characterized as a

"loan." (Klotz Decl. Ex. 50 ¶¶ 26, 27, 47, 48; *see also* Klotz Decl. Ex. 49 at 15.) [4]

There is, however, no evidence that SAC paid Lurie an additional $3 million in December

1986 and January 1987, or that Lurie then paid this money to Steven, and no witness supports the

allegation that these payments (or endorsements) were ever made.[5]  Moreover, even if these

payments were made, they simply transferred $3 million from SAC, which Steven wholly owned

and controlled, to Lurie, and then to Steven personally.  But Patricia had complete disclosure of

SAC's revenues, expenses, and assets, and there is no evidence, or even an allegation, that this

disclosure was incomplete or inaccurate.  It cannot have made any difference to Patricia whether

money she knew was paid originally to SAC stayed there, went to Steven, or went to Lurie and

then to Steven:  none of the transfers – even if they had happened as Lurie claimed – changed

either Steven's disclosed net worth or the total amount of money (*i.e.*, $7.5 million) that both

Steven and Lurie agreed had been given to Lurie and not returned.

In any event, only a few weeks later, in July 1987, Lurie abandoned his claim that

$5.5 million of the money Steven and SAC allegedly gave to him was "salary" that did not need to

be repaid, and agreed that he owed Steven the full $7.5 million sought in the *Cohen v. Lurie*

Complaint.  (SF ¶ 79.)  This agreement was embodied in a Release and Settlement Agreement (the

"Lurie Settlement Agreement") with Steven and SAC.  (Klotz Decl. Ex. 37.)  In connection with

the Lurie Settlement Agreement, Lurie provided to SAC a note for $7.5 million – the full net

---

[4] Lurie's affidavit is internally inconsistent on this point.  A few paragraphs earlier, Lurie claims
that "the first two years" of his "salary" in the amount of $5.5 million "had previously been
received by reason of the advances outlined above" (*i.e.*, before the Employment Agreement was
signed in November 1986).  (Klotz Decl. Ex. 50 ¶ 24.)
[5] Lederman testified that he was not aware of any January 1987 payment to Lurie and that the
reference to a $2.75 million payment in his February 1987 letter to Lurie was a reference to the
Employment Agreement, not personal knowledge of a further payment.  (Klotz Decl. Ex. 21 at
79:11-80:3, 80:13-81:15.)  Donald testified that he has no memory of a $2.75 million payment to
Lurie in January 1987.  (Klotz Decl. Ex. 5 at 132:4-12.)

amount extended by Steven to Lurie. (SF ¶ 79.) The Lurie Settlement closed at the end of

January 1988, with Steven putting an additional $1.3 million into the project. (SF ¶¶ 80-82.) At

that time, Lurie also provided Steven with a sworn certification concerning the $7.5 million

received from Steven and SAC, and how these funds were used in the real estate project. (Klotz

Decl. Ex. 54.) The certification makes no mention of Lurie's supposed salary or of additional

payments by Steven or SAC in December 1986 and January 1987.

      The Lurie Investment was ultimately an abject failure for Steven and the other investors.

(SF ¶ 84.) Lurie's properties were foreclosed upon; Lurie's principal lender, Coronet, went into

bankruptcy; and Lurie himself was prosecuted, convicted, and imprisoned for multiple counts of

fraud in connection with the marketing of units in the project. (SF ¶¶ 84-85, 89.) Though Steven

received interest payments from Coronet in 1988 and 1989 (SF ¶ 86), he received no money back

from Lurie (SF ¶ 88). Patricia's current claim, after several different theories, is that Steven failed

to disclose the alleged "repayment" of money given to Lurie in and before January 1987, *i.e.*, she

claims that Steven did not really invest – and lose – the full amount he claimed to have invested

and lost at the time of the divorce. (Klotz Decl. Ex. 1 ¶ 21.)[6] Even Lurie, however, agreed that

Steven invested a net amount of $7.5 million, plus an additional $1.3 million at the closing of the

Lurie Settlement Agreement. (SF ¶¶ 79, 82.)

    **D.**    **The Divorce Negotiations And Settlement**

      In connection with divorce settlement negotiations, Steven's counsel provided to Patricia's

counsel, among other things, the 1988 Financial Statement, reflecting the Lurie Investment as the

couple's largest investment, with a total value at cost of $8,745,169. (SF ¶¶ 93-95.) The note to

this entry states, in relevant part: **"Mr. Cohen has been involved in litigation with Mr. Brett**

---

[6] Patricia's matrimonial law expert in this action agrees that "the representation that [the Lurie Investment] was worthless wasn't the false representation. It turned out to be worthless." (Klotz Decl. Ex. 63 at 70:17-71:2.)

**Lurie with reference to this investment."** (Klotz Decl. Ex. 65 at PC11599 (emphasis added).)[7]
Patricia alleges that Steven also told her during negotiations that the Lurie Investment was "lost."
(Klotz Decl. Ex. 1 ¶ 24.)

Brog's files contained detailed information regarding the Lurie Litigation, including a copy
of the Lurie Settlement Agreement and related documents, such as the certified statement from
Lurie setting forth payments received from Steven and spent on real estate. (SF ¶ 101.) The
caption and index number of the Lurie Litigation were repeatedly referenced in the documents
provided to Brog. (*Id.*) Brog also met with Robert Shansky, Steven's attorney from Jones Day,
regarding the Lurie Investment. (SF ¶ 100.) Brog testified, however, that he did not check the
publicly available court file from the Lurie Litigation. (Klotz Decl. Ex. 14 at 53:6-18.)

In or around May 1989, Patricia fired Brog and retained attorney Martin Kera. (SF ¶ 105.)
Several months after that, Patricia fired Kera and retained attorneys Joan Ellenbogen and Marcia
Goldstein, who represented her when Patricia ultimately entered into the 1989 Separation
Agreement. (SF ¶¶ 19, 106-107.)

In the 1989 Separation Agreement, Patricia and Steven agreed: (i) that "complete financial
disclosure which could be required . . . has not been obtained" (Klotz Decl. Ex. 4 ¶ 14.5); (ii) they
were settling based "on the limited financial data supplied to date" and were waiving additional
discovery (*id.*); and (iii) "[n]o representations or warranties have been made by either party to the
other, or by anyone else, except as expressly set forth in this Agreement" (*id.* at ¶ 19.5). As to the
Lurie Investment, Patricia specifically agreed that Steven "makes no representation as to the value
of the interest in" the Lurie Investment "listed on his statement of financial condition dated as of
July 1, 1988 at a value of $8,745,169." (*Id.* at ¶ 14.4.)

---

[7] The amount of the Lurie Investment on the 1988 Financial Statement ties directly to the Lurie
Settlement Agreement, including the additional $1.3 million Steven invested at the closing of that
agreement, plus or minus subsequent accrued interest or repayments. (SF ¶¶ 82-83, 86-87, 95.)

Almost immediately, Patricia challenged the 1989 Separation Agreement on the ground, among other things, that she had been defrauded in the divorce.  In March 1991, Patricia again retained attorney Martin Kera and brought a motion to modify and set aside portions of the 1989 Separation Agreement, claiming that it was unconscionable and was procured by "fraud and economic duress" (the "1991 Action").  (Klotz Decl. Ex. 87 ¶ 3.)  In support of this motion, Patricia and Kera asserted that Steven had concealed assets by funneling his income to SAC or to Donald, or deferring his compensation so that his income tax return did not show his true income.  (Klotz Decl. Ex. 25 ¶ 4.)  Patricia also alleged that Steven's income in 1989 and 1990 was $20 million per year, although discovery in the litigation showed that it was less than $12 million for the two years combined.  (Id.;  Klotz Decl. Ex. 26 at SC_DC-00011838; Klotz Decl. Ex. 88.)

Ultimately, Patricia's fraud claim was withdrawn and the parties settled by entering into an Amendment to the Stipulation of Settlement and Separation Agreement on January 6, 1992 (the "1992 Amendment").  (SF ¶¶ 121-124; see Klotz Decl. Ex. 91.) The 1992 Amendment, among other things, provided for increased child support and a restructuring of the property settlement, and it incorporated by reference the full release and the disclaimer of reliance on any unwritten representations from the 1989 Separation Agreement.  (Klotz Decl. Ex. 91 at 1 and ¶¶ 3, 5.)[8] Patricia now says that her false allegation about Steven's 1989 and 1990 income was based on a "misinterpretation."  (Klotz Decl. Ex. 2 at 207:9-16.)

---

[8] Pursuant to the 1992 Amendment, Steven provided financial support for the couple's two children into adulthood.  (SF ¶ 126.)  He has also provided millions of dollars in money and indirect financial support to Patricia and the children beyond his legal obligations.  (SF ¶ 127.)  Today, Patricia lives at minimal cost in a spacious Central Park West apartment furnished by Steven and receives more than $100,000 per year in tax-free income supplements from him.  (SF ¶¶ 1-4.)

### E.    Patricia's Investigation In 2006

On December 13, 2009, Patricia filed this lawsuit alleging that Steven had defrauded her in the divorce.  Her original complaint alleged only violations of the federal RICO statute.  (Klotz Decl. Ex. 93 ¶¶ 55-66.)  At that time, while she was operating under the assumption that she only had to satisfy a four-year statute of limitations for RICO claims rather than the shorter two-year limitations period for her current fraud claims, Patricia admitted that she "was put on notice of defendant Cohen's [fraud]" in <u>March 2006</u>.  (*Id.* ¶ 3.)

According to Patricia, in March 2006, she watched a *60 Minutes* report discussing litigation between SAC and Biovail, a Canadian pharmaceutical company, that was "highly critical of defendant Cohen's business practices."  (*Id.* ¶ 3.)  It was this *60 Minutes* report that caused her, in 2006, to "investigate" the information provided to her in the 1988 Financial Statement and in the 1991 Litigation.  (*Id.* ¶¶ 40-49; Klotz Decl. Ex. 1 ¶ 1; SF ¶ 129.)  By September 25, 2006, Patricia had started working with counsel, Michael Bowe of Kasowitz Benson Torres & Friedman LLP ("Kasowitz"), to investigate her alleged fraud claims against Steven.  (SF ¶ 135.)[9]  By no later than October 14, 2006, Patricia was focused on Lurie and the Lurie Investment:  she wrote to Lurie in prison, telling him that Steven was a "deceitful" and "corrupt" person who had used Lurie for the purpose of "hiding" assets.  (Klotz Decl. Ex. 38 at PC10431.)  In January 2007, Patricia and Bowe discussed visiting Lurie in prison and Bowe said that he would do so.  (Klotz Decl. Ex. 98.)  In connection with this contemplated visit, Patricia advised Bowe that Steven and Lurie had appeared in court in connection with their dispute over the Lurie Investment and that the judge had urged them to settle.  (*Id.*)

---

[9] Kasowitz, and Bowe, also represented Biovail in a 2006 civil RICO litigation against S.A.C. Capital Advisors, L.L.C. and Steven Cohen.  The *60 Minutes* report featured the allegations in this lawsuit.  The case was subsequently dismissed.

F.     **The Evolution of Patricia's Allegations**

Patricia has filed four complaints in this action. All iterations rest on the alleged contents

of the Lurie Litigation file. (*See* Klotz Decl. Ex. 93 ¶¶ 49-50; Klotz Decl. Ex. 13 ¶ 88; Klotz Decl.

Ex. 102 ¶ 39; Klotz Decl. Ex. 1 ¶ 39.) Yet the alleged "fraud" has changed from complaint to

complaint. For example, Patricia's original Complaint alleged Steven failed to disclose "a

substantial bank account" at Pan American Bank in Miami, Florida, and the existence of "putative

entities" identified as "CPA Hedgefund Co., Ltd." and "CPA Hedge Co." (Klotz Decl. Ex. 93

¶¶ 32, 34, 53.) In fact, the Pan American account was disclosed on the 1988 Financial Statement,

where it was listed under the name of its successor entity, N.C.N.B., and the "putative entities"

were private partnerships that Donald set up with his clients that had nothing to do with Steven.

(Klotz Decl. Ex. 5 at 224:1-17.) Patricia's First Amended Complaint alleged that the Lurie

Litigation settlement was either "worth well in excess of $17.5 million" at the time of the divorce

or that it was worthless through Steven's negligence and should be charged to him as dissipation.

(Klotz Decl. Ex. 13 ¶¶ 58, 70, 99.) Both claims were subsequently abandoned. (SF ¶ 150.) Only

in her third complaint did Patricia assert her present claim: that Steven failed to disclose Lurie's

alleged "repayment" of $5.5 million to Steven.

## ARGUMENT

The party moving for summary judgment bears the "initial responsibility" of setting out the

basis for its motion and identifying those portions of the record that "demonstrate the absence of a

genuine issue of material fact" to support the non-movant's claim. *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986). In countering a motion for summary judgment, the non-moving party must

"cit[e] to particular parts of materials in the record" or "show[] that the materials cited" establish

the existence of a genuine triable issue. Fed. R. Civ. P. 56(c)(1); *see also Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("[non-moving party] must do more than

simply show that there is some metaphysical doubt as to the material facts"). Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. *See Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). For fraud-based claims under New York law, "[e]ach element of the fraud claim must be shown by clear and convincing evidence," and "the evidence presented by the non-moving party in opposition to summary judgment must be enough to make any inference of fraud . . . unequivocal." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009) (internal quotations and citations omitted).

For the reasons discussed below, Patricia has no evidence that Defendants committed fraud – let alone that she asserted her decades' old claims in a timely manner – and Defendants are entitled to summary judgment dismissing all her claims.

## I.    THERE IS NO ADMISSIBLE EVIDENCE THAT STEVEN HID ANYTHING FROM PATRICIA IN THE 1989 DIVORCE ACTION.

Patricia alleges that Steven was "repaid" $5.5 million by Lurie by January 1987, still had that money as of July 1, 1988, and failed to disclose it to her. (Klotz Decl. Ex. 1 ¶¶ 21-24, 41.) Now that we have completed discovery, it is clear that Patricia has no admissible evidence supporting this allegation.[10]

### A.    There Is No Admissible Evidence That Lurie "Repaid" Steven Any Money.

Patricia has no evidence of hidden assets. Patricia has not uncovered a "secret" bank account, or property, or cancelled checks reflecting payments to Steven, or any other supposedly hidden asset that was not disclosed on the 1988 Financial Statement.

---

[10] Patricia's breach of fiduciary duty claim against Steven and aiding and abetting claim against Donald are coextensive with her allegation of fraud and also fail as a matter of law for the same reasons. (*See* Klotz Decl. Ex. 1 ¶ 101.)

The only thing she has – and the only basis for her allegation that Steven received $5.5 million from Lurie – are Lurie's affidavits in the 1987 Lurie Litigation, in which he claims to have "repaid" Steven some portion of the money Steven advanced to him. (Klotz Dec. Ex. 50 ¶¶ 26-28.) Neither party, however, has located Lurie, and his affidavits are inadmissible hearsay that cannot defeat summary judgment.[11]

The hearsay statements upon which Patricia now relies are also highly suspect and internally inconsistent. For one thing, Lurie was subsequently convicted of felony fraud. For another, at the time Lurie submitted his affidavits, he was being sued by Steven for $7.5 million and had every incentive to misrepresent the facts to suggest he owed less money. (SF ¶¶ 75-78.) Finally, Lurie abandoned his claim of "repayment" within weeks of making it. The Lurie Settlement Agreement was entered into on July 17, 1987, weeks after Lurie signed the June 30, 1987 affidavit. It memorialized that Lurie owed Steven the full $7.5 million in dispute, and Lurie executed a note for this amount to SAC. (SF ¶ 79.) No amount was deducted on account of what allegedly was "repaid" to Steven.

With Lurie apparently unavailable to testify, the complete record of Steven's investment with him is the record reflected in the *Cohen v. Lurie* Complaint, ratified in the Settlement Agreement, and reflected fully and accurately in the 1988 Financial Statement furnished to Patricia in the divorce settlement negotiations. (SF ¶¶ 53-62, 79, 95-96.)

Moreover, even if Lurie's 1987 affidavits were admissible, or Lurie unexpectedly appeared to testify and reiterated what he said in 1987, his testimony would not support Patricia's claim.

---

[11] *See* Fed. R. Evid. 802; Fed. R. Civ. P. 56(e); Local Rule 56.1; *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) ("Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial."); *see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (noting it is well-settled that a party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment.").

Throughout the 1987 litigation with Steven, Lurie <u>admitted</u> that he received a net amount of $7.5 million from Steven and had not paid it back. (Klotz Decl. Ex. 50 ¶¶ 35, 37.) His claim was only that he was not obligated to pay back $5.5 million of this money because it was paid as "salary" that belonged to him. (*Id.* ¶¶ 46-49.)

### B.     Even If SAC Paid Lurie an Additional $3 Million in December 1986 and January 1987, Steven Accurately Reported His Net Investment With Lurie.

As discussed above, in November 1986, Steven and Lurie entered into an Employment Agreement pursuant to which Steven would pay Lurie $2.75 million per year for 1986, 1987, and 1988. Because Steven had only made "salary" payments of $2.5 million prior to that time, Lurie claimed that in late 1986 and early 1987 SAC gave him an additional $3 million (*i.e.*, the balance of his 1986 "salary" and his entire 1987 "salary"), which he immediately "endorsed back" to Steven, "repaying" the earlier advances in that same amount. (Klotz Decl. Ex. 50 ¶¶ 26, 27, 47, 48; *see also* Klotz Decl. Ex. 49 at 15.)

Even if these alleged round-trip payments happened – we have only Lurie's hearsay for it – it means only that Steven's gross investment with Lurie was $10.5 million rather than $7.5 million. This is irrelevant to Patricia's claim, however, because it leaves Steven's net investment with Lurie, after the supposed repayment of $3 million, unchanged at $7.5 million. Attached as Exhibit 1 is a graphic that shows that the additional transfers of money alleged by Lurie do not alter the undisputed net amount that Steven invested and lost. Nor do the round-trip payments alleged by Lurie, if made, change the information available to Patricia about Steven's total wealth. She already knew about the total revenues received by SAC. Steven's net worth was unaltered whether these revenues stayed at SAC which Steven owned, were paid by SAC to Steven, or went to Steven via Lurie. The payments from Lurie to Steven, if made, would not have increased Steven's disclosed net worth.

-14-

C.      **Even If Steven Received $5.5 Million Back From Lurie, There Is No Evidence That Any Money Was Hidden From Patricia.**

Finally, even assuming *arguendo*, as Patricia alleges, that Steven received money back from Lurie, there is no evidence that any asset was missing from the 1988 Financial Statement. According to Lurie's hearsay affidavits, all money he claims to have "repaid" was "repaid" in and before January 1987. (Klotz Decl. Ex. 50 ¶¶ 26, 27, 47, 48.) Patricia, however, has no evidence that this money was retained but undisclosed when Steven prepared the 1988 Financial Statement 19 months later. Steven had substantial, known cash expenditures after January 1987. For example, he paid $1.3 million in January 1988 in connection with the Lurie Settlement closing. (SF ¶ 82.) He also paid $1.7 million (in addition to previous withholdings) in April 1988 when he filed for extensions for his 1987 tax returns. (Klotz Decl. Ex. 76.) And, even after these substantial cash outlays, together with payments to support the couple's expensive lifestyle, the 1988 Financial Statement shows $4 million in liquid assets. (Klotz Decl. Ex. 65.) Thus, even assuming that Steven received money from Lurie, there is no evidence it was not fully accounted for in his financial disclosure to Patricia, and Steven has testified that all of his assets were disclosed to Patricia. (Klotz Decl. Ex. 11 at 128:9-13.)

\*           \*           \*

In short, there is no evidence that Steven concealed any assets from Patricia during the divorce. Certainly she does not have clear and convincing evidence, or evidence sufficient to make an "inference of fraud . . . unequivocal." *Century Pac., Inc.*, 528 F. Supp. 2d at 219. Absent such evidence, there is no triable issue in this case and summary judgment must be granted. *See Greenberg v. Chrust*, 282 F. Supp. 2d 112, 117-18 (S.D.N.Y. 2003); *Sado v. Ellis*, 882 F. Supp. 1401, 1406 (S.D.N.Y. 1995); *Korngold v. Korngold*, 810 N.Y.S.2d 206, 208 (N.Y. App. Div. 2006); *Stoerchle v. Stoerchle*, 475 N.Y.S.2d 489, 491 (N.Y. App. Div. 1984).

## II.   PATRICIA COULD NOT REASONABLY HAVE RELIED ON ANY MISSTATEMENT OR OMISSION STEVEN MADE ABOUT THE LURIE INVESTMENT.

Patricia's fraud claim also fails because she cannot prove an essential element:  reasonable reliance. *See Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001).

At the time of the divorce settlement negotiations, Patricia claims to have believed Steven was a criminal who was guilty of insider trading and that Steven had invested money with Lurie in part in order to protect their assets from seizure by the government.  (SF ¶¶ 40-43, 60-61.)  Patricia and her lawyers also knew that Steven had invested nearly $9 million with Lurie, more than half of the couple's net worth at the time, and that Steven and Lurie had been in litigation regarding the investment.  (SF ¶¶ 93-101.)  In the 1989 Separation Agreement, Steven expressly and unequivocally told Patricia he was making "no representation as to the value of" the Lurie Investment listed on the 1988 Financial Statement at a value of $8,745,169.  (Klotz Decl. Ex. ¶ 14.4.)  Patricia also acknowledged that "complete financial disclosure . . . has not been obtained" and agreed to waive further discovery.  (*Id.* ¶ 14.5.)

Under these circumstances, Patricia cannot now claim either to have reasonably relied on an alleged oral representation by Steven that the entire Lurie Investment was worthless or to have been injured by Steven's alleged silence about money supposedly received back from Lurie. *Luftig v. Luftig*, 657 N.Y.S.2d. 658, 659 (N.Y. App. Div. 1997) ("[B]ecause the provisions in the agreement specifically preclude consideration of the type of oral representation alleged here, the wife's claim of reliance is manifestly unreasonable.").  Patricia's supposed reliance was particularly unreasonable in 1991, when she sought to set aside the 1989 Separation Agreement on grounds of fraud, specifically alleging that Steven concealed significant income from her during their divorce negotiations.  (SF ¶¶ 115-116; Klotz Decl. Ex. 25 ¶ 4.)  Patricia abandoned this claim of fraud, waived additional opportunities for discovery, and entered into the 1992 Amendment,

-16-

which incorporated all of the disclaimers from the 1989 Separation Agreement.  (SF ¶¶ 119-123; Klotz Decl. Ex. 91 at 1.)

In New York, parties in divorce settlement negotiations are required "to disclose the *existence* of assets or material information that could not be discovered by the other party through reasonable diligence; however, the law places no affirmative duty on a party to accurately disclose the valuation of an asset that is known or should have been known, through reasonable diligence, by the other party." *Harding v. Naseman*, No. 07 CV. 8767 (RPP), 2009 WL 1953041, at *23 (S.D.N.Y. July 8, 2009) (emphasis added), *aff'd*, 377 F. App'x 48 (2d Cir. 2010); *see also Kojovic v. Goldman*, 823 N.Y.S.2d 35, 38 (N.Y. App. Div. 2006).[12]

Here, Steven fully disclosed to Patricia his income and assets at the time of the divorce:  he provided Patricia's counsel with, among other things, his personal tax returns and Gruntal W-2s from 1982-1987, and tax returns for SAC from 1986 and 1987.  These documents, collectively, showed Steven's entire income during the relevant time period, and Patricia offers no evidence of undisclosed sources of income.  Steven also furnished Patricia with a Statement of Financial Condition as of July 1, 1988 that included among the list of assets the amount he had invested in the Queens Coop-Brett Lurie Mortgages, $8,745,169.  (SF ¶¶ 93-96; Klotz Decl. Ex. 65.)  Patricia was therefore on notice of the very asset (and that it was the subject of litigation) that she now claims she undervalued at the time of the divorce.  She nonetheless elected to settle without further discovery or further investigation and expressly agreed that she was <u>not</u> relying on any representations about the value of that asset.  (SF ¶¶ 109-110.)

As the Appellate Division emphasized in *Etzion v. Etzion*, 62 A.D.3d 646 (N.Y. App. Div. 2009), a party in a matrimonial action only has "a duty to make full and complete disclosure of

---

[12] Claims of fraudulent concealment in divorce cases are particularly frowned upon in New York when each party is represented by independent counsel during the negotiation and execution of a settlement agreement.  *See Naseman*, 2009 WL 1953041, at *24 (collecting cases).

information requested by the plaintiff in proper discovery demands, he [does] not have a duty arising out of the marital relationship to volunteer information freely available in the public domain . . . ." *Id.* at 654.  The evidence is clear that Patricia knowingly waived discovery and entered into the 1989 Separation Agreement because it suited her preferences at the time.  The Lurie Affidavits on which Patricia relies were also freely available in the public domain.  And, notwithstanding Patricia's blatant prior misrepresentations of facts, it is undisputed that Patricia and her lawyers were all well aware of the Lurie Litigation prior to signing the 1989 Separation Agreement and the 1992 Amendment.

Courts routinely dismiss actions to overturn divorce settlement agreements on grounds of fraud where a party, represented by independent counsel, waives her right to further financial discovery.  *See, e.g., Luftig*, 657 N.Y.S.2d at 659 (dismissing counterclaim seeking to set aside separation agreement on grounds of fraud where wife agreed that property settlement would not be impaired or invalidated by reason of any lack of financial disclosure); *Smith v. Smith*, 29 Misc. 3d 1226(A), at *5 (N.Y. Sup. Ct. 2010); *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 600 (N.Y. 1959) ("If the language here used is not sufficient to estop a party from claiming that he entered the contract because of fraudulent representations, then no language can accomplish that purpose.").[13]  That is the case here and Patricia's claims should be dismissed.

## III.   PATRICIA'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

Under New York law, Patricia's fraud and breach of fiduciary duty claims were required to be filed within "the greater of six years from the date the cause of action accrued or two years

---

[13] Judge Pauley's decision declining to dismiss the complaint on reliance grounds does not require a contrary decision.  Even on the pleadings, Judge Pauley considered this a "close" question. Mem. & Order, *Cohen v. Cohen*, No. 09-CV-10230 (S.D.N.Y. Jan. 27, 2014), ECF No. 114. More importantly, Judge Pauley did not have a full record showing either the extent of Patricia's suspicions or the extent of her contemporaneous knowledge about the Lurie Investment and the Lurie Litigation.

from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8); *id.* § 203(g); *Dinger v. Kling Agency, Inc.*, 654 N.Y.S.2d 415, 416 (N.Y. App. Div.1997).[14]

This lawsuit was filed on December 13, 2009 – about two decades after Patricia's fraud claim accrued – and Patricia must rely on the two-year discovery rule. The question is when she was on "inquiry notice" of the facts giving rise to the alleged fraud or knowledge of facts which, "in the exercise of reasonable diligence, would have led to actual knowledge." *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 154 (2d Cir. 2003) (citation omitted). The test for inquiry notice is "an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings and the public disclosures themselves." *Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402, 1408 (S.D.N.Y. 1996); *see also In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) ("the question of inquiry notice need not be left to a finder of fact"). If Patricia was on inquiry notice that Steven had defrauded her during the divorce at any time before December 13, 2007, her claim is time-barred. As discussed below, there is no genuine dispute that this is the case.

In her Reply Brief to the Second Circuit, Patricia argued she "did not even know Steven had sued Lurie" and "had no reason to search for [the Lurie Litigation file]." (Klotz Decl. Ex. 103 at 10.) At oral argument, Patricia's attorney represented that Patricia had "no notice whatsoever about a Cohen v. Lurie lawsuit or settlement." (Klotz Decl. Ex. 104 at 25:1-24.) These materially false representations were crucial to the Second Circuit's reversal of Judge Holwell's dismissal on statute of limitations grounds:

---

[14] The statute of limitations for a breach of fiduciary duty claim based upon fraud is subject to the same limitations period. *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013); *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 272 (N.Y. 2009).

> [G]iven what Patricia knew, . . . there is no adequate reason on this record to conclude that such further reasonable diligence would have revealed the Lurie lawsuit. . . . The facts in the present record do not support a conclusion that reasonable diligence would have uncovered Steven's lawsuit against Lurie, as the information available to Patricia in 1991 did not suggest in any way that Steven had sued Lurie, much less that he received a concealed payment in settlement of the suit.

*Cohen*, 711 F.3d at 362-63.

There is now no legitimate dispute that Patricia knew about the Lurie Litigation all along, but lied to this Court and to the Second Circuit about her knowledge. As discovery has demonstrated, Patricia and her counsel were very much aware of the Lurie Litigation at the time of the divorce. The litigation was referenced in the 1988 Financial Statement, and the Lurie Settlement Agreement that resolved the litigation was in Patricia's divorce attorney's file. Her attorney Mr. Brog testified that he discussed the settlement of the litigation with an attorney for Steven from Jones Day, back in 1988. (Klotz Decl. Ex. 14 at 55:15-56:11.)[15]

In addition to these specific disclosures in the 1980s, Patricia herself specifically discussed the Lurie Litigation with attorney Michael Bowe over email in January 2007, sharing with Bowe her specific knowledge that Steven and Lurie "went to court at one point" and even described what transpired during a court hearing in 1987. (Klotz Decl. Ex. 98 at 1.) It is therefore indisputable that Patricia has known about the existence of the Lurie Litigation, despite her misrepresentations to the contrary, well over two years before this action was filed.

Patricia also argued to the Second Circuit that the fraud she suspected in 1991, when she attempted to set aside the 1989 Settlement Agreement, was different from the fraud she now alleges and that she had no reason to focus on the Lurie Investment, or what the Lurie Litigation might show about it, at the time. (Klotz Decl. Ex. 105 at 20-22, 30-33.) When the Second Circuit

---

[15] As a matter of law, Patricia is charged with the same knowledge as her counsel. *See Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994).

reversed Judge Holwell's dismissal of this case on statute of limitations grounds, the Court held

that the then-current "record includes no fact known to Patricia in 1991 that gave rise to any duty

to investigate the Lurie matter." *Cohen*, 711 F.3d at 363.

We disagree that Patricia was not on inquiry notice of the fraud she now alleges by no later

than 1991. Regardless of how the Court resolves this issue, however, it is clear from the full

record following discovery that Patricia was on inquiry notice more than two years before she

brought this lawsuit. Patricia herself admits she "was put on notice of defendant Cohen's

fraudulent filings" giving rise to this lawsuit in <u>March 2006</u> after she watched an episode of *60

Minutes* that she alleged was "highly critical of defendant Cohen's business practices." (Klotz

Decl. Ex. 93 ¶ 3.) This pleaded admission is alone sufficient to hold that Patricia was, as she

alleged, "on notice" of the alleged fraud in March 2006, and that this action is therefore time-

barred. *See Babaev v. Grossman*, 312 F. Supp. 2d 407, 410 (E.D.N.Y. 2004) ("The toothpaste of

an admission of actual knowledge of fraud should not so easily be squeezed back into the

tube.").[16]

Patricia's pleaded admission also comports with the facts. In the wake of the *60 Minutes*

program, Patricia began an active investigation into whether Steven defrauded her in the divorce

and quickly focused on the subject – Lurie and the Lurie Investment – that forms the basis for her

---

[16] This admission was made when Patricia was asserting only RICO claims that were subject to a
four-year statute of limitations. That she later changed her story, and dropped this allegation,
when she asserted a fraud claim subject to the shorter two-year limitations period does not alter the
result. *See Babaev*, 312 F. Supp. 2d at 409 ("Courts within this jurisdiction have found that
plaintiffs' affidavits admitting actual knowledge of frauds at dates certain may be treated as
judicial admissions leading to the dismissal, under the statute of limitations, of even amended
complaints that later attempt to place the knowledge of the fraud within the confines of the
relevant statute.") (citing *Ainbinder v. Kelleher*, 97-CV-7315 (SS), 1997 WL 420279, at *4
(S.D.N.Y. July 25, 1997)); *Ezra Charitable Trust v. Frontier Ins. Grp., Inc.*, No. 00-CV-5361
(LMM), 2002 WL 87723, at *5 (S.D.N.Y. Jan. 23, 2002) (taking judicial notice of a document
with a statement from defendant that was filed in an earlier legal proceeding and dismissing claims
as time-barred).

current claim of fraud. (SF ¶¶ 130-137.) On October 14, 2006, Patricia wrote to Lurie in prison, expressing her view at the time that Steven was a "deceitful" and "corrupt" person for whom there was a "special place in hell" and referring to the Lurie Investment as a method of Steven's "hiding" assets. (Klotz Decl. Ex. 38.)  A few months later, Patricia specifically identified Lurie to Bowe as an "unwitting tool in [Steven's] scheme" and was hopeful that he would cooperate with her to avoid being perceived as "acting in collusion to cover up a conspiracy." (*Id.*)  On January 24 and 25, 2007, Patricia and Bowe discussed visiting Lurie in prison and Bowe said that he would do so. (Klotz Decl. Ex. 98.)  At the time of these discussions, Patricia was actively aware of the Lurie Litigation, even drawing Bowe's attention to the litigation and referencing a specific court appearance in that litigation in which the judge urged the parties to settle. (*Id.*)

In short, by no later than January 2007, Patricia was actively investigating with counsel Lurie's role in the alleged scheme to defraud her in the divorce, and was well aware that Steven and Lurie had "[gone] to court" over the Lurie Investment. (*Id.*)  The Lurie Litigation court file was an obvious place to look for information about Lurie's involvement in a fraud against Patricia. And the Lurie Litigation court file – including the Lurie affidavits that comprise the entire basis of Patricia's fraud claim – has been publicly available since 1987.

Accordingly, knowledge of the contents of this file must be imputed to Patricia by January 2007 at the latest, when Patricia was actively investigating Lurie and discussing the existence of the publicly available Lurie Litigation with counsel. *See, e.g., Cohen*, 711 F.3d at 361 (court "will impute knowledge of what a plaintiff in the exercise of reasonable diligence should have discovered concerning the fraud."); *Shah v. Meeker*, 435 F.3d 244, 250-51 (2d Cir. 2006) (inquiry notice existed where a single news article discussed all of the improper business practices alleged in plaintiff's complaint), *abrogated on other grounds by Merck & Co. v. Reynolds*, 559 U.S. 633 (2010); *LC Capital Partners, LP*, 318 F.3d at 155 (affirming dismissal of fraud claim where

-22-

"'storm warnings' evident on the face of the detailed complaint and in related publicly available documents gave rise to a duty of inquiry"); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000) (LAP) (news article put plaintiffs on inquiry notice where it discussed the same issues that formed the basis for some of their claims); *Marshall v. Milberg LLP*, No. 07-CV-6950 (LAP), 2009 WL 5177975, at *4 (S.D.N.Y. Dec. 23, 2009) (collecting cases); *CIFG Assur. N. Am., Inc. v. Credit Suisse Securities (USA) LLC*, 11 N.Y.S.3d 563, 564 (N.Y. App. Div. 2015) (public reports indicating the alleged actions that formed the basis of plaintiff's claims placed plaintiff on notice and knowledge was imputed where plaintiff failed to conduct an inquiry at that time). January 2007 is outside the two-year statute of limitations and Patricia's claim is therefore time-barred.

## IV.   THERE IS NO EVIDENCE TO SUPPORT A CLAIM AGAINST DONALD COHEN.

There is no evidence that Donald Cohen played any role in the alleged fraud and he should be dismissed as a defendant in this action no matter what.

Patricia names Donald as a defendant in this action because he prepared the 1988 Financial Statement that Patricia alleges misrepresented the value of the Lurie Investment. The 1988 Financial Statement, however, was a compilation, reflecting the facts that Donald received from Steven. It was not a representation by Donald that the financials had been audited or reviewed for accuracy. (Klotz Decl. Ex. 5 at 123:15-21.)

There is no evidence that Donald believed the information in the 1988 Financial Statement was inaccurate or knew about any other representations allegedly made by Steven to Patricia regarding the value of the Lurie Investment. Donald testified that he was not aware that Patricia was told at the time of the divorce that the Lurie Investment was "worthless" and, in fact, did not know what the Lurie Investment was worth at the time. (*Id.* at 210:21-25.) Donald was also not

involved in the discussions surrounding the Separation and Settlement Agreement and had no

knowledge of how Steven and Patricia treated the Lurie Investment under its terms. (*Id.* at 211:1-

12.) Finally, there is no evidence that Donald knew of any money repaid by Lurie to Steven,

much less that any such money was hidden from Patricia. (*Id.* at 168:23-169:8.)

In short, the record is devoid of any evidence that Donald knowingly participated in any

fraud or breach of fiduciary duty against Patricia.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their

motion for summary judgment.

Dated: New York, New York
September 18, 2015

**WILLKIE FARR & GALLAGHER LLP**

By: _Martin Klotz_

Martin Klotz
mklotz@willkie.com
Jeffrey B. Korn
jkorn@willkie.com
Alison R. Levine
alevine@willkie.com
Loreal T. Monroe
lmonroe@willkie.com
787 Seventh Avenue
New York, New York  10019
(212) 728-8000

*Attorneys for Defendants*
*Steven Cohen and Donald Cohen*

-24-

EXHIBIT 1

