# EXHIBIT 52

STEVEN A. COHEN ("COHEN")
AND
SAC TRADING CORP. ("SAC")
SETTLEMENT OF LITIGATION WITH
BRETT K. LURIE ("LURIE")
AND
CONVERSION FUNDING CORP. ("CONVERSION")
January 27, 1988

## Closing Documents

Document No.

### SAC Documents

1. Release and Settlement Agreement

2. First Amendment to Release and Settlement Agreement

3. Second Amendment to Release and Settlment Agreement

4. $7,496,997 Note from Lurie and Conversion to SAC

5. $3,748,499.50 Subordinate Mortgage from Lurie to SAC

6. $350,000 Note from Lurie to SAC

7. Stipulation of Discontinuance

8. Releases of Lis Pendens

9. General Releases – Cohen and SAC to Lurie and Conversion

10. General Releases – Lurie and Conversion to Cohen and SAC

11. Lurie Certification re: SAC Note Proceeds

12. SAC Corporate Resolutions

13. UCC–1 Financing Statements (SAC Subordinate Mortgage)

14. Insurance Certificate

**D. Ex. 250**

Confidential

<u>Coronet Capital Company ("Coronet") Documents</u>

15. Participation and Servicing Agreement between Coronet and SAC
16. Subordination Agreement between Coronet and SAC
17. Restated Loan Commitment from Coronet to Lurie
18. $24,900,000 Wraparound Mortgage Note
19. $24,900,000 Wraparound Mortgage
20. Section 255 Affidavit for Wrap Mortgage
21. Letter re: Application of Proceeds (and copies of checks)
22. Coronet-Lurie Letter re: Building C Mortgage
23. Building Loan Agreement between Coronet and Lurie (concerning the capital improvement reserve)
24. UCC-1 Financing Statements
25. Letter Agreement between Coronet and Lurie re: Financial Statement
26. Carro, Spanbock, Kaster & Cuiffo Legal Opinion
27. SAC Letter re: Interest in Loan

<u>BRT Realty Trust ("BRT") Documents</u>

28. $18,000,000 Restated and Amended Note from Lurie to BRT
29. $18,000,000 Mortgage Consolidation, Modification and Extension Agreement between BRT and Lurie
30. Section 255 Affidavit for Consolidation, Modification and Extension Agreement
31. UCC-1 Financing Statements
32. Subordination and Collateral Security Agreement between BRT and Coronet

33.                    Section 255 Affidavit for Subordination and Collateral Security Agreement

34.                    Demand Note and Mortgage for $1,860,000 from Lurie to BRT

35.                    Carro, Spanbock, Kaster & Cuiffo Legal Opinion

36.                    Title Company Letter to BRT and Coronet

37.                    Miscellaneous Letters from Lurie to Coronet re: Closing Mechanics

38.                    Letter from Lurie to Security Title

39.                    Letter from Lurie to Bank Leumi Trust Company of New York

Confidential

SC_DC-00005083

1

Confidential

48219/005-C
7/15/87

RELEASE AND SETTLEMENT AGRFEMENT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STEVEN A. COHEN,
SAC TRADING CORP.

-with-

BRETT K. LURIE,
CONVERSION FUNDING CORP.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

July 17, 1987

Confidential

## Table of Contents

| Paragraph | Title | Page |
|---|---|---|
| 1 | Stay of Proceedings and Release of Lis Pendens........................................ | 2 |
| 2 | Conditions; Closing........................ | 4 |
| 3 | Loan Advances; Principal Payment; Contingent Interest........................ | 8 |
| 4 | Unsold Shares............................ | 16 |
| 5 | Borrowers' Covenants...................... | 18 |
| 6 | [Intentionally Deleted].................. | 22 |
| 7 | Delivery................................. | 24 |
| 8 | "Net Cash Proceeds"...................... | 26 |
| 9 | Entire Agreement......................... | 28 |
| 10 | Choice at Law............................ | 29 |
| 11 | Forum Selection and Consent to Jurisdiction.............................. | 29 |
| 12 | Counterparts............................. | 29 |
| 13 | Acknowledgement.......................... | 29 |
| 14 | Escrow................................... | 30 |
| 15 | Specific Enforcement..................... | 37 |
| 16 | Notice................................... | 37 |
| 17 | Default.................................. | 38 |
| 18 | Further Assurances....................... | 39 |
| 19 | Miscellaneous............................ | 39 |

(i)

Confidential



## Exhibits

"A"  Note

"B"  Lenders' Second Mortgage

"C"  Security Agreement

"D"  Release of Cohen and SAC

"E"  Release of Lurie and Conversion

## Schedules

1.  Prior Documents

2.  Description of Offering Plans

3.  Principal Payment and Contingent Interest

(ii)

## RELEASE AND SETTLEMENT AGREEMENT

THIS RELEASE AND SETTLEMENT AGREEMENT made as of the
_17_ day of July, 1987 between STEVEN A. COHEN ("Cohen"),
SAC TRADING CORP., a New York corporation ("SAC"; Cohen and
SAC are hereinafter individually and collectively referred
to as the "Lenders"), BRETT K. LURIE ("Lurie") and CONVER-
SION FUNDING CORP., a New York corporation ("Funding"; Lurie
and Funding are hereinafter individually and collectively
referred to as the "Borrowers").

### W I T N E S S E T H :

WHEREAS, during the year 1986, Lenders from time to
time advanced to Borrowers sums totaling $8,246,997; and

WHEREAS, prior to the date hereof, Borrowers returned
to Lenders $750,000 of such advances, leaving a balance of
such funds in Borrowers' possession of $7,496,997; and

WHEREAS, Lenders and Borrowers have from time to time
prior to the date hereof executed and/or delivered certain
letters and/or agreements (collectively the "Prior Docu-
ments") purporting to characterize the basis for the ad-
vances to Borrowers hereinabove referred to, including,
without limitation, those agreements listed on Schedule 1
annexed hereto; and

WHEREAS, certain disputes have arisen between Lenders
and Borrowers resulting in a commencement of an action by
Lenders against Borrowers in the Supreme Court of the State

Confidential

of New York, County of New York (the "Court") under Index
No. 8981/87 (the "Litigation") wherein Lenders have asserted
six Counts (the "Claims") and have filed Notices of Pendency
(collectively, the "Lis Pendens") against certain properties
owned by Lurie and hereinafter described; and

WHEREAS, Lurie is the owner of the properties subject
to the aforementioned Lis Pendens and listed and denominated
on Schedule 2 annexed hereto and made a part hereof (collec-
tively, the "Properties", or individually as a "Property");
and

WHEREAS, Lenders and Borrowers have agreed to settle
all claims that they now have or may have against each other
upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual pro-
mises, releases and representations hereinafter set forth
and for other good and valuable consideration, the receipt
and sufficiency of which is hereby acknowledged, the parties
agree as follows:

1.    Stay of Proceedings and Release of Lis Pendens

A. For and in consideration of the sum of Ten
($10.00) Dollars in lawful money of the United States of
America paid to Lenders by Borrowers at the date hereof, and
other good and valuable consideration, the receipt and suf-
ficiency of which is hereby acknowledged by Lenders, Borrow-
ers and Lenders hereby agree to stay enforcement of the

-2-

SC_DC-00005089

Claims and/or any present actions asserted or which could be asserted in the Litigation, and agree to take no further action or institute any further proceedings arising out of, under or related to the Litigation, the Properties, or any other relationship between or among the Lenders and Borrowers, until the first to occur of (a) the termination of this Agreement pursuant to Paragraph 2 hereof, or (b) the "Closing" (as such quoted term is hereinafter defined in Paragraph 2 hereof). Lenders also agree to stay from July 1, 1987 until the effective termination date of this Agreement the running of the ninety (90) day time period referred to in 11 USCA §547 of the Federal Bankruptcy Code as the same may apply (if at all) to the filing of the Lis Pendens.

B. The parties to the Litigation shall request the Court to retain limited jurisdiction of the Litigation until the Loan (described below) is paid in full. The parties acknowledge that the request of the Court to retain jurisdiction of the Litigation is only for the purpose of obtaining an expedited remedy in the event of a default by either party under this Settlement Agreement, and shall in no way be construed to allow for the survival or ability to reinstate or continue the assertion of the Litigation or any of the Claims asserted therein or in connection with any of the releases delivered pursuant to this Agreement. Lenders and Borrowers agree to deliver at Closing stipulations of dis-

-3-

continuance of the Claims and the Litigation (except as hereinabove limited) in recordable form and sufficient to terminate the Claims and Litigation (except as hereinabove limited) to the "Escrowee" (as such quoted term is defined in Paragraph 3D hereof), who shall hold the same pursuant to Paragraph 14 hereof.

C.   Lenders shall cause those Lis Pendens currently filed of record in Kings County, New York to be released (without prejudice) from 488 Ocean Parkway prior to Closing in the event that the holder of the Existing Mortgage (as hereinafter described thereon) demands a release thereof pursuant to applicable loan documents governing its interests as mortgagee in said Property.  Lenders shall cause the release referred to above to be delivered to Escrowee within five (5) days of the date hereof who shall hold the same pursuant to Paragraph 14 hereof.  Notwithstanding the aforesaid, all Lis Pendens filed against the Properties shall in any event be released by Lenders in accordance with Paragraph 7 hereof.

2.   <u>Conditions; Closing</u>.

A.   Borrowers represent that the Properties are presently encumbered by mortgages as follows (the "Existing Mortgages"):

(i)   As to all Properties other than 488 Ocean Parkway and 90-10 34th Avenue, by a blanket first mortgage in favor of Credit Alliance Corporation ("CAC") dated March

-4-

Confidential

27, 1986, recorded in the Office of the City Register of Queens County in Reel 2070, p 1680 and by a blanket second mortgage in favor of BRT Realty Trust ("BRT") dated March 27, 1986, recorded in the Office of the City Register of Queens County in Reel 2070 p. 1739; and

(ii)  As to 90-10 34th Avenue, by a first mortgage in favor of Columbia Banking Federal Savings & Loan Association ("Columbia") dated June 3, 1986 recorded in the Office of the City Register, Queens County in _____; and

(iii)  As to 488 Ocean Parkway, by a first mortgage in favor of Columbia, dated December 3, 1986 recorded in the Office of the City Register of Kings County in _____.

B.  Borrowers represent that they are presently negotiating to refinance the Properties presently encumbered by the CAC and BRT mortgages with a new, $18,500,000 consolidated first mortgage in favor of Coronet Capital Company ("Coronet") releasing from the lien thereof 74-15 35th Avenue, Jackson Heights.  Borrowers have orally requested and will request in writing upon the execution hereof that Coronet consent to a subordinated blanket mortgage on the Properties subject to the lien of its mortgage in favor of SAC and a second mortgage on 74-15 35th Avenue subject to a mortgage which has terms no more onerous than the purchase

-5-

Confidential

money mortgage set forth in the applicable offering plan, and which may or may not be given before or after Closing. Promptly after Closing, Borrowers shall request that Columbia consent to a subordinated blanket mortgage on 488 Ocean Parkway and 90-10 34th Avenue, provided Borrowers shall not be obligated to expend any additional monies or incur any additional costs as a condition to obtaining such consent, other than recording costs relating to recordation of a subordination agreement.

C.  In the event (i) a loan commitment to refinance the Properties by Coronet, or any other lender who agrees to lend on terms not substantially more onerous than the terms set forth in the draft loan commitment from Coronet heretofore delivered to Lenders (the party making such loan, whether or not Coronet, being hereinafter referred to as the "New Lender"), is not executed and delivered by Borrowers on or before September 30, 1987, (ii) the loan with New Lender is not funded and disbursed by December 31, 1987 or (iii) New Lender does not consent to the Loan being secured by a blanket second mortgage on the Properties substantially in the form of Exhibit "B" attached hereto, which mortgage is hereinafter more particularly discussed, then Borrowers or Lenders shall have the right to terminate this Agreement by written notice to the other party, provided such termination shall not be effective if (a) Borrowers notify Lenders on or

-6-

Confidential

before December 31, 1987 that the Closing will take place by January 31, 1988, (b) Borrowers furnish evidence to Lenders of New Lenders' intention to close such loan by such date, and (c) such loan in fact closes on or before January 31, 1988.  Notwithstanding the foregoing, Borrowers may, by five days' prior written notice to Lenders, terminate this Agreement at any time prior to December 31, 1987 if Borrowers in good faith believe that they will be unable to satisfy such conditions by said date.

In the event this Release and Settlement Agreement is terminated by Lenders or Borrowers in accordance with the foregoing, all provisions hereof other than those contained in Paragraph 1A hereof shall be null and void and of no further force and effect, no party shall have liability or obligation hereunder, and neither party hereto shall be prejudiced in its pursuit of the Litigation or any claim or counterclaim now or hereafter to be asserted therein.  On such termination, all documents then held by Escrowee shall be returned to the party who delivered such documents.

D.  Unless this Agreement is terminated in accordance with the foregoing, the "Closing" of this Release and Settlement Agreement shall take place simultaneously with the closing of the loan with the New Lender at the offices of Messrs. Carro, Spanbock, Kaster & Cuiffo, or at the New

-7-

York City offices of the New Lender or its counsel. At Closing, Lenders and Borrowers shall each deliver to each other and Escrowee the documents referred to the Paragraph 6 hereof.

E. Borrowers covenant, represent and warrant to Lenders as follows:

(1) Borrowers have received no notices of default under the Existing Mortgages;

(2) Borrowers shall give Lenders copies of any notice sent to or received from the holder of an Existing Mortgage and the New Lender, and copies of any statement or report furnished by Borrowers to the holders of the Existing Mortgages or the New Lender;

(3) All funds secured by the Existing Mortgages have been advanced except for such portions held in reserves as contemplated under the applicable loan documents and there are no additional funds available for disbursement thereunder; and

(4) There is no present material litigation or proceeding (other than the Litigation) against Borrowers or the Properties, or to Borrower's knowledge pending or threatened in writing, not covered by insurance.

3. <u>Loan Advances; Principal Payment; Contingent Interest</u>.

A. Provided the Closing of the loan as aforesaid takes place, the Parties acknowledge and agree that (i)

-8-

unreimbursed portions of the advances hereinabove made by SAC to Borrowers shall be deemed to constitute, and shall only thereafter be acknowledged to continue to constitute, loans by SAC to Borrowers intended to bear no stated rate of interest and repayable, together with contingent interest, (ii) as of the date of the Closing, the principal amount outstanding of this loan shall be deemed to be Seven Million Four Hundred Ninety Six Thousand Nine Hundred Ninety-Seven ($7,496,997.00) Dollars (hereinafter the "Loan"), and (iii) to the extent the Prior Documents have any force and effect (the parties acknowledge that the force and effect of the Prior Documents are, in part, the subject of the Litigation), as of the date of Closing the Prior Documents have no further force or effect.   The Loan shall be evidenced by a Note substantially in the form and substance of Exhibit "A" annexed hereto and made a part hereof, which Borrowers shall deliver to SAC at the Closing in accordance with Paragraph 7 hereof.

B.   The Loan shall bear no stated rate of interest prior to maturity and shall impose no personal liability on the Borrowers, except as hereinbelow provided in Paragraph E.

C.   Except as hereinafter provided, the Loan shall mature on January 2, 1990 (the "Maturity Date").   At such time, Borrowers shall discharge the Loan by payment of the

-9-

"Maturity Amount" (as such term is defined in Paragraph 3L hereof). The Maturity Amount shall be payable in cash by Borrowers as to the principal amount outstanding on the Loan, and as to the contingent interest, either (x) in cash, or (y) at Borrowers' option (except as hereinafter limited) in unsold shares in the cooperative corporation to which the Properties have been conveyed, ~~whose offering price (as set forth in the most recent amendment of any offering plans filed with respect thereto) is~~ ^VALUED AT no ~~less~~ than ^(more) the lowest "insider price" offered to tenant-residents of each Property in the most recent amendment to any of said offering plan and equal to one hundred percent (100%) of the Maturity Amount. Borrowers may deliver any combination of cash or unsold shares complying with the foregoing to effect such satisfaction. Notwithstanding the foregoing to the contrary, Lenders shall have the right, by written notice to Borrowers given within five (5) days of receipt of Borrowers' tender, to refuse such tender, to return the tendered shares and to extend the Maturity Date to January 2, 1993.

*the lesser of (i)*

*or (ii)* ✱

Upon payment in full of the Loan and contingent interest as herein provided, Lenders shall be required to cause the Lenders' Blanket Mortgage to be satisfied and discharged of record and any unsold shares delivered as security hereunder to be released and returned to Borrowers or as Borrowers may in writing direct, all at Borrowers' sole cost

✱ the fair market value for such apartments as they are occupied as determined by a recognized selling agent in New York City as designated by Lenders and reasonably satisfactory to Lurie, which Agent is experienced in the sale and evaluation of co-operative apartments

-10-

Confidential

SC_DC-00005097

and expense, provided that Lenders shall be responsible for the payment of fees and disbursements of Lenders' attorneys, accountants and any other professionals retained by Lenders in connection therewith.

Payments under the Note shall be by certified or bank check drawn on a New York City financial institution and payable to the direct order of SAC.

D.   The Loan may be prepaid in full or in part at any time without penalty or premium. Borrowers may direct that any prepayment be applied to reduce the balance of any Principal Payment or to contingent interest so as to effect releases of unsold shares in Borrowers' sole discretion (and Borrowers may from time to time reallocate any such application so long as unused to effect a release of security hereunder).

E.   Borrowers' aggregate liability under the Loan for repayment thereof, including contingent interest, shall be limited to recourse against the Properties and the further sum of Two ⟨Four⟩ Million ($1,000,000.00) Dollars only; provided, however, Borrowers shall also be liable without limitation for any breach of any covenant or agreement herein set forth including, without limitation, to make payments from Net Cash Proceeds as and when required hereunder.

F.   (1)  The Loan shall be secured by a blanket mortgage ("Lenders' Blanket Mortgage") substantially in the form and content of Exhibit "B" annexed hereto and made a

-11-

Confidential

SC_DC-00005098

part hereof and securing only a portion of the original principal amount equal to $3,748,498.50.

(2)   Lenders' Blanket Mortgage shall constitute a second lien on 74-15 35th Avenue and a second lien on the Properties encumbered by the New Loan.  If Columbia consents thereto, the Lenders' Blanket Mortgage shall constitute a second lien on 488 Ocean Parkway and 90-10 34th Avenue.

(3)   Borrowers shall be solely responsible for the payment of mortgage recording taxes due and payable on Lenders' Blanket Mortgage up to the amount of $84,342 and all other costs and expenses of the execution and delivery of Lenders' Blanket Mortgage including any fees or expenses charged by the New Lender, any Existing Lenders or any other lender in connection therewith, provided that Lenders shall be responsible for the payment of fees and disbursements of Lenders' attorneys, accountants or any other professionals retained by Lenders in connection therewith.

G.   Lurie represents and warrants that he has submitted to the Attorney General of the State of New York offering plans for the conversion of each of the Properties to cooperative ownership by tenant-occupants therein. Borrowers (i) represent to Lenders that true and/or complete dates and descriptions as of the date hereof of said plans, as amended, are shown on Schedule 2 annexed hereto and made a part hereof (the "Offering Plans"), and (ii) agree to notify Len-

-12-

SC_DC-00005099

ders if any of these plans are amended or supplemented, sub-
ject to Paragraph 5 below.   Copies of the Offering Plans
have been delivered by Borrowers to Lenders, who acknowledge
the receipt thereof.   Borrowers agree that if, as and when
any Property is conveyed to its respective cooperative cor-
poration pursuant to an offering plan duly declared effec-
tive in connection therewith, Borrowers shall pay to SAC on
account of the principal of the Loan the "Principal Payment"
denominated as such for such Property on <u>Schedule 3</u> hereto.
Further, if the "Net Cash Proceeds" (as hereinbelow defined)
from any such conveyance shall exceed the applicable Princi-
pal Payment, one-third of the excess Net Cash Proceeds shall
be paid to ~~Lenders~~ SAC and shall be payable on account of con-
tingent interest.

H.   [See page 13(a)(b)] ~~If, as and when the Properties shall be conver-~~
ted to cooperative ownership Borrowers shall pay contingent
interest, only, on the Loan in the maximum amounts ascribed
to each Property as set forth on <u>Schedule 3</u> in the manner
hereinafter provided.   All payments by Borrower upon the
conveyance of a Property to its cooperative corporation in
excess of the Principal Payment shall be applied to such
contingent interest as aforesaid and, from and after conver-
sion, an additional sum equal to the lesser of (i) $3,200.00
per room ("Release Consideration") in any cooperative apart-
~~ment thereafter sold and (ii) the Net Cash Proceeds from~~

-13-

Confidential

H.   If, as and when each of the Properties shall be converted to cooperative ownership Borrowers shall pay to SAC, in addition to the Principal Payments provided for in Paragraph 3(G) hereof, but in the maximum amounts as to any such Property as set forth on Schedule 3 hereto, contingent interest, only, on the Loan in the manner hereinafter provided.  All payments by Borrower to SAC upon the conveyance of any Property to its cooperative corporation in excess of the Principal Payment, as provided for in Paragraph 3(G) hereof, shall first be applied to the respective maximum amount of contingent interest ascribed to such Property as set forth on Schedule 3.  From and after any such conversion and in connection with the sale by Borrower of unsold shares in such cooperative corporation, an additional sum equal to the lesser of (i) $3,200.00 per room ("Release Consideration") in any cooperative apartment thereafter sold and (ii) the Net Cash Proceeds from such sale of unsold shares shall be paid on account of such contingent interest.  If Net Cash Proceeds shall be less than $3,200.00 per room, the shortfall shall be allocated ratably to the remaining unsold rooms in such Property.  When contingent interest as to any Property is paid in full, Borrowers shall nevertheless prepay the Loan (including contingent interest attributable to other Properties, whether or not such other Properties have been converted to cooperative ownership) thereafter in the amount of one-third of Net Cash Proceeds from sales of any further units in such Property closing on or prior to the Maturity Date.  Any prepayments of the Loan which are not denominated by the Borrowers at the time of payment as

-13a-

Confidential

Principal Payments shall be deemed payments of contingent interest and shall reduce the amounts of unpaid contingent interest attributable to other Properties on a pro-rata basis. Any prepayments of Principal Payments under this Agreement shall be available to be used by Borrowers to reduce the amount required to be paid in connection with the conversion of subsequent Properties pursuant to Paragraph 3(G) hereof.

-13b-

Confidential

*See p. 13a + 13b*

such sale shall be paid on account of such contingent interest in connection with the sale by Borrowers of unsold shares in such cooperative corporation. If Net Cash Proceeds shall be less than $3,200 per room, the shortfall shall be allocated ratably to the remaining unsold rooms in such Property. When contingent interest as to any Property is paid in full, Borrowers shall nevertheless prepay the Loan (including contingent interest whether or not then accrued) thereafter in the amount of one-third of Net Cash ~~Proceeds from sales of any further units in such Property.~~

I. For the purposes of this Release and Settlement Agreement, the "rooms" in any cooperative apartment shall be the number shown for such apartment in the offering plan relating to such Property.

J. If any dispute arises at the time of a conversion or sale of unsold shares as to the amount of contingent interest required to be paid to effect a release of a lien of SAC hereunder, the disputed portion shall be paid into an escrow with Escrowee, who shall hold said amount pursuant to escrow provisions more specifically set forth in Paragraph 14 hereof and pending resolution of the dispute, and the Property and/or unsold shares from which such proceeds are derived shall, upon such deposit, be released from the lien of the Lenders' Blanket Mortgage or ~~Lenders~~' SAC's security interest in shares, as appropriate. Any undisputed amounts re-

-14-

quired to be paid to effect a release of a lien of ~~Lenders~~ [S4C]
hereunder shall be paid directly to ~~Lenders~~ [SAC].

K. As to Lenders' Blanket Mortgage encumbering
Property D, the same shall be subject and subordinate to the
mortgage or mortgages described in Paragraph 2B hereof.
Lenders acknowledge that the wrap-around mortgage therein
described may be held by one or more of Borrowers or their
affiliates (and may or may not be wraparound in nature).

L. On the Maturity Date, Borrowers shall pay to
SAC an amount (the "Maturity Amount") equal to the sum of
(i) unpaid principal of the Loan plus (ii) contingent interest (in [which has not been previously paid]
the manner described in Paragraph 3(H) hereof) for any Prop-
erty in which an offering plan has been declared effective
by the New York Department of Law. On the Maturity Date, as
for Properties for which no offering plan has been declared
effective, (1) if the plan has been abandoned, any unpaid
contingent interest as to such Property shall be deemed
waived, and (2) if the plan has not been abandoned, then (x)
if and when such plan is abandoned, such contingent interest
shall be deemed waived, or (y) if such plan is declared
effective, contingent interest applicable to such Property
shall be paid from one third of Net Cash Proceeds as and
when received from the conversion of such Property or from
the sale of unsold shares therein.

4. Unsold Shares.

A. Upon conversion of 74-15 35th Avenue or 41-15

-15-

46th Avenue, Lurie shall pledge to SAC one-half of any un-
sold shares with respect to those Properties to further se-
cure repayment of the Loan and contingent interest thereon.
Such pledge shall create a first priority security interest
in said unsold shares and shall be effected by delivery of
the shares, the appurtenant leases, Aztec recognition agree-
ment, UCC-1 financing statement, stock power endorsed in
blank, assignment in blank of proprietary leases and secur-
ity agreement substantially in the form and content of Exhi-
bit "C" annexed hereto and made a part hereof, each deli-
vered in escrow to Escrowee, who shall hold the same in es-
crow pursuant to Paragraph 14 hereof until required to be
released hereunder, or upon default by Borrowers as herein-
after provided to SAC.   In pledging the foregoing unsold
shares to SAC, Borrowers shall deliver to SAC approximately
the same number of unsold shares appurtenant to both unoccu-
pied and occupied apartments and apartments having different
numbers of rooms which it retains for itself.

     B.   Upon conversion of 90-10 34th Avenue or 488
Ocean Parkway, Borrowers shall pledge to SAC (provided
the same are available) one-half of any unsold shares with
respect to those Properties to further secure repayment of
the Loan and contingent interest thereon.   Such pledge shall
be effected by the delivery of the documents set forth in
Paragraph A above.

     C.   Lenders shall cause any unsold shares and any
security instruments pledged or given hereunder to be re-

-16-

SC_DC-00005105

leased upon the appropriate payment of contingent interest, except as set forth in Paragraph 3L hereof. Borrowers shall pay the costs and expenses of creating or releasing such security interests under this Agreement, provided Lenders shall pay the fees and disbursements of Lenders' attorneys, accountants and other professionals retained with respect thereto.

D. Upon the conversion of the Properties desig-nated A and B on Schedule 3 to cooperative ownership, Bor-rowers will pledge to ~~Lenders~~ SAC one-half of the unsold shares with respect to each of those Properties to further secure the Loan. Such pledge shall be effected by the delivery of the documents set forth in Paragraph A above to Escrowee.

E. [SUBJECT TO THE NOTE BELOW*] Borrowers shall only have the obligation to pledge unsold shares as provided for in parts B and D of this Paragraph 4 to the extent such shares are not otherwise pledged to Columbia the New Lender or to other lenders which hereafter furnish funds for project purposes (i.e., as described in Paragraph 5J below) upon the security of such shares. Lenders hereby acknowledge that Borrowers shall have the sole discretion to pledge the unsold shares as aforesaid, provided the proceeds received by Borrowers in consideration for pledging said shares are required by the terms of the Columbia loan documents (including the commit-ment therefor) or are used for the purposes set forth in Paragraph 5J hereof. To the extent that Borrowers so pledge

\* Borrowers obligation to pledge 25% of the unsold shares with respect to the Properties designated A and B on Schedule 3 shall not be subject to this paragraph E.

-17-

SC_DC-00005106

any unsold shares, Borrowers shall deliver to Lenders a statement describing the terms of such pledge, the funds or other consideration received therefor and the projected uses of any of such loan proceeds.   As and when any of such pledged unsold shares are released by such lenders, Borrowers shall pledge one-half of the such shares released if, as and when such shares become available.

5.  Borrowers' Covenants.

Borrowers agree that, from and after the date of Closing (and, as to Subparagraphs C, E, F, G, H, K and L, from and after the date hereof):

A.  Borrowers will deliver to Lenders copies of all notices received from and all financial statements furnished to the Attorney General's Office in connection with any offering plan and of all material correspondence and financial reports received from or delivered by Borrowers to New Lender or Columbia; and

B.  Borrowers shall deliver to Lenders quarterly reports on the operations of the Properties not later than thirty (30) days from the end of the first, second or third calendar quarters or ninety (90) days after the close of any calendar years; and

C.  Borrowers shall deliver to Lenders monthly reports of apartments sold at each Property not later than ten (10) days from the end of each preceding month; and

D.  Borrowers will name Lenders as additional in-

-18-

Confidential

sured under Borrowers' policies of liability and casualty insurance maintained in connection with the Properties and will continue to name Lenders as additional insured so long as Lenders' Blanket Mortgage continues to be a lien against any portion of the Properties; and

E. Borrowers shall not modify or amend the Existing Mortgages and shall not further mortgage or otherwise encumber the Properties without the Lenders' prior written consent except (i) as provided for in the Offering Plans and any amendments thereto, (ii) as may be required to enter into the New Loan, or (iii) provided Borrowers shall deliver to Lenders a statement describing the terms of such modification, amendment or borrowing, and the projected use, of any such loan proceeds, to modify or amend the Existing Mortgages or to borrow additional funds as may be reasonably required by Borrowers for the continued ownership, operation, or conversion of the Properties or to obtain any releases in connection with the conversion thereof; and

F. Borrowers shall not decrease or cause to be decreased the offering or sales price on any shares (including unsold shares) of any cooperative corporation to which a Property has been or will be conveyed below $35.00 per share. Borrowers represent that it will not modify, amend or supplement the Offering Plans in such a way so as to change the number of shares or share allocation set forth in the Offering Plans. Lenders agree that they shall not un-

-19-

Confidential

reasonably withhold their consent to allow Borrowers to decrease the offering or sales price on any such shares or to change the number or allocation of shares set forth in the Offering Plans, which consent must be given within five (5) business days of receipt of written request from Borrowers with respect thereto. Lenders' failure to respond to Borrowers' written request hereunder shall be deemed to be approval of Borrowers' request therefore. Notwithstanding the aforesaid to the contrary, as to any such shares appurtenant to a Property for which New Lender holds a mortgage upon, Lenders agree to consent to any decrease of the offering or sales price or change the number or allocation of shares consented to by New Lender; and

     G. If required by law, Lurie shall cause the Offering Plans to be amended to reflect that the Litigation has been settled as herein provided, or to reflect such other matters related to this Agreement as may be required by law to be included in such amendments; and

     H. Borrowers shall not enter into any contract or agreement which provides for compensation to be paid to Borrowers or any entity in which Lurie has an interest, direct or indirect, or modify or amend an existing agreement which provides for any such compensation to be paid to Borrowers, in amounts greater than would normally be paid to or charged by third parties having no such relationship with Borrowers.

-20-

Confidential

Lenders acknowledge the existence of and do not object to Borrowers' entering into (certain terms and conditions of which are described in the Offering Plans) any management agreement, garage lease or purchase money mortgage intended to affect a Property upon conversion thereof and one or more commission agreements pursuant to which Borrowers or their affiliates will collect a five (5) percent sales commission on the sale of units in any of the Properties; and

I. Lurie shall keep full and accurate records of the acquisition, operation and conversion of the Properties which shall be retained at his office at 82 Wall Street, New York, New York. Lenders or their duly authorized representatives may from time to time and at any reasonable time during regular business hours, examine and copy such records. Borrowers shall furnish to Lenders such reasonable information concerning the operation or conversion of the Properties as Lenders may reasonably request; and

J. Lurie agrees to provide Lenders with copies of monthly bank statements with respect to the money market account in which deposits of rental income, sales income and any other income in connection with the operation of the Properties are made and the account from which all operating expenses for the Properties are paid. Lurie also agrees to provide Lenders with sufficient documentation so as to allow Lenders to trace the proceeds derived from the pledge or

-21-

Confidential

sale of any purchase money mortgage set forth in the Offering Plans and the pledging of any unsold shares appurtenant to units in any of the Properties. Funds may be withdrawn by Lurie from said accounts only for purposes (1) of distributing from the account in which sale proceeds are deposited to Borrowers portions of Net Cash Proceeds not required to be paid to SAC, which Borrowers may use for any purpose, or (2) as to all other funds, for the ownership, management, administration, operation, maintenance or repairs of and to the Properties or in connection with the cooperative conversion thereof or obtaining any releases required in connection with conversion of the sale of unsold shares, including without limitation payroll and payroll expenses for persons performing work at the Properties, medical, surgical and general welfare benefits (including group life insurance), pension benefits, payroll taxes, workmen's compensation, uniform and dry cleaning costs, all charges for window cleaning and service contracts, management fees and administration expenses, leasing commissions, real and personal property taxes and assessments, water and sewer charges, supply costs, license and permit fees, accounting, legal and other professional fees and expenses in connection with the management, operation, leasing or maintenance of the properties, ordinary repair, replacement and maintenance expenses, the cost of improvements necessary or desireable in connection with the preparation for sale of cooperative

-22-

SC_DC-00005111

units or to make space currently vacant or ready for occupancy by tenants or residents or otherwise as required by law or by tenant leases or purchase agreements or the Offering Plans, utility charges, insurance premiums and debt service (i.e., payments of principal and interest on the indebtedness of Borrowers permitted hereunder). Notwithstanding the foregoing or the provisions of Paragraph 4(E), if Borrowers utilize any portion of the proceeds derived from pledging any unsold shares or the pledge or sale of purchase money mortgages described in the Offering Plans for purposes outside those set forth in Paragraph 5J hereof, Borrowers shall simultaneously with disbursement of such funds to Borrowers use one-third of such portion of said proceeds to prepay the Loan, to be applied first to unpaid contingent interest whether or not then accrued, if any, applicable to the Property to which such shares or mortgages relate and the balance, if any, as Borrowers may direct between principal and contingent interest; and

K.  Lurie shall provide Lenders with not less than five (5) days' prior notice of (i) a scheduled closing of the New Loan, (ii) a pledge of unsold shares, (iii) a pledge or sale of the purchase money mortgages, (iv) any conveyance of a Property to a cooperative corporation, and (v) any adjournment of such a closing date; and

L.  Borrower agrees to furnish Lender with amend-

-23-

Confidential

ments to the Offering Plans, as and when filed with the Department of Law, and the New Loan commitment, if and when obtained.

6. Intentionally Omitted.

7. Delivery.

A. Lenders shall deliver to Escrowee upon the execution hereof the release referred to in Paragraph 1B hereof.

B. The following instruments and documents will be executed and delivered at Closing:

1. Lenders shall deliver to the Borrowers, in recordable form, releases of each Lis Pendens sufficient to discharge the same of record, except as to the Lis Pendens heretofore released pursuant to Paragraph 1B hereof.

2. Borrowers and Lenders shall deliver to the Escrowee, in recordable form, stipulations of discontinuance of the Claims and the Litigation (except as limited herein), sufficient to terminate the same, with prejudice against their recommencement or continuance in the event of default hereunder.

3. Lenders and Borrowers shall each deliver to each other, general releases in the forms of Exhibits "D" and "E" annexed hereto and made a part hereof. Notwithstanding the delivery of the releases herein, the parties acknowledge these releases are not intended to relate to the

-24-

obligations of the parties under this Release and Settlement Agreement.

4. Borrowers shall deliver to Lenders a note evidencing the Loan in the form and substance of Exhibit "A" annexed hereto and made a part hereof.

5. Lurie shall deliver Lenders' Blanket Mortgage securing one-half of the principal amount of the Loan and affecting Properties A, B, C and D denominated on Schedule 2 hereto and Properties E and F if the consent of Columbia shall be obtained in accordance with Paragraph 2B hereof along with a check for appropriate recording and filing fees.

6. Lenders shall deliver to Borrowers such instruments of subordination of payment and/or lien under Lenders' Blanket Mortgage as may be required by New Lender, provided such instruments shall not require Lenders to release any security interest it may have in any unsold shares pledged by Borrowers to Lenders pursuant hereto.

7. Borrowers shall deliver to Lenders at Closing true and correct copies of the following:

(a) Fee title insurance policies or marked-up commitments with respect to each of the Properties;

(b) All instruments and documents evidencing and securing the loans held by Columbia and the New Lender;

(c) Closing statements with respect to the ac-

-25-

Confidential

quisition of the Properties and closing of the loans held by
Columbia and the New Lender;

(d)  Service and maintenance agreements affect-
ing the Properties ("Operating Agreements");

(e)  Pro forma statement setting forth informa-
tion as to how the $7,496,977 heretofore advanced to Bor-
rowers by Lenders has been spent or will be spent with re-
spect to the Properties;

(f)  Surveys of the Properties, to the extent
in Borrowers' possession; and

(g)  Copies of any pro formas relating to the
plan of conversion of the Properties delivered to New Lend-
er.

8.  **"Net Cash Proceeds"**

For the purposes of this Release and Settlement
Agreement, the term "Net Cash Proceeds" shall mean:

A.  In connection with a conveyance of a Property
to a cooperative corporation, the excess, if any, of the
aggregate of the cash sales prices received by Borrowers
from the sale of cooperative units at such Property (which
sales are closed on or before the date of the conveyance)
over the sum of: (i) the release price, if any, payable to
the holders of the Existing Mortgages (or the New Lender, as
the case may be, to effect the release of said Property from
the lien of their respective mortgages (including without

-26-

Confidential

limitation any interest and additional interest payable at such time); (ii) the amount of the reserve fund and/or working capital fund required under the relevant offering plan to be established and funded on the date of conversion; (iii) the amount of any maintenance payments, buy-back escrows or obligations, or other payments or allowances relating to the shares so sold and required to be funded by Borrowers after such sale as embodied in any amendment to the Offering Plan, if required to be set forth therein, or as embodied in any written purchase agreement with respect to the sale of such shares; (iv) reasonable sales commissions in connection with the sales of cooperative units actually closed on or before the date of conveyance (whether paid to independent salesmen or brokers or to affiliates of Borrower); and (v) all closing costs, including without limitation transfer taxes, documentary stamp taxes, real property capital gains taxes, recording charges, title insurance premiums, survey charges and reasonable attorneys fees incurred by Borrowers in connection with such conveyance.

B.   In connection with a subsequent sale of unsold shares in a cooperative corporation to which a Property has been conveyed, the excess, if any, of the aggregate of the cash sales prices received by Borrowers from the sale of cooperative units over the sum of: (i) the release price, if any, payable to New Lender or any lender of funds used for

-27-

Confidential

the purposes set forth in Paragraph 5J hereof, including but not limited to the holders of the Existing Mortgages as the case may be, by Borrowers to effect the release of such shares from any lien granted to such lender; (ii) the amount of the reserve fund required under the relevant offering plan to be funded on the date of the sale; (iii) the amount of any maintenance payment, buybacks escrows or obligations, or other payments or allowances, relating to the shares so sold and required to be funded by Borrowers after such sale as embodied in any amendment to the Offering Plans, if required to be set forth therein, or as embodied in any written purchase agreement with respect to the sale of such shares, (iv) reasonable sales commissions in connection with the sales of cooperative units actually closed on or before the date of conveyance (whether paid to independent salesmen or brokers or to affiliates of Borrowers); and (v) all closing costs, including without limitation transfer taxes, documentary stamp taxes, real property transfer gains taxes and reasonable attorneys fees incurred by Borrowers in connection with such sale.

Borrowers shall deliver to SAC within five (5) days after the conversion of a Property to cooperative ownership or after the sale of unsold shares a statement showing the determination of Net Cash Proceeds, certified by Borrowers to be a true and correct statement thereof.

-28-

9.  <u>Entire Agreement</u>.

This Release and Settlement Agreement constitutes the entire agreement and understanding among the Parties with respect to the settlement of any disputes relating to the Parties hereto and shall be binding upon, and inure to the benefit of, the Parties hereto, their respective heirs, successors and assigns.  This Release and Settlement Agreement may not be modified or changed except by an instrument in writing signed by or on behalf of each of the Parties hereto.

10.  <u>Choice of Law</u>.

This document and the agreements contained herein, its scope and its interpretation shall be subject to and be construed according to the laws of the State of New York, United States of America.

11.  <u>Forum Selection and Consent to Jurisdiction</u>.

The undersigned agree to bring any judicial action, including any complaint, counterclaim, cross-claim or third Party complaint, arising directly, indirectly, or otherwise in connection with, out of, related to or from this Release and Settlement Agreement or any transaction covered hereby only in courts located in New York County, New York, United States of America, and all undersigned Parties agree that such court shall have jurisdiction over the parties unless all undersigned parties voluntarily in writing expressly submit to another jurisdiction.

-29-

Confidential

12.  Counterparts.

This Release and Settlement Agreement may be exe-
cuted simultaneously in one or more counterparts, each of
which shall be deemed an original, but all of which together
shall constitute one and the same instrument.

13.  Acknowledgement.

The parties hereto acknowledge that they have read
the terms of this Release and Settlement Agreement, that
they have been assisted and advised by counsel with respect
to this Release and Settlement Agreement, that the terms of
this Release and Settlement Agreement are fully understood
by each of them, that they have each entered into this Re-
lease and Settlement Agreement voluntarily with full know-
ledge of the effect thereof.

14.  Escrow.

This Paragraph 14 shall constitute the escrow in-
structions to Escrowee from Lenders and Borrowers.  Whenever
Escrowee under the terms of this Release and Settlement
Agreement shall hold or be asked to hold any monies, instru-
ment and/or documents in escrow on behalf of Lenders and/or
Borrowers, the following provisions shall apply:

(a)  Items Placed in Escrow.
(i)  ~~Upon~~ *within 5 days of* the execution hereof, Lenders shall
deliver to Escrowee the release described in Paragraph 1B
hereof.  Escrowee shall release said release as and when
hereinelsewhere set forth.

-30-

SC_DC-00005119

(ii) Lenders and Borrowers shall deliver to Escrowee at Closing the stipulations of discontinuance set forth in Paragraph 1 hereof. Escrowee shall file said stipulations with the Court at such time as the Court denies the Borrowers' and Lenders' request to retain limited jurisdiction of the Litigation pursuant to Paragraph 1 above or upon the completion of each of the Borrowers' and Lenders' obligations hereunder; and

(iii) Borrowers shall also deliver to Escrowee those certain documents more particularly set forth in Paragraph 4 hereof ("Documents"), and in addition, if any dispute arises under this Release and Settlement Agreement as to the amount of contingent interest required to be paid to effect a release of a lien of Lenders hereunder, the disputed portion shall be paid into escrow with Escrowee (the "Disputed Amount"). The Documents and/or the Disputed Amount are to be held in escrow by Escrowee pursuant to the terms of this Agreement. Upon receipt of the Documents and/or the Disputed Amount, Escrowee shall notify the other party, or both parties in the event the Documents and/or the Disputed Amount is received from a third party as to what is received, and the date of receipt thereof.

(b) <u>Disposition of Documents and/or Disputed Amount</u>. Escrowee shall deliver the Documents and/or the Disputed Amount to Lenders or to Borrowers, as the case may

-31-

Confidential

be, under the following conditions:

(i)   To Lenders, if Borrowers "Materially De-
fault" (as such quoted term is hereinafter defined) default
in the performance of their obligations hereunder.

(ii)   To Borrowers, if Borrowers have paid
the total amount of the Loan and contingent interest with
respect thereto.

(iii)   Notwithstanding the aforesaid, Escrowee
shall be required to release and disburse the Documents at
any closing wherein a unit or units for which such Documents
relate or are appurtenant are or will be sold to a third
Party; provided, however, to release and disburse said Docu-
ments, Escrowee must receive cash in lieu of such shares in
an amount no less than the amount set forth in Paragraph 5F
hereof prior to or simultaneous with the releasing of said
Documents.

(iv)   In the event either Party hereto
believes it is entitled to receive the Documents and/or the
Disputed Amount, such Party shall assert the same by sending
written notice (the "Demand") of such assertion to the
Escrowee in the manner provided in Paragraph 15 hereof.
This Demand shall set forth the basis for such assertion.
Upon receipt of the Demand, Escrowee shall promptly deliver
a copy thereof to other party. In the event Escrowee fails
to receive any response from such other party (the "Notice

-32-

Confidential

of Objection") within five (5) days of delivering such Demand, Escrowee is entitled to consider that there is no dispute between the parties hereto and that it may act in accordance herewith.

(v)  In the event the Escrowee shall have received the Notice of Objection within the time herein prescribed, the Escrowee may continue to hold the Documents and/or the Disputed Amount.  If the Escrowee receives written notice from Lenders and Borrowers directing the disbursement of the Documents and/or the Disputed Amount, it may then disburse the Documents and/or the Disputed Amount in accordance with such direction.  In the event of litigation between Lenders and Borrowers, the Escrowee may deliver the Documents and/or the Disputed Amount to the clerk of the court in which said litigation is pending, or take such affirmative steps as the Escrowee may, at the Escrowee's option, elect in order to terminate the Escrowee's duties hereunder including, but not limited to, depositing the Documents and/or the Disputed Amount in any court which the Escrowee Agent shall select in New York County, New York and commencing an action for interpleader, the costs thereof to be borne equally by Lenders and Borrowers.

(c)  <u>Liability and Responsibilities of Escrowee</u>. The Escrowee may act upon any instrument or other writing believed by the Escrowee in good faith to be genuine and to

-33-

Confidential

be signed and presented by the proper person, and shall not be liable in connection with the performance of any duties imposed upon the Escrowee by the provisions of this Agreement, except for the Escrowee's own gross negligence. The Escrowee shall have no duties or responsibilities except those set forth in this Agreement. The Escrowee shall not be bound by any modification of this Agreement, unless the same is in writing and signed by Lenders and Borrowers, and delivered to the Escrowee and, if the Escrowee's duties hereunder are affected, unless Escrowee shall have given prior written consent thereto. In the event that the Escrowee shall be uncertain as to the Escrowee's duties or rights hereunder, or shall receive instructions from Lenders or Borrowers which, in the Escrowee's opinion, are in conflict with any of the provisions hereof, the Escrowee shall be entitled to hold and disburse the Documents and/or the Disputed Amount pursuant to Paragraph 2(b) hereof and may decline to take any other action.

(d) Accommodation. It is agreed that the escrow made herein is for the accommodation of the parties hereto. The parties do severally and jointly agree to indemnify and save harmless the Escrowee from the payment of any expenses or disbursements incurred by reason hereof, including, without limitation, reasonable attorneys' fees incurred in connection with a dispute hereunder as to which such counsel

-34-

Confidential

shall be retained. The parties agree that Escrowee shall not be disqualified or prohibited from representing any party to this Agreement in any action at law or equity arising out of this Agreement or any other agreement due to the Escrowee acting as escrow agent.

(e) _Interest_. Escrowee shall have no obligation to place any money received or held pursuant to this Paragraph 14 in an interest bearing account or investment. In the event any interest earned on any money received or held by Escrowee pursuant hereto, such interest shall belong and be paid to the party entitled to receive the funds which generated or accrued such interest.

(f) _Definition of Material Default_. For purposes of this Paragraph, a "Material Default" shall mean (i) a default by Borrowers in making a Principal Payment (for which there shall be no grace period), or (ii) any (other) monetary default of Borrowers hereunder which Borrowers fail to cure for a period of five (5) days following the receipt of written notice from Lenders specifying such other monetary default, or (iii) a material default in the performance of Borrowers' non-monetary obligations hereunder which Borrowers fail to cure for a period of thirty (30) days following the receipt of written notice from Lenders specifying such non-monetary default, or for such longer period as may be reasonably necessary to cure such non-monetary default that

-35-

Confidential

can not be reasonably cured within said thirty (30) day Period, provided Borrowers shall commence to cure said non-monetary default within said thirty (30) day period and diligently prosecute to cure said default thereafter, or (iv) if Borrowers breach any representations or warranties made hereunder, or (v) if Borrowers suspend or discontinue its business, or admit in writing its inability to pay its debts as they become due, or file a voluntary petition in bankruptcy, or become insolvent, or file any petition or answer seeking for adjustment of debt, liquidation or dissolution or similar relief under any present or future statute, law or regulation of any jurisdiction, or petition or apply to any tribunal for any receiver, custodian or any trustee for any substantial part of its Property, or there shall be commenced against the Borrowers any such proceeding which remains undismissed for a period of 60 days, or file any answer admitting or not contesting the material allegations of any such petition filed against it, or of any order, judgment or decree approving such petition in any such proceeding, or seek, approve, consent to, or acquiesce in any such proceeding, or in the appointment of any trustee, receiver, custodian, liquidator, or fiscal agent for it, or any substantial part of its Property, or an order is entered appointing any such trustee, receiver, custodian, liquidator or fiscal agent and such order remains in effect for 60

-36-

days, or take any formal action for the purpose of effecting any of the foregoing or looking to the liquidation or winding up of the Borrowers.   Notwithstanding the aforesaid to the contrary, there shall not be a Material Default as to the computation of contingent interest under this Agreement if a default arises because of a bona fide dispute with respect to the obligations of Borrowers hereunder unless and until Borrower shall fail to perform the same after resolution of said dispute.

15. <u>Specific Enforcement</u>.

In the event either Party hereunder fails or refuses to deliver any mortgage, lien, release, subordination or other document or to perform any other covenant or obligation in accordance with the terms hereof to the other party hereto, such other party shall have the right to any remedy available at law or equity, including, but not limited to, injunctive relief and specific performance.   Each party hereto acknowledges that monetary damages will not adequately compensate the other party for a breach hereunder.

16. <u>Notice</u>.

All notices, demands, consents, approvals and other communications which are required or desired to be given hereunder shall be in writing and shall be sent by hand delivery or other same day service, unless the appropriate party is outside of New York City, in which case

-37-

Confidential

notice shall be sent by Federal Express or other similar courier providing next-day delivery service, (i) if to Lenders at the offices of Steven A. Cohen, c/o Gruntal and Co., 14 Wall Street, New York, New York, with a copy to Schulte, Roth & Zabel, 900 Third Avenue, New York, New York 10022, Attention: Gregory P. Pressman, with an additional copy to Jones, Day, Reavis & Pogue, 599 Lexington Avenue, New York, New York, Attention: Robert J. Shansky, Esq.; (ii) if to Borrowers, at the address of 82 Wall Street, New York, New York, Attention: Brett K. Lurie, with a copy to Carro, Spanbock, Kaster & Cuiffo, 1345 Avenue of the Americas, New York, New York 10105, Attention: Kenneth B. Marcus, Esq.; and (iii) if to Escrowee, at the offices of Carro, Spanbock, Kaster & Cuiffo, 1345 Avenue of the Americas, New York, New York 10105, Attention: Kenneth B. Marcus, Esq., or at such other address as such parties shall have last designated by notice to the other. Notices signed by the parties' respective attorneys shall be deemed sufficient within the meaning of this Paragraph without the signatures of the parties themselves. Notices, demands, consents, approvals, and other communications shall be deemed given the day of delivery in the case of same day service, or one day after delivery to a courier in the case of next-day delivery service. During the existence of a strike, notices and other communications should be be given by personal service and such notices and communications shall be effective when received.

-38-

Confidential

17. <u>Default</u>. Upon the occurrence of a Material Default (as such term is defined in Paragraph 14 hereof) by Borrowers with respect their obligations hereunder,the Loan shall become immediately due at the option of SAC, without presentment, protest, demand or notice of any kind, all of which are hereby waived, and Borrowers will forthwith pay to SAC the outstanding principal balance of the Loan, and any contingent interest accrued thereon.

18. <u>Further Assurances</u>. From and after Closing, each party agrees to furnish such other instruments reasonably necessary to further the purposes of this Agreement, including Lurie's resignation from any office of SAC which Lurie may not have heretofore relinquished.

19. <u>Miscellaneous</u>.

(a) Nothing contained in this Release and Settlement Agreement or any instrument or document executed and delivered in connection therewith, shall be deemed to make or constitute or shall make or constitute the Lenders and Borrowers partners or joint venturers.

(b) The Lenders may resort to any security given by or pursuant to this Release and Settlement Agreement or to any other security now existing or hereafter secured hereby, in whole or in part, and in such proportions and in such order as may seem best to the Lenders in its sole and absolute discretion, and any such action shall not in any

-39-

Confidential

way be considered as a waiver of all rights or benefits, liens or security interest created by this Release and Settlement Agreement or any instrument or document executed and delivered pursuant to this Agreement.

(c) Except as provided in Paragraph 3E, all remedies herein provided are in addition to any and all remedies provided for in any loan document or the Release and Settlement Agreement and all other remedies now or here-after existing at law or equity, and the Lenders shall, in addition to the remedies herein expressly provided, be entitled to avail themselves of all such other remedies as may now exist or hereafter exist at law or equity for the collection of the note and liabilities of Borrowers and the enforcement of the covenants herein and the foreclosure of the liens and security interests granted hereby or pur-suant to, and the resort to any remedy provided hereunder or provided by law shall not prevent the concurrent or subse-quent employment of any other appropriate remedy or remedies against the Borrower.

(d) The default rate provided for herein and in the note shall continue to accrue and be paid on any amount to which the default rate is applied until such amount is paid in full.

(e) It is the intent of the Borrowers and Lend-ers that Borrowers, under no circumstances, shall be re-

-40-

Confidential

SC_DC-00005129

quired to pay, nor shall Lenders be entitled to receive any interest on the Loan which shall be in excess of the maximum legal rate permitted under the applicable laws with respect to usury.

(f)  In the event any one or more of the provisions contained in this Release and Settlement Agreement or any document executed and delivered pursuant thereto shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall, at the option of Lenders, not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein or therein.

IN WITNESS WHEREOF, the undersigned have executed this Release and Settlement Agreement on this _17_ day of July, 1987.

ESCROWEE:

AS TO PARAGRAPH 14 ONLY,
AGREED TO AND CONFIRMED
BY:

Carro, Spanbock, Kaster
    & Cuiffo

By: _____

LENDERS:

_____
Steven A. Cohen

SAC Trading Corp.

By: _____
    Name: Steven A. Cohen
    Its: President

BORROWERS:

_____
Brett K. Lurie

Conversion Funding Corporation

By: _____
    Name:
    Its:

-41-

Confidential

## Schedule 1

## Prior Agreements

1. Agreement dated November 5, 1986, between SAC Trading Corp. and Brett K. Lurie, entitled "Employment Agreements."

2. Agreement dated December 24, 1986, between SAC Trading Corp. and Conversion Funding Corp. relating to 488 Ocean Parkway ($150,000), Brooklyn.

3. Agreement dated December 24, 1986, between Conversion Funding Corp. and Brett K. Lurie relating to 488 Ocean Parkway, Brooklyn.

4. Agreement dated December 24, 1986, between SAC Trading Corp. and Conversion Funding Corp. relating to 90-10 34th Avenue, Jackson Heights ($300,000).

5. Agreement dated December 24, 1986, between Conversion Funding Corp. and Brett K. Lurie relating to 90-10 34th Avenue, Jackson Heights.

6. Agreement dated December 24, 1986, between SAC Trading Corp. and Conversion Funding Corp. relating to 42-15 43rd Avenue, Sunnyside ($400,000).

7. Agreement dated December 24, 1986, between Conversion Funding Corp. and Brett K. Lurie.

8. Agreement dated December 24, 1986, between SAC Trading Corp. and Conversion Funding Corp. relating to 41-15 46th Street, Sunnyside ($200,000).

9. Agreement dated December 24, 1986, between Conversion Funding Corp. and Brett K. Lurie relating to 41-15 46th Street, Sunnyside.

10. Agreement dated December 24, 1986, between SAC Trading Corp. and Conversion Funding Corp. relating to 41-15-34 45th, 41-20-30 46th Street, Sunnyside ($700,000).

11. Agreement dated December 24, 1986, between Conversion Funding Corp. and Brett K. Lurie relating to 41-15-35 45th Street and 41-20-30 46th Street, Sunnyside.

Confidential

12.  Agreement dated December 24, 1986, between SAC Trading
     Corp. and Conversion Funding Corp. relating to 74-15
     35th Avenue, Jackson Heights ($250,000).

13.  Agreement dated December 24, 1986, between Conversion
     Funding Corp. and Brett K. Lurie relating to 74-15
     35th Avenue, Jackson Heights.

Confidential

## SCHEDULE 2

## DESCRIPTION OF OFFERING PLANS

1.   Cooperative Offering Plan for the premises located at 74-15 35th Avenue, Jackson Heights, New York, accepted by the Attorney General January 23, 1987, as amended by First Amendment to Offering Plan dated and presented January 28, 1987, as amended by Second Amendment to Offering Plan dated and presented February 22, 1987, as amended by Third Amendment to Offering Plan dated and presented May 6, 1987, as amended by Fourth Amendment to Offering Plan dated and presented June 30, 1987.

2.   Cooperative Offering Plan for the premises located 488 Ocean Parkway, Brooklyn, New York (Red Herring).

3.   Cooperative Offering Plan for the premises located at 90-10 34th Avenue, Jackson Heights, New York, accepted by the Attorney General May 20, 1987, as amended and presented by First Amendment dated June 24, 1987.

4.   Cooperative Offering Plan for the premises located at 41-15 46th Street, Sunnyside, New York, accepted by the Attorney General March 9, 1987, as amended by First Amendment dated and presented June 21, 1987.

5.   Cooperative Offering Plan for the premises located at 41-15 45th Street, 41-35 45th Street, 41-20 46th Street, 41-30 46th Street, Sunnyside, New York (Red Herring).

6.   Cooperative Offering Plan for the premises located at 42-15 43rd Avenue, Sunnyside, Queens, New York (Red Herring).

Confidential

SCHEDULE 3
To
RELEASE AND SETTLEMENT AGREEMENT
DATED JUNE    , 1987

| | Property Address(es) | Principal Payment | Contingent Interest |
|---|---|---|---|
| A. | 41-15 45th Street<br>41-35 45th Street<br>41-20 46th Street<br>41-30 46th Street<br>Sunnyside, Queens, N.Y. | $2,845,000.00 | $1,715,000.00 |
| B. | 42-15 43rd Avenue<br>Sunnyside, Queens, N.Y. | $1,449,997.00 | $ 856,000.00 |
| C. | 41-15 46th Street<br>Sunnyside, Queens, N.Y. | $ 700,000.00 | $ 406,000.00 |
| D. | 74-15 35th Street<br>Jackson Heights,<br>Queens, N.Y. | $ 956,000.00 | $ 585,000.00 |
| E. | 488 Ocean Parkway<br>Brooklyn' N.Y. | $ 479,000.00 | $ 270,800.00 |
| F. | 90-10 34th Avenue<br>Jackson Heights,<br>Queens, N.Y. | $1,066,000.00 | $ 632,000.00 |
| | | $7,496,997.00 | $4,464,800.00 |

Confidential

EXHIBIT A

NOTE

$7,496,997.00                              July __, 1987

FOR VALUE RECEIVED, the undersigned, BRETT K. LURIE ("Lurie") AND CONVERSION FUNDING CORP., a corporation duly organized and existing under and by virtue of the laws of the State of New York, having offices at 82 Wall Street, New York, New York ("Maker"), promises to pay to SAC TRADING CORP., a corporation duly organized and existing under and by virtue of the laws of the State of New York, having offices at _____ ("Payee"), or order, at Payee's office or at such other place as may be designated in writing by Payee, the combined, undivided and total sum of Seven Million Four Hundred Ninety Six Thousand Nine Hundred Ninety Seven and 00/100 Dollars ($7,496,997.00) on the 2nd day of January, 1990 together with interest as herein provided.

AND the Maker covenants with the Payee as follows:

1.   The Maker will pay the indebtedness as hereinbefore provided.

2.   This Note is subject and is being given pursuant to the terms and conditions of that certain Release and Settlement Agreement of even date by and between the Maker and Payee, which terms and conditions are hereby incorporated by reference (the "Settlement Agreement").

3.   This Note is partially secured by a certain subordinate mortgage of even date herewith given by Lurie to Payee securing the principal amount of Three Million Seven Hundred Forty Eight Thousand Four Hundred Ninety-Eight and 50/100 ($3,748,498.50) Dollars.  Maker covenants and agrees that any payment made pursuant to this Note shall first be applied to the unsecured portion of this indebtedness, that is, the $3,748,498.50 which is not secured by said mortgage.

4.   In the event Maker fails to make any mandatory Principal Payment (as defined in the Settlement Agreement) or if contingent interest provided for in the Settlement Agreement is not paid five (5) days after notice and demand from Payee, or Maker fails to comply in any material respect with the terms, covenants and conditions of the Settlement Agreement (excluding monetary default) and such failure results in a default under the Settlement Agreement [and such default should not be thereafter waived in writing by Payee shall have the] right to declare the remaining unpaid principal amount of this Note [and any contingent interest accrued thereon] due and payable and/or collect interest on the unpaid [Principal] balance hereof computed [at Payee's option to] from the date Maker receives

written notice from Payee of such default at the rate of the lower of (a) five (5%) percent over the then existing prime rate offered by Chase Manhattan Bank, N.A., New York, New York, or (b) the maximum rate permitted by law.

5.    This Note may be prepaid in whole or in part at any time, without notice and without premium or penalty. Notwithstanding the prepayment in full of the principal amount, maker shall remain obligated to pay contingent interest in accordance with the Settlement Agreement.

6.    The Maker waives presentment for payment, demand, protest, notice of protest and notice of non-payment or dishonor of this Note and consents that the Payee may extend the time of payment of any part of the whole of the debt at any time or grant any other indulgence in connection herewith.

7.    Any notice or demand required or permitted to be made or given hereunder shall be deemed sufficiently made and given if given pursuant to Paragraph 16 of the Settlement Agreement.

8.    This Note may not be changed or terminated orally and shall be construed in accordance with the laws of the State of New York.

9.    Maker's liability under this Note shall be governed by the terms and conditions of Paragraph 3B of the Settlement Agreement.

10.    If Payee has to institute any proceeding to enforce the terms of this Note, Maker shall pay to Payee the legal costs and disbursements therefore.

IN WITNESS WHEREOF, the undersigned has executed this instrument the day and year first above written.

WITNESS:                          MAKER:

                                 Conversion Funding Corporation

_____          By:
                                     Name:
                                     Its:

_____          _____
                                 Brett K. Lurie

[Acknowledgement]

Confidential

A 367  Standard N.Y.B.T.U. Form 8015
Mortgage (Subordinate) Individual or Corporation.     DATE CODE
EXHIBIT "8"     JULIUS BLUMBERG, INC., LAW BLANK PUBLISHERS

**CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT—THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.**

**THIS MORTGAGE,** made the           day of              , nineteen hundred and   eighty-seven

**BETWEEN**     BRETT K. LURIE with offices at 82 Wall Street, New
York, New York 10005

, the mortgagor,

and                         SAC TRADING CORP., a New York
corporation with offices at

, the mortgagee,

**WITNESSETH,** that to secure the payment of an indebtedness in the sum of  Three Million Seven
Hundred Forty-Eight Thousand Four Hundred Ninety-Eight and          xxxxxxx
~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ 50/100 ($3,748,498.50) lawful monies of
the United States

~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~XXXXXXXXXXXXXXXXX ~~xxxxxxx
xxxxxxxxxxx~~ to be paid on the   2nd   day of January        19 90 ~~xxxxxxxxxxxxxxx~~
~~xxxxxxxxx~~

according to a certain bond,
note or obligation bearing even date herewith, the mortgagor hereby mortgages to the mortgagee

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate,
lying and being ~~lotbx~~ at the following addresses:

     A.   41-15 45th Street
           41-35 45th Street
           41-20 46th Street
           41-30 64th Street
           Sunnyside, Queens, New York;

     B.   42-15 43rd Avenue
           Sunnyside, Queens, New York;

     C.   41-15 46th Street
           Sunnyside, Queens, New York;

     D.   74-15 35th Avenue
           Jackson Heights, Queens, New York

The above properties are more particularly described on Exhibit "A"
attached hereto and made a part hereof.

**TOGETHER** with all right, title and interest of the mortgagor in and to the land lying in the streets and roads in front of and adjoining said premises;

**TOGETHER** with all fixtures, chattels and articles of personal property now or hereafter attached to or used in connection with said premises, including but not limited to furnaces, boilers, oil burners, radiators and piping, coal stokers, plumbing and bathroom fixtures, refrigeration, air conditioning and sprinkler systems, wash-tubs, sinks, gas and electric fixtures, stoves, ranges, awnings, screens, window shades, elevators, motors, dynamos, refrigerators, kitchen cabinets, incinerators, plants and shrubbery and all other equipment and machinery, appliances, fittings, and fixtures of every kind in or used in the operation of the buildings standing on said premises, together with any and all replacements thereof and additions thereto;

**TOGETHER** with all awards heretofore and hereafter made to the mortgagor for taking by eminent domain the whole or any part of said premises or any easement therein, including any awards for changes of grade of streets, which said awards are hereby assigned to the mortgagee, who is hereby authorised to collect and receive the proceeds of such awards and to give proper receipts and acquittances therefor, and to apply the same toward the payment of the mortgage debt, notwithstanding the fact that the amount owing thereon may not then be due and payable; and the said mortgagor hereby agrees, upon request, to make, execute and deliver any and all assignments and other instruments sufficient for the purpose of assigning said awards to the mortgagee, free, clear and discharged of any encumbrances of any kind or nature whatsoever.

**AND** the mortgagor covenants with the mortgagee as follows:

1.  That the mortgagor will pay the indebtedness as hereinbefore provided.

2.  That the mortgagor will keep the buildings on the premises insured against loss by fire for the benefit of the mortgagee; that he will assign and deliver the policies to the mortgagee; and that he will reimburse the mortgagee for any premiums paid for insurance made by the mortgagee on the mortgagor's default in so insuring the buildings or in so assigning and delivering the policies.

3.  That no building on the premises shall be altered, removed or demolished without the consent of the mortgagee.

4.  That the whole of said principal sum and interest shall become due at the option of the mortgagee: after default in the payment of any instalment of principal or of interest for five days or after default in the payment of any tax, water rate, sewer rent or assessment for thirty days after notice and demand; or after default after notice and demand either in assigning and delivering the policies insuring the buildings against loss by fire or in reimbursing the mortgagee for premiums paid on such insurance, as hereinbefore provided; or after default upon request in furnishing a statement of the amount due on the mortgage and whether any offsets or defenses exist against the mortgage debt, as hereinafter provided. An assessment which has been made payable in instalments at the application of the mortgagor or lessee of the premises shall nevertheless, for the purpose of this paragraph, be deemed due and payable in its entirety on the day the first instalment becomes due or payable or a lien.*contingent **after the receipt of written notice and demand

5.  That the holder of this mortgage, in any action to foreclose it, shall be entitled to the appointment of a receiver.

6.  That the mortgagor will pay all taxes, assessments, sewer rents or water rates, and in default thereof, the mortgagee may pay the same.

7.  That the mortgagor within five days upon request in person or within ten days upon request by mail will furnish a written statement duly acknowledged of the amount due on this mortgage and whether any offsets or defenses exist against the mortgage debt.

8.  That notice and demand or request may be in writing and may be served in person or by mail.

9.  That the mortgagor warrants the title to the premises.

10. That the fire insurance policies required by paragraph No. 2 above shall contain the usual extended coverage endorsement; that in addition thereto the mortgagor, within thirty days after notice and demand, will keep the premises insured against war risk and any other hazard that may reasonably be required by the mortgagee. All of the provisions of paragraphs No. 2 and No. 4 above relating to fire insurance and the provisions of Section 254 of the Real Property Law construing the same shall apply to the additional insurance required by this paragraph.

11. That in case of a foreclosure sale, said premises, or so much thereof as may be affected by this mortgage, may be sold in one parcel.

12. That if any action or proceeding be commenced (except an action to foreclose this mortgage or to collect the debt secured thereby), to which action or proceeding the mortgagee is made a party, or in which it becomes necessary to defend or uphold the lien of this mortgage, all sums paid by the mortgagee for the expense of any litigation to prosecute or defend the rights and lien created by this mortgage (including reasonable counsel fees), shall be paid by the mortgagor, together with interest thereon at the rate of six per cent. per annum, and any such sum and the interest thereon shall be a lien on said premises, prior to any right, or title to, interest in or claim upon said premises attaching or accruing subsequent to the lien of this mortgage, and shall be deemed to be secured by this mortgage. In any action or proceeding to foreclose this mortgage, or to recover or collect the debt secured thereby, the provisions of law respecting the recovering of costs, disbursements and allowances shall prevail unaffected by this covenant.

SC_DC-00005138

13. That the mortgagor hereby assigns to the mortgagee the rents, issues and profits of the premises as further security for the payment of said indebtedness, and the mortgagor grants to the mortgagee the right to enter upon and to take possession of the premises for the purpose of collecting the same and to let the premises or any part thereof, and to apply the rents, issues and profits, after payment of all necessary charges and expenses, on account of said indebtedness. This assignment and grant shall continue in effect until this mortgage is paid. The mortgagee hereby waives the right to enter upon and to take possession of said premises for the purpose of collecting said rents, issues and profits, and the mortgagor shall be entitled to collect and receive said rents, issues and profits until default under any of the covenants, conditions or agreements contained in this mortgage. And agrees to use such rents, issues and profits in payment of principal and interest becoming due on this mortgage and in payment of taxes, assessments, sewer rents, water rates and carrying charges becoming due against said premises, but such right of the mortgagor may be revoked by the mortgagee upon any default. xxx*** xxxxxxxxxxxxxxxxxx. The mortgagor will not, without the written consent of the mortgagee, receive or collect rent from any tenant of said premises or any part thereof ** a period of more than one month in advance, and in the event of any default under this mortgage** ay monthly in advance to the mortgagee, or to any receiver appointed to collect said rents, issues ann .osts, the fair and reasonable rental value for the use and occupation of said premises or of such part thereof as may be in the possession of the mortgagor, and upon default in any such payment will vacate and surrender the possession of said premises to the mortgagee or to such receiver, and in default thereof may be evicted by summary proceedings.

14. That the whole of said principal sum and the interest shall become due at the option of the mortgagee: (a) after failure to exhibit to the mortgagee, within fifteen days after demand, receipts showing payment of all taxes, water rates, sewer rents and assessments; or (b) after the actual or threatened alteration, demolition or removal of any building on the prem .. without the written consent of the mortgagee; or (c) after the assignment of the rents of the prem .. or any part thereof without the written consent of the mortgagee; or (d) if the buildings on said premises are not maintained in reasonably good repair; or (e) after failure to comply with any requirement or order or notice of violation of law or ordinance issued by any governmental department claiming jurisdiction over the premises within three months from the issuance thereof; or (f) if on application of the mortgagee two or more fire insurance companies lawfully doing business in the State of New York refuse to issue policies insuring the buildings on the premises; or (g) in the event of the removal, demolition or destruction in whole or in part of any of the fixtures, chattels or articles of personal property covered hereby, unless the same are promptly replaced by similar fixtures, chattels and articles of personal property at least equal in quality and condition to those replaced, free from chattel mortgages or other encumbrances thereon and free from any reservation of title thereto; or (h) after thirty days' notice to the mortgagor, in the event of the passage of any law deducting from the value of land for the purpose of taxation any lien thereon, or changing in any way the taxation of mortgages or debts secured thereby for state or local purposes; or (i) if the mortgagor fails to keep, observe and perform any of the other covenants, conditions or agreements contained in this mortgage; or (j) if the mortgagor fails to keep, observe and perform any of the covenants, conditions or agreements contained in any prior mortgage or fails to repay to the mortgagee the amount of any instalment of principal or interest which the mortgagee may have paid on such mortgage with interest thereon as provided in paragraph 16 of this mortgage.

15. That the mortgagor will, in compliance with Section 13 of the Lien Law, receive the advances secured hereby and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

16. If the mortgagor fails to pay any instalment of principal or interest on any prior mortgage when the same becomes due, the mortgagee may pay the same, and the mortgagor on demand will repay the amount so paid with interest thereon at the legal rate and the same shall be added to the mortgage indebtedness and be secured by this mortgage.

<span style="font-size:small">Strike out clause if if impossible.</span>

17. xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

18. This mortgage is subject and subordinate to those certain mortgages described on Exhibit "B" attached hereto and made a part hereof.

\* subject to applicable grace periods described in paragraph 5 of the Rider attached hereto.

\*\* and the passage of applicable grace periods

\*\*\* subject to applicable grace periods described in paragraph 5 of the rider hereto.

SEE RIDER ANNEXED HERETO AND HEREBY MADE A PART HEREOF.

This mortgage may not be changed or terminated orally. The covenants contained in this mortgage shall run with the land and bind the mortgagor, the heirs, personal representatives, successors and assigns of the mortgagor and all subsequent owners, encumbrancers, tenants and subtenants of the premises, and shall enure to the benefit of the mortgagee, the personal representatives, successors and assigns of the mortgagee and all subsequent holders of this mortgage. The word "mortgagor" shall be construed as if it read "mortgagors" and the word "mortgagee" shall be construed as if it read "mortgagees" whenever the sense of this mortgage so requires.

IN WITNESS WHEREOF, this mortgage has been duly executed by the mortgagor

IN PRESENCE OF:

_____        _____

_____        Brett K. Lurie

Confidential

STATE OF NEW YORK, COUNTY OF                                    ss:

On the          day of                    19    , before me
personally came

to me known to be the individual      described in and who
executed the foregoing instrument, and acknowledged that
executed the same.

STATE OF NEW YORK, COUNTY OF                                    ss:

On the          day of                    19    , before me
personally came

to me known to be the individual      described in and who
executed the foregoing instrument, and acknowledged that
executed the same.

STATE OF NEW YORK, COUNTY OF                             ss:

On the          day of                    19    , before me
personally came
to me known, who, being by me duly sworn, did depose and
say that    he resides at No.

that    he is the
of                                    , the corporation described
in and which executed the foregoing instrument; that    he
knows the seal of said corporation; that the seal affixed
to said instrument is such corporate seal; that it was so
affixed by order of the board of directors of said corpora-
tion, and that    he signed h    name thereto by like order.

STATE OF NEW YORK, COUNTY OF                             ss:

On the          day of                    19    , before me
personally came
the subscribing witness to the foregoing instrument, with
whom I am personally acquainted, who, being by me duly
sworn, did depose and say that    he resides at No.

that    he knows

                                    to be the individual
described in and who executed the foregoing instrument;
that    he, said subscribing witness, was present and saw
            execute the same; and that    he, said witness,
at the same time subscribed h    name as witness thereto.

**Mortgage**
(SUBORDINATE)

TITLE No.

TO

SECTION

BLOCK

LOT

COUNTY OR TOWN

RETURN BY MAIL TO:

Zip No.

*Reserve this space for use of Recording Office.*

Confidential

RIDER TO MORTGAGE DATED _____, 1987
BY AND BETWEEN BRETT K. LURIE, AS
MORTGAGOR, AND SAC TRADING CORP.,
AS MORTGAGEE

1. This mortgage is being given pursuant to a certain Release and Settlement Agreement dated _____, 1987 by and between mortgagor and mortgagee (the "Release and Settlement Agreement"), which is hereby incorporated by reference. If any provisions of this Mortgage shall conflict with any provisions of the Release and Settlement Agreement, the provisions of the Release and Settlement shall control. If any provisions of this Rider shall conflict with any printed provision of this Mortgage, the provisions of this Rider shall control.

2. When and if any of the properties secured by this Mortgage are conveyed by mortgagor, the mortgagee agrees to deliver to the mortgagor instruments of release (in recordable form) upon payment of the appropriate sums provided for in the Release and Settlement Agreement.

3. Provided no Material Default (as defined in the Settlement Agreement) has occurred, upon request of the mortgagor, the mortgagee shall "split" and sever this Mortgage at the sole cost and expense of mortgagor into two or more separate mortgages, each of which shall secure a portion of the then outstanding principal balance and each substantially on the same terms and conditions as this Mortgage, so long as the aggregate principal balance of the new separate mortgages created equals the then outstanding principal balance of this Mortgage. In such event: (i) mortgagor shall execute and deliver a substitute note made payable to mortgagee for each new mortgage created, and mortgagee shall return to mortgagor all other original notes, and (ii) replacement mortgages shall be issued, each of which shall be substantially on the same terms and conditions as this Mortgage and each of which shall secure only one substitute note in corresponding amount. Upon the recording of such replacement mortgages, the lien of this Mortgage shall be deemed transferred to the replacement mortgages with the same effect as if replacement mortgages were originally recorded in lieu of this Mortgage and this Mortgage shall thereafter cease to be effective and shall be deemed released.

4. This mortgage is and shall be junior and subordinate to a certain mortgage on a portion of the mortgaged premises and having an address of 74-15 35th Avenue, Jackson Heights, New York in the original principal amount of $3,500,000.

Confidential

Mortgagee hereby agrees to execute and deliver any subordination agreement necessary to subordinate the lien of this mortgage to the lien of said mortgage.

5. For the purposes of this mortgage, no default shall be deemed to exist hereunder unless and until the mortgagor shall fail to (i) pay principal, (ii) pay contingent interest due and payable five days after the receipt of written notice and demand therefor from mortgagee, or (iii) perform a non-monetary obligation for a period of thirty (30) days following the receipt of written notice from mortgagee specifying the obligation not so performed, or for such longer period as may be reasonably necessary to cure a non-monetary obligation that cannot reasonably be performed within said thirty (30) day period, provided mortgagor shall commence to cure the non-monetary obligation within said thirty (30) day period and prosecutes the same diligently thereafter. The acceleration by the holder of any mortgage superior to this mortgage of its loan shall be deemed to be a default hereunder; provided, however, in the event said superior mortgagee reinstates its loan or discontinues acceleration thereof, the loan secured hereby shall be similarly reinstated and no longer accelerated, provided this mortgage is not otherwise in default.

6. Any Material Default under the Release and Settlement Agreement shall be deemed a default hereunder entitling Mortgagee to exercise all of its rights or remedies under this Mortgage without further notice.

7. Except as provided in the Release and Settlement Agreement, the Mortgagee may resort to any security given by this Mortgage or to any other security now existing or hereafter secured hereby, in whole or in part, and in such proportions and in such order as may deem best to the Mortgagee in its sole and absolute discretion, and any such action shall not in any way be considered as a waiver of all rights or benefits, liens or security interest created by this Mortgage.

8. All remedies herein provided are in addition to any and all remedies provided for in any other loan document or the Release and Settlement Agreement and all other remedies now or hereafter existing at law or equity, and the Mortgagee shall, in addition to the remedies herein expressly provided, be entitled to avail itself of all such other remedies as may now exist or hereafter exist

Confidential

SC_DC-00005142

at law or equity for the collection of the Note partially secured hereby and liabilities of Mortgagor and the enforcement of the covenants herein and the foreclosure of the liens and security interests granted hereby, and the resort to any remedy provided hereunder or provided by law shall not prevent the concurrent or subsequent employment of any other appropriate remedy or remedies against the Mortgagor.

9.  No release of any part of the mortgaged property shall in any way alter, vary or diminish the force, effect or lien or security interest of this Mortgage on the mortgaged property or portion thereof remaining subject to the lien and security interest created hereby.

10.  The default rate provided for herein and in the note shall continue to accrue and be paid on any amount to which the default rate is applied until such amount is paid in full.

11.  This mortgage shall be deemed to be a security agreement pursuant to the Uniform Commercial Code of the State of New York, and mortgagors shall execute and deliver appropriate UCC's in accordance therewith.

12.  It is the intent of Mortgagors and Mortgagees that Mortgagors, under no circumstances, shall be required to pay, nor shall Mortgagee be entitled to receive any interest which shall be in excess of the maximum legal rate permitted under the applicble laws with respect to usury.

13.  In the event any one or more of the provisions contained in the Release and Settlement Agreement or any document executed and delivered pursuant thereto shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall, at the option of Mortgagee, not affect any other provision of said Agreement but said Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein or therein.

14.  Any casualty insurance proceeds payable on account of any damage or destruction to all or any part of the mortgaged premises shall be applied to the reparation or restoration of such premises, so long as the senior mortgagee consents to such action. Any insurance proceeds

and so long as no Material Default exists under the Release and Settlement Agreement

-3-

Confidential

paid may be held by the senior mortgagee for disbursement during such restoration or reparation, or if it chooses not to hold such proceeds for disbursement, such proceeds may be held and disbursed by any institutional escrowee chosen therefor by the senior mortgagee.

15. Nothing contained herein or in the Release and Settlement Agreement shall be deemed to make or constitute or shall make or constitute the Mortgagee and Mortgagor partners or joint venturers.

16. Mortgagor agrees that if it fails to perform any act which it is required to perform hereunder or under any superior mortgage, the Mortgagee may, but shall not be obligated to, perform or cause to be performed such act and pay such money and any expenses thereby incurred by Mortgagee and any money so paid shall be a demand obligation owing by Mortgagor and shall bear interest at the default rate specified in the note from the date of making such payment until paid and shall be part of the liabilities hereby secured, and the Mortgagee making such payment shall be subrogated to all of the rights of the person receiving such payment.

Confidential

SC_DC-00005144