

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
PATRICIA COHEN,                       :
                                      :
            Plaintiff,                :     09-CV-10230 (LAP)
                                      :
    -against-                         :     OPINION
                                      :
STEVEN COHEN, DONALD COHEN, and       :
BRETT LURIE,                          :
                                      :
            Defendants.               :
------------------------------------x

LORETTA A. PRESKA, Chief United States District Judge:

Plaintiff Patricia Cohen brings this action raising various fraud and breach of fiduciary duty claims relating to alleged hiding of marital assets against Steven Cohen, her former husband, Donald Cohen, their accountant at the relevant time and Stephen's brother (collectively "the Cohen Defendants"), and Brett Lurie,[1] with whom the Cohens had an investment during their marriage.  The Cohen Defendants have moved for summary judgment on various grounds.  For the reasons set out below, the motion is granted.

---

[1] Lurie has not been served, and his whereabouts are apparently unknown.

## I. STATEMENT OF FACTS

### A.   The Cohen Marriage

Patricia and Steven Cohen were married in 1979.  (SF ¶ 25.)[2]
On July 7, 1988, Steven filed for divorce.  (SF ¶ 32.)  After
lengthy negotiations between Patricia and Steven and their
respective counsel, the terms of their divorce and division of
assets were eventually reflected in a Stipulation of Settlement
and Separation Agreement dated December 15, 1989 ("1989
Separation Agreement").  (SF ¶ 93-109; Klotz Decl. Ex. 4.)  On
March 13, 1990, a Judgment of Divorce was entered in New York
County Supreme Court.  (SF ¶ 111; Klotz Decl. Ex. 86.)

### B.   The Lurie Investment

In connection with divorce settlement negotiations,
Steven's counsel provided to Patricia's counsel at the time,
Avron Brog, various documents reflecting the couple's net worth.
(SF ¶ 93-99.)  Among other things, Brog received copies of
Patricia and Steven's joint tax returns for the years 1982
through 1986; a pro forma joint return for 1987 reflecting
Steven's income of approximately $13 million, tax returns for
Steven's wholly owned company, SAC Trading Corporation ("SAC"),
for 1986 and 1987, an April 31, 1986 SAC statement of
operations, and a 1988 Statement of Financial Condition as of

---

[2] "SF ¶ __ " refers to paragraphs in the Cohen Defendants' Rule
56.1 Statement of Material Facts, dated September 18, 2015.

July 1, 1988 ("1988 Financial Statement"), listing the couple's net worth at approximately $17 million.  (SF ¶ 93-99.)  The 1988 Financial Statement disclosed "Queens Coop-Brett Lurie Mortgages" (the "Lurie Investment") as the couple's largest asset, listed at cost as $8,745,169 (Klotz Decl. Ex. 65 at PC11598),[3] and stated that "Mr. Cohen has been involved in litigation with Mr. Brett Lurie with reference to this investment. . . ."  (Id. at PC11599.)

Brett Lurie, who conceived of the Lurie Investment, was a personal friend of Steven's who had also served as Steven and Patricia's attorney in several residential real estate transactions.  (SF ¶ 50-52.)  In early 1986, Lurie approached Steven to invest in real estate in Queens for conversion to cooperative apartments.  (SF ¶ 54.)[4]  Steven had recently made approximately $10 million in connection with trading in the stock of RCA Corporation ("RCA").  (SF ¶ 33-36.)  Patricia believed at the time that Steven, who was under investigation by the SEC, had engaged in illegal insider trading in RCA stock and invested with Lurie in part to protect their assets from seizure by the Government in connection with the insider trading

---

[3] "Klotz Decl. Ex. __" refers to the exhibits annexed to the Declaration of Martin Klotz, executed on September 18, 2015.
[4] Brett Lurie was convicted and imprisoned for multiple counts of fraud in connection with the marketing of the Queens coop project that Steven invested in as the Lurie Investment.  (SF ¶ 85.)

investigation.  (SF ¶ 37-43.)  No one was ever charged criminally or civilly with wrongdoing in connection with trading in RCA.  (SF ¶ 44.)

Between January and July of 1986, Steven and SAC made a number of payments to the Lurie Investment,[5] although the parties dispute the total amount.  Steven argues that the total was approximately $8.25 million, (see SF ¶ 56, 59), while Patricia, based on, inter alia, the Lurie affidavits discussed below, argues that the amount was higher.  (Plaintiff Patricia Cohen's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opp. Memo") at 6-7.)  By January 1987, Lurie had returned approximately $750,000 to Steven or SAC.  (SF ¶ 57-59.)  In January 1988, after litigation (discussed below) over this investment had settled, Steven invested an additional $1.3 million in the project to try to salvage it.  (SF ¶ 82.)

Steven and Lurie initially planned to treat Lurie as an "employee" of SAC who earned a "salary" for providing investment advice.  (SF ¶ 63.)  In connection with this plan, approximately $2.5 million of the Lurie Investment was originally characterized as "salary," and Donald issued two checks to Lurie reflecting this characterization in early 1986.  (SF ¶ 64-65.) Lurie subsequently drafted an "Employment Agreement," which was

---

[5] Payments went to Lurie and to his company, Conversion Funding Corporation ("CFC").

executed in November 1986, naming Lurie as "Senior Vice President" of SAC with a base salary of $2.75 million per year for 1986 through 1988. (SF ¶ 66; Klotz Decl. Ex. 39.) Donald provided Lurie with a W-2 from SAC for $2.75 million for his 1986 salary. (SF ¶ 67; Klotz Decl. Ex. 40.)

Sometime in 1987, Steven and Lurie had had a falling out, and Donald became worried about the Lurie Investment, the terms of which had not been adequately documented. (SF ¶ 73.) Steven told Patricia that the investment was in trouble and, eventually, that it had been lost. (Klotz Dec. Ex. 2 at 180:2-9.) In January 1987, Steven asked Scott Lederman — his friend, former roommate, and a Chicago-based attorney — for advice. Among other things, Lederman reviewed the Employment Agreement and advised Steven that the payments to Lurie for the Lurie Investment could not properly be characterized as salary from SAC. (SF ¶ 69.) In February 1987, Lederman wrote to Lurie and explained that "the treatment of the transfer of $5.5 million from S.A.C. to [Lurie] in installments of $2.75 million in 1986 and $2.75 million in 1987 as a deductible business expense would be an improper characterization of such transfer." (Klotz Decl. Ex. 22.) Lederman also enclosed a corrected 1986 W-2 showing no salary from SAC. (Id.; SF ¶ 70.)

**C.   The Lurie Litigation**

In April 1987, Steven and SAC sued Lurie and CFC in New York Supreme Court to recover their investment (the "Lurie Litigation" or "Cohen v. Lurie"). (SF ¶ 75.) The Cohen v. Lurie complaint alleged that Steven and SAC had paid Lurie and CFC a net amount of $7.5 million and sought the return of that amount plus interest. (Klotz Decl. Ex. 41 ¶¶ 49, 69.)

Lurie responded to the Cohen v. Lurie complaint with affidavits in May 1987 and June 1987 (the "Lurie Affidavits") and an Answer in June 1987. (SF ¶ 78.) In these filings, Lurie agreed that Steven had paid to him a net amount of $7.5 million. (Klotz Decl. Ex. 50 ¶¶ 35, 57, 59.) He contended, however, that $5.5 million of this amount was provided as his "salary" for 1986 and 1987 and did not have to be "repaid." (Id. ¶¶ 19, 24, 26-28, 35, 39, 483 49; see also Klotz Decl. Ex. 49 at 8-9, 15-46.) Of the $5.5 million, $2.5 million had originally been characterized as "salary" when it was paid to Lurie in March 1986, before Lederman informed Lurie that this characterization was "improper." (Klotz Decl. Ex. 50 ¶ 19; SF ¶¶ 64-65, 69; see also Klotz Decl. Ex. 49 at 8-9, 15, 17.) In the Lurie Affidavits Lurie asserted that, in December 1986 and January 1987, Donald gave him additional "salary" checks for $250,000 and $2.75 million from SAC, which he immediately endorsed back to Steven as "repayment" for $3 million of the money advanced to

6

him and previously characterized as a "loan" (Klotz Decl. Ex. 50 ¶¶ 26 ($250,000 paid on December 25, 1986), 27 ($2,750,000 paid "earlier this year [(1987)]", 47 ($250,000 paid on December 24, 1986), 48 ($2,750,000 paid "in early January 1987"); see also Klotz Decl. Ex. 49 at 15.)[6]

A few weeks later, in July 1987, Lurie abandoned his claim that $5.5 million of the money Steven and SAC allegedly gave to him was "salary" that did not need to be repaid and agreed that he owed Steven the full $7.5 million sought in the Cohen v. Lurie Complaint. (SF ¶ 79.)  This agreement was embodied in a Release and Settlement Agreements (the "Lurie Settlement Agreement") with Steven and SAC. (Klotz Decl. Ex. 37.)  In connection with the Lurie Settlement Agreement, Lurie provided to SAC a note for $7.5 million — the full net amount Steven says he paid to Lurie. (SF ¶ 79.)  The Lurie Settlement closed at the end of January 1988, with Steven putting an additional $1.3 million into the project. (SF ¶¶ 80-82.)  At that time, Lurie also provided Steven with a sworn certification concerning the $7.5 million received from Steven and SAC and how these funds were used in the real estate project. (Klotz Decl. Ex. 54.)

---

[6] Lurie's affidavit is internally inconsistent on this point.  A few paragraphs earlier, Lurie claims that "the first two years" of his "salary" in the amount of $5.5 million "had previously been received by reason of the advances outline above" (i.e., before the Employment Agreement was signed in November 1986). (Klotz Decl. Ex. 50 ¶ 24.)

The certification makes no mention of Lurie's supposed salary or of additional payments by Steven or SAC in December 1986 and January 1987.

The Lurie Investment ultimately failed. (SF ¶ 84.)  Lurie's principal lender, Coronet, went into bankruptcy, and Lurie himself was convicted and imprisoned for fraud in connection with the marketing of units in the project.  (SF ¶¶ 84-85, 89.) Though Steven received interest payments from Coronet in 1988 and 1989 totaling approximately $199,000 (SF ¶ 86), he asserts that he received no money back from Lurie.  (SF ¶ 88.)  Patricia argues that Steven failed to disclose the alleged "repayment" of money given to Lurie on and before January 1987, as asserted in the Lurie Affidavits, i.e., she claims that Steven did not really invest — and lose — the full amount he claimed to have invested and lost at the time of the divorce.  (Dkt. No. 99, Third Amended Complaint ¶ 21.)[7]

## D.   The Divorce Negotiations and Settlement

As noted above, in connection with divorce settlement negotiations, Steven's counsel provided to Patricia's counsel, among other things, the 1988 Financial Statement, reflecting the

---

[7] Patricia's matrimonial law expert in this action agrees that "the representation that [the Lurie Investment] was worthless wasn't the false representation.  It turned out to be worthless."  (Klotz Decl. Ex. 63 at 70:17-72:2.)  Thus, no disputed issue of fact is presented on this point.

Lurie Investment as the couple's largest investment, with a total value at cost at $8,745,169. (SF ¶¶ 93-95; Klotz Decl. Ex. 65 at PC 11599.) The note to this entry states, in relevant part: "Mr. Cohen has been involved in litigation with Mr. Brett Lurie with reference to this investment." (Klotz Decl. Ex. 65 at PC11599.)[8] Patricia alleges that Steven also told her during negotiations that the Lurie Investment was "lost." (Third Amended Complaint ¶ 24.)

The files of Avron Brog, Patricia's divorce attorney at the time of the divorce, contained detailed information regarding the Lurie Litigation, including a copy of the Lurie Settlement Agreement and related documents, such as the certified statement from Lurie setting forth payments received from Steven and spent on real estate. (SF ¶ 101.) The caption and index number of the Lurie Litigation were repeatedly referenced in the documents provided to Brog, including a Stipulation Canceling Notice of Pendency and another Stipulation document filed in Cohen v. Lurie, Index No. 8981/87, New York Superior Court, January, 1988. (Id.) Brog also met with Robert Shansky, Steven's

---

[8] The $8,745,169 value of the Lurie Investment, as listed in Steven's 1988 Financial Statement to Patricia (see SF ¶ 95), reflects the 1987 Lurie Settlement Agreement under which Lurie owed $7,496,997 to Steven (see SF ¶ 79), plus the additional $1.3 million Steven invested with Lurie at the closing of that agreement (see SF ¶ 82), plus or minus subsequent accrued interest or repayments (see SF ¶¶ 86-87).

attorney from Jones Day, regarding the Lurie Investment. (SF ¶ 100.) Brog testified, however, that he did not check the publicly available court file of the Lurie Litigation. (Klotz Decl. Ex. 14 at 53:6-18.)

In or around May 1989, Patricia fired Brog and retained attorney Martin Kera. (SF ¶ 105.) Several months after that, Patricia fired Kera and retained attorneys Joan Ellenbogen and Marcia Goldstein, who represented her when Patricia ultimately entered into the 1989 Separation Agreement. (SF ¶¶ 19, 106-107.)

In the 1989 Separation Agreement, Patricia and Steven agreed that: (i) "complete financial disclosure which could be required . . . has not been obtained" (Klotz Decl. Ex. 4 ¶ 14.5); (ii) they were settling based "on the limited financial data supplied to date" and were waiving additional discovery (id.); and (iii) "[n]o representations or warranties have been made by either party to the other, or by anyone else, except as expressly set forth in this Agreement" (id. at ¶ 19.5). As to the Lurie Investment, Patricia specifically agreed that Steven "makes no representation as to the value of the interest in" the Lurie Investment "listed on his statement of financial condition dated as of July 1, 1988 at a value of $8,745,169." (Id. at ¶ 14.4.)

In March 1991, Patricia again retained attorney Martin Kera and brought a motion to modify and set aside portions of the 1989 Separation Agreement, claiming that it was unconscionable and was procured by "fraud and economic duress" (the "1991 Action"). (Klotz Decl. Ex. 87 ¶ 3.) In support of that motion, Patricia and attorney Kera asserted that Steven had concealed assets by funneling his income to SAC or to Donald or deferring his compensation so that his income tax return did not show his true income. (Klotz Decl. Ex. 25 ¶ 4.) Patricia also alleged that Steven's income in 1989 and 1990 was $20 million per year, although discovery in the litigation showed that it was less than $12 million for the two years combined. (Id.; Klotz Decl. Ex. 26 at SC_DC-001838; Klotz Decl. Ex. 88.)

Ultimately, Patricia's fraud claim was withdrawn, and the parties settled by entering into an Amendment to the Stipulation of Settlement and Separation Agreement on January 6, 1992 (the "1992 Amendment"). (SF ¶¶ 119-121; see Klotz Decl. Ex. 91.) The 1992 Amendment, among other things, provided for increased child support and a restructuring of the property settlement and incorporated by reference the full release and the disclaimer of reliance on any unwritten representations from the 1989 Separation Agreement. (Klotz Decl. Ex. 91 at 1 and ¶¶ 3, 5.) Patricia now says that her false allegation about Steven's 1989

11

and 1990 income was based on a "misinterpretation." (Klotz
Decl. Ex. 2 at 207:9-16.)

## E.   Patricia's Investigation In 2006

According to Patricia, in March 2006, she watched a 60
Minutes report discussing litigation between SAC and Biovail, a
Canadian pharmaceutical company, which was "highly critical of
defendant Cohen's business practices." (Dkt. no. 1, Complaint
¶¶ 40-49; Third Amended Complaint ¶ 1; SF ¶ 129.) By September
25, 2006, Patricia had started working with counsel Michael Bowe
of Kasowitz Benson Torres & Friedman LLP ("Kasowitz"), to
investigate fraud claims against Steven. (SF ¶ 135.)[9] By
October of 2006, the investigation focused on Lurie and the
Lurie Investment. Patricia wrote to Lurie in prison, telling
him that Steven was a "deceitful" and "corrupt" person who had
used Lurie for the purpose of "hiding" his assets. (Klotz Decl.
Ex. 38 at PC10431.) In January 2007, Patricia and Bowe
discussed visiting Lurie in prison, and Bowe said that he would
do so. (Klotz Decl. Ex. 98.) In connection with this
contemplated visit, Patricia advised Bowe that Steven and Lurie
had appeared in court in connection with their dispute over the

---

[9] Kasowitz and Bowe also represented Biovail in a 2006 civil RICO
litigation against S.A.C. Capital Advisors, L.L.C. and Steven
Cohen. The 60 Minutes report mentioned the allegations in that
lawsuit. The case was subsequently dismissed. See Biovail
Pharm. LLC v. SAC Capital Mgmt LLC et al., ESX-L-1583-06, N.J.
Sup. Ct. Aug. 20, 2009.

Lurie Investment and that the judge had urged them to settle. (Id.)

## II. Procedural History

On December 16, 2009, Patricia filed this action alleging that Steven had defrauded her in the divorce. Her original Complaint alleged only violations of the federal RICO statute, which is subject to a four-year statute of limitations. (Complaint ¶¶ 55-66.) In this Complaint, Patricia admitted that she "was put on notice of defendant Cohen's "[fraud]" in March 2006. (Id. ¶ 3.) On April 7, 2010, Patricia filed a First Amended Complaint, which added a common law fraud cause of action against Defendants and preserved her RICO claims. (Dkt. no. 19, First Amended Complaint ¶¶ 94-104, 105-111.) The First Amended Complaint alleged that the Lurie investment was either "worth well in excess of $17.5 million" at the time of the divorce or that it was worthless through Steven's negligence and should be charged to him as dissipation. (Id. at ¶¶ 70, 99.) On August 6, 2010, this Court deemed as filed Patricia's Second Amended Complaint, which added claims for breach of fiduciary duty and unjust enrichment against Defendants and preserved the earlier RICO and common law fraud claims. (See dkt. no. 51, Endorsed Letter, Holwell, J., at 3; dkt. no 48, Motion for Leave to File Second Amended Complaint Ex. 1, Second Amended Complaint at 12-17.) Patricia's Second Amended Complaint abandoned the

13

First Amended Complaint's allegation that the Lurie settlement
was worth more than $17.5 million as well as the alternative
negligence/dissipation allegation.  (SF ¶ 150.)

On March 30, 2011, this Court dismissed all of the claims
in Patricia's Second Amended Complaint with prejudice.  (Dkt.
no. 59, Memorandum Opinion and Order, Holwell, J., at 39.)
Patricia filed her Notice of Appeal on April 8, 2011.  (Dkt. no.
61, Notice of Appeal at 1.)  In her brief on appeal, Patricia
declaimed any awareness of the Lurie Litigation prior to 2008:

> Patricia admits the Cohen v. Lurie file was
> in a courthouse in Manhattan available to the
> public in 1991, but she had no knowledge of
> the secret Lurie repayment, and did not even
> know that Steven had sued Lurie.  Therefore,
> she had no reason to search for it.

(Klotz Decl. Ex. 103 at 10.)  At oral argument, Patricia's
counsel asserted that "she had no notice whatsoever about a
Cohen v. Lurie lawsuit or settlement," prior to the time she
found a file related to that lawsuit during her 2008
investigation.  (Klotz Decl. Ex. 104 at 25.)

Patricia's assertions induced the Court of Appeals to find
as a matter of fact that "in August 2008 she chanced upon a
court file of a suit brought by Steven against Brett Lurie [the
Lurie litigation]" and that "[a]s a result of that discovery, on

14

December 16, 2009, Patricia commenced this action." (Dkt. no. 63, Order at 6.) On the basis of that finding and others, the Court of Appeals held that Patricia's claims were not time-barred, vacated this Court's judgment dismissing Patricia's claims based in fraud and breach of fiduciary duty as time-barred and for failure to state a claim upon which relief may be granted, and remanded those claims to this Court. (Order at 16.) The Court of Appeals affirmed this Court's dismissal of the claim of unjust enrichment as time-barred. (Id.) On October 2, 2013, Patricia filed her Third Amended Complaint, which included RICO, common law fraud, breach of fiduciary duty, and unjust enrichment claims. (Third Amended Complaint at 12-18.) This Court granted Defendants' motion to dismiss Patricia's RICO claims on January 27, 2014, but denied their motion to dismiss the common law fraud claims. (Dkt. no. 114, Memorandum & Order, Pauley, J., at 20.) In the same order, this Court granted Defendants' motion to dismiss Patricia's breach of fiduciary duty claim against Donald Cohen but preserved the claim against Steven Cohen, as well as the claim for aiding and abetting breach of fiduciary duty against Donald Cohen. (Id.) After additional discovery, Defendants moved for summary judgment on all of Patricia's remaining claims. (Dkt. no. 171, Notice of Motion for Summary Judgment at 1.)

### III. DISCUSSION

The party moving for summary judgment bears the "initial responsibility" of setting out the basis for its motion and identifying those portions of the record that "demonstrate the absence of a genuine issue of material fact" to support the non-movant's claim. Celotext Corp. v. Catrett, 477 U.S. 317, 323 (1986). In countering a motion for summary judgment, the non-moving party must "cit[e] to particular parts of materials in the record" or "show[] that the materials cited" establish the existence of a genuine triable issue. Fed. R. Civ. P. 56(C)(1); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("[non-moving party] must do more than simply show that there is some metaphysical doubt as to the material facts"). Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. See Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996). In addition, "[a]ffidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial." Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001); see also Fed. R. Evid 802; Fed. R. Civ. P. 56(e). For fraud-based claims under New York law,[10] "[e]ach element of the fraud claim must be shown by

---

[10] The parties do not appear to disagree that New York law is applicable to Patricia's state law claims.

clear and convincing evidence," and "the evidence presented by
the non-moving party in opposition to summary judgment must be
enough to make any inference of fraud . . . unequivocal."
Century Pac., Inc. v. Hilton Hotels Corp., 528 F. Supp. 2d 206,
219 (S.D.N.Y. 2007), aff'd, 354 F. App'x 496 (2d Cir, 2009)
(citing Abrahami v. UPC Const. Co. Inc., 638 N.Y.S.2d 11, 13
(1st Dep't 1996) (internal quotations and citations omitted)).

## A.    Patricia's Fraud Claim

Patricia's first remaining cause of action is a common law
fraud claim against the Cohen Defendants.  To establish a fraud
claim, she must prove four elements: (i) that the Cohen
Defendants made a material, false representation, (ii) that they
had an intent to defraud her thereby, (iii) that Patricia
reasonably relied on the representation, and (iv) that the
representation damaged her.  See May Dept. Stores Co. v. Int'l
Leasing Corp., Inc., 1 F.3d 138, 141 (2d Cir. 1993); see also
Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 422 (N.Y.
2009) (citations omitted).

In support of her fraud claim, Patricia alleges that Steven
and Donald Cohen falsely represented the value of the Lurie
investment to her in 1989-1991, that they did so with the intent
to claim that Steven's net worth was less than its true amount
during their divorce settlement, that she relied on these false
representations when she accepted the 1989 Separation Agreement

and the 1992 Amendment, and that she was thereby injured in the amount of "at least $2.75 million, half of the amount of the value of the Lurie Investment, a sum she would have been entitled to from the divorce and Settlement Agreement." (Third Amended Complaint at ¶¶ 90-96.)  More specifically, Patricia alleges that Steven was "repaid" $5.5 million by Lurie in January 1987, still had that money as of July 1, 1988, and failed to disclose it to her.  (Id. at ¶ 21.)

In order to defeat Defendants' motion for summary judgment on this claim, Patricia would have to proffer "enough proof to allow a reasonable jury to find by clear and convincing evidence the existence of each of the elements necessary to make out a claim for fraud in the inducement." See Woo v. Times Enter., Inc., No. 98-cv-9171, 2000 WL 297114, at *4 (S.D.N.Y. Mar. 22, 2000); see also Callahan v. Miller, 599 N.Y.S.2d 145, 146 (3rd Dep't 1993).

Given the evidence before the Court, a reasonable jury could not find in favor of Patricia on this cause of action.

## 1. There Was No Material Misrepresentation

There is insufficient evidence of the alleged payments to Steven.  Patricia has not produced evidence of any bank account, cancelled checks, property, or other assets belonging to Steven which he did not disclose to her in his 1988 Financial Statement.  She instead relies primarily upon two affidavits,

18

both written in 1987, in which Lurie, then a defendant in Cohen v. Lurie, claimed (i) that $5.5 million of the net $7,496,997 he had received from Steven was originally supposed to be his salary, and (ii) that Donald gave Lurie two checks for a total of $3 million, which Lurie immediately endorsed back to Steven.

Patricia now claims that Lurie gave the monies to Steven and that Steven hid them from her.  (Third Amended Complaint ¶¶ 1, 5, 41-42, 96.)  In her papers Patricia relies primarily on the Lurie Affidavits for the required proof.  As set out below, however, no reasonable jury could find an unequivocal inference of fraud based on those affidavits and the remaining evidence.

First, as noted in Part I.C, above, at footnote 6, the Lurie Affidavits are internally inconsistent as to the supposed payments.

Second, as also noted in Part I.C, supra, mere weeks after filing the Lurie Affidavits, Lurie abandoned his salary claim and admitted in the Release and Settlement Agreement that he owed Steven the entire $7.5 million that Steven had sued for in Cohen v. Lurie.  (Klotz Decl. Ex. 37.)

Third, in any event, contrary to Patricia's arguments, the Lurie Affidavits are not admissible.  First, Patricia suggests the Lurie Affidavits are admissible under Rule 803(16), the "ancient documents" exception.  This exception was intended to admit documents deemed to have a "[s]ufficient assurance of

19

trustworthiness" because they have been created "prior to the existence of any motive to falsify" (7 Michael H. Graham, Handbook of Federal Evidence § 803:16 (7th ed. 2012)).  Here, to the contrary, the Lurie Affidavits were created at a time when Lurie had a motive to falsify.  Steven had sued him on the Lurie Investment, and the Affidavits were an attempt – later abandoned – to minimize Lurie's liability to Steven.[11]  As the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States recently explained, "a document does not magically become reliable enough to escape the rule against hearsay on the day it turns 20."  Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, Report of the Advisory Committee on Evidence Rules at 18 (May 7, 2015), http://www.uscourts.gov/file/18375/download.  Because the Lurie Affidavits bear no indication of trustworthiness, this exception does not apply.

Secondly, Patricia argues that the Lurie Affidavits are admissible as statements against penal interest, but the Affidavits not only admit no wrongdoing by Lurie, least of all criminal wrongdoing, they make a point of blaming Steven for any irregularities in the Lurie Investment.  (See, e.g. Klotz Decl.

---

[11] See Klotz Decl. Ex. 50 ¶ 49 ("Consequently, because I am no longer indebted to Mr. Cohen for the $5,496,997.00 previously advanced to me . . . Plaintiffs (sic) damage claim, at most, is ($2,000,000.)"

Ex. 50 at ¶ 13 ("Except for performing certain ministerial functions . . . I have not provided any other legal services to SAC Trading and, certainly, I did not represent Mr. Cohen or SAC Trading as a lawyer or in any other fiduciary capacity with respect to the transactions at issue herein.")  Thus, this exception does not apply.

Third, Patricia argues that the Lurie Affidavits are admissible as co-conspirator statements under Fed Rule of Evidence 802(d)(2)(E), but it is clear that in the Cohen v. Lurie litigation Lurie and Steven were adversaries with opposing characterizations of the Lurie Investment.  They were not co-conspirators.  Thus, this exception does not apply.

Fourth, Patricia suggests the Lurie Affidavits should be admitted under Rule 807, the residual exception, which allows for the admission of hearsay evidence where

> the statement has equivalent [to Rule 803 or
> 804] circumstantial guarantees of trustworth-
> iness; . . . is offered as evidence of a
> material fact; . . . is more probative on the
> point for which it is offered than any other
> evidence that the proponent can obtain through
> reasonable efforts; . . . [and] admitting it
> will best serve the purposes of these rules
> and the interests of justice.

See Fed. R. Evid. 807(a).  As noted above, however, the Lurie Affidavits are internally inconsistent litigation documents authored by a fraud felon at a time when he had a motive to falsify and which were effectively withdrawn only a few weeks after filing.  Thus they bear none of the "circumstantial guarantees of trustworthiness" essential to admission under the residual exception of Rule 807.

Finally, even if the Lurie Affidavits were admissible, because evidence of fraud must be clear and convincing in order to defeat summary judgment (see Woo, 2000 WL 297114, at *4 (S.D.N.Y. Mar. 22, 2000), no reasonable jury could conclude, based on these documents, that Steven gave Lurie an additional $3 million which Lurie immediately returned.  See Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt., No. 98-cv-5499, 2004 WL 691680, at *7 (S.D.N.Y. Marc. 31, 2004) (granting motion for summary judgment where plaintiff relied on single document.)[12]

---

[12] Patricia also cites to Lurie's 1986 W-2 (see Opp. Memo. At 6), Donald Cohen's testimony that "an additional $250,000 was given to Lurie" (id. at 15), Scott Lederman's February 1987 letter to Brett Lurie "confirm[ing] Lurie's assertion that he was paid an additional $250,000 in 1986 . . . [and] that he was paid an additional $2.75 million in 1987 . . . ." (id. at 18-19), the November 1986 Employment Agreement (id. at 17), the Cohen v. Lurie complaint (id. at 19), and the 1986 financial statement of Steven and Patricia Cohen (id. at 17-18) as further evidence of the supposed $3 million payment.  Those documents however do not constitute evidence that Steven and SAC gave Lurie $10.5 million, rather than $7.5 million. (continued)

   a. **Even If SAC Paid Lurie an Additional $3 Million in December 1986 and January 1987, There is Insufficient Evidence Steven Inaccurately Reported His Net Investment With Lurie.**

As discussed above, in November 1986, Steven and Lurie entered into an Employment Agreement pursuant to which Steven would pay Lurie $2.75 million per year for 1986, 1987, and 1988. Because Steven had only made "salary" payments of $2.5 million prior to that time, Lurie claimed that in late 1986 and early 1987, SAC gave him an additional $3 million (i.e., the balance of his 1986 "salary" and his entire 1987 "salary"), which he immediately "endorsed back" to Steven, "repaying" the earlier advances in that same amount.  (Klotz Decl. Ex. 50 ¶¶ 26, 27, 47, 48; see also Klotz Decl. Ex. 49 at 15.)

Even if the Court credited Lurie's hearsay that these alleged round-trip payments happened, it means only that Steven's gross investment with Lurie was $10.5 million rather than $7.5 million.  This is irrelevant to Patricia's claim, however.  As illustrated in Exhibit 1 to the Opening Memo (dkt. no. 172), Steven's net investment with Lurie, after the supposed repayment of $3 million, remained unchanged at $7.5 million.

_____

(continued)(See Opp. Memo at 6.)  These documents show only that Steven at one point was planning to take a deduction for Lurie's salary in 1986 through 1988, but there is no dispute that this plan was abandoned in February 1987 and no tax deduction was ever made.  Patricia has proffered no evidence suggesting that this plan had anything to do with hiding assets from her in the divorce over a year later.

Moreover, the round-trip payments alleged by Lurie, if made, in no way changed the information available to Patricia about Steven's total wealth.  As noted above, she already had full disclosure about the total revenues received by SAC, and she makes no argument here that Steven did not disclose to her his full income, including the income and expenses of SAC.  Thus Patricia's argument that $3 million went from SAC to Lurie to Steven is irrelevant to the question on the table of whether Steven defrauded Patricia.

In any event, even if a fact finder credits Lurie to the effect that the $3 million was repaid to Steven, there is no evidence that Steven retained the $3 million for himself.  Indeed, Patricia concedes that "[w]hat Steven did with those checks has never been determined." (Opp. Memo at 3.)  On the other hand, Steven has testified affirmatively that all of his assets were disclosed to Patricia.  (Klotz Decl. Ex. 11 at 128:9-13.)  Thus, no issue of fact is raised.

Accordingly, there is no evidence that Steven concealed any assets from Patricia during the divorce.  Certainly she does not have clear and convincing evidence or evidence sufficient to make an "inference of fraud . . . unequivocal." Century Pac. Inc., 528 F. Supp. 2d at 219.  Absent such evidence, there is no triable issue of fact.  See Greenberg v. Chrust, 282 F. Supp. 2d 112, 117-118 (S.D.N.Y. 2003); Sado v. Ellis, 882 F. Supp. 1401,

24

1406 (S.D.N.Y. 1995); Korngold v. Korngold, 810 N.Y.S.2d 206,

208 (N.Y. App. Div. 2006); Stoerchle v. Stoerchle, 475 N.Y.S.2d

489, 491 (N.Y. App. Div. 1984).

> **2. Patricia Could Not Reasonably Have Relied On Any Misstatement or Omission Steven Made About the Lurie Investment**

New York law is clear that divorce settlement agreements,

negotiated by independent counsel, are supposed to be final and

should not be lightly disturbed. See, e.g., Harding v. Nasemen,

No. 07 Cv. 8767 (RPP), 2009 WL 1953041, at *24 (S.D.N.Y. July 8,

2009) (citing McFarland v. McFarland, 70 N.Y.2d 916 (N.Y.

1987)). Where spouses expressly waive their rights to further

financial discovery, as Patricia did here, they are not

permitted to reopen a divorce simply by asserting that they

subsequently discovered some new fact that they did not know

before. See, e.g., Danann Realty Corp. v. Harris, 157 N.E.2d

597, 600 (N.Y. 1959); Luftig v. Luftig, 657 N.Y.S.2d 658, 659

(N.Y. App. Div. 1997); Smith v. Smith, No. 112654/09, 2010 WL

4723452, at *5 (N.Y. Sup. Ct. 2010).

In New York, parties in divorce settlement negotiations are

required to "disclose the existence of assets or material

information that could not be discovered by the other party

through reasonable diligence; however, the law places no

affirmative duty on a party to disclose accurately the valuation

of an asset that is known or should have been known, through

reasonable diligence, by the other party." Harding v. Naseman,
No. 07 CV. 8767 (RPP), 2009 WL 1953041, at *23 (S.D.N.Y. July 8,
2009) (emphasis added), aff'd, 377 F. App'x 48 (2d Cir. 2010);
see also Kojovic v. Goldman, 823 N.Y.S.2d 35, 38 (N.Y. App. Div.
2006).  Claims of fraudulent concealment in divorce cases are
particularly frowned upon in New York when each party is
represented by independent counsel during the negotiation and
execution of a settlement agreement.  See Naseman, 2009 WL
1953041, *24 (citing McFarland, 70 N.Y.2d 916; Kavner v. Geller,
854 N.Y.S.2d 343 (1st Dep't 2008); Martin v. Martin, 427
N.Y.S.2d 1002 (4th Dep't 1980)).

Patricia does not dispute that this is the law but cites
only Christian v. Christian, 365 N.E.2d 849 (N.Y. 1977), for the
general proposition that "spouses are fiduciaries" with duties
of disclosure.  (Opp. at 23.)  But Christian did not address,
much less hold, that spouses may not effectively disclaim
reliance or waive the right to further financial discovery.

Here, as noted above, in the 1989 Separation Agreement,
Patricia and Steven agreed:  (i) that "complete financial
disclosure which could be required . . . . has not been
obtained" (Klotz Decl. Ex. 4 ¶ 14.5); (ii) they were settling
based "on the limited financial data supplied to date" and were
waiving additional discovery (id.); and (iii) "[n]o
representations or warranties have been made by either party to

26

the other, or by anyone else, except as expressly set forth in this Agreement" (id. At ¶ 19.5).  As to the Lurie Investment, Patricia specifically agreed that Steven "makes no representation as to the value of the interest in" the Lurie Investment "listed on his statement of financial condition dated as of July 1, 1988 at a value of $8,745,169."  (Id. at ¶ 14.4.) As also noted above, Steven disclosed the existence of the Lurie Investment that Patricia now complains about, in compliance with Harding.  Under these circumstances, any reliance by Patricia on any representations or omissions by Steven as to his assets, the value of the Lurie Investment, and the like would be unreasonable.  As the New York Court of Appeals once put it, "[i]f the language here used is not sufficient to estop a party from claiming that he entered the contract because of fraudulent representations, then no language can accomplish that purpose." Danann Realty Corp. v. Harris, 157 N.E.2d 597, 600 (N.Y. 1959).

### 3.    The Statute of Limitations Has Run

Plaintiff's fraud claim is also barred by the statute of limitations.[13]  Under New York law, a fraud claim must be filed within "the greater of six years from the date the cause of

---

[13] A breach of fiduciary duty claim based upon fraud is subject to a similar limitations period of "either three or six years, depending on the nature of the relief sought by the plaintiff." See Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 361 n.3 (2d Cir. 2013) (citing IDT Corp. v. Morgan Stanley Dean Witter & Co., 907 N.E.2d 268, 272 (N.Y. 2009)).

action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it.  See N.Y. C.P.L.R. § 213(g); Dinger v. Kling Agency, Inc., 654 N.Y.S.2d. 415, 416 (2d Dep't 1997).

This lawsuit was filed on December 16, 2009, some seventeen years after Patricia's fraud claim accrued, assuming it accrued at the time of the 1992 Amendment.  Thus, the question is when Patricia was on "inquiry notice" of the facts giving rise to the alleged fraud or knowledge."  LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 154 (2d Cir. 2003) (citation omitted); see also Sielcken-Schwarz v. American Factors, Ltd., 266 N.Y. 239, 245 (N.Y. 1934).  The test for inquiry notice is "an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings and the public disclosures themselves." Salinger v. Projectavision, Inc., 934 F. Supp. 1402, 1408 (S.D.N.Y. 1996); see also In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 60 (2d Cir. 1998) ("the question of inquiry notice need not be left to a finder of fact").  If Patricia was on inquiry notice that Steven had defrauded her during the divorce at any time before December 13, 2007, her claim is time-barred.  As discussed below, there is no genuine dispute that this is the case.

Despite Patricia's representations to the Court of Appeals to the effect that she "did not even know Steven had sued Lurie," "had no reason to search for [the Lurie Litigation file]", (Klotz Decl. Ex. 103 at 10), and had "no notice whatsoever about a Cohen v. Lurie lawsuit or settlement," (Klotz Decl. Ex. 104 at 25:1-24), the record now proves otherwise.   As noted above, the 1989 Financial Statement noted as to the Lurie Investment that "Mr. Cohen has been involved in litigation with Mr. Brett Lurie with reference to this investment" (Klotz Decl. Ex. 65 at PC11599), numerous documents from and about the Lurie Litigation were present in the files of Patricia's 1989 divorce lawyer (SF ¶ 101), and Patricia's attorney Brog discussed the settlement of the Lurie litigation with an attorney for Steven in 1988.   (Klotz Decl. Ex 14 at 55:15-56:11.)[14]   While Patricia argues that these facts do not "warrant a suspicion that she was defrauded or trigger an obligation to inquire," (Opp. Memo at 22), the record reflects that Patricia in fact suspected Steven of fraud in 1991 and in 2006.

In her first complaint in this action on December 16, 2009, Patricia affirmatively admitted that she was put on notice of Steven's fraudulent filings in the divorce giving rise to this

---

[14] As a matter of law, Patricia is charged with the same knowledge as her counsel.   See Veal v. Geraci, 23 F.3d 722, 725 (2d Cir. 1994); see also Center v. Hampton Affiliates, Inc., 66 N.Y.2d 782, 785 (N.Y. 1985).

lawsuit in <u>March 2006</u> after she watched an episode of <u>60</u>
<u>Minutes</u>. (Complaint ¶ 3.) Her deposition testimony is
consistent with this pleaded admission. (Klotz Decl. Ex. 106 at
182:3-183:17.) And, contrary to her new self-serving
declaration, (<u>see</u> Opp. Memo. at 22; Lefcourt Decl. Ex. P at
¶ 4)[15] Patricia explained in a prior declaration in this action
on November 18, 2014 that her suspicions of fraud were among the
reasons she sought Bowe's advice in 2006. (Klotz Decl. Ex. 97
¶ 2 (describing her "suspicions" that Steven "had improperly
taken advantage of [her] in [their] divorce by hiding income.")
Patricia and her counsel had even started to discuss "fraud
theories" against Steven by October 2007. (Klotz Decl. Ex. 94
at 2.)[16]

    Not only did Patricia suspect in 2006 that Steven had
defrauded her during the divorce, she actively investigated her
suspicions of fraud starting at that time. That investigation
specifically focused on Lurie and the Lurie Investment as
confirmed by contemporaneous correspondence from Patricia to
Lurie on October 14, 2006 (Klotz Decl. Ex. 38) and with Bowe on

---

[15] "Lefcourt Decl. Ex. __" refers to the exhibits annexed to the
Declaration of Gerald B. Lefcourt, executed on October 16, 2015.
[16] This evidence demonstrates that Patricia's new declaration on
November 18, 2014, in which she claims that she was only
considering "reimbursement" and "intentional infliction of
emotional distress" claims at this time, cannot raise a triable
issue. (Opp. at 22; Lefcourt Decl. Ex. P at ¶ 4.)

January 24-25, 2007 (Klotz Decl. Ex. 98).  Patricia wrote to
Lurie on October 14, 2006, "If you hadn't been drafted for
[Steven's] plan to save all the money by hiding it or half of it
by way of a write-off . . . ."  (Klotz Decl. Ex. 38 at 1.)  She
adds, "I knew I could have used the information I had against
him during the proceedings . . . ."  (Id. at 1.)  Patricia wrote
an email to her attorney, Michael J. Bowe, on January 25, 2007,
in which she stated that Lurie and Steven "went to court at one
point . . . ."  (Klotz Decl. Ex. 98 at 1.)

Thus, the issue is not whether Patricia's or her lawyers'
knowledge of the Lurie Litigation would cause her to suspect
that she had been defrauded, triggering an obligation to
inquire.  It is undisputed on this record that Patricia in fact
suspected that she had been defrauded in connection with the
Lurie Investment.  Thus, the only question is whether Patricia
should have discovered the Lurie Litigation and thus the Lurie
Affidavits.  The answer can only be yes, because her counsel had
in fact discovered the Lurie Litigation and had discussed it
with Steven's lawyer, and the entire file in that litigation,
including the Lurie Affidavits, was public record.  Accordingly,
Patricia is charged with knowledge of the contents of the Lurie
Litigation file, and thus of the Lurie Affidavits, prior to
December 13, 2007.  Accordingly, her claims are barred by the
statute of limitations.

**B.   Patricia's Causes of Action for Breach of Fiduciary Duty and Aiding and Abetting Thereof**

Plaintiff's second remaining cause of action is a claim for breach of fiduciary duty against Steven Cohen.  This cause of action requires Plaintiff to establish three elements: (i) the existence of a fiduciary duty, (ii) a knowing breach of that duty, and (iii) damages resulting therefrom.  See Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 138 (2d Cir. 2011).  For the reasons stated in Part III.A.1 and III.A.2, supra, it would not be possible for a reasonable jury to conclude that Steven Cohen's alleged back-and-forth transactions with Defendant Lurie had a material affect on Plaintiff's marital assets or her knowledge thereof.  This cause of action, like Plaintiff's fraud claim, is also barred by the statute of limitations for the reasons stated in Part III.A.3.

Given the impossibility of establishing Steven's alleged fiduciary breach, Plaintiff's claim against Donald Cohen for aiding and abetting such a breach must fail as well.  See Terrydale Liquidating Trust v. Barness, 846 F.2d 845, 847 (2d Cir. 1988).

CONCLUSION

For the foregoing reasons, the Court concludes that the Cohen Defendants have demonstrated that there are no genuine issues of material fact and that they are entitled to judgment

as a matter of law.  Accordingly, Defendants' motion for summary judgment (dkt. no. 171) is hereby GRANTED.  The Clerk of the Court shall terminate Defendant Steven Cohen and Defendant Donald Cohen from this case.

     SO ORDERED.

Dated:   New York, New York
       May 19, 2016

_____
LORETTA A. PRESKA
Chief United States District Judge